Duff & Phelps, LLC
Rebecca Macfie Vice President - Corporate Counsel
Duff & Phelps, LLC
55 East 52nd Street
Floor 31
NEW YORK NY 10055

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s). ALL information should be verified by you.

Note: Any questions regarding the substance of the matter described below, including the status or to whom or where to respond, should be directed to the person set forth in line 12 below or to the court or government agency where the matter is being heard.

Item: 2018-7

| | | |
|---|---|---|
| 1. | Client Entity: | Duff & Phelps, LLC |
| 2. | Title of Action: | Peter S. Huck vs. Duff & Phelps, LLC, AA Management Group, Inc., et al. |
| 3. | Document(s) Served: | Summons<br>Complaint<br>Plaintiff's First Set of Requests to Admit, Interrogatories and Requests for Production of Documents to Defendants |
| 4. | Court/Agency: | Milwaukee County Circuit Court, Wisconsin |
| 5. | State Served: | Delaware |
| 6. | Case Number: | 2018CV001032 |
| 7. | Case Type: | Common Law Fraud/Fraudulent Inducement |
| 8. | Method of Service: | Hand Delivered |
| 9. | Date Received: | Wednesday 5/2/2018 |
| 10. | Date to Client: | Thursday 5/03/2018 |
| 11. | # Days When Answer Due: 45<br>Answer Due Date: 6/16/2018 | **CAUTION:** Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of service in their records matches the Date Received. | |
| 12. | SOP Sender:<br>(Name, Address and Phone Number) | Nora E Gierke<br>Wauwatosa, WI<br>414-395-4600 |
| 13. | Shipped to Client By: | Email Only with PDF Link |
| 14. | Tracking Number: | Not Applicable |
| 15. | Handled By: | 081 |
| 16. | Notes: | Also Attached: * Electronic Filing Notice |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information. At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process. To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective. It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.

11380 Prosperity Farms Road #221E, Palm Beach Gardens, FL 33410    Tel: (561) 694-8107    Fax: (561) 694-1639
www.CorporateCreations.com

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 1 of 232   Document 1-1

3411

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

STATE OF WISCONSIN     CIRCUIT COURT     MILWAUKEE COUNTY
                           CIVIL DIVISION

PETER S. HUCK,
1100 Madera Circle
Elm Grove, WI 53122

                         Plaintiff,

                                       Case No._____
                                       Intentional Tort 30106
                                       Money Judgment 30301

                     v.

DUFF & PHELPS, LLC,
a Delaware limited liability company,
55 East 52nd Street
New York, NY 10055

c/o its Registered Agent:
Corporate Creations Network, Inc.
3411 Silverside Road
Tatnall Building, Suite 104
Wilmington, DE 19810

and

AA Management Group, Inc., a wholly
owned subsidiary of DUFF & PHELPS,
LLC,
55 East 52nd Street
New York, NY 10055

c/o its Registered Agent:
Corporate Creations Network Inc.
4650 W Spencer Street
Appleton, WI 54914

and

JOSEPH P. ZVESPER
777 North Prospect Ave MT6,
Milwaukee, WI 53202

and

PRAIRIE CAPITAL ADVISERS, INC.,
an Illinois Corporation,
One Lincoln Centre
18W140 Butterfield Road, Suite 800
Oakbrook Terrace, IL 60181

c/o its Registered Agent:
Robert J Gross
One Lincoln Centre
18W140 Butterfield Road, Suite 800
Oakbrook Terrace, IL 60181

Defendants.

---

## SUMMONS

---

THE STATE OF WISCONSIN

To each person/entity named above as a Defendant:

You are hereby notified that the plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within forty-five (45) days of receiving this Summons, exclusive of the day of service, after the Summons has been served personally upon each Defendant or served by substitution personally upon another authorized to accept service of the Summons for the Defendants, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint.

The Court may reject or disregard an Answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Court, whose address is 901 North 9th Street, Room 104, Milwaukee, WI 53233 and Plaintiff's attorney, whose address is 1011 North Mayfair Road, Suite 304, Wauwatosa, WI 53226.

2

You may have an attorney help or represent you.

If you do not provide a proper Answer within the required time period, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 5th day of February 2018.

**GIERKE FRANK NOORLANDER LLC**

Electronically signed by: Nora E. Gierke

Nora E. Gierke
State Bar No. 1033618
ngierke@gierkefrank.com
David E. Frank
State Bar No. 1056505
dfrank@gierkefrank.com
Willem J. Noorlander
wnoorlander@gierkefrank.com
State Bar No. 1033089
1011 North Mayfair Road, Suite 304
Wauwatosa, WI 53226
P: 414.395.4600
F: 414.921.4108

3

**FILED**
**02-05-2018**
**John Barrett**
**Clerk of Circuit Court**
**2018CV001032**
**Honorable Glenn H**
**Yamahiro-34**
**Branch 34**

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY
                                  CIVIL DIVISION

---

PETER S. HUCK,
1100 Madera Circle
Elm Grove, WI 53122-2128

                                Plaintiff,

                   v.

DUFF & PHELPS, LLC,
a Delaware limited liability company,
55 East 52nd Street
New York, NY 10055

c/o its Registered Agent:
Corporate Creations Network, Inc.
3411 Silverside Road
Tatnall Building, Suite 104
Wilmington, DE 19810

and

AA Management Group, Inc., a wholly owned
subsidiary of DUFF & PHELPS, LLC,
55 East 52nd Street
New York, NY 10055

c/o its Registered Agent:
Corporate Creations Network Inc.
4650 W Spencer Street
Appleton, WI 54914

and

JOSEPH P. ZVESPER
777 North Prospect Ave MT6, Milwaukee,
WI 53202

and

Case No._____
Intentional Tort 30106
Money Judgment 30301

PRAIRIE CAPITAL ADVISERS, INC.,
an Illinois Corporation,
One Lincoln Centre
18W140 Butterfield Road, Suite 800
Oakbrook Terrace, IL 60181

c/o its Registered Agent:
Robert J Gross
One Lincoln Centre
18W140 Butterfield Road, Suite 800
Oakbrook Terrace, IL 60181

                                    Defendants.

---

## COMPLAINT

Plaintiff Peter S. Huck ("Huck"), by and through his counsel Gierke Frank Noorlander LLC, for his Complaint against Defendants Duff & Phelps, LLC ("Duff & Phelps"), Joseph P. Zvesper ("Zvesper") and Prairie Capital Advisers, Inc. ("Prairie Capital"), alleges and states as follows:

### PARTIES

1.      Plaintiff Peter S. Huck is an adult resident of the State of Wisconsin, who resides at 1100 Madera Circle, Elm Grove, Wisconsin 53122-2128.

2.      Mr. Huck was previously employed by and a minority shareholder of American Appraisal Associates, Inc. ("American Appraisal"), a wholly owned subsidiary of AA Management Group, Inc. ("AAMG").

3.      Mr. Huck joined American Appraisal in 1973 as an associate appraiser specializing in public utilities. He held various consulting and management positions with the company throughout his tenure. In 1999 he was appointed Assistant Vice President and Director responsible for utility services and held that

2

position until his retirement on or about September 30, 2014.

4. On February 24, 2015, AAMG was acquired by and merged with Duff & Phelps. Upon information and belief, as of February 24, 2015, following the merger, AAMG now operates as a wholly owned subsidiary of Duff & Phelps.

5. AAMG's principal place of business is 55 East 52nd Street New York, NY 10055.

6. AAMG's Registered Agent is Corporate Creations Network Inc., whose address is 4650 West Spencer Street, Appleton, WI 54914.

7. Prior to the merger with Duff & Phelps, AAMG was a privately held valuation and related advisory services firm, with its headquarters located at 411 East Wisconsin Avenue, Suite 1900, Milwaukee, Wisconsin 53202. AAMG was a leading valuation and related advisory services firm that provided expertise in all classifications of tangible and intangible assets. It had approximately 900 employees, operating from cities throughout Asia-Pacific, Europe, North America and South America. Its portfolio of services focused on four key competencies: valuation, transaction consulting, real estate advisory and fixed asset management.

8. Defendant Duff & Phelps is Delaware limited liability company with its headquarters located at 55 East 52nd Street, New York, NY 10055.

9. Duff & Phelps' Registered Agent is Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

10. Duff & Phelps is a privately owned large global valuation and corporate finance advisor that provides financial services in the areas of complex valuation, dispute and legal management consulting, mergers and acquisitions,

3

restructuring, and compliance and regulatory consulting. Duff & Phelps has more than 2,000 employees who serve clients from offices around the world.

11.     Defendant Prairie Capital Advisors, Inc. is an Illinois corporation with its headquarters located at One Lincoln Centre, 18W140 Butterfield Road, Suite 800 Oakbrook Terrace, IL 60181.

12.     Prairie Capital's Registered Agent is Robert J Gross, whose address is One Lincoln Centre, 18W140 Butterfield Road, Suite 800, Oakbrook Terrace, IL 60181.

13.     Prairie Capital is a privately owned investment banking firm that offers employee stock ownership plan (ESOP) advisory and valuation services in the areas of mergers and acquisition, divestiture, solvency and fairness opinion, capital raising, business valuation, management buyout, and strategic advisory services. Additionally, Prairie Capital provides transaction feasibility, financing, annual valuation, and litigation support.

14.     Defendant Joseph P. Zvesper ("Zvesper") is an adult resident of the State of Wisconsin, who resides at 777 North Prospect Avenu, MT6, Milwaukee WI 53202.

15.     Mr. Zvesper was the Chief Executive Officer as well as Chairman of the Board of Directors of AAMG prior to the company's February 24, 2015 acquisition by Duff & Phelps. Mr. Zvesper is now an Executive Vice Chairman at Duff & Phelps. He maintains offices in various locations, but is listed as the Managing Director of the Milwaukee Office of Duff & Phelps, which is located at 411 East Wisconsin Avenue Suite 1900, Milwaukee, 53202 (the same address Mr.

4

Zvesper worked out of when he was working with AAMG). Mr. Zvesper has extensive experience in the mergers and acquisitions arena, both as an advisor and investor. Mr. Zvesper is also a certified public accountant and earned his university degree in Accounting and Economics (magna cum laude) from Carroll University in 1976.

## JURISDICTION AND VENUE

16.    This Court has personal jurisdiction over Duff & Phelps pursuant to Wis. Stat. § 801.05(1)(d) and/or § 801.05 (3) as Duff & Phelps is engaged in substantial and not isolated activities within this state and/or caused injury to Plaintiff Mr. Huck in Wisconsin as a result of an act or omission in the State of Wisconsin.

17.    This Court has personal jurisdiction over AAMG pursuant to Wis. Stat. § 801.05(1)(d) and/or § 801.05 (3) as AAMG is engaged in substantial and not isolated activities within this state and/or caused injury to Plaintiff Mr. Huck in Wisconsin as a result of an act or omission in the State of Wisconsin.

18.    This Court has personal jurisdiction over Prairie Capital pursuant to Wis. Stat. § 801.05(1)(d) and/or § 801.05 (3) as Prairie Capital is engaged in substantial and not isolated activities within this state and/or caused injury to Plaintiff Mr. Huck in the State of Wisconsin as a result of an act or omission in the State of Wisconsin.

19.    This Court has personal jurisdiction over Mr. Zvesper pursuant to Wis. Stat. § 801.05(1)(b), (d) and/or § 801.05 (3) as he is a person domiciled and engaged in substantial and not isolated activities within the State of Wisconsin

5

and/or caused injury to Plaintiff Mr. Huck in the State of Wisconsin as a result of an act or omission in the State of Wisconsin and/or § 801.05(8) as he was an office, director, or manager of a domestic corporation and this action arises out of his conduct as such or out of the activities of the corporation while he held such offices in Wisconsin.

20.     Venue is proper in this Court pursuant to Wis. Stat. § 801.50 (2)(a) as this is the county in which the claim arose and pursuant to Wis. Stat. § 801.50 (2)(c) as this is the county where all the defendants either reside or do substantial business. Also, this is the county which is contractually selected as the venue for any dispute arising out of or in connection with the agreement that is at issue in this case.

## FACTUAL BACKGROUND

21.     On or about July 28, 1994, AAMG entered into a stock purchase agreement to acquire certain shares of common stock from a company called RLM Investments. In connection with the RLM stock purchase agreement, AAMG also offered up to 130,000 shares of common stock in AAMG for a purchase price of $35.67 per share to selected and qualified employees of American Appraisal and its affiliates.

22.     On or about August 30, 1994, Mr. Huck accepted AAMG's offering and purchased 1080 shares of common stock in AAMG, and became a minority shareholder as well as an employee in the company, subject to the terms of the AAMG Subscription Agreement, dated September 8, 1994 and the AAMG Bylaws. A copy of the AAMG Bylaws are attached as Exhibit A and incorporated herein by

6

reference ("AAMG Bylaws"). A copy of the Subscription Agreement (undated) is attached as Exhibit B and incorporated herein by reference ("Subscription Agreement").

23.　In the years that followed, Mr. Huck continued to work for AAMG as a valued employee as well as a shareholder in good standing with the company.

24.　In August 2014, Mr. Zvesper approached Mr. Huck and proposed that Mr. Huck retire prior to the date that he would otherwise be eligible, and that AAMG repurchase Mr. Huck's 1080 shares of common stock on payment terms that accelerated the payment terms of the promissory note provisions prescribed within Section 6.06(B) of the AAMG Bylaws.

25.　On or about August 4, 2014, Prairie Capital provided AAMG with an appraisal as to the fair market value of the common stock of AAMG. A copy of Prairie Capital's August 4, 2014 letter is attached as Exhibit C and incorporated herein by reference.

26.　According to Prairie Capital's August 4, 2014 appraisal, the fair market value of AAMG's Non-ESOP common stock was $611.48 per share.

27.　Mr. Zvesper provided a copy of Prairie Capital's August 4, 2014 appraisal to Mr. Huck in order to induce him to agree to enter into an agreement to redeem his 1080 shares of AAMG common stock for $611.48 as the fair market value of the shares.

28.　Mr. Huck reviewed the Prairie Capital appraisal, reasonably relied on it and based upon the fair market value provided in that appraisal, on August 28, 2014, Mr. Huck agreed to enter into a Stock Redemption and Non-Solicitation

7

Agreement with AAMG (Mr. Zvesper signing on behalf of AAMG) to sell his 1080

shares of common stock back to AAMG for a price of $611.48 per share for a total

purchase price of $660,398.40, to be paid out on the following terms:

> Based upon application of these provisions of the AAMG bylaws, the Parties agree that the price per share to be paid to the Shareholder is $611.48 and the total redemption payment amount is $660,398.40.
>
> c. Payment Dates – Unless altered by Section 5 below, the redemption payments shall be made as follows:
>
>     i. On or about September 1, 2015, ($165,099.60) (25%)
>     ii. On or about September 1, 2016, ($165,099.60) (25%)
>     iii. On or about September 1, 2017, ($165,099.60) (25%)
>     iv. On or about September 1, 2018, ($165,099.60) (25%)

A copy of the Stock Redemption and Non-Solicitation Agreement is attached

as Exhibit D and incorporated herein by reference.

29. Pursuant to the terms of the Stock Redemption and Non-Solicitation

Agreement, Mr. Huck also agreed to terminate his employment with AAMG on or

before September 30, 2014.

30. Then, even though Mr. Zvesper had been the one to propose that Mr.

Huck retire early, before Mr. Huck's retirement date of September 30, 2014, Mr.

Zvesper proposed that Mr. Huck continue to work as a part-time temporary

consultant for AAMG on an hourly basis, for the same hourly rate that he was

receiving before he retired.

31. AAMG confirmed Mr. Zvesper's part-time consulting offer by letter

dated September 25, 2014. A copy of the September 25, 2014 letter is attached as

Exhibit E and incorporated herein by reference.

32. Mr. Huck retired as a full-time employee of AAMG's as agreed

effective September 30, 2014.

33. In or around May 2015 he began going into the office again to provide

8

consulting services to AAMG pursuant to the terms set forth in the September 25, 2014 letter and continued to do so for at least two years after his retirement date.

34.    Between September 30, 2014 and May 2015, Mr. Huck did not go into the office at AAMG.

35.    In or around early February 2015, Mr. Huck received an envelope in the mail from Great Bank Trust Company. The envelope was postmarked February 3, 2015 (a copy of which is attached as Exhibit J and incorporated herein by reference) and contained the following documents:

- AAMG Information Statement for Special Meeting of Shareholders to be held February 24, 2015, a copy of which is attached as Exhibit F and incorporated herein by reference;

- A Confidential Information Statement in connection with the Agreement and Plan of Merger among Duff & Phelps, LLC, D&P Alabama Acquisition Corp., AA Management Group, Inc., dated February 3, 2015, a copy of which is attached as Exhibit G and incorporated herein by reference;

- A Participant Directive Statement, dated February 3, 2015, a copy of which is attached as Exhibit H and incorporated herein by reference;

- A Voting Card, a copy of which is attached as Exhibit I and incorporated herein by reference; and

36.    The above documents disclosed for the first time to Mr. Huck that the board of directors of AAMG, with board of director and Chairman and CEO Mr. Zvesper acting as the Shareholder's Representative, had entered into a merger

9

agreement whereby Duff & Phelps would be purchasing AAMG and shares of AAMG common stock would be converted at a value equal to approximately $1,450 to $1,475 per share.

37. Moreover, the documents disclosed that the merger discussions between Duff & Phelps and the AAMG board of directors, which included Mr. Zvesper, had been going on for "several months" prior to the January 30, 2015 agreement to enter into the merger.

38. Upon information and belief, Mr. Zvesper was already actively engaged in merger discussions on behalf of AAMG with Duff & Phelps at the time that he proposed that Mr. Huck retire early and sell his 1080 shares of common stock for only $611.48 a share.

39. Upon information and belief, Mr. Zvesper knew or should have known that this information would have been material to Mr. Huck's willingness to agree to enter into the Stock Redemption and Non-Solicitation Agreement with AAMG.

40. Despite this, upon information and belief, Mr. Zvesper intentionally withheld this information from Mr. Huck in order to induce Mr. Huck to retire early and sell his 1080 shares of common stock back to AAMG for a lower price.

41. Further, upon information and belief, Prairie Capital knew or should have known that AAMG was engaged in merger discussions with Duff & Phelps and negligently failed to take this information into account in providing an appraisal of the fair market value of the AAMG common stock.

42. Mr. Huck subsequently learned that another AAMG shareholder, Lee

10

Hackett, also retired in December 2014.

43.     Upon information and belief, Mr. Zvesper and AAMG conspired to withhold material information about the status of the merger discussions from Mr. Huck, and perhaps also Mr. Hackett, in order to induce Mr. Huck and Mr. Hackett to retire prior to the merger and to enable AAMG to repurchase their shares of common stock for a lower price.

44.     If Mr. Huck had been informed in August 2014 that AAMG and Duff & Phelps were engaged in merger discussions he would not have retired early and would not have agreed to enter into the Stock Redemption and Non-Solicitation Agreement with AAMG and to sell his shares for only $611.48 a share.

45.     Upon information and belief, Duff & Phelps acquired substantially all of the assets of AAMG such that the transaction between Duff & Phelps and AAMG amounted to a consolidation or merger of the corporations and Duff & Phelps is merely a continuation of AAMG.

### COUNT I – COMMON LAW FRAUD/FRAUDULENT INDUCEMENT (AGAINST AAMG AND MR. ZVESPER AND DUFF & PHELPS AS SUCCESSOR IN INTEREST)

46.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 45 above.

47.     Mr. Zvesper, acting on behalf of AAMG and himself as a majority shareholder, intentionally misrepresented facts and omitted material facts when he encouraged Mr. Huck to accept an offer of early retirement and to redeem his AAMG common stock shares without disclosing to Mr. Huck the material fact that Mr. Zvesper was actively engaged in merger discussions with Duff & Phelps on behalf of himself as a

11

majority shareholder and AAMG.

48.    Mr. Zvesper and AAMG knew or should have known that the information about the ongoing merger discussions with Duff & Phelps would have been material to Mr. Huck's decision whether to accept early retirement and to sell his 1080 shares of common stock back to AAMG in August 2014, in that Mr. Zvesper and AAMG knew or should have known that if they had disclosed the fact of the merger discussions to Mr. Huck in August 2014 it would have influenced Mr. Huck's decision whether to accept the offer of early retirement prior to the merger and/or would have caused Mr. Huck to demand a higher share price for redeeming his 1080 shares of common stock.

49.    Mr. Zvesper and AAMG knew or should have known that when he provided Mr. Huck with the August 4, 2014 appraisal letter from Prairie Capital and the proposed Stock Redemption and Non-Solicitation Agreement with AAMG, both of which stating that the fair market valuation price for his 1080 shares of common stock was $611.48, that this was misleading in light of the ongoing merger discussions with Duff & Phelps because Mr. Zvesper and AAMG knew or should have known that the anticipated merger would likely have increased the price of the stock, making the reported share price inaccurate.

50.    The fact of the ongoing merger discussions with Duff & Phelps was a material fact and failing to disclose it to Mr. Huck was a material omission that was misleading and/or made the information that was disclosed to Mr. Huck about the $611.48 per share price fraudulent, inaccurate and misleading.

51.    Mr. Huck reasonably relied on the fraudulent, inaccurate and misleading

12

information provided by Mr. Zvesper regarding the $611.48 fair market share price of his 1080 shares of AAMG common stock and this information fraudulently induced him to enter into the Stock Redemption and Non-Solicitation Agreement with AAMG.

52.  If Mr. Huck had been informed of the ongoing merger discussions with Duff & Phelps he would not have entered into the Stock Redemption and Non-Solicitation Agreement with AAMG and/or would have waited until after the merger to sell his stock back at a higher price.

53.  As a direct and proximate cause of Mr. Zvesper and AAMG's fraudulent, inaccurate and misleading statements about the $611.48 fair market share price of Mr. Huck's 1080 shares of AAMG common stock and/or their failure to disclose the pending merger discussions with Duff & Phelps, Mr. Huck has suffered and will continue to suffer damages in an amount to be determined at trial.

54.  Upon information and belief, Duff & Phelps acquired substantially all of the assets of AAMG such that the transaction between Duff & Phelps and AAMG amounted to a consolidation or merger of the corporations and Duff & Phelps is merely a continuation of AAMG and, thus, liable as a successor in interest for the above wrongful conduct of Mr. Zvesper and AAMG.

55.  Mr. Huck is entitled to recover compensatory and punitive damages, along with its costs and reasonable attorney's fees from Defendants.

## COUNT II – BREACH OF FIDUCIARY DUTY
## (AGAINST MR. ZVESPER)

56.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 55 above.

57.     As a majority shareholder in AAMG, Mr. Zvesper owed a fiduciary duty to minority shareholder Mr. Huck.

58.     Mr. Zvesper breached his fiduciary to Mr. Huck and willfully failed to deal fairly with Mr. Huck when he encouraged Mr. Huck to accept an offer of early retirement and to redeem his shares in AAMG without disclosing to Mr. Huck the material fact that Mr. Zvesper was actively engaged in merger discussions with Duff & Phelps on behalf of himself as a majority shareholder and AAMG.

59.     Mr. Zvesper knew or should have known that the information about his ongoing merger discussions with Duff & Phelps would have been material to Mr. Huck's decision whether to accept early retirement and to sell his 1080 shares of common stock back to AAMG in August 2014, in that Mr. Zvesper knew or should have known that if Mr. Zvesper had disclosed the fact of the merger discussions to Mr. Huck in August 2014 it would have influenced Mr. Huck's decision whether to accept the offer of early retirement prior to the merger and/or would have caused Mr. Huck to demand a higher share price for redeeming his 1080 shares of common stock.

60.     Mr. Zvesper knew or should have known that when he provided Mr. Huck with the August 4, 2011 appraisal letter from Prairie Capital and the proposed Stock Redemption and Non-Solicitation Agreement with AAMG, both of which stating that the fair market valuation price for his 1080 shares of common stock was $611.48, that this was misleading in light of the ongoing merger discussions with Duff & Phelps because

14

Mr. Zvesper knew of should have known that the anticipated merger would likely have increased the price of the stock, making the reported share price inaccurate.

61.     Mr. Zvesper had a material conflict of interest with Mr. Huck at the time he offered Mr. Huck early retirement and entered into the Stock Redemption and Non-Solicitation Agreement with AAMG (which Mr. Zvesper signed on behalf of AAMG) to buy back Mr. Huck's 1080 shares of common stock for a price of $611.48 per share, because Mr. Zvesper knew that as a majority shareholder he stood to gain a larger share of the profit when AAMG merged with Duff & Phelps.

62.     Mr. Zvesper had a duty to disclose the existence of the merger discussions at the time he entered into the Stock Redemption and Non-Solicitation Agreement with AAMG in August 2014 and he breached his duty by intentionally failing to disclose the fact of the ongoing merger discussions with Duff & Phelps.

63.     The fact of the ongoing merger discussions with Duff & Phelps was a material fact and failing to disclose it to Mr. Huck was a material omission that was misleading and/or made the information that he did disclose to Mr. Huck about the $611.48 per share price false, inaccurate and misleading.

64.     As a direct and proximate cause of Mr. Zvesper's breach of fiduciary duty, Mr. Huck has suffered and will continue to suffer damages in an amount to be determined at trial.

65.     Mr. Huck is entitled to recover compensatory and punitive damages, along with its costs and reasonable attorney's fees from Mr. Zvesper.

15

## COUNT III – UNJUST ENRICHMENT
## (AGAINST AAMG AND MR. ZVESPER AND DUFF & PHELPS AS
## SUCCESSOR IN INTEREST)

66.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 above.

67.     Mr. Zvesper and AAMG's unjustly benefitted from their fraudulent, inaccurate and misleading statements about the $611.48 fair market share price of Mr. Huck's 1080 shares of AAMG common stock and/or their failure to disclose the pending merger discussions with Duff & Phelps, and it would unjust to permit them to retain that benefit.

68.     As a result of Defendants' unjust enrichment, Mr. Huck is entitled to recover compensatory and punitive damages, along with its costs and reasonable attorney's fees from Defendants in an amount to be determined at trial.

## COUNT IV – PROFESSIONAL NEGLIGENCE
## (AGAINST PRAIRIE CAPITAL)

69.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 68 above.

70.     Prairie Capital's August 4, 2014 letter contained representations of fact concerning the fair market share price of Mr. Huck's AAMG common stock which were false, inaccurate or misleading.

71.     Prairie Capital knew or should have known that the representations of fact concerning the fair market share price of Mr. Huck's AAMG common stock which were false, inaccurate or misleading and was negligent in failing to discover and/or to take into account the pending merger discussions between AAMG and Duff & Phelps in providing the appraisal of the share price.

16

72. Prairie Capital owed a duty of care in performing the appraisal of the fair market share price of the AAMG common stock and Prairie Capital's negligently breached this duty of care by providing a false, inaccurate or misleading appraisal that failed to discover and/or to take into account the pending merger discussions between AAMG and Duff & Phelps in providing the appraisal of the share price.

73. Prairie Capital's breach of its duty of care caused foreseeable harm to Mr. Huck as a shareholder.

74. Mr. Huck received and reasonably relied on Prairie Capital's appraisal of the fair market value of his common stock when he entered into the Stock Redemption and Non-Solicitation Agreement with AAMG in August 2014.

75. As a direct and proximate cause of Prairie Capital's negligence, Mr. Huck has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT V – PUNITIVE DAMAGES**
**(AGAINST AAMG AND MR. ZVESPER AND DUFF & PHELPS)**

76. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 77 above.

77. Defendants AAMG, Mr. Zvesper and Duff & Phelps, as successor in interest, acted maliciously and with intentional disregard for Plaintiff's rights.

78. As a direct and proximate cause of Defendants' above misconduct, Mr. Huck has suffered and will continue to suffer damages in an amount to be determined at trial and is entitled to recover compensatory and punitive damages, along with its costs and reasonable attorney's fees from Defendants in an amount to be determined at trial.

17

WHEREFORE, Plaintiff respectfully requests that this Court :

1.      Enter judgment against Defendants, jointly and severally, awarding Plaintiff compensatory damages, in an amount to be determined at trial, and his costs and reasonable attorney's;

2.      Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff awarding him punitive damages, in an amount to be determined at trial.

3.      Award Plaintiff such other relief as the Court deems just and appropriate.

Dated this 5th day of February 2018.

GIERKE FRANK NOORLANDER LLC

Electronically signed by: Nora E. Gierke

Nora E. Gierke
State Bar No. 1033618
ngierke@gierkefrank.com
David E. Frank
State Bar No. 1056505
dfrank@gierkefrank.com
Willem J. Noorlander
wnoorlander@gierkefrank.com
State Bar No. 1033089
1011 North Mayfair Road, Suite 304
Wauwatosa, WI 53226
P: 414.395.4600
F: 414.921.4108

18

# EXHIBIT A

**FILED**
**02-05-2018**
**John Barrett**
**Clerk of Circuit Court**
**2018CV001032**
**Honorable Glenn H**
**Yamahiro-34**
**Branch 34**

## THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

# BY-LAWS

## OF

## AA MANAGEMENT GROUP, INC.
### (a Wisconsin corporation)

TEMPORARILY SEALED

# BY-LAWS

## OF

## AA MANAGEMENT GROUP, INC.
### (a Wisconsin corporation)

### Introduction – Variable References

0.01.     Date of annual shareholders' meeting (See Section 2.01):

| <u>10:00 a.m.</u> | <u>4th</u> | <u>WEDNESDAY</u> | <u>JULY</u> | <u>1995</u> |
|-------------------|------------|------------------|-------------|-------------|
| (HOUR) | (WEEK) | (DAY) | (MONTH) | (FIRST YEAR) |

0.02.     Required notice of shareholders' meeting (See Section 2.04):  not less than 10 days.

0.03.     Authorized number of Directors (See Section 3.01):  7.

0.04.     Required notice of Directors' meeting (See Section 3.05): not less than 48 hours.

TEMPORARILY SEALED

# TABLE OF CONTENTS

Page

## ARTICLE I.  OFFICES

1.01   Principal and Business Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.02   Registered Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## ARTICLE II.  SHAREHOLDERS

2.01   Annual Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.02   Special Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.03   Place of Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.04   Notice of Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.05   Fixing of Record Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2 06   Voting Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2.07   Notice, Nominations and Proposals by Shareholders . . . . . . . . . . . . . . . 3
2.08   Quorum and Voting Requirements; Postponements; Adjournments . . . . . . . 4
2.09   Conduct of Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.10   Proxies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.11   Voting of Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
2.12   Voting of Shares by Certain Holders . . . . . . . . . . . . . . . . . . . . . . . . . 6
       (A)  Other Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       (B)  Legal Representatives and Fiduciaries . . . . . . . . . . . . . . . . . . . 6
       (C)  Pledgees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       (D)  Treasury Stock and Subsidiaries . . . . . . . . . . . . . . . . . . . . . . 7
       (E)  Minors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       (F)  Incompetents and Spendthrifts . . . . . . . . . . . . . . . . . . . . . . . 7
       (G)  Joint Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.13   Waiver of Notice by Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.14   Unanimous Consent without Meeting . . . . . . . . . . . . . . . . . . . . . . . . 8
2.15   Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## ARTICLE III.  BOARD OF DIRECTORS

3.01   General Powers and Number of Directors . . . . . . . . . . . . . . . . . . . . . . 8
3.02   Tenure and Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.03   Regular Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
3.04   Special Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
3.05   Notice; Waiver of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
3.06   Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

-i-

| 3.07 | Manner of Acting | 10 |
|------|------------------|----|
| 3.08 | Conduct of Meetings | 10 |
| 3.09 | Vacancies | 10 |
| 3.10 | Compensation | 11 |
| 3.11 | Presumption of Assent | 11 |
| 3.12 | Committees | 11 |
| | (A) Regular Committees | 11 |
| | (B) Special Committees | 14 |
| | (C) Vacancies; Temporary Appointments | 14 |
| | (D) Committee Minutes and Reports | 14 |
| 3.13 | Unanimous Consent without Meeting | 14 |
| 3.14 | Meetings By Telephone Or By Other Communication Technology | 14 |

## ARTICLE IV. OFFICERS

| 4.01 | Number, Election, and Term of Office | 14 |
|------|--------------------------------------|----|
| 4.02 | Removal | 15 |
| 4.03 | Vacancies | 15 |
| 4.04 | Chairman of the Board | 15 |
| 4.05 | President | 15 |
| 4.06 | The Executive Vice Presidents | 15 |
| 4.07 | The Chief Financial Officer | 15 |
| 4.08 | The Vice Presidents | 15 |
| 4.09 | The Secretary | 15 |
| 4.10 | The Treasurer | 16 |
| 4.11 | Subordinate Officers | 16 |
| 4.12 | Salaries | 16 |

## ARTICLE V.
## CONFLICT OF INTEREST TRANSACTIONS,
## CONTRACTS; LOANS; CHECKS; DEPOSITS; AND
## SPECIAL CORPORATE ACTS

| 5.01 | Conflict of Interest Transactions | 16 |
|------|-----------------------------------|----|
| 5.02 | Contracts | 16 |
| 5.03 | Loans | 16 |
| 5.04 | Checks, Drafts, Etc. | 17 |
| 5.05 | Deposits | 17 |
| 5.06 | Voting Securities Owned by this Corporation | 17 |

-ii-

## ARTICLE VI. TRANSFER RESTRICTIONS AND CERTIFICATES FOR SHARES

| | | |
|---|---|---|
| 6.01 | Transfer Restrictions During Life | 17 |
| | (A) General Transfer Prohibition | 17 |
| | (B) Right of First Refusal | 18 |
| | (C) Involuntary Transfers | 18 |
| | (D) Proxies and Voting Trusts | 19 |
| | (E) Permitted Transfers | 19 |
| 6.02 | Termination of Marital Relationship | 19 |
| | (A) Termination of Marital Relationship | 19 |
| | (B) Notice of Death or Dissolution of Marital Relationship | 20 |
| 6.03 | Termination of Employment | 20 |
| 6.04 | Death of Shareholder | 21 |
| 6.05 | Purchase Price | 22 |
| | (A) Purchase Price | 22 |
| | (B) Fair Market Value Per Share | 22 |
| | (C) Pricing Dates | 23 |
| | (D) Stock Splits | 23 |
| 6.06 | Payment of Purchase Price; Closing | 23 |
| | (A) Payment of Purchase Price | 23 |
| | (B) Terms of Promissory Note | 24 |
| | (C) Closing | 24 |
| 6.07 | General Provisions Relating to Transfer Restrictions | 24 |
| | (A) Endorsement on Stock Certificates | 24 |
| | (B) Spouses and Interests in Shares | 25 |
| | (C) Specific Performance | 25 |
| | (D) Termination | 25 |
| | (E) Notices | 26 |
| | (F) Arbitration | 26 |
| | (G) Voting and Quorum Requirement | 26 |
| | (H) Legal Impediments | 27 |
| 6.08 | Certificate for Shares | 27 |
| 6.09 | Facsimile Signatures and Seal | 27 |
| 6.10 | Signature by Former Officer | 27 |
| 6.11 | Transfer of Shares | 27 |
| 6.12 | Restrictions on Transfer | 27 |
| 6.13 | Lost, Destroyed, or Stolen Certificates | 28 |
| 6.14 | Consideration for Shares | 28 |
| 6.15 | Uncertified Shares | 28 |
| 6.16 | Transfer Agent and Registrar | 28 |
| 6.17 | Stock Regulations | 29 |

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 28 of 232   Document 1-1

# ARTICLE VII.
## INDEMNIFICATION

# ARTICLE VIII. CORPORATE SEAL

# ARTICLE IX. FISCAL YEAR

# ARTICLE X.
## AMENDMENTS

10.01   By Shareholder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
10.02   By Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
10.03   Implied Amendments   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

TEMPORARILY SEALED

-iv-

# BY-LAWS OF
## AA MANAGEMENT GROUP, INC.

## ARTICLE I. OFFICES

**Section 1.01** <u>Principal and Business Offices</u>. The Corporation may have such principal and other business offices, either within or without the State of Wisconsin, as the Board of Directors may designate or as the business of the Corporation may require from time to time.

**Section 1.02** <u>Registered Office</u>. The registered office of the Corporation required by the Wisconsin Business Corporation Law to be maintained in the State of Wisconsin may be, but need not be, identical to the principal office in the State of Wisconsin, and the address of the registered office may be changed from time to time by the Board of Directors or by the registered agent. The business office of the registered agent of the Corporation shall be identical to the registered office.

## ARTICLE II. SHAREHOLDERS

**Section 2.01** <u>Annual Meeting</u>. The annual meeting of the shareholders shall be held at the date and hour in each year set forth in Section 0.01, or at such other time and date within 30 days before or after said date as may be fixed by or under the authority of the Board of Directors, for the purpose of electing Directors and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday in the State of Wisconsin, such meeting shall be held on the next succeeding business day. If the election of Directors shall not be held on the day designated herein, or fixed as herein provided, for any annual meeting of the shareholders, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a special meeting of the shareholders as soon thereafter as conveniently may be. Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the shareholders may be made at the annual meeting or any special meeting only in accordance with Section 2.07 hereof.

**Section 2.02** <u>Special Meeting</u>. Special meetings of the shareholders, for any purpose or purposes, unless otherwise prescribed by the Wisconsin Business Corporation Law, may be called by the Chairman of the Board of Directors, the President, by resolution adopted by a majority of the Board of Directors, or by the holders of at least ten percent of all the votes entitled to be cast on any issue proposed to be considered at the proposed special meeting who sign, date and deliver to the Corporation one or more written demands for the meeting describing one or more purposes for which it is to be held. The record date for determining shareholders entitled to demand a special meeting shall be the date that the first shareholder signs the demand. If duly called, the Corporation shall communicate notice of a special meeting as

-1-

set forth in Section 2.04. Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the shareholders may be made at a special meeting only in accordance with Section 2.07 hereof.

Section 2.03 **Place of Meeting**. The Board of Directors may designate any place, either within or without the State of Wisconsin, as the place of meeting for any annual or special meeting. If no designation is made, the place of meeting shall be the principal business office of the Corporation in the State of Wisconsin or such other suitable place in the county of such principal office as may be designated by the person calling such meeting, but any meeting may be adjourned to reconvene at any place designated by vote of a majority of the shares represented thereat.

Section 2.04 **Notice of Meeting**. Notice may be communicated in person, by telephone, telegraph, teletype, facsimile or other form of wire or wireless communication, or by mail or private carrier, and, if these forms of personal notice are impracticable, notice may be communicated by a newspaper of general circulation in the area where published, or by radio, television or other form of public broadcast communication. Such notice stating the place, day and hour of the meeting and, in case of a special meeting, a description of each purpose for which the meeting is called, shall be communicated or sent not less than the number of days set forth in Section 0.02 (unless a longer period is required by the Wisconsin Business Corporation Law or the Articles of Incorporation) nor more than 60 days before the date of the meeting, by or at the direction of the Chairman of the Board (if one is designated), the President, the Secretary, or other Officer or persons calling the meeting, to each shareholder of record entitled to vote at such meeting. Written notice is effective at the earliest of the following:

(i)     when received;

(ii)    on deposit in the U.S. mail, if mailed postpaid and correctly addressed; or

(iii)   on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested and the receipt is signed by or on behalf of the addressee.

Written notice to a shareholder shall be deemed correctly addressed if it is addressed to the shareholder's address shown in the Corporation's current record of shareholders. Oral notice is effective when communicated and the Corporation shall maintain a record setting forth the date, time, manner and recipient of the notice.

Section 2.05 **Fixing of Record Date**. A "shareholder" of the Corporation shall mean the person in whose name shares are registered in the stock transfer books of the Corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with the Corporation. Such nominee certificates, if any, shall be reflected in the stock transfer books of the Corporation. For the purpose of determining shareholders entitled to notice

-2-

of or to vote at any meeting of shareholders or any adjournment thereof, the Board of Directors shall fix a future date not less than ten days and not more than 70 days prior to the date of any meeting of shareholders for the determination of the shareholders entitled to notice of, or to vote at, such meeting. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, the close of business on the day before the notice of the meeting is mailed shall be the record date for such determination of shareholders. The Board of Directors also may fix a future date as the record date for the purpose of determining shareholders entitled to take any other action or determining shareholders for any other purpose, which record date shall not be more than 70 days prior to the date on which the particular action, requiring such determination of shareholders, is to be taken. When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this Section, such determination shall be applied to any adjournment thereof unless the Board of Directors fixes a new record date, which it shall do if the meeting is adjourned to a date more than 120 days after the date fixed for the original meeting. The record date for determining shareholders entitled to a distribution or a share dividend shall be the date on which the Board of Directors authorizes the distribution or share dividend, as the case may be, unless the Board of Directors fixes a different record date.

Section 2.06  **Voting Record.** The Officer or agent having charge of the stock transfer books for shares of the Corporation shall, before each meeting of shareholders, make a complete list of the shareholders entitled to vote at such meeting, or any adjournment thereof, with the address of and the number of shares held by each. The Corporation shall make the shareholders' list available for inspection by any shareholder beginning two business days after the notice of meeting is given for which the list was prepared and continuing to the date of the meeting, at the Corporation's principal office. Such record also shall be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any shareholder during the whole time of the meeting for the purposes of the meeting. A shareholder or his or her agent or attorney may, on written demand, inspect and copy the list subject to the requirements set forth in Sections 180.1602 and 180.0720 of the Wisconsin Business Corporation Law. The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such record or transfer books or to vote at any meeting of shareholders. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at such meeting.

Section 2.07  **Notice, Nominations and Proposals by Shareholders.**

A.  Nominations for the election of directors and proposals for any business to be considered by shareholders at any annual or special meeting of shareholders may be made by the Board or by any shareholder of the Corporation entitled to vote generally in the election of directors. In order for a shareholder of the Corporation to make any such nominations and/or proposals, and for such nominations or other business to be properly before the annual or special meeting, he or she must give notice thereof in writing, delivered or mailed by first class United States mail, postage prepaid, to the Secretary of the Corporation not later than the close of business on the tenth day following the day on which notice of the meeting was mailed to

-3-

shareholders. Each such notice given by a shareholder with respect to nominations for election of directors shall set forth (i) the name, age, business address and residence address of each nominee proposed in such notice, (ii) the principal occupation or employment of each such nominee, (iii) the number of shares of stock of the Corporation beneficially owned by each such nominee; (iv) a description of all arrangements or understandings between such shareholders and such nominees and any other person (naming such person) pursuant to which the nomination is to be made by the shareholders; (iv) the written consent of each nominee to be named in a proxy statement as a nominee and to serve, if elected, as a director, and (v) as to the shareholder giving such notice (a) his or her name and address as they appear on the Corporation's books, (b) the class and number of shares of the Corporation which are beneficially owned by such shareholder, and (c) a representation that such shareholder is a holder of shares entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to make the nomination. In addition, the shareholder making such nomination shall promptly provide any other information reasonably requested by the Corporation.

B.     Each notice given by a shareholder to the Secretary with respect to business proposals to be brought before a meeting shall set forth in writing as to each matter: (i) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting; (ii) the name and address, as they appear on the Corporation's books, of the shareholder proposing such business; (iii) the class and number of shares of the Corporation beneficially owned by such shareholder; and (iv) any material interest of the shareholder in such business. Notwithstanding anything in these By-laws to the contrary, no business shall be considered at an annual or special meeting except in strict accordance with the procedures set forth in this Section 2.07.

C.     The Chairman of the annual or special meeting of shareholders may, if the facts warrant, determine that a nomination or proposal was not made in accordance with the foregoing procedures, and if he or she should so determine, he or she shall declare to the meeting that the defective nomination or proposal shall be disregarded. This provision shall not require the holding of any adjourned or special meeting for the purpose of considering a defective nomination or proposal.

Section 2.08  Quorum and Voting Requirements; Postponements; Adjournments. Shares entitled to vote as a separate voting group as defined in the Wisconsin Business Corporation Law may take action on a matter at a meeting only if a quorum of those shares exists with respect to that matter. Unless the Articles of Incorporation or the Wisconsin Business Corporation Law provides otherwise, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

Once a share is represented for any purpose at a meeting, other than for the purpose of objecting to holding the meeting or transacting business at the meeting, it is considered present for purposes of determining whether a quorum exists, for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for that adjourned meeting.

-4-

If a quorum exists, action on a matter, other than the election of directors, by a voting group is approved if the votes cast within the voting group favoring the action exceed the votes cast opposing the action, unless the Articles of Incorporation or the Wisconsin Business Corporation Law requires a greater number of affirmative votes. Unless otherwise provided in the Articles of Incorporation of the Corporation, directors are elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present. "Plurality" means that the individuals with the largest number of votes are elected as directors up to the maximum number of directors to be chosen at the election.

"Voting group" means any of the following:

(i)     All shares of one or more classes or series that under the Articles of Incorporation or the Wisconsin Business Corporation Law are entitled to vote and be counted together collectively on a matter at a meeting of shareholders; or

(ii)    All shares that under the Articles of Incorporation or the Wisconsin Business Corporation Law are entitled to vote generally on a matter.

The Board of Directors acting by resolution may postpone and reschedule any previously scheduled meeting, provided, however, that a special meeting called by at least 10% of the shareholders may not be postponed beyond the 30th day following the originally scheduled meeting. Any meeting may be adjourned from time to time, whether or not there is a quorum:

(i)     at any time, upon a resolution of shareholders if the votes cast in favor of such resolution by the holders of shares of each voting group entitled to vote on any matter theretofore properly brought before the meeting exceed the number of votes cast against such resolution by the holders of shares of each such voting group; or

(ii)    at any time prior to the transaction of any business at a meeting which was not called by at least 10% of the shareholders, by the Chairman of the Board, the President or pursuant to a resolution of the Board of Directors.

No notice of the time and place of adjourned meetings need be given except as required by the Wisconsin Business Corporation Law. At any adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

Section 2.09  **Conduct of Meetings.**  The Chairman of the Board, or in the Chairman's absence, the President, or in the President's absence, the Executive Vice President, or in the Executive Vice President's absence, a Vice President in the order provided under Section 4.08, and in their absence, any person chosen by the shareholders present shall call the meeting of the shareholders to order and shall act as chairman of the meeting, and the Secretary of the

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 34 of 232   Document 1-1

Corporation shall act as Secretary of all meetings of the shareholders, but, in the absence of the Secretary, the presiding Officer may appoint any other person to act as Secretary of the meeting.

**Section 2.10  Proxies.**  At all meetings of shareholders, a shareholder entitled to vote may vote in person or by proxy.  A shareholder may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form, either personally or by his or her attorney-in-fact.  Such proxy appointment is effective when received by the Secretary of the Corporation before or at the time of the meeting.  Unless otherwise provided in the appointment form of proxy, a proxy appointment may be revoked at any time before it is voted, either by written notice filed with the Secretary or the acting Secretary of the meeting or by oral notice given by the shareholder to the presiding Officer during the meeting.  The presence of a shareholder who has filed his or her proxy appointment shall not of itself constitute a revocation.  No proxy appointment shall be valid after eleven months from the date of its execution, unless otherwise provided in the appointment form of proxy.  In addition to the presumptions set forth in Section 2.12 below, the Board of Directors shall have the power and authority to make rules establishing presumptions as to the validity and sufficiency of proxy appointments.

**Section 2.11  Voting of Shares.**  Each outstanding share shall be entitled to one vote upon each matter submitted to a vote at a meeting of shareholders, except to the extent that the voting rights of the shares of any voting group or groups are enlarged, limited or denied by the Articles of Incorporation.

**Section 2.12  Voting of Shares by Certain Holders.**

**A.  _Other Corporations_.**  Shares standing in the name of another corporation may be voted either in person or by proxy, by the president of such corporation or any other officer appointed by such president.  An appointment form of proxy executed by any principal officer of such other corporation or assistant thereto shall be conclusive evidence of the signer's authority to act, in the absence of express notice to this Corporation, given in writing to the Secretary of this Corporation, or the designation of some other person by the board of directors or by the by-laws of such other corporation.

**B.  _Legal Representatives and Fiduciaries_.**  Shares held by an administrator, executor, guardian, conservator, trustee in bankruptcy, receiver or assignee for creditors may be voted by him, either in person or by proxy, without a transfer of such shares into his or her name, provided there is filed with the Secretary before or at the time of meeting proper evidence of his or her incumbency and the number of shares held by him or her.  Shares standing in the name of a fiduciary may be voted by him or her, either in person or by proxy.  An appointment form of proxy executed by a fiduciary shall be conclusive evidence of the signer's authority to act, in the absence of express notice to this Corporation, given in writing to the Secretary of this Corporation, that such manner of voting is expressly prohibited or otherwise directed by the document creating the fiduciary relationship.

-6-

**C.** *Pledgees.* A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred; provided, however, a pledgee shall be entitled to vote shares held of record by the pledgor if the Corporation receives acceptable evidence of the pledgee's authority to sign.

**D.** *Treasury Stock and Subsidiaries.* Neither treasury shares, nor shares held by another corporation if a majority of the shares entitled to vote for the election of directors of such other corporation is held by this Corporation, shall be voted at any meeting or counted in determining the total number of outstanding shares entitled to vote, but shares of its own issue held by this Corporation in a fiduciary capacity, or held by such other corporation in a fiduciary capacity, may be voted and shall be counted in determining the total number of outstanding shares entitled to vote.

**E.** *Minors.* Shares held by a minor may be voted by such minor in person or by proxy and no such vote shall be subject to disaffirmance or avoidance, unless prior to such vote the Secretary of the Corporation has received written notice or has actual knowledge that such shareholder is a minor. Shares held by a minor may be voted by a personal representative, administrator, executor, guardian or conservator representing the minor if evidence of such fiduciary status is presented and acceptable to the Corporation.

**F.** *Incompetents and Spendthrifts.* Shares held by an incompetent or spendthrift may be voted by such incompetent or spendthrift in person or by proxy and no such vote shall be subject to disaffirmance or avoidance, unless prior to such vote the Secretary of the Corporation has actual knowledge that such shareholder has been adjudicated as incompetent or spendthrift or actual knowledge of filing of judicial proceedings for appointment of a guardian. Shares held by an incompetent or spendthrift may be voted by a personal representative, administrator, executor, guardian or conservator representing the minor if evidence of such fiduciary status is presented and acceptable to the Corporation.

**G.** *Joint Tenants.* Shares registered in the names of two or more individuals who are named in the registration as joint tenants may be voted in person or by proxy signed by any one or more of such individuals if either (i) no other such individual or his or her legal representative is present and claims the right to participate in the voting of such shares or prior to the vote files with the Secretary of the Corporation a contrary written voting authorization or direction or written denial or authority of the individual present or signing the appointment form of proxy proposed to be voted or (ii) all such other individuals are deceased and the Secretary of the Corporation has no actual knowledge that the survivor has been adjudicated not to be the successor to the interests of those deceased.

**Section 2.13 Waiver of Notice by Shareholders.** Whenever any notice whatsoever is required to be given to any shareholder of the Corporation under the Articles of Incorporation or By-laws or any provision of law, a waiver thereof in writing, signed at any time, whether before or after the time of meeting, by the shareholder entitled to such notice, shall be deemed

-7-

equivalent to the giving of such notice and the Corporation shall include copies of such waivers in its corporate records; provided that such waiver in respect to any matter of which notice is required under any provision of the Wisconsin Business Corporation Law, shall contain the same information as would have been required to be included in such notice, except the time and place of meeting. A shareholder's attendance at a meeting, in person or by proxy, waives objection to the following:

        (i)      lack of notice or defective notice of the meeting unless the shareholder at the beginning of the meeting or promptly upon arrival objects to holding the meeting or transacting business at the meeting; and

       (ii)     consideration of a particular matter at the meeting that is not within the purpose described in the meeting notice, unless the shareholder objects to considering the matter when it is presented.

     **Section 2.14** <u>**Unanimous Consent Without Meeting**</u>. Any action required or permitted by the Articles of Incorporation or By-laws or any provision of law to be taken at a meeting of the shareholders may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof.

     **Section 2.15** <u>**Invalidity**</u>. The Chairperson, upon recommendation of the Secretary, may reject a vote, consent, waiver or proxy appointment if the Secretary or other officer or agent of the Corporation authorized to tabulate votes, acting in good faith, has reasonable doubt about the validity of the signature on it or about the signatory's authority to sign for the shareholder. The Corporation and its officer or agent who accepts or rejects a vote, consent, waiver or proxy appointment in good faith and in accordance with Wisconsin Business Corporation Law shall not be liable for damages to the shareholders for consequences of the acceptance or rejection.

## ARTICLE III. BOARD OF DIRECTORS

     **Section 3.01** <u>**General Powers and Number of Directors**</u>. All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation managed under the direction of, the Board of Directors, subject to any limitations set forth in the Articles of Incorporation. The number of Directors of the Corporation shall be as provided in section 0.03. The number of directors may be increased or decreased from time to time by amendment to this section adopted by the shareholders or the Board of Directors, but no decrease shall have the effect of shortening the term of an incumbent director.

     **Section 3.02** <u>**Tenure and Qualifications**</u>. Elected directors shall hold office for a term of three years and until their successors are elected and qualified, except as otherwise provided in this section or until their death, resignation or removal. The Board of Directors shall be divided into three classes of not less than 2 nor more than 4 directors each. A director may be

-8-

removed from office for cause by the affirmative vote of 80% of the shareholders or a majority of the Board of Directors as provided in Article V of the Corporation's Articles of Incorporation. A director may resign at any time by filing his or her written resignation with the Secretary of the Corporation. Directors need not be residents of the State of Wisconsin or shareholders of the Corporation.

Nominations for the election of directors shall be made in accordance with the provisions of Article II, Section 2.07 hereof, which requirements are hereby incorporated by reference in this Article III, Section 3.02.

**Section 3.03** **Regular Meetings**. A regular meeting of the Board of Directors shall be held without notice other than this By-law immediately after, and at the same place as, the annual meeting of shareholders, and each adjourned session thereof, for election of corporate officers and transaction of other business. The Board of Directors may provide, by resolution, the time and place, either within or without the State of Wisconsin, for holding additional regular meetings without other notice than such resolution.

**Section 3.04** **Special Meetings**. Special meetings of the Board of Directors may be called by or at the request of the Chairman of the Board, President, Secretary or any two directors. The Chairman of the Board, President, Secretary or any two directors calling any special meeting of the Board of Directors may fix any place, either within or without the State of Wisconsin, as the place for holding any special meeting of the Board of Directors called by them, and if no other place is fixed, then the place of meeting shall be the principal office of the Corporation in the State of Wisconsin.

**Section 3.05** **Notice; Waiver of Notice**. Notice may be communicated in person, by telephone telegraph, teletype, facsimile or other form of wire or wireless communication, or by mail or private carrier, and, if these forms of personal notice are impracticable, notice may be communicated by a newspaper of general circulation in the area where published, or by radio, television or other form of public broadcast communication. Notice of each meeting of the Board of Directors shall be communicated to each director at his or her business address or telephone number or at such other address or telephone number as such director shall have designated in writing filed with the Secretary, in each case not less than that number of hours prior thereto as set forth in Section 0.04. Written notice is effective at the earliest of the following:

    (i)       when received;

    (ii)     on deposit in the U.S. Mail, if mailed postpaid and correctly addressed; or

    (iii)    on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested and the receipt is signed by or on behalf of the addressee.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 38 of 232   Document 1-1

Oral notice is effective when communicated and the Corporation shall maintain a record setting forth the date, time, manner and recipient of the notice. Whenever any notice whatever is required to be given to any director of the Corporation under the Articles of Incorporation or By-laws or any provisions of law, a waiver thereof in writing, signed at any time, whether before or after the time of the meeting, by the director entitled to such notice, shall be deemed equivalent to the giving of such notice, and the Corporation shall retain copies of such waivers in its corporate records. A director's attendance at or participation in a meeting waives any required notice to him or her of the meeting unless the director at the beginning of the meeting or promptly upon his or her arrival objects to holding the meeting and does not thereafter vote for or assent to action taken at the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting or the Board of Directors need be specified in the notice or waiver of notice of such meeting.

Section 3.06 **Quorum.** Except as otherwise provided by the Articles of Incorporation, By-laws or Wisconsin Business Corporation Law, a majority of the number of directors as provided in Section 0.03, or a majority of the number of directors then in office (provided this number constitutes no fewer than one-third of the number of directors then in office) shall constitute a quorum for the transaction of business at any meeting of the Board of Directors, but a majority of the directors present or participating (though less than a quorum) may adjourn the meeting from time to time without further notice.

Section 3.07 **Manner of Acting.** If a quorum is present or participating when a vote is taken, the affirmative vote of a majority of directors present or participating is the act of the Board of Directors or a committee of the Board of Directors, unless the Wisconsin Business Corporation Law or the Articles of Incorporation or these By-laws require the vote of a greater number of directors.

Section 3.08 **Conduct of Meetings.** The Chairman of the Board, or in the Chairman's absence, the President, or in the President's absence, the Executive Vice President, or in the Executive Vice President's absence, a Vice President in the order provided under Section 4.08, and in their absence, any director chosen by the directors present, shall call meetings of the Board of Directors to order and shall act as Chairman of the meeting. The Secretary of the Corporation shall act as Secretary of all meetings of the Board of Directors, but in the absence of the Secretary, the presiding Officer may appoint an Assistant Secretary or any director or other person present or participating to act as Secretary of the meeting.

Section 3.09 **Vacancies.** Subject to the rights of the holders of any series of Preferred Stock outstanding, vacancies, including those created by an increase in the number of directors in the Board of Directors, may be filled by the remaining directors until the next succeeding annual election by the affirmative vote of a majority of directors then in office, though less than a quorum of the Board of Directors; provided, that in the case of a vacancy created by the removal of a director by vote of the shareholders, the shareholders shall have the right to fill such vacancy at the same meeting or at any adjournment thereof. A director elected to fill a vacancy shall serve for the unexpired term of his or her predecessor. In the absence of action

-10-

by the remaining directors, the shareholders may fill such vacancy at a special meeting in accordance with the Articles of Incorporation, or by unanimous consent according to these By-laws.

**Section 3.10  Compensation.**  The Board of Directors, by affirmative vote of a majority of the directors then in office, and irrespective of any personal interest of any of its members, may establish reasonable compensation of all directors for services to the Corporation as directors, officers or otherwise, or may delegate such authority to an appropriate committee. The Board of Directors also shall have the authority to provide for or to delegate to an appropriate committee to provide for reasonable pensions, disability or death benefits, and other benefits or payments, to directors, officers and employees and to their estates, families, dependents or beneficiaries on account of prior services rendered by such directors, officers and employees to the Corporation.

**Section 3.11  Presumption of Assent.**  A director of the Corporation who is present or participates in a meeting of the Board of Directors or a committee thereof of which he or she is a member, at which action on any corporate matter is taken, shall be presumed to have assented to the action taken unless his or her dissent shall be entered in the minutes of that meeting or unless he or she shall file his or her written dissent to such action with the person acting as the Secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a director who voted in favor of such action.

**Section 3.12  Committees.**

A.    **Regular Committees.**

1.    **General Description.**  In order to facilitate the work of the Board of Directors of this Corporation, the following regular committees shall be elected from the membership of the Board of Directors at the annual meeting of the Board of Directors (or at such other time as the Board of Directors may determine):

Audit Committee

Compensation Committee

Each committee shall have 2 to 4 members.  The Chairman of the Board of Directors, and in the Chairman's absence, the President, or in the President's absence, the Executive Vice President(s) (if more than one Executive Vice President, the Executive Vice President as designated by the Board of Directors), or in the absence of an Executive Vice President, such Vice President as is designated by the Board of Directors, shall submit nominations for such

-11-

committee memberships. Committee members shall hold office until the next board meeting at which Committee elections are conducted in accordance with these By-laws, and until their successors are elected and qualified. Each Regular Committee of the Board of Directors may exercise the authority of the full Board within the scope of the duties and powers delegated to it in these By-laws, except that no committee of this Board shall do any of the following:

(a) Authorize distributions;

(b) Approve or propose to shareholders action that the Wisconsin Business Corporation Law requires be approved by shareholders;

(c) Fill vacancies on the board of directors or, except as provided herein, on any of its committees;

(d) Amend the Articles of Incorporation;

(e) Adopt, amend or repeal the By-laws;

(f) Approve a plan of merger not requiring shareholder approval;

(g) Authorize or approve reacquisition of shares, except according to a formula or method prescribed by the full Board of Directors; or

(h) Authorize or approve the issuance or sale or contract for sale of shares or determine the designation and relative rights, preferences and limitations of a class or series of shares, except that the Board of Directors may authorize a committee or a senior executive officer of the Corporation to do so within limits prescribed by the Board of Directors.

2. **The Audit Committee**. When the Board of Directors is not in session, the Audit Committee shall have and may exercise all of the powers of the full Board of Directors solely with regard to those matters which are within the scope of the Audit Committee's designated duties, as provided herein.

The Audit Committee shall:

(a) Select and engage the independent certified public accountants to audit the books, records and financial transactions of the Corporation;

(b) Review with the independent accountants the scope of their examination, with particular emphasis on the areas to which either

-12-

the committee or the independent accountants believe special attention should be directed. The Audit Committee may have the independent accountants perform such additional procedures as the Committee or the auditors deem necessary;

(c)     Review and approve the annual plan for the financial audit (internal audit) department;

(d)     Review with the independent accountants the financial statements and auditors' reports thereon;

(e)     Review the management letter of the independent accountants, and audit reports by the Corporation's internal auditors to assure that appropriate action has been taken by Senior Management as to each item recommended;

(f)     Encourage the independent accountants and the internal auditors to communicate directly with the Chairman of the Board and President or, if necessary, the Chairman of the Audit Committee whenever any significant recommendation has not been satisfactorily resolved at the Senior Management level;

(g)     Review and approve all related party transactions; and

(h)     Carry out such special assignments as the Board of Directors may, from time to time, give to the Audit Committee.

3.     **Compensation Committee**.  When the Board of Directors is not in session, the Compensation Committee shall have and may exercise all of the powers of the full Board of Directors solely with regard to those matters which are within the scope of the Compensation Committee's duties, as provided herein.

The Compensation Committee shall:

(a)     Review issues regarding compensation;

(b)     Make recommendations to the Board of Directors on total compensation for executive officers and the types, methods and levels of compensation programs (including any stock option plans); and

(c)     Carry out such special assignments as the Board of Directors may, from time to time, give to the Compensation Committee.

-13-

**B.**     <u>Special Committees</u>. In addition to the foregoing Regular Committees, the Board of Directors may, from time to time, establish Special Committees and specify the composition, functions and authority of any such Special Committee.

**C.**     <u>Vacancies: Temporary Appointments</u>. When, for any cause, a vacancy occurs in any Regular Committee, the remaining committee members, by majority vote, may fill such vacancy by a temporary appointment of a director on the Board of Directors not on the subject committee to fill the vacancy until the next Board Meeting, at which time the full Board of Directors shall fill the vacancy.

**D.**     <u>Committee Minutes and Reports</u>. All of the foregoing committees shall keep minutes and records of all of their meetings and activities and shall report the same to the Board of Directors at its regular meeting. Such minutes and records shall be available for inspection by the directors at all times.

Section 3.13 <u>Unanimous Consent Without Meeting</u>. Any action required or permitted by the Articles of Incorporation or By-laws or any provision of law to be taken by the Board of Directors at a meeting or by resolution may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors then in office.

Section 3.14 <u>Meeting by Telephone or by Other Communication Technology</u>. Meetings of the Board of Directors or committees of the Board may be conducted by telephone or by other communication technology in accordance with Section 180.0820 of the Wisconsin Business Corporation Law.

## ARTICLE IV. OFFICERS

Section 4.01 <u>Number: Election and Term of Office</u>. The principal officers of the Corporation shall be a Chairman of the Board, a President, an Executive Vice President, a Chief Financial Officer, the number of Vice Presidents as may be determined by the Board of Directors, a Secretary and a Treasurer, each of whom the Board of Directors shall from time to time determine. All officers shall hold office for a period of one year and until their successors are duly elected and qualified, or until their prior death, resignation or removal. Such other officers and assistant officers as may be deemed necessary may be elected or appointed by the Board of Directors. The Board of Directors may authorize a duly appointed officer to appoint one or more officers or assistant officers. The same natural person may simultaneously hold more than one office in the Corporation. Such other Officers and Assistant Officers as may be deemed necessary may be elected or appointed by the Board of Directors. The Board of Directors may authorize a duly appointed officer to appoint one or more officers or assistant officers. The same natural person may simultaneously hold more than one office in the Corporation.

-14-

**Section 4.02    Removal.**  Any officer or agent may be removed by the Board of Directors, with or without cause, whenever in its judgment the best interests of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment shall not of itself create contract rights.

**Section 4.03    Vacancies.**    A vacancy in any principal office because of death, resignation, removal or otherwise, shall be filled by the Board of Directors for the unexpired portion of the term.

**Section 4.04    Chairman of the Board.**  The Chairman of the Board shall preside at all meetings of the shareholders and of the Directors and shall do and perform such other duties as from time to time may be assigned to that office by the Board of Directors.

**Section 4.05    President.**  The President shall have general supervision of the business and affairs of the Corporation.  The President may sign and execute all authorized bonds, notes, checks, contracts, or other obligations in the name of the Corporation.  The President shall perform such other duties as from time to time may be assigned to him or her by the Board of Directors.

**Section 4.06    Executive Vice Presidents.**  Should the Chairman or President be absent or unable to act, the Board of Directors shall designate an Executive Vice President to discharge the duties of the vacant office with the same power and authority as is vested in that office.  The Executive Vice President(s) shall perform such other duties as from time to time may be assigned to him or her by the Board of Directors.

**Section 4.07    Chief Financial Officer.**  The Chief Financial Officer, subject to the control of the Board of Directors, shall have such powers and discharge such duties as may be from time to time conferred or imposed upon him or her by the Chairman of the Board, the President, the Executive Vice President or the Board of Directors.

**Section 4.08    Vice Presidents.**  Should the Chairman, the President or the Executive Vice President be absent or unable to act, the Board of Directors shall designate a Vice President or other officer to discharge the duties of the vacant office with the same power and authority as is vested in that office.  The Vice Presidents shall perform such other duties as from time to time may be assigned to them by the President, the Executive Vice President or the Board of Directors.

**Section 4.09    Secretary.**  The Secretary shall:  (i) keep the minutes of the meetings of the Shareholders and of the Board of Directors in one or more books provided for that purpose; (ii) see that all notices are duly given in accordance with the provisions of the By-laws or as required by law; (iii) be custodian of corporate records; (iv) keep or arrange for the keeping of a register of the post office boxes of each Shareholder which shall be furnished to the Secretary by such Shareholder; (v) have general charge of the stock transfer books of the Corporation; and (vi) in general, perform all duties incident to the office of Secretary and have such other duties

-15-

and exercise such authority as from time to time may be delegated or assigned to him or her by the President, the Executive Vice President or by the Board of Directors.

Section 4.10 **Treasurer.** The Treasurer, subject to the control of the Board of Directors, shall have such powers and discharge such duties as may be from time to time conferred or imposed upon him or her by the Chairman of the Board, the President, the Executive Vice President, the Chief Financial Officer, or the Board of Directors.

Section 4.11 **Subordinate Officers.** Subordinate officers appointed by the Board of Directors shall have such powers and discharge such duties as may from time to time be conferred or imposed upon them by the Chairman of the Board, the President or the Board of Directors.

Section 4.12 **Salaries.** The salaries of the principal officers shall be fixed from time to time by the Board of Directors or by a duly authorized committee thereof, and no officer shall be prevented from receiving such salary by reason of the fact that he or she is also a director of the Corporation.

## ARTICLE V. CONFLICT OF INTEREST TRANSACTIONS, CONTRACTS, LOANS, CHECKS; DEPOSITS; AND SPECIAL CORPORATE ACTS

Section 5.01 **Conflict of Interest Transactions.** A "conflict of interest" transaction means a transaction with the Corporation in which a Director of the Corporation has a direct or indirect interest. The circumstances in which a Director of the Corporation has an indirect interest in a transaction include but are not limited to a transaction under any of the following circumstances: (i) another entity in which the Director has a material financial interest or in which the Director is a general partner is a party to the transaction; or (ii) another entity of which the Director is a director, officer or trustee is a party to the transaction and the transaction is or, because of its significance to the Corporation should be, considered by the Board of Directors of the Corporation. A conflict of interest transaction is not voidable by the Corporation solely because of the Director's interest in the transaction if any of the circumstances set forth in Section 180.0831 of the Wisconsin Business Corporation Law (or any successor statutory provision) are true or occur.

Section 5.02 **Contracts.** The Board of Directors may authorize any Officer or Officers, agent or agents, to enter into any contract or execute or deliver any instrument in the name of and on behalf of the Corporation, and such authorization may be general or confined to specific instances.

Section 5.03 **Loans.** No indebtedness for borrowed money shall be contracted on behalf of the Corporation and no evidences of such indebtedness shall be issued in its name unless authorized by or under the authority of a resolution of the Board of Directors. Such authorization may be general or confined to specific instances.

-16-

**Section 5.04  Checks, Drafts, Etc.**  All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation, shall be signed by such Officer or Officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by or under the authority of a resolution of the Board of Directors.

**Section 5.05  Deposits.**  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as may be selected by or under the authority of a resolution of the Board of Directors.

**Section 5.06  Voting of Securities Owned by this Corporation.**  Subject to the specific direction of the Board of Directors, (i) any shares or other securities issued by any other corporation and owned or controlled by this Corporation may be voted at any meeting of security holders of such other corporation by the President of this Corporation if he or she is present, or in the President's absence, by the Vice President of this Corporation who may be present, and (ii) whenever, in the judgment of the President, or in his absence, of any Vice President, it is desirable for this Corporation to execute an appointment of proxy or written consent in respect to any shares or other securities issued by any other corporation and owned by this Corporation, such proxy appointment or consent shall be executed in the name of this Corporation by the President, or one of the Vice Presidents of this Corporation in the order as provided in clause (i) of this Section, without necessity of any authorization by the Board of Directors or countersignature or attestation by another Officer.  Any person or persons designated in the manner above stated as the proxy or proxies of this Corporation shall have full right, power and authority to vote the shares or other securities issued by such other corporation and owned by this Corporation the same as such shares or other securities might be voted by this Corporation.

## ARTICLE VI.
## TRANSFER RESTRICTIONS AND
## CERTIFICATES FOR SHARES

**Section 6.01  Transfer Restrictions During Life.**

**A.**      **General Transfer Prohibition.**  During a Shareholder's lifetime, no Shareholder (or any spouse of a Shareholder who may have an interest in the shares of capital stock of the Corporation (the "Shares") directly or by virtue of the application of any marital or community property law, or otherwise) may gift, sell, dispose of or otherwise transfer Shares to any person or entity (other than to the Corporation), or permit or suffer to exist any involuntary transfer of Shares as a matter of law or any attachment, execution, levy or similar proceeding with respect to Shares as a result of the filing against such Shareholder of any voluntary or involuntary bankruptcy or insolvency proceeding, or otherwise (collectively, a "transfer"), without having complied with the provisions of this Section 6.01 of Article VI.

-17-

**B.** **Right of First Refusal**. A Shareholder who proposes to sell Shares to a third party may do so if such sale is pursuant to a bona fide, non-assignable written offer involving all cash consideration but only if such Shareholder (who hereinafter shall be referred to in this Section 6.01(B) as the "Transferor") shall first offer to sell such Shares to the Corporation and such offer shall not have been accepted, in the manner hereinafter provided:

(1) **Offer by Transferor**. The Transferor shall offer to sell to the Corporation all of the Shares proposed to be sold to the third party transferee (collectively referred to in this Section 6.01(B) as the "Subject Shares"). The Transferor's offer shall be in writing and shall consist of an offer to sell the Subject Shares at the purchase price and upon the terms set forth in Sections 6.05 and 6.06 hereof, and shall set forth the name and address of the proposed third party buyer, the number of Subject Shares and a copy of the third party's offer to purchase. Said offer to sell shall be irrevocable until the expiration of the offer described below.

(2) **Acceptance of Offer**. Within 30 days after the date of such offer, the Corporation, at its option, by written notice to the Transferor, may accept such offer and elect to purchase all or a portion of the Subject Shares or decline such offer. Any election to purchase the Subject Shares shall specify a proposed date for closing of the purchase, which date shall not be more than 60 days after the effective date of the election. Failure on the part of the Corporation to make the above election to purchase the Subject Shares within the applicable time period herein provided shall conclusively be deemed as an election not to accept the Transferor's offer.

(3) **Release from Restriction**. If the Transferor's offer is not accepted in full as to all of the Subject Shares by the Corporation, the Transferor may make a bona fide sale of the Subject Shares not purchased by the Corporation to the proposed third party buyer named in the Transferor's written offer, with such transfer to be made only in strict accordance with the terms therein stated and only if such transferee agrees in writing to the conditions set forth in Section 6.01(B)(4) hereof. If the Transferor fails to effect such sale within 60 days after the date of such offer, such Subject Shares shall again become subject to all of the restrictions of this Article VI.

(4) **Agreement by Purchaser**. The sale otherwise permitted under Section 6.01(B)(3) hereof shall be allowed only if the buyer signs all appropriate documents necessary in the opinion of the Corporation's legal counsel to impose on the Shares so sold restrictions on further transferability identical to the restrictions imposed by this Article VI, so as to bind such buyer.

**C.** **Involuntary Transfers**. In the event that any Shareholder permits or suffers to exist any involuntary transfer of Shares (the "Involuntary Transferor") as a matter of law or any attachment, execution, levy or similar proceeding with respect to the Shares as a result of the filing against such Shareholder of any voluntary or involuntary bankruptcy or insolvency proceeding or otherwise, such Involuntary Transferor shall immediately notify the Corporation. Such notice shall contain a description of the facts and circumstances giving rise to such

-18-

involuntary transfer, the names and addresses of the proposed third party transferee, the number of Shares to be so transferred and the material terms of the proposed transfer. Whether or not said notice is delivered, the Corporation shall have the option described in Section 6.01(B) above to purchase the Shares subject to such involuntary transfer; provided, however, for purposes of when such option expires, the time period specified in Section 6.01(B) for the Corporation to purchase such Shares shall not begin until the Corporation has received notice of the involuntary transfer from the Involuntary Transferor.

**D.** **Proxies and Voting Trusts.** The Shareholders shall not execute a proxy, assignment, voting trust or any other document transferring all or any of their voting rights except for a proxy appointment necessitated by a Shareholder's inability to attend a meeting due to a business conflict, vacation, illness, guardianship, conservatorship or other legal proceeding which has transferred voting rights to such Shareholder's Shares.

**E.** **Permitted Transfers.** Shareholders who obtain their Shares by original issue from the Corporation shall be permitted to transfer (a "Permitted Transfer") all or any part of such Shares during their lifetime, without the necessity of complying with this Section 6.01, if the transfer is made to any of the following persons (a "Permitted Transferee") and if such persons take the actions described in Section 6.01(B)(4) hereof: (i) the transferring Shareholder's spouse; (ii) the transferring Shareholder's natural or adopted issue; or (iii) any trust (provided the trust meets the requirements of Section 1361(c)(2) of the Internal Revenue Code of 1986, as amended) with respect to which a person described in clauses (i) or (ii) is the sole beneficiary.

## Section 6.02 Termination of Marital Relationship.

**A.** **Termination of Marital Relationship.** If the marital relationship of a Shareholder terminates for any reason other than the death of such Shareholder (the "Titled Shareholder") and if the spouse of the Titled Shareholder has an interest (the "Spousal Interest") in the Shares of the Titled Shareholder (by virtue of marital or community property law, divorce judgment or otherwise), then:

(1) **Immediate Transfer to Titled Shareholder.** To the extent that the Spousal Interest is transferred to the Titled Shareholder by way of bequest, intestacy, divorce judgment or otherwise, such transfer shall be permitted, but the Spousal Interest so transferred to the Titled Shareholder shall be subject to all of the terms and conditions of this Article VI.

(2) **Options to Purchase.** To the extent that the Spousal Interest is not so transferred to the Titled Shareholder, the Titled Shareholder and the Corporation shall have the following successive options:

(a) The Titled Shareholder shall have an option to purchase all or a portion of the Spousal Interest at the purchase price and upon the terms and conditions provided in Sections 6.05 and 6.06. If the Titled Shareholder desires to exercise such option, the Titled Shareholder shall do so by giving written notice to such Titled Shareholder's spouse or to the

-19-

legal representative of such spouse's estate no later than 60 days after whichever of the following applies: in the case of a dissolution of marriage due to death of the Titled Shareholder's spouse, the date of the qualification of the legal representative of the deceased spouse's estate or, in the case of a dissolution of marriage due other than to death, the date of entry of any order, judgment or decree determining the rights of the Titled Shareholder's spouse in the Shares held by the Titled Shareholder.

(b)  If the Titled Shareholder does not exercise the option set forth in Section 6.02(A)(2)(a) above or accepts such option and elects to purchase less than all of the Spousal Interest, the Corporation shall have an option to purchase all or a portion of the remaining Spousal Interest not purchased by the Titled Shareholder at the purchase price and upon the terms and conditions provided in Sections 6.05 and 6.06.  If the Corporation desires to exercise such option, the Corporation shall do so by giving written notice thereof to the Titled Shareholder's spouse or the legal representative of such spouse's estate within 60 days after the earlier of (i) notice from the Titled Shareholder of his or her decision to decline to purchase all of the Spousal Interest or (ii) the expiration of the Titled Shareholder's 60-day period in which to exercise his or her option (provided notice is received pursuant to Section 6.02(B) hereof).

(c)  Notwithstanding any other provisions of this Section 6.02, if the foregoing options to purchase are not exercised by the Titled Shareholder or the Corporation as to all of the Spousal Interest, then the Titled Shareholder's spouse or the legal representative of such spouse's estate, whichever the case may be, shall be free to retain the Spousal Interest. In any event, the Spousal Interest shall remain subject to all of the terms and conditions of this Article VI.

**B.**  **Notice of Death or Dissolution of Marital Relationship**.  In the event the marriage of a Shareholder terminates due to the death of such Shareholder's spouse or dissolution of the marital relationship, such Shareholder shall give written notice thereof to the Corporation within 30 days thereof specifying the date of death or the date of entry of any order, judgment or decree determining the rights, if any, of such Shareholder's spouse in the Shares held by such Shareholder.

Section 6.03  **Termination of Employment**.  In the event that a Shareholder (the "Terminated Shareholder") is terminated by the Corporation from employment with the Corporation, any of its wholly-owned subsidiaries or any of its affiliates, for any reason (other than termination resulting from death), or quits such employment, then all of the Shares owned by the Terminated Shareholder and such Shareholder's spouse (by virtue of marital or community property law, divorce judgment or otherwise), and those Shares acquired from the Terminated Shareholder by a Permitted Transferee in a Permitted Transfer and all of the Shares acquired by a third party pursuant to Section 6.01(B) or by a Permitted Transferee pursuant to Section 6.01(E) (all such Shares collectively referred to in this Section 6.03 as the "Subject Shares"), shall be subject to the following option:

-20-

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 49 of 232   Document 1-1

**A.** For a period of 90 days following the Terminated Shareholder's termination of employment, the Corporation shall have the option to purchase from the Terminated Shareholder, his or her spouse and Permitted Transferees, and they shall sell to the Corporation, all or any of the Subject Shares at the purchase price and upon the terms and conditions provided in Sections 6.05 and 6.06. If the Corporation exercises its option, written notice thereof shall be given to the Terminated Shareholder within such 90-day period. If the Corporation fails to give notice of its election to exercise its option to purchase within said 90-day period, the Corporation shall conclusively be deemed to have elected not to exercise its option.

**B.** Notwithstanding any other provisions of this Section 6.03, if the foregoing option to purchase is not exercised by the Corporation as to all of the Subject Shares, then the Terminated Shareholder, and his or her spouse and Permitted Transferees, shall be free to retain all of the Subject Shares not so purchased notwithstanding the termination of employment. In any event, the Subject Shares shall continue to be subject to the provisions of this Article VI.

**Section 6.04  Death of Shareholder.** Upon the death of a Shareholder (hereinafter the "Decedent"), all of the Shares owned by the Decedent and such Decedent's spouse (by virtue of marital or community property law, divorce judgment or otherwise), and those Shares acquired from the Decedent by a Permitted Transferee in a Permitted Transfer and all of the Shares acquired by a third party pursuant to Section 6.01(B) or by a Permitted Transferee pursuant to Section 6.01(E) (all such Shares collectively referred to in this Section 6.04 as the "Subject Shares"), may be sold and purchased as follows:

**A.** For a period of 180 days after the death of the Decedent, the Corporation shall have the option to purchase any or all of the Subject Shares at the purchase price and upon the terms and conditions provided in Sections 6.05 and 6.06. If the Corporation exercises its option, written notice thereof shall be given to the Decedent's estate within such 180-day period. If the Corporation fails to give notice of its election to exercise its option to purchase within said 180-day period, the Corporation shall conclusively be deemed to have elected not to exercise its option.

**B.** Notwithstanding any other provisions of this Section 6.04, if the foregoing option to purchase is not exercised by the Corporation as to all of the Subject Shares, then the Decedent's estate, and the Decedent's spouse and Permitted Transferees, shall be free to retain all of the Subject Shares not so purchased notwithstanding the death of the Decedent. In any event, the Subject Shares shall continue to be subject to the provisions of this Article VI.

-21-

### Section 6.05  Purchase Price.

**A.  Purchase Price.**

**(1)  Lifetime Transfers.**

(a)    If the transfer is a sale described in Section 6.01(B), the purchase price shall the lesser of (1) that price offered by the proposed buyer or (2) the lesser of until August 31, 1997, $35.67 per share or the Fair Market Value Per Share (as hereinafter defined) as of the Pricing Date (as hereinafter defined), and on and after August 31, 1997, the Fair Market Value Per Share as of the Pricing Date; or

(b)    If the transfer is an Involuntary Transfer described in Section 6.01(C) hereof, the purchase price shall be the lesser of Fair Market Value Per Share as of the Pricing Date or $35.67 per share until August 31, 1997, and the Fair Market Value Per Share as of the Pricing Date on and after August 31, 1997.

**(2)  Termination of Marital Relationship.**  The purchase price for the Shares purchased pursuant to Section 6.02 shall be $35.67 per share until August 31, 1997, and on and after August 31, 1997, the Fair Market Value Per Share as of the Pricing Date.

**(3)  Termination of Employment.**  The purchase price for the Shares purchased pursuant to Section 6.03 shall be as follows:

(a) If the Terminated Shareholder (i) is terminated by the Corporation for "cause" or (ii) quits without the approval of the Corporation, the purchase price for such Shares shall be the lesser of Fair Market Value Per Share as of the Pricing Date or $35.67 per share until August 31, 1997, and on and after August 31, 1997, the Fair Market Value Per Share as of the Pricing Date; or

(b) If the Terminated Shareholder (i) is terminated by the Corporation other than for "cause", (ii) quits with the approval of the Corporation, or (iii) leaves the employ of the Corporation (or any of its subsidiaries or affiliates) due to death, permanent disability or retirement, the purchase price for such Shares shall be the Fair Market Value Per Share as of the Pricing Date.

**(4)  Death.**  The purchase price for the Shares purchased pursuant to Section 6.04 shall be the Fair Market Value as of the Pricing Date.

**B.  Fair Market Value Per Share.**  "Fair Market Value Per Share" shall be computed by multiplying the Weighted Average Earnings From Operations by a factor of 5.0 less the amount of any senior and subordinated debt of the Corporation on a consolidated basis plus cash divided by the number of shares of Common Stock issued and outstanding, whereby "Weighted Average Earnings From Operations" is computed as follows:

-22-

[(.25 x Prior Fiscal Year Earnings From Operations) + (.50 x Current Fiscal Year Projected Earnings From Operations) + (.25 x Succeeding Fiscal Year Forecasted Earnings From Operations)];

whereby "Projected Earnings From Operations" shall be defined as actual earnings from operations as of the Pricing Date plus budgeted earnings from operations for the portion of the remaining fiscal year.

**C.** **Pricing Dates.** The term "Pricing Date" means: (i) with respect to any purchase of Shares pursuant to Section 6.01(C) hereof, the last day of the fiscal quarter immediately preceding the fiscal quarter in which notice is given to the Corporation regarding such involuntary transfer or the date the Corporation elects to purchase or not to purchase all or any of the Shares subject to such involuntary transfer, whichever occurs first; (ii) with respect to any purchase of Shares pursuant to Section 6.02 hereof, the last day of the fiscal quarter immediately preceding the fiscal quarter in which a Shareholder's marriage terminates; (iii) with respect to any purchase of Shares pursuant to Section 6.03 hereof, the last day of the fiscal quarter immediately preceding the effective date of the Terminated Shareholder's termination of employment; and (iv) with respect to any purchase of Shares pursuant to Section 6.04 hereof, the last day of the fiscal quarter immediately preceding the fiscal quarter in which the Decedent's death occurs.

**D.** **Stock Splits.** Appropriate adjustment to the purchase prices for the Shares described in this Section 6.05 shall be made for any dividend, stock split, recapitalization or issuance of stock subsequent to the applicable Pricing Date.

**Section 6.06 Payment of Purchase Price; Closing.**

**A.** **Payment of Purchase Price.**

(1) **Lifetime Transfer.** The purchase price for Shares purchased pursuant to Section 6.01 shall be paid as follows: (i) if the transfer is a sale described in Section 6.01(B) hereof, the purchase terms shall be those offered by the proposed transferee; or (ii) if the transfer is an involuntary transfer described in Section 6.01(C) hereof, the purchase price shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

(2) **Termination of Marital Relationship.** The purchase price for Shares purchased pursuant to Section 6.02 shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

(3) **Termination of Employment.** The purchase price for Shares purchased pursuant to Section 6.03 shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

-23-

"Transfer of the securities evidenced by this certificate is not valid except to the extent that such transfer has complied with the provisions regarding transfer contained in the By-laws of the Corporation as may be amended from time to time. A copy of the By-laws of the Corporation, which imposes various restrictions upon the holder of this certificate, is available to interested parties for inspection at the offices of the Corporation."

"The securities evidenced by this certificate have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state, but have been issued in reliance upon exemptions therefrom. The securities may not be offered, sold, pledged or otherwise transferred without registration under the Act or the opinion of counsel satisfactory to the corporation that an exemption from registration is available or that such transfer may otherwise lawfully be made."

**B.** <u>Spouses and Interests in Shares</u>. For purposes of this Article VI, all references to "Shares" owned or held by a Shareholder shall include, without limitation, all interests in Shares now owned or acquired in the future by such Shareholder's spouse, if any, as marital property or quasi-marital property, or pursuant to such spouse's elective rights to deferred marital property or to an augmented marital property estate. The creation of an interest in the Shares of a Shareholder's spouse by operation of marital property laws during the Shareholder's lifetime shall not be deemed to be a transfer of such Shares or any portion thereof for purposes of this Article VI so long as (i) the Shares in which such interest is created continue to be registered solely in the name of such Shareholder, and (ii) such Shareholder maintains full management and control rights with respect to such Shares; provided, however, that if either of the foregoing conditions shall cease to be satisfied, then such Shareholder and the Corporation shall have the option to purchase such spouse's interest in the Shares in the sequence and manner and upon the same terms and conditions as specified in Section 6.03 as if the martial relationship of such Shareholder and such Shareholder's spouse had been terminated. The Shares of a Shareholder, and any interest of such Shareholder's spouse in such Shares, shall remain subject to this Article VI regardless of the termination, for any reason, of the marital relationship of any Shareholder and the Shareholder's spouse.

**C.** <u>Specific Performance</u>. The Shareholders and the Corporation agree that it is impossible to measure in money the damages which will accrue by reason of a failure to perform any of the obligations under this Article VI. Therefore, if any party shall institute any action or proceeding to enforce the provisions hereof, any person (including the Corporation) against whom such action or proceeding is brought hereby waives all claims or defenses therein that such party has an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists. Such remedy shall be cumulative and nonexclusive and shall be in addition to any other remedy which the parties may have. The failure of any party at any time to require performance of any provision hereof shall in no manner affect their right at a time to enforce the same. No waiver by any party or any breach of any terms contained in this Article VI, whether by conduct or otherwise, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other term contained in this Article VI.

-25-

**D.    Termination.** The provisions of this Article VI shall terminate and have force or effect upon the occurrence of any of the following events:

(1)    There is only one Shareholder;

(2)    The Corporation is dissolved or becomes insolvent or the subject of bankruptcy or insolvency proceedings, provided, in the case of involuntary bankruptcy or insolvency proceedings, this Article VI shall not terminate unless such proceedings have continued unstayed for any period of 60 consecutive days; or

(3)    The Shares are registered under the Securities Act of 1933, as amended, or become subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended.

Upon termination of this Article VI, the Secretary of the Corporation shall, upon tender of the certificates of stock, delete the legend endorsed thereon pursuant to Section 6.07(A).

**E.    Notices.** All notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be delivered or mailed first class with postage prepaid, addressed to the Corporation, to its principal office. Any notice so given shall be deemed effective upon personal delivery or two days following deposit in the United States Mail.

**F.    Arbitration.** Any controversy or claim arising out of or relating to this Article VI, or the breach thereof, shall be settled by a single arbitrator in arbitration conducted in Milwaukee, Wisconsin, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator's decision shall be final and nonappealable. The arbitrator shall have the authority to settle such controversy or claim by finding that a party should be enjoined from certain actions or be compelled to undertake certain actions, and in such event said court may enter an order enjoining and/or compelling such actions as found by that arbitrator. The arbitrator shall make a determination regarding which party's legal position in any such controversy or claim is the more substantially correct (the "Prevailing Party") and the arbitrator shall require the other party to pay the legal and other professional fees and costs incurred by the Prevailing Party in connection with such arbitration proceeding and any necessary court action.

**G.    Voting and Quorum Requirement.** Any Shareholder who proposes to transfer Shares or is required to transfer Shares pursuant to this Article VI agrees to vote (if a vote is required) in the same manner as the majority of the non-transferring Shareholders vote with respect to the Corporation's decision whether (or not) the Corporation will exercise its option to purchase Shares, and shall appear at any meeting of Shareholders or directors held for the purpose of deciding whether (or not) the Corporation will exercise its option, in order to establish a quorum, or consent in writing to any action in respect thereof.

-26-

## CERTIFICATE OF ADOPTION
### THE UNDERSIGNED OFFICER OF AA MANAGEMENT GROUP, INC.
### CERTIFIES:

**THE FOREGOING BYLAWS OF SAID CORPORATE WERE DULY ADOPTED ON THE _____ DAY OF _____, 1994.**

_____
_____, Secretary

-31-

# BY-LAW AMENDMENT
## SECTION 6.05 PURCHASE PRICE

A.   <u>Purchase Price</u>

    (1)   <u>Lifetime Transfers.</u>

        (a)   If the transfer is a sale described in Section 6.01(B), the purchase price shall be the lesser of (1) that price offered by the proposed buyer or (2) until the expiration of a period of three (3) years from the original date of purchase, the lesser of the original purchase price per share or the Fair Market Value Per Share (as hereinafter defined) as of the Pricing Date (as hereinafter defined), and on and after the expiration of a period of three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date; or

        (b)   If the transfer is an Involuntary Transfer described in Section 6.01(C) hereof, the purchase price shall be the lesser of Fair Market Value Per Share as of the Pricing Date or the original purchase price per share until three (3) years from the original date of purchase and the Fair Market Value Per Share as of the Pricing Date on and after three (3) years from the original date of purchase.

    (2)   <u>Termination of Marital Relationship.</u>  The purchase price for the Shares purchased pursuant to Section 6.02 shall be the original purchase price per share until three (3) years from the original date of purchase and on and after three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date.

    (3)   <u>Termination of Employment.</u>  The purchase price for the Shares purchased pursuant to Section 6.03 shall be as follows:

        (a)   If the Terminated Shareholder (i) is terminated by the Corporation for "cause" or (ii) quits without the approval of the Corporation, the purchase price for such Shares shall be the lesser of Fair Market Value Per Share as of the Pricing Date or the original purchase price per share until three (3) years from the original date of purchase, and on and after three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date; or

        (b)   If the Terminated Shareholder (i) is terminated by the Corporation other than for "cause", (ii) quits with the approval of the Corporation, or (iii) leaves the employ of the Corporation (or any of its subsidiaries or affiliates) due to death, permanent disability or retirement, the purchase price for such Shares shall be the Fair Market Value Per Share as of the Pricing Date.

    (4)   <u>Death.</u>  The purchase price for the Shares purchased pursuant to Section 6.04 shall be the Fair Market Value as of the Pricing Date.

6/21/96


**AA Management Group**

411 East Wisconsin Avenue
Suite 1900
P.O. Box 664
Milwaukee, Wisconsin 53201-0664

Telephone (414) 271-7240
Fax (414) 271-1041

www.american-appraisal.com

March 9, 2001

Dear Shareholder:

Enclosed are the proxy materials and a copy of the proposed changes to Article VI of the AA Management Group, Inc. By-laws. These amendments will be the subject of the Special Meeting of Shareholders to be held in Milwaukee, Wisconsin, on **Friday, March 23, 2001.**

Please complete the enclosed RSVP card and Proxy and return both to Ms. Paula D. Bost as soon as possible but not later than March 19, 2001.

You should note that failure to vote counts as a "NO" vote, as an affirmative vote of 80% of the outstanding stock as of March 9, 2001 is required to pass the amendments.

The Board of Directors recommends a vote "FOR" these amendments.

Sincerely,

Ronald M. Goergen
President

p

Enclosures

*Passed w/ ~90% of vote*

*We value your business.®*



**AA Management Group**

411 East Wisconsin Avenue
Suite 1900
P.O. Box 664
Milwaukee, Wisconsin 53201-0664

Telephone (414) 271-7240
Fax        (414) 271-1041

www.american-appraisal.com

## NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

### TO THE SHAREHOLDERS OF AA MANAGEMENT GROUP, INC.:

A Special Meeting of Shareholders of AA Management Group, Inc. will be held at the corporate headquarters of the company, 411 East Wisconsin Avenue, 5th Floor Auditorium, Milwaukee, Wisconsin, on Friday, March 23, 2001, at 11:00 am (C.S.T.) for the following purpose:

1.     to make amendments to certain section of Article VI of the AA Management Group, Inc. By-Laws.

Only holders of record of the Common Stock of AA Management Group, Inc., at the close of business on March 9, 2001 will be entitled to notice of and to vote at the Special Meeting.

Please complete, sign and date the enclosed proxy and return it as soon as possible.

With regard to the Special Meeting of AA Management Group, Inc., please complete the enclosed R.S.V.P. form if you will be attending the meeting and return it no later than March 19, 2001.

By Order of the Board of Directors

Joseph P. Zvesper
Corporate Secretary

Milwaukee, Wisconsin
March 9, 2001

*We value your business.®*

# PROXY STATEMENT

### Introduction

This Proxy Statement is furnished in connection with the solicitation of proxies by the Board of Directors of AA Management group, Inc., ("AAMG" or the Corporation") to be voted at a Special Meeting of Shareholders (the "Meeting") of AAMG to be held on Friday, March 23, 2001 at 11:00 am (C.S.T.) and at any adjournment thereof, for the purposes set forth in the accompanying Notice of Special Meeting of Shareholders.

### Voting and Revocation of Proxies

Proxies received by the Board of Directors in the form accompanying this Proxy Statement will be voted at the meeting and at any adjournment thereof as specified therein by the person giving the proxy. If no specification is made, the shares represented by the proxy will be voted for the amendment to certain sections of Article VI of AA Management Group, Inc.'s By-laws. Any proxy may be revoked by the person executing it, at any time before the authority thereby granted is exercised, by filing with the Secretary of AAMG, at the address shown above written revocation or duly elected proxy bearing a later date or by personally voting the shares relating thereto by ballot at the Special Meeting.

### Shares Entitled to Vote; Record Date

Each shareholder of record will be entitled to one vote for each share of Common Stock held at the close of business on March 9, 2001, which is the record date fixed by the Board of Directors for determining the shareholders entitled to notice of and to vote at the Special Meeting or any adjournments thereof.

### Mailing to Shareholders

This Proxy Statement and the accompanying form of proxy are being mailed to Shareholders on March 9, 2001.

### Executing of Proxies

Shareholders are requested to execute and promptly return the enclosed Proxy, which is solicited on behalf of the Board of Directors, the persons named therein as proxies having been selected by the Board of Directors. Any Shareholder executing and returning the enclosed Proxy may revoke the same at any time prior to voting thereof. The giving of the Proxy will not affect the right to vote in person if the Shareholder attends the meeting and asks to do so.

The Board of Directors recommends the approval of the proposed Amendments, a copy of which is attached, to **Article VI** <u>**Transfer Restrictions and Certificates for Shares**</u> of the By-laws because it improves the potential liquidity of Shareholder's interest in the Common Stock of AAMG.

A summary of the proposed Amendments are is as follows:

a) **Sec. 6.03** <u>**Termination of Employment.**</u> adds "Permanent Disability" to the definition of what constitutes a termination of employment.

**Sec. 6.03 C) (new)** establishes age 65 as the date at which shares may be offered to the Corporation for purchase (except in the case of death or permanent disability).

b) **Sec. 6.04** <u>**Death or Permanent Disability of Shareholder.**</u> adds "Permanent Disability", including a definition thereof, to the section.

c) **Sec. 6.05** <u>**Purchase Price.**</u> eliminates in Sec. 6.05 B) <u>Fair Market Value Per Share</u> the determination of "Fair Market Value" by formula and substitutes the determination of "Fair Market Value" for purposes of the American Appraisal Associates, Inc. Employee Stock Ownership Plan ("ESOP").

**Sec. 6.05** <u>**Pricing Dates**</u> is changed by **elimination** of the quarterly determination on value and establishing the valuation for ESOP purposes (presumed to be annual).

d) **Sec. 6.06** <u>**Payment of Purchase Price; Closing.**</u> Clarifies in Sec. 6.06 A) (4) <u>Death or Permanent Disability</u> that payment shall be made to the "Shareholder or the Shareholder's Estate".

*THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE ABOVE PROPOSAL*

*Other Business*

The Board of Directors knows of no other business to be presented for shareholder action of the meeting. However, should matters other than those set forth in the Notice of Special Meeting properly come before the meeting, it is intended that the persons named in the Proxy will vote upon them in accordance with their best judgment.

By Order of the Board of Directors

Joseph P. Zvesper
Corporate Secretary

Milwaukee, Wisconsin
March 9, 2001

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 60 of 232   Document 1-1

## AMENDMENTS TO THE BYLAWS OF
## AA MANAGEMENT GROUP, INC.
### (a Wisconsin Corporation)

**RESOLVED**, that the following ByLaw Amendments shall be submitted to the shareholders at a special meeting to be held on March 23, 2001 as required by Section 10.01 of the Bylaws of the Corporation.

1.      Section 6.03 of the ByLaws shall be restated to read as follows:

**Section 6.03   Termination of Employment.** In the event that a Shareholder (the "Terminated Shareholder") is terminated by the Corporation from employment with the Corporation, any of its wholly-owned subsidiaries or any of its affiliates, for any reason (other than termination resulting from death or Permanent Disability), or quits such employment **or retires at age 65 or older,** then all of the Shares owned by the Terminated Shareholder and such Shareholder's spouse (by virtue of marital or community property law, divorce judgment or otherwise), and those Shares acquired from the Terminated Shareholder by a Permitted Transferee in a Permitted Transfer and all of the Shares acquired by a third party pursuant to Section 6.01(B) or by a Permitted Transferee pursuant to Section 6.01(E) (all such Shares collectively referred to in this Section 6.03 as the "Subject Shares"), shall be subject to the following option:

**A.** For a period of 90 days following the Terminated Shareholder's termination of employment, the Corporation shall have the option to purchase from the Terminated Shareholder, his or her spouse and Permitted Transferees, and they shall sell to the Corporation, all or any of the Subject Shares at the purchase price and upon the terms and conditions provided in Sections 6.05 and 6.06. If the Corporation exercises its option, written notice thereof shall be given to the Terminated Shareholder within such 90-day period. If the Corporation fails to give notice of its election to exercise its option to purchase within said 90-day period, the Corporation shall conclusively be deemed to have elected not to exercise its option.

**B.** Notwithstanding any other provisions of this Section 6.03, if the foregoing option to purchase is not exercised by the Corporation as to all of the Subject Shares, then the Terminated Shareholder, and his or her spouse and Permitted Transferees, shall be free to retain all of the Subject Shares not so purchased notwithstanding the termination of employment. In any event, the Subject Shares shall continue to be subject to the provisions of this Article VI.

**C.      At such time as a Shareholder shall attain age 65, Shares owned by such Shareholder and such Shareholder's spouse (by virtue of marital or community property law, divorce judgment or otherwise) and those shares acquired from such Shareholder by a Permitted Transferee in a Permitted Transfer may be offered to the Corporation at the Purchase Price and upon the terms and conditions provided in Section 6.05 and 6.06.**

2.      Section 6.04 of the ByLaws shall be restated to read as follows:

**Section 6.04   Death or Permanent Disability of Shareholder.** Upon the death **or Permanent Disability** of a Shareholder, all of the Shares owned by such Shareholder and such

Shareholder's spouse (by virtue of marital or community property law, divorce judgment or otherwise), and those Shares acquired from the Shareholder by a Permitted Transferee in a Permitted Transfer and all of the Shares acquired by a third party pursuant to Section 6.01(B) or by a Permitted Transferee pursuant to Section 6.01(E) (all such Shares collectively referred to in this Section 6.04 as the "Subject Shares"), may be sold and purchased as follows:

A.   For a period of 180 days after the death of or determination of **Permanent Disability of Shareholder, the Corporation shall have the option to purchase any or all of the Subject Shares** at the purchase price and upon the terms and conditions provided in Sections 6.06 and 6.07.   If the Corporation exercises its option, written notice thereof shall be given to such Shareholder or his or her estate within such 180-day period.   If the Corporation fails to give notice of its election to exercise its option to purchase within said 180-day period, the Corporation shall conclusively be deemed to have elected not to exercise its option.

B.   Notwithstanding any other provisions of this Section 6.04, if the foregoing option to purchase is not exercised by the Corporation as to all of the Subject Shares, then such **Shareholder or such Shareholder's estate, and his or her spouse and Permitted Transferees, shall be free to retain all of the Subject Shares not so purchased notwithstanding the death or Permanent Disability of the Shareholder.** In any event, the Subject Shares shall continue to be subject to the provisions of this Article VI.

C.   **For purposes of this Article VI, Permanent Disability shall mean a Shareholder's inability, as a result of physical or mental incapacity, to substantially perform his duties with the Corporation for a period of six consecutive months; provided, that, within thirty (30) days after written notice of termination is given, and Shareholder shall not have returned to the performance of his duties on a full-time basis.  Before any termination due to Permanent Disability, the corporation shall have been furnished with certificates from not less than two qualified physicians, one selected by the Corporation and one selected by or on behalf of the Shareholder, stating that in their respective opinion such Shareholders is and will continue to be by reason of such incapacity unable to perform adequately the services required of him or her.  If the two physicians so selected are unable to reach agreement on the issue of each Shareholder's ability to perform such services adequately, they shall promptly designate a qualified physician to make such determination and the decision of such third physician shall be binding on the Corporation and the Shareholders.  If the two physicians are unable to agree upon a third physician for such purposes, the parties shall request the Dean of the Medical College of Wisconsin to choose such third physician.**

2

3.   Sections 6.05 and 6.06 of the ByLaws shall be restated to read as follows:

Section 6.05  Purchase Price.

A.    Purchase Price.

(1)    Lifetime Transfers.

(a)    If the transfer is a sale described in Section 6.01(B), the purchase price shall be the lesser of (1) that price offered by the proposed buyer or (2) until the expiration of a period of three (3) years from the original date of purchase, the lesser of the original purchase price per share or the Fair Market Value Per Share (as hereinafter defined) as of the Pricing Date (as hereinafter defined), and on and after the expiration of a period of three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date; or

(b)    If the transfer is an Involuntary Transfer described in Section 6.01(C) hereof, the purchase price shall be the lesser of Fair Market Value Per Share as of the Pricing Date or the original purchase price per share until three (3) years from the original date of purchase and the Fair Market Value Per Share as of the Pricing Date on and after three (3) years from the original date of purchase.

(2)    Termination of Marital Relationship.  The purchase price for the Shares purchased pursuant to Section 6.02 shall be the original purchase price per share until three (3) years from the original date of purchase and on and after three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date.

(3)    Termination of Employment.  The purchase price for the Shares purchased pursuant to Sections 6.03 and 6.04 shall be as follows:

(a)    If the Terminated Shareholder (i) is terminated by the Corporation for "cause" or (ii) quits without the approval of the Corporation, the purchase price for such Shares shall be the lesser of Fair Market Value Per Share as of the Pricing Date or the original purchase price per share until three (3) years from the original date of purchase, and on and after three (3) years from the original date of purchase, the Fair Market Value Per Share as of the Pricing Date; or

(b)    If the Terminated Shareholder (i) is terminated by the Corporation other than for "cause", (ii) quits with the approval of the Corporation, or (iii) leaves the employ of the Corporation (or any of its subsidiaries or affiliates) due to death, permanent disability or retirement, the purchase price for such Shares shall be the Fair Market Value Per Share as of the Pricing Date.

B.    Fair Market Value Per Share.  "Fair Market Value Per Share" shall be the per share value determined for purposes of the American Appraisal Associates, Inc. Employee Stock Ownership Plan ("ESOP").

C.    Pricing Dates.  The term "Pricing Date" means the date of the last preceding valuation for ESOP purposes.

3

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 63 of 232   Document 1-1

D.     Stock Splits.  Appropriate adjustment to the purchase prices for the Shares described in this Section 6.05 shall be made for any dividend, stock split, recapitalization or issuance of stock subsequent to the applicable Pricing Date.

**Section 6.06  Payment of Purchase Price; Closing.**

A.     **Payment of Purchase Price.**

(1)     **Lifetime Transfer.**  The purchase price for Shares purchased pursuant to Section 6.01 shall be paid as follows:  (i) if the transfer is a sale described in Section 6.01(B) hereof, the purchase terms shall be those offered by the proposed transferee; or (ii) if the transfer is an involuntary transfer described in Section 6.01(C) hereof, the purchase price shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

(2)     **Termination of Marital Relationship.**  The purchase price for Shares purchased pursuant to Section 6.02 shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

(3)     **Termination of Employment.**  The purchase price for Shares purchased pursuant to Section 6.03 shall be paid by the Corporation, at its sole option, in cash or by the execution and delivery to the transferor of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

(4) **Death or Permanent Disability.**  The purchase price for Shares purchased pursuant to Section 6.04 shall be paid  by the Corporation, at its sole option, in cash or by the execution and delivery to Shareholder or the Shareholder's estate of a promissory note in the principal amount equal to the purchase price payable by the Corporation.

B.     **Terms of Promissory Note.**  Any promissory note executed and delivered pursuant to this Section 6.06 shall provide for one lump sum payment of principal due two years from the date of the execution of the promissory note together with interest computed upon the unpaid principal amount at an adjustable rate equal to the Corporation's Cost of Funds.  The Corporation's "Cost of Funds" shall mean the interest rate on the senior debt of the Corporation. The promissory note shall reserve the right of the maker to prepay the indebtedness evidenced thereby, in whole or in part at any time, without penalty.  Such indebtedness shall be subordinate to all secured financing provided to the Corporation on the terms and conditions satisfactory to the secured lenders.  The holders of a promissory note hereby agree to execute any and all documents upon the request of the Corporation necessary to effect the above-described subordination.

C.     **Closing.**  The closing of the purchase of Shares under this Article VI shall take place at the principal office of the Corporation, or at such other place as may be mutually agreed upon, as follows:

4

(1) **Lifetime Transfers**. For purchases under Section 6.01(B), on the date specified by the Corporation which date shall not be less than 15 nor more than 60 days after its notice to so purchase is given to the Transferor;

(2) **Termination of Marital Relationship**. For purchases under Section 6.02, on a date agreed upon as soon as practicable following the exercise of the option, which date shall not be more than 60 days following the giving of notice by the Titled Shareholder or the Corporation of their decision to exercise their option;

(3) **Termination of Employment**. For purchases under Section 6.03, on a date designated by the Corporation which date shall not be less than 15 nor more than 60 days after its notice to so purchase is given to the Terminated Shareholder; and

(4) **Death or Permanent Disability**. For purchases under Section 6.04, on a date designated by the Corporation which shall not be less than 15 nor more than 60 days after its notice to so purchase is given to the Shareholder or his or her estate.

T:\CLIENTA\10204\0001\A0137105

5

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT B

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

THE OFFER AND SALE OF SHARES OF COMMON STOCK OF AA MANAGEMENT GROUP, INC.
ARE MADE ONLY BY MEANS OF THE CONFIDENTIAL PRIVATE
PLACEMENT MEMORANDUM DATED JULY 29, 1994.

# SUBSCRIPTION AGREEMENT

# FOR

# SHARES OF

# COMMON STOCK

# OF

# AA MANAGEMENT GROUP, INC.

**CAREFULLY REVIEW AND FOLLOW THE
INSTRUCTION SHEET IMMEDIATELY FOLLOWING THIS COVER PAGE**

**AA MANAGEMENT GROUP, INC.
Suite 2100
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202**

# INSTRUCTIONS TO INVESTORS

In order to subscribe for shares of Common Stock of AA Management Group, Inc. (the "Company"), the following should be done:

## A. SUBSCRIPTION AGREEMENT.

You should complete and return in the enclosed self-addressed envelope the Subscription Agreement ("Subscription Agreement") to AA Management Group, Inc., Suite 2100, 100 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, Attention, Ronald M. Goergen. Please note that incomplete documents will be returned to investors for completion. If you have any questions about completion of the subscription documents, please contact Ronald M. Goergen at (414) 271-7240.

1. Please print the name of the prospective investor in the upper right-hand corner of the cover page to the Subscription Agreement and fill in the number of shares of Common Stock subscribed for. The payment of shares of Common Stock should be paid in the manner described in Part B of this instruction sheet.

2. Please note that Section 2 contains non-compete covenants all prospective investors must agree to in order to become shareholders of the Company.

3. Please check and initial the investor category to which you belong in Section 3. If you do not qualify under any of the investor categories (i) through (viii), please circle "None" under sub. (ix) and notify Ronald M. Goergen by telephone at (414) 271-7240.

4. Please note your obligations to update your representations and warranties, as set forth at the end of Section 4 on page 6.

5. Please complete all required information on page 7 and sign the Subscription Agreement.

6. THE SUBSCRIPTION AGREEMENT SHOULD BE RETURNED OR DELIVERED TO:

AA Management Group, Inc.
Suite 2100
100 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: Ronald M. Goergen

## B. PAYMENT FOR SHARES OF COMMON STOCK.

You must pay for your shares of Common Stock by check or by wire transfer, and if by check, payment must accompany the delivery of your executed Subscription Agreement.

(a) Payment by Check.

If you wish to pay by check, please deliver to the Company a check in an amount equal to $35.67 per share subscribed for, made payable to "AA Management Group, Inc." PAYMENT MUST ACCOMPANY YOUR SUBSCRIPTION AGREEMENT.

(b) Payment by Wire Transfer.

If you wish to pay by wire transfer, please contact the Company at (414) 271-7240 for wire transfer instructions.

Name of Prospective Investor: _____

[Please Print]

Number of Shares of Common Stock Subscribed For: _____

# AA MANAGEMENT GROUP, INC.

## SUBSCRIPTION AGREEMENT

**Shares of Common Stock**
**Subscription Price - $35.67 Per Share**
**Minimum Purchase - 700 Shares**

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SHARES OF COMMON STOCK ("SHARES") REFERRED TO IN THIS SUBSCRIPTION AGREEMENT IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

THE SHARES REFERRED TO IN THIS SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED IN THE UNITED STATES UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"). SUCH SHARES ARE BEING OFFERED AND SOLD IN THE UNITED STATES PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND/OR PURSUANT TO REGULATION D.

A PURCHASER OF SHARES SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES HAVE NOT BEEN REGISTERED IN THE UNITED STATES UNDER THE SECURITIES ACT, AND, THEREFORE, CANNOT BE SOLD IN THE UNITED STATES UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THERE IS NO OBLIGATION OF THE COMPANY TO REGISTER THE SHARES UNDER THE SECURITIES ACT. NO PUBLIC OR OTHER MARKET WILL DEVELOP FOR THE SHARES. THE SHARES ARE NOT TRANSFERABLE WITHOUT THE CONSENT OF THE COMPANY, COMPLIANCE WITH CERTAIN PROVISIONS OF THE BY-LAWS OF THE COMPANY, AND SATISFACTION OF CERTAIN OTHER CONDITIONS.

THE SHARES HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE AND ANY TRANSFER OF THE SHARES MUST COMPLY WITH ANY APPLICABLE STATE SECURITIES LAWS.

# AA MANAGEMENT GROUP, INC.

# SUBSCRIPTION AGREEMENT

To:    AA Management Group, Inc.
       Suite 2100
       100 East Wisconsin Avenue
       Milwaukee, Wisconsin 53202
       Attention: Ronald M. Goergen

Gentlemen:

You have informed the undersigned that AA Management Group, Inc. (the "Company") has been formed pursuant to the Wisconsin Business Corporation Law, and will be operated substantially as described in the Confidential Private Placement Memorandum dated July 29, 1994 ("Memorandum") furnished to the undersigned.

1.    **Subscription.**

(a)    Subject to the terms and conditions hereof, by delivery of this executed Subscription Agreement ("Subscription Agreement"), the undersigned hereby agrees to tender this subscription in the amount of $_____ ("Subscription Amount") for _____ shares of Common Stock of the Company ("Shares"). The undersigned understands that the purchase price per Share is $35.67. The Subscription Amount shall by paid preceding or accompanying delivery of the executed Subscription Agreement to the Company.

(b)    The undersigned understands that the Subscription Amount will be held in escrow under the terms described in the Memorandum, and will be returned promptly, together with any interest earned thereon, to the undersigned in the event at least 84,130 shares of Common Stock are not subscribed for and exchanged for and payments therefor are not made by August 24, 1994, or such subsequent date as described in the Memorandum. By such payment, the undersigned acknowledges receipt of the Memorandum, and hereby specifically executes this Subscription Agreement, accepts and adopts each and every provision hereof and agrees to be bound hereby.

2.    **Acceptance of Subscription Agreement; Non-Compete Covenants.**

It is understood and agreed that this Subscription Agreement is made subject to the following terms and conditions:

(a)    The Company shall have the right to accept or reject this subscription, in whole or in part, in its sole and absolute discretion.

(b)    If the Company accepts this Subscription Agreement and the undersigned becomes a shareholder of the Company, then in partial consideration of such acceptance, the undersigned (hereinafter in this Section 2, the "Employee") agrees to be bound to the following provisions:

1. All tangible items furnished to Employee from time to time in connection with the performance of Employee's duties, including but not limited to corporate standard books, training materials, client reports, and work papers, shall at all times remain the sole property of the Company and American Appraisal Associates, Inc. ("AAA") and are provided to Employee for the limited purpose of enabling the Employee to perform his duties, and Employee shall not, either during or after the term of employment with AAA or any of its affiliates, use or permit any of the same to be used for any other purpose. Upon the demand of the Company or AAA at any time or upon the termination of employment with AAA or any of its affiliates under any circumstances, Employee shall forthwith deliver all such items to the Company or AAA.

2. All information imparted to Employee by AAA or the Company, or otherwise obtained by Employee at any time relating to the Company's or AAA's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; and any other client data, is revealed and entrusted to Employee in confidence solely in connection with and for the purpose of employment on behalf of AAA. Employee shall not at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it other than pursuant to Employee's employment on behalf of AAA. Without limiting the generality of the foregoing, upon the termination of employment under any circumstances, Employee shall forthwith deliver to the Company or AAA all lists, records, work papers, reports and other documents in Employee's possession or control relating to any customers or the business of AAA or the Company.

3. It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of AAA or the Company, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all times remain the sole property of the Company and AAA. Accordingly, Employee agrees that during the term of his employment with AAA or any of its affiliates and for a further period of twenty-four months beginning on the termination of his employment with AAA or any of its affiliates under any circumstances, Employee shall not, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatever, directly or indirectly solicit orders from, sell or render services to any client or prospective client solicited, sold, or serviced by AAA or the Company (at any time during the two years immediately preceding the termination of his employment with AAA or any of its affiliates, under any circumstances) with respect to any product or service competitive with any product or service provided by AAA or any of its affiliates in the United States, Canada, Europe or Asia; nor shall Employee, directly or indirectly, aid or assist any other person, firm, or corporation to do any of the aforesaid acts.

4. During the term of his employment with AAA or any of its affiliates and for a further period of twenty-four months beginning on the termination of his employment with AAA or any of its affiliates, under any circumstances, Employee shall not, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any officer, salesman, appraiser or other employee of AAA or any of its affiliates, for any employment in a line of business similar to that conducted by AAA or any of its affiliates; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

-2-

5. If any provision of this subsection 2(b) shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this subsection 2(b), as the case may require, and this subsection 2(b) shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

6. This subsection 2(b) shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this subsection 2(b) is not assignable by Employee.

7. For residents of the United States, this subsection 2(b) shall be governed in all respects by the laws of the State of Wisconsin, any disputes arising under this subsection 2(b) shall be tried in the Courts sitting within the State of Wisconsin, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose. For non-U.S. residents, Employee consents and submits his or her person to the jurisdiction of the United States (to the extent possible) and the jurisdiction of the courts of the country in which he or she resides.

8. By executing this Subscription Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

3. <u>Representation as to Accredited Investor Status</u>.

The undersigned understands that Regulation D defines an "accredited investor" as any person coming within any of the following categories and hereby represents to the Company that the undersigned is an "accredited investor" and is included within the following category or categories which are initialed and circled below:

<u>Initial Here</u>

_____ i. Any bank as defined in Section 3(a)(2) of the Securities Act of 1933, as amended ("Securities Act"), or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities and Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

-3-

_____ ii.　Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

**Initial Here**

_____ iii.　Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Share(s), with total assets in excess of $5,000,000;

_____ iv.　Any director or executive officer or the Company;

_____ v.　Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000 (the term "net worth" means the excess of total assets over total liabilities. In computing net worth, the undersigned's principal residence must be valued either at (i) cost, including the cost of improvements, net of current encumbrances upon the property, or (ii) the appraised value of the property as determined upon a written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. In determining income, the undersigned should add to his or her adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income);

_____ vi.　Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

_____ vii.　Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Share(s), whose purchase is directed by a person who either alone or together with his purchaser representative(s) has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the prospective investment; or

_____ viii.　Any entity in which all of the equity owners are accredited investors.

_____ ix.　None.

**4. Other Representations and Warranties of the Undersigned.** The undersigned hereby represents and warrants to the Company as follows:

(a)　The Shares are being acquired for his or her own account for investment, with no intention of distributing or selling any portion thereof in the United States within the meaning of the Securities Act, and will not be transferred by him or her in the United States in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than the undersigned has any interest in or any right to acquire the Share(s). The undersigned understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of such Share(s) by anyone but the undersigned.

(b)　The undersigned's financial condition is such that he or she is able to bear the risk of holding the Share(s) for an indefinite period of time and the risk of loss of his or her entire investment in the Company.

-4-

(c) The undersigned has received, has read and understood and is familiar with the Memorandum, wherein the terms and conditions of the offering and the special risks in purchasing or exchanging for shares of Common Stock are described, and this Subscription Agreement.

(d) The Company has made available all additional information which the undersigned has requested in connection with the transactions contemplated by the Memorandum and the undersigned has been afforded an opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of the purchase of the Share(s) and the opportunity to obtain any additional information (to the extent the Company has such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of information otherwise furnished by the Company.

(e) No representations or warranties have been made to the undersigned by the Company or any agent of the Company, other than as set forth in the Memorandum and this Subscription Agreement.

(f) The undersigned has investigated the acquisition of the Share(s) to the extent he or she deemed necessary or desirable and the Company has provided him or her with any assistance he or she has requested in connection therewith.

(g) The undersigned has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of acquisition of the Share(s) and of making an informed investment decision with respect thereto.

(h) The undersigned is aware that his or her rights to transfer the Share(s) are restricted by the Securities Act in the United States, applicable foreign laws outside the United States, applicable state securities laws, the By-laws of the Company and the absence of a market for the Share(s), and he or she will not offer for sale, sell or otherwise transfer the Share(s) without complying with the provisions of the By-laws of the Company.

(i) The address set forth below is the undersigned's true and correct residence.

(j) The undersigned understands that the Share(s) have not been registered in the United States pursuant to the Securities Act or any state securities act in reliance on an exemption for private offerings, and have not been registered in any other country, and the undersigned acknowledges that he or she is purchasing the Share(s) without being furnished any offering literature or prospectus other than the Memorandum and this Subscription Agreement.

(k) The undersigned has full power and authority to make the representations referred to herein, and to purchase the Share(s) pursuant to the Memorandum and to execute and deliver this Subscription Agreement.

(l) The undersigned acknowledges and is aware of the following:

(i) The Company has recently been formed and has a short financial and operating history and the investment in the Share(s) is speculative and involves a high degree of risk of loss of the entire investment in the Company.

(ii) An investment in the shares of Common Stock involves material risk factors, and the undersigned has carefully read and considered the matters set forth under the caption "Risk Factors" and "Restrictions on Transfer" set forth in the Memorandum.

(iii) There are substantial restrictions on the transferability of the Share(s); the Share(s) will not be, and investors in the Company have no rights to require that the Shares be, registered under the Securities Act in the United States; there will be no public market for the Share(s); the undersigned may not be able to avail himself or herself of the

-5-

**SIGNATURE PAGE**

**AA MANAGEMENT GROUP, INC.**

Dated:_____

_____
Number of Shares Subscribed For

$_____
 Total Subscription Amount

OWNERSHIP TYPE:

____ Individual     ____ Community Property

____ Joint Tenants     ____ In Common

_____
Name (Please Print)

_____
Signature

_____
Co-Investor Name (Please Print)

**RESIDENCE ADDRESS:**

_____
Number and Street

_____
City/State/Zip Code

_____
Country

_____
Telephone Number

_____
Social Security Number

SUBSCRIPTION ACCEPTED BY
AA MANAGEMENT GROUP, INC. AS TO
____ SHARES OF COMMON STOCK

BY:_____

SUBSCRIPTION REJECTED BY
AA MANAGEMENT GROUP, INC. AS TO
____ SHARES OF COMMON STOCK

BY:_____

_____
Co-Investor Social Security Number

**CO-INVESTOR ADDRESS (if different):**

_____
Number and Street

_____
City/State/Zip Code

_____
Country

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 75 of 232   Document 1-1

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT C

## THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

**prairie capital**
■■ advisors, inc. ■■
an employee owned company

August 4, 2014

GreatBanc Trust Company,
*not in its corporate capacity but solely in its capacity as Trustee of*
*The American Appraisal Associates ESOP Trust*
c/o Mr. Paul Trost
801 Warrenville Road, Suite 500
Lisle, Illinois 60532

The American Appraisal ESOP Administrative Committee
c/o Ms. Kimberly Russo
411 E. Wisconsin Ave.
Milwaukee, WI 53202

Dear ESOP Trustee and ESOP Committee:

You have requested our opinion as to the fair market value of the common stock of AA Management Group, Inc. (the "Company") held by the American Appraisal Associates ESOP Trust (the "ESOP Trust") as of March 31, 2014 (the "Valuation Date"). As of the Valuation Date, the ESOP Trust held 5,648 shares of common stock in the Company, which represents a minority interest. It is our understanding that this valuation will be used for the continued administration of the ESOP Trust as of the end of the fiscal and plan year.

In developing our opinions we have reviewed various documents describing the Company's financial performance and expectations and we have met with senior management to review the Company's operations and performance. We have also considered various factors deemed to be appropriate in reaching our opinion. These factors include, but are not limited to, the following:

- The history and nature of the Company;

- The current economic environment, in general, and the specific economic factors bearing on firms competing in the Company's industry;

- The historical financial performance of the Company as reflected in the internally prepared financial reports;

- Projected operational performance as forecast by the Company;

- Costs of capital as reflected in the current markets for debt and equity securities; and

- Other factors that were deemed relevant in developing our conclusion of value.

In completing this engagement, we have relied on information provided by the Company including, but not limited to, financial statements, management projections, employee data, and

 One Mid America Plaza ■ Suite 1000 ■ Oakbrook Terrace, IL 60181 ■ 630.413.5565 

*Securities offered through Prairie Capital Markets, LLC*

**GreatBanc Trust Company**
*not in its corporate capacity but solely in its capacity as Trustee of*
*The American Appraisal Associates ESOP Trust*
**c/o Mr. Paul Trost**
**The American Appraisal ESOP Administrative Committee**
**c/o Ms. Kimberly Russo**
**Page 2**

other information as may have been requested. This information has been accepted as being accurate without independent verification by us. However, we have exercised our independent judgment in evaluating this information and we have not relied on information that we have determined to be inadequate or incomplete.

With respect to the financial statements as of March 31, 2014, we have been provided with draft audited financial statements and assume that no material changes will be reflected in the final version of the audit report except for the reflection of the concluded value of the Company's common stock as stated herein.

Our detailed report presents the fair market value per share of the Company's common stock held by the ESOP Trust assuming a minority interest valuation premise. In addition, the report exhibits include a computation of the value of the Company's common stock assuming it is held by individual minority interest shareholders outside of the ESOP Trust. The difference in value relates to the greater liquidity (or "put right") of the ESOP shares as compared to the non-ESOP shares.

Based on the foregoing, the conclusions of value presented in the valuation report are:

| | |
|---|---|
| **ESOP Value per Share** | **$ 733.77** |
| **Non-ESOP Value per Share** | **$ 611.48** |

The preceding conclusions are more fully described in our narrative valuation report.

We have not investigated the title to or any disclosed or undisclosed liabilities against either the assets or equity securities of the Company. In accordance with recognized professional ethics, our fees for this service are not contingent upon the opinions expressed in this letter, and neither Prairie Capital Advisors, Inc. nor any of its employees has a present or intended financial interest in the Company.

Respectfully submitted,

*Prairie Capital Advisors, Inc.*
Prairie Capital Advisors, Inc.

 One Mid America Plaza ■ Suite 1000 ■ Oakbrook Terrace, IL 60181■ 630.413.5565 

*Securities offered through Prairie Capital Markets, LLC*

**FILED**
**02-05-2018**
**John Barrett**
**Clerk of Circuit Court**
**2018CV001032**
**Honorable Glenn H**
**Yamahiro-34**
**Branch 34**

# EXHIBIT D

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

American Appraisal Associates, Inc.
411 East Wisconsin Avenue, Milwaukee, WI 53202
tel 414 271 7240

Leading / Thinking / Performing

EXECUTIVE OFFICE

AUG 20 2014

**American Appraisal**

### STOCK REDEMPTION AND NON-SOLICITATION AGREEMENT

This Stock Redemption and Non-Solicitation Agreement ("Redemption Agreement") is effective August 1, 2014 between Peter S. Huck ("Shareholder") and American Appraisal Associates, Inc. ("American Appraisal"), a wholly owned subsidiary of AA Management Group, Inc. ("AAMG"), collectively, (the "Parties").

WHEREAS, Shareholder's employment will end on or before September 30, 2014 ("Separation Date") and Shareholder owns AAMG common stock that is subject to a Subscription Agreement dated September 8, 1994.

WHEREAS, Shareholder has requested his or her AAMG shares be redeemed;

WHEREAS, the September 8, 1994 Subscription Agreement and the applicable bylaws of AAMG do not obligate AAMG to redeem Shareholder's AAMG stock;

WHEREAS, this Redemption Agreement therefore allows Shareholder to redeem his stock, and accelerate the payment terms of the promissory note provisions prescribed within Section 6.06(B) of the AAMG bylaws; and

WHEREAS, in exchange for each of these material economic benefits, Shareholder desires and agrees to forego the interest payment provisions within Section 6.06(B) of the AAMG bylaws.

Therefore, in accordance with the mutual consideration listed herein, the Parties agree as follows:

1. Obligations of Shareholder:

   a. Upon Execution of this Redemption Agreement – Shareholder shall properly endorse and return to AAMG his stock certificate No. 24 dated September 9, 1994 for 1,080 shares of AAMG common stock.

   b. Non-Solicitation of Clients – For 12 months after the Separation Date, Shareholder shall not perform, or solicit the performance or sale of, a competing service to or for a Client, or assist another person or entity in doing so. A "Client" means any individual or entity with which Shareholder had business contact during his or her final 18 months of employment with American Appraisal and that also purchased or received services from American Appraisal during that same period.

   c. Non-Solicitation of Employees – For 12 months after the Separation Date, Shareholder agrees not to directly or indirectly solicit or encourage, and not to assist another person or entity to solicit or encourage, any employee of American Appraisal who reported to Shareholder or over whom Shareholder had an influential position in the 12 months preceding the end of Shareholder's employment, to leave his or her employment with American Appraisal or to accept other employment or work involving valuation or related professional services.

   d. Non-Disparagement – Shareholder agrees not to disparage or otherwise attempt to discredit American Appraisal with any existing or potential client, competitor, or employee of American Appraisal, or any media entity.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 80 of 232   Document 1-1



**American Appraisal**

2. Obligations of AAMG:

   a. Upon Execution of this Redemption Agreement – This Redemption Agreement shall constitute a valid and enforceable obligation upon AAMG to pay Shareholder the amount derived from the calculation, and on the payment dates, set forth below.

   b. Redemption Price Per Share –The Parties acknowledge that this redemption transaction is governed by the applicable provisions of the bylaws of AAMG which indicate that:

      i. the redemption price per share is to be calculated using the fair market value per share as of March 31 of the year preceding the fiscal year in which the termination of Shareholder's employment occurs; and

      ii. the redemption price per share is to be based upon the Non-ESOP premise per share value as determined in conjunction with the annual valuation of the common stock of AAMG as determined by the ESOP Trustee's designated independent consultant.

   Based upon application of these provisions of the AAMG bylaws, the Parties agree that the price per share to be paid to the Shareholder is $611.48 and the total redemption payment amount is $660,398.40.

   c. Payment Dates - Unless altered by Section 5 below, the redemption payments shall be made as follows:

      i. On or about September 1, 2015, ($165,099.60) (25%)
      ii. On or about September 1, 2016, ($165,099.60) (25%)
      iii. On or about September 1, 2017, ($165,099.60) (25%)
      iv. On or about September 1, 2018, ($165,099.60) (25%)

3. Termination of Shareholder Rights – Shareholder acknowledges that this Redemption Agreement constitutes a promissory note and that upon execution Shareholder ceases to have any further shareholder rights. American Appraisal and AAMG do not make any representation or warranty regarding the actual fair market value of Shareholder's AAMG common stock. Pursuant to applicable provisions of its bylaws, AAMG may subsequently purchase or sell AAMG common stock at per-share prices different than the per-share price set forth in Section 2b above.

4. Subordination – All redemption payments are subordinate to any obligations owed by either American Appraisal or AAMG, at any time, to BMO Harris Bank or its successors.

5. Breach – The Parties acknowledge that any breach by Shareholder of this Redemption Agreement will result in immediate and irreparable injury to American Appraisal. Accordingly, American Appraisal shall be entitled to an injunction or other remedies, including delaying any remaining redemption payment(s) and recovery of the costs and attorneys' fees associated with the breach.

6. Entire Agreement – This Redemption Agreement sets forth the entire agreement between the Parties concerning the expedited redemption of Shareholder's AAMG common stock, and fully supersedes any and all prior discussions, offers, representations, letters, or agreements.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 81 of 232   Document 1-1



**American Appraisal**

7. <u>Confidentiality</u>. The Parties agree to keep the terms of this Redemption Agreement confidential and will not disclose the terms hereof other than to their attorneys, accountants, tax advisers, or as required by law.

8. <u>Venue and Jurisdiction</u> – This Redemption Agreement shall be governed by the laws of the State of Wisconsin. The venue for any dispute arising out of or in connection with this Redemption Agreement shall be any state or federal court located in Milwaukee, Wisconsin, having subject matter jurisdiction. The Parties consent to personal jurisdiction in those courts.

AMERICAN APPRAISAL ASSOCIATES, INC.
and AA MANAGEMENT GROUP, INC.

Signed: _____

Joseph P. Zvesper
Chairman & Chief Executive Officer

Signed: _____

Officer/Title

Date: _____

SHAREHOLDER

Signed: _____

Peter S. Huck

Date: _8/28/2014_

## LOST STOCK CERTIFICATE
## CERTIFICATION

I, *Peter S. Huck*, hereby certify that I am the owner of AA Management Group, Inc., shares in the total amount of *1080* shares.

I confirm that I was issued AA Management Group, Inc., stock certificate number _____ on *August 1994* for *1080* shares. I further confirm that my physical certificate cannot be located and deem the certificate lost.

I agree that AA Management Group, Inc. and I have executed a proper Stock Redemption & Non-Solicitation Agreement, effective October 1, 2013 which establishes an agreement to pay me in full for shares owned as noted above. This Lost Stock Certificate Certification deems the lost certificate null and void, and I have no further claims of ownership in AA Management Group, Inc.

_Peter S. Huck_
Name:

Date: _8/28/2014_

_Paula D Best_
Witness Signature

Date: _8/28/2014_

Accepted by:

_[signature]_

Joseph P. Zvesper, Chairman and CEO
AA Management Group, Inc.

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT E

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED



American Appraisal Associates, Inc.
411 East Wisconsin Avenue Milwaukee, WI 53202
tel 414 271 7240

Leading / Thinking / Performing

**American Appraisal**

September 25, 2014

Peter S Huck
1100 Madera Circle
Elm Grove, WI 53122

Dear Peter:

This letter outlines the concluding arrangements concerning all matters related to your retirement as a full-time employee with American Appraisal as of September 30, 2014. In addition, this letter outlines the arrangements for current and future consulting services as a temporary employee, when necessary to meet client obligations.

Your final paycheck will include your wages through September 30, 2014, less all appropriate tax withholdings and deductions. This check will also include a reconciliation of your Corporate American Express account balance. To ensure timely reconciliation of your account balance, please submit all business expenses and receipts immediately. Upon reconciliation, your Corporate American Express account will be cancelled. Please note that your final payment will *not* be directly deposited into your bank account; the check will be mailed to you on the next scheduled pay date.

**Temporary Employment**

Because of your commitment to specific client relationships and a need for your expertise in certain consulting services, potential opportunities for future employment as a temporary employee exist. For any period of temporary employment, your job title will be Senior Manager/AVP and you will report to Christopher Sytsma.

*Same pay + hours (20) as when employee,*

As a temporary employee, you will be paid on an hourly basis and will need to accurately record all hours worked in the Firm's time system. You will be paid at your current rate of pay, which calculates to $62.62 per hour, paid biweekly. This rate of pay does not, however, bind either party to a fixed or guaranteed term of employment, and any temporary employment shall remain an "at-will" relationship at all times. As a temporary employee, you will be ineligible to participate in the Firm's benefit programs with the exception of the 401(k) plan.

**Non-compete Covenants**

As a practice leader, you developed valuable working relationships with, and had access to detailed knowledge about our clients and our employees. As such, we remind you of the non-compete covenants of your Stock Redemption and Non-Solicitation Agreement, dated August 28, 2014. These restrictive covenants are necessary to protect American Appraisal's client portfolio and proprietary trade secrets, and to prohibit the solicitation of our current employees. Additionally, applicable law and Firm policy requires employees to return, and not take or keep any copies of all proprietary,

Valuation / Transaction Consulting / Real Estate Advisory / Fixed Asset Management


**American Appraisal**

confidential, and trade secret information, such as client lists, templates, valuation models and other Firm property. Should you have any such information, please return it to my attention.

**401(k) Plan**
You have a vested account balance in the American Appraisal Retirement Plan. Please visit the Plan's Web site (www.millimanbenefits.com) for distribution and rollover options, and tax and penalty information. Instructions for accessing your account online are enclosed.

As a retiree, you are eligible to receive a 401(k) Company Match contribution for the plan year which ended December 31, 2013 and for the current Plan Year, which ends December 31, 2014. If a matching contribution is made for these Plan Years, the funds will be distributed no later than December 15, 2014 and 2015 respectively. If your 401(k) account is closed at the time of these distributions, it will be reopened to receive these contributions.

**Employee Stock Ownership Plan**
You have a vested account balance in the Employee Stock Ownership Plan ("ESOP"). According to section 401(a) (14) of the IRS Code your distribution will be made at the end of the fiscal year in which you turn 65 years old. Therefore, your distribution will be made on or before March 31, 2016.

Prior to your distribution, you will receive annual statements upon completion of the ESOP's valuation at the end of each Plan Year. Distribution paperwork will be sent to you 30 to 90 days prior to the payout of this benefit.

**W-2**
To ensure you receive your W-2 for calendar year 2014, and future notifications for your 401(k) or ESOP accounts, notify Human Resources of any address changes.

Peter, we wish you well throughout your retirement. If we can help you, or if you have any questions, please contact Diane Bradley or me at any time.

Sincerely,

*Merrie E. Reed*

Merrie E. Reed
Vice President and
Director – Human Resources

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 86 of 232   Document 1-1

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT F

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

**IMPORTANT SPECIAL MEETING OF SHAREHOLDERS**

January 30, 2015

To the Shareholders of AA Management Group, Inc.:

You are cordially invited to attend a special meeting of the shareholders of AA Management Group, Inc. to be held on Tuesday, February 24, 2015, at 9:00 a.m., Central Standard Time, at the offices of Foley & Lardner LLP, 777 East Wisconsin Avenue, 40th Floor, Milwaukee, Wisconsin 53202.

On January 30, 2015, we entered into an agreement and plan of merger with Duff & Phelps, LLC (which we refer to as Buyer) and D&P Alabama Acquisition Corp. (which we refer to as Merger Sub). If the agreement and plan of merger is approved by our shareholders and the other conditions in the agreement and plan of merger are satisfied or waived, then Merger Sub will merge with and into our company and AA Management Group, Inc. will become a wholly-owned subsidiary of Buyer. Upon completion of the merger, each outstanding share of our common stock (other than shares of common stock held by dissenting shareholders) and each outstanding share of restricted common stock (other than shares of common stock held by dissenting shareholders) will be converted into the right to receive a portion of the merger consideration, without interest and less applicable withholding tax, as described in the agreement and plan of merger and the accompanying information statement.

At the special meeting, holders of our common stock will be invited to vote on (i) the agreement and plan of merger and (ii) such other business as may properly come before the special meeting. Our board of directors has carefully reviewed and considered the terms and conditions of the agreement and plan of merger, and has received a fairness opinion from Emory & Co., a financial advisory firm, stating that the merger consideration to be received by our shareholders in connection with the merger is fair to our shareholders from a financial point of view. Based on its review of the agreement and plan of merger and the fairness opinion rendered by Emory & Co., our board of directors has unanimously adopted and approved the agreement and plan of merger.

Certain shareholders of our company have entered into a voting agreement whereby those shareholders have agreed to vote in favor of the agreement and plan of merger. Assuming those shareholders comply with their voting agreements, the agreement and plan of merger will be approved at the special meeting. Nevertheless, your cooperation in voting your shares is important. You may vote your shares in person at the special meeting or, if you are unable to attend the special meeting, you may authorize another person to vote your shares pursuant to a valid proxy in the manner described in the accompanying information statement. Neither this letter nor the accompanying information statement constitutes a solicitation of a proxy.

The accompanying information statement provides you with more detailed information regarding the special meeting, the agreement and plan of merger and the proposed merger. We urge you to read the information statement, including the accompanying agreement and plan of merger, in its entirety.

In light of a confidentiality requirement in the agreement and plan of merger that would be applicable to you, please maintain the information reflected in the enclosed materials, as well as other information regarding the merger, in strict confidence. Please do not disclose the information to anyone other than those of your advisors with whom you wish to consult concerning the merger.

I look forward to seeing you at the special meeting.

Sincerely,

Joseph P. Zvesper
Chairman & Chief Executive Officer

4839-3580-5217.7

**AA MANAGEMENT GROUP, INC.**
411 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

## NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
## TO BE HELD ON FEBRUARY 24, 2015

To Our Shareholders:

Notice is hereby given that a special meeting of shareholders of AA Management Group, Inc. (which we refer to as the Company) will be held on Tuesday, February 24, 2015, at 9:00 a.m., Central Standard Time, at the offices of Foley & Lardner LLP, 777 East Wisconsin Avenue, 40th Floor, Milwaukee, Wisconsin 53202. The purpose of the special meeting is to consider and vote upon (i) a proposal to approve an agreement and plan of merger, dated as of January 30, 2015, among the Company, Duff & Phelps, LLC (which we refer to as Buyer), D&P Alabama Acquisition Corp. (which we refer to as Merger Sub) and Joseph P. Zvesper, solely in his capacity as the representative of the Company's shareholders, and (ii) such other business as may properly come before the special meeting.

The agreement and plan of merger provides for the merger of Merger Sub with and into the Company, with the Company continuing as the surviving corporation, and the conversion of each outstanding share of the Company's common stock (including shares of common stock held by the American Appraisal Associates, Inc. Employee Stock Ownership Plan (ESOP)) and restricted common stock (other than shares of common stock or restricted common stock held by dissenting shareholders) into the right to receive a portion of the merger consideration. We describe the agreement and plan of merger and the related merger in the accompanying information statement, which you should read in its entirety before voting.

The record date to determine who is entitled to vote at the special meeting is January 30, 2015. Only holders of common stock at the close of business on the record date are entitled to vote at the special meeting. If you hold shares of common stock beneficially through the ESOP, you will receive a separate notice and information statement whereby the ESOP trustee will request that you vote on the agreement and plan of merger in a separate "pass through" vote by ESOP participants.

Please do not submit your stock certificates at this time. The Company will mail a letter of transmittal and instructions to all shareholders. The letter of transmittal and instructions will describe the process for surrendering stock certificates in order to receive the merger consideration described in the agreement and plan of merger.

Shareholders who do not believe the merger consideration is reflective of the "fair value" of their shares may elect not to surrender their shares in exchange for the applicable portion of the merger consideration and may instead seek to assert dissenters' rights under Sections 180.1301 through 180.1331 of the Wisconsin Business Corporation Law, copies of which are included as Exhibit B to the accompanying information statement.

By Order of Our Board of Directors,

Joseph P. Zvesper
Chairman & Chief Executive Officer

4839-3580-5217.7

partnership units of the parent holding company of Buyer, following the completion of a specified period of employment with the surviving corporation or a termination of employment in certain instances. These employment and retention agreements are described in greater detail in the section entitled "Employee Arrangements" below.

## How Shares Are Voted; Proxies; Surrender of Certificates

Shareholders may vote by attending the special meeting and voting in person by ballot or by authorizing another person to vote their shares pursuant to a valid proxy in accordance with the requirements of our bylaws. In order for a proxy to be valid and effective, our bylaws require that the proxy be in writing and delivered to our corporate secretary at or prior to the special meeting.

Neither this information statement nor any materials accompanying this information statement constitutes the solicitation of a proxy.

Please do not submit stock certificates at this time. We will send you instructions detailing the procedures for exchanging existing stock certificates in order to receive a portion of the merger consideration as described in the section entitled "Merger Consideration" below.

## Adjournment

If the special meeting is adjourned to a different place, date or time, then we do not need to give notice of the new place, date or time if the new place, date or time is announced at the special meeting before adjournment, unless a new record date is or must be set for the adjourned meeting. Our board of directors must fix a new record date if the special meeting is adjourned to a date more than 120 days after the date fixed for the original special meeting.

## Attending the Special Meeting

To attend the special meeting in person, you must be a shareholder of record of our common stock on the record date, hold a valid proxy from a shareholder of record of our common stock on the record date or be our invited guest. We are inviting persons who hold shares of our common stock beneficially through the ESOP to attend the special meeting, but those persons are not entitled to vote such shares of common stock at, or otherwise participate (in their capacity as an ESOP participant) in, the special meeting. You may be asked to provide proper identification at the registration desk on the day of the special meeting or any adjournment of the special meeting.

## THE MERGER

### Closing and Effective Time of the Merger

We will complete the merger when all of the conditions to completion of the merger contained in the agreement and plan of merger, many of which are summarized in the section entitled "Closing Conditions" below, are satisfied or waived, including the condition that the agreement and plan of merger is approved by our shareholders at the special meeting. The merger will become effective upon the filing of articles of merger with the Department of Financial Institutions of the State of Wisconsin or at such later time as may be agreed by AAMG and Buyer and set forth in the articles of merger.

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 90 of 232    Document 1-1

## Merger Consideration

The agreement and plan of merger provides for an enterprise value of AAMG of $86,000,000.

Upon completion of the merger, the outstanding shares of common stock (other than shares of common stock held by dissenting shareholders) will be converted into the right to receive an aggregate sum equal to $86,000,000, minus the amount of certain obligations of AAMG to redeem shares of common stock from certain former shareholders, and minus the amount of certain transaction-related expenses of AAMG.

The Company estimates that, as of the date of this information statement, without giving effect to amounts of the merger consideration to be deposited into the escrow account and administrative expense account described below, the merger consideration into which each share of common stock (other than shares of common stock held by the ESOP) will be converted will be equal to approximately $1,450 to $1,475 (approximately $1,175 to $1,200 net of the amount deposited in the escrow account and administrative expense account). Please note that these figures are estimates only and are based on certain assumptions. Please see the agreement and plan of merger for additional details.

## Employee Arrangements

In addition to the merger consideration, certain of the executive officers and managing directors of the Company and its subsidiaries, including Joseph P. Zvesper and Kimberly Russo, each of whom also serves as a director of the Company, will enter into arrangements with Buyer that provide for, among other benefits, a retention bonus payment, payable in cash and/or partnership units of the parent holding company of Buyer, following the completion of a two- or three-year period of continued employment with Buyer or upon a termination of employment by Buyer other than for cause or by the recipient for good reason. Each recipient will also be required to enter into a restrictive covenant agreement pursuant to which the recipient will agree, among other things, not to compete with Buyer and its affiliates for a specified period. The aggregate amount of the retention bonus payments will not exceed $12,000,000, which amount will be allocated among 33 recipients in amounts ranging from 50% to 250% of each recipient's base salary with Buyer.

In addition, Mr. Zvesper and Ms. Russo will each be party to an employment agreement with Buyer, pursuant to which Mr. Zvesper and Ms. Russo will be employed by Buyer in the position of Executive Vice Chairman and Managing Director, Finance, respectively. Mr. Zvesper will receive an annual base salary of $1,000,000, and Ms. Russo will receive an annual base salary of $500,000. Neither Mr. Zvesper nor Ms. Russo will be eligible to participate in any incentive compensation program of Buyer. As a result, Mr. Zvesper's and Ms. Russo's total annual compensation while employed by Buyer will be substantially less than their current total annual compensation as employees of the Company.

## Escrow Account and Administrative Expense Account

The merger consideration to be received by shareholders (other than the ESOP) at the closing will be reduced by (i) $12,000,000, which will be deposited into an interest-bearing escrow account for the purpose of securing the shareholders' potential obligations to indemnify Buyer and Merger Sub under the indemnification provisions of the agreement and plan of merger, and (ii) $1,000,000, which will be deposited into a non-interest bearing escrow account for the purpose of providing the shareholders' representative (who is expected to be Joseph P. Zvesper) with funds to cover costs and expenses incurred on behalf of the shareholders from and after the closing. These reductions will apply to each shareholder (other than the ESOP) based on their pro rata share, which is an amount specified pursuant to the terms of the agreement and plan of merger and calculated based on the number of shares of common stock that a

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 91 of 232   Document 1-1

shareholder (other than the ESOP) owns in relation to the total number of shares of common stock (other than shares of common stock held by the ESOP) outstanding as of the closing.

To the extent not necessary to make an indemnification payment to Buyer or Merger Sub under the agreement and plan of merger, any remaining balance of the escrow amount will be distributed to the shareholders (other than the ESOP) based on their pro rata share as described above. To preserve rights relative to the escrow amount, Buyer and Merger Sub must submit a valid claim with respect to most indemnification payments prior to the date that is 18 months after the closing (except for certain specified indemnification claims described below for which the time period to submit a claim is 60 months). Except as described in the following paragraph, on the date that is 60 months following the closing, the balance of the escrow amount will be distributed to the shareholders (other than the ESOP) based on their pro rata share as described above.

Certain subsidiaries of the Company are currently party to litigation in Italy and Thailand and are subject to threatened litigation in Germany and Italy. If, on the date that is 60 months following the closing, one or both of the Italy and Thailand litigations remain pending, then, subject to the terms and conditions set forth in the agreement and plan of merger and Exhibit 8.4 thereto, up to $8,000,000 may be retained in the escrow account until the final resolution of both litigations. If, on the date that is 60 months following the closing, both the Italy and Thailand litigations have reached a final resolution, but one or both of the two litigations threatened against subsidiaries of the Company in Germany and Italy have resulted in litigation that remains pending, then, subject to the terms and conditions set forth in the agreement and plan of merger and Exhibit 8.4 thereto, up to $2,000,000 may be retained in the escrow account until the final resolution of such pending litigation. Following the final resolution of the Italy and Thailand litigations and any threatened litigation in Germany or Italy that has resulted in litigation, and the related escrow disbursement (at or after the date that is 60 months following the closing), the entire amount then remaining in the escrow account will be distributed to the shareholders (other than the ESOP) based on their pro rata share as described above. Similarly, to the extent not necessary to satisfy fees and expenses incurred by the shareholders' representative in connection with the performance of his rights and duties under the agreement and plan of merger, any balance of the $1,000,000 administrative expense amount will be distributed to the shareholders (other than the ESOP) based on their pro rata share as described above.

Buyer has required as a condition to its willingness to enter into the agreement and plan of merger that the ESOP terminate immediately upon the closing. As a result, the ESOP cannot participate in the escrow account or the administrative expense account, and the merger consideration received by the ESOP at the closing will therefore not be reduced by the ESOP's pro rata share of the escrow amount and administrative expense amount. Similarly, the ESOP will not be entitled to any portion of any subsequent distribution of the escrow amount or administrative expense amount. The merger consideration to be received by the ESOP will, however, be reduced by the amount of fees and expenses payable to the ESOP Trustee, as well as the amount of all fees and expenses incurred by the ESOP Trustee in connection with the merger, including the fees and expenses of counsel to the ESOP Trustee and the ESOP financial advisor. The ESOP financial advisor will render a fairness opinion to the ESOP Trustee with respect to the fairness to ESOP participants, from a financial point of view, of the transactions contemplated by the agreement and plan of merger.

**Representations and Warranties**

The agreement and plan of merger contains customary representations and warranties made by AAMG, which include representations and warranties with respect to, among other things, (i) corporate organization and qualification, (ii) authorization, (iii) no conflict or violation, (iv) capitalization, (v) subsidiaries, (vi) financial statements, (vii) tax matters, (viii) accounts receivable, (ix) absence of certain

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 92 of 232   Document 1-1

changes or events, (x) litigation, (xi) compliance with laws and orders, (xii) licenses and permits, (xiii) real and personal property, (xiv) material contracts, (xv) employee benefit plans, (xvi) intellectual property rights, (xvii) insurance, (xviii) labor, (xix) regulatory matters and (xx) affiliate transactions.

In addition, Buyer and Merger Sub make customary representations and warranties with respect to, among other things, (i) organization and qualification, (ii) authorization, (iii) no conflict or violation, (iv) litigation, (v) capitalization of Merger Sub and (vi) financial capacity.

By submitting a letter of transmittal, each shareholder will make certain representations and warranties with respect to, among other things, (i) ownership of common stock, (ii) organization (to the extent a shareholder is a trust) and authorization, (iii) no conflict or violation and (iv) consents and approvals. Each shareholder should carefully review the letter of transmittal prior to signing and submitting a letter of transmittal to AAMG.

**Pre-Closing Covenants and Agreements**

During the period between signing the agreement and plan of merger and the closing of the transaction, the agreement and plan of merger provides that the parties will take certain actions or refrain from taking certain actions, including, among other things, that AAMG will seek to obtain the approval of its shareholders to the adoption of the agreement and plan of merger and the merger. In addition and among other covenants set forth in the agreement and plan of merger, (i) AAMG must conduct its business in the ordinary course and may not take certain actions without Buyer's consent, (ii) each party agrees to use its reasonable best efforts to effect all necessary filings, notices and submissions of information with, and to obtain all necessary approvals from, any person or entity, including any governmental entity, (iii) AAMG agrees that neither it nor its officers, directors or authorized representatives will solicit, initiate or encourage or participate in any discussions or negotiations regarding any inquiries or the making of any proposal or offer with respect to any merger, acquisition or similar transaction involving a substantial portion of the assets or any equity securities of AAMG or any of its subsidiaries and (iv) AAMG and Buyer agree to promptly notify one another and keep one another apprised of any litigation, arbitration, investigation or similar proceeding pending or threatened that challenges the transactions contemplated by the agreement and plan of merger.

**Closing Conditions**

*Conditions to the Obligations of Buyer.* The obligation of Buyer to complete the merger in accordance with the agreement and plan of merger is subject to the satisfaction of certain conditions, including the following:

- the agreement and plan of merger must be approved by the AAMG shareholders as required by law;

- the ESOP participants must approve the agreement and plan of merger in a separate "pass through" vote conducted by the ESOP Trustee, and certain other matters pertaining to the ESOP must be completed;

- AAMG must perform and comply in all material respects with its obligations and covenants to be performed or complied with prior to the closing;

- there must not have been an event or series of events, including any breach of any representation and warranty made by AAMG in the agreement and plan of merger, that has

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 93 of 232   Document 1-1

had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, financial condition or results of operations of AAMG; and

- no injunction or other law or order will have the effect of making the merger illegal or otherwise prohibiting the completion of the merger.

*Conditions to the Obligations of AAMG.* The obligation of AAMG to complete the merger in accordance with the agreement and plan of merger is subject to the satisfaction of certain conditions, including the following:

- the agreement and plan of merger must be approved by the AAMG shareholders as required by law;

- the ESOP participants must approve the agreement and plan of merger in a separate "pass through" vote conducted by the ESOP Trustee, and certain other matters pertaining to the ESOP must be completed;

- Buyer and Merger Sub must perform and comply in all material respects with their respective obligations and covenants to be performed or complied with prior to the closing; and

- no injunction or other law or order will have the effect of making the merger illegal or otherwise prohibiting the completion of the merger.

**Termination**

The agreement and plan of merger and the obligations to complete the merger may be terminated by AAMG and Buyer upon the occurrence of certain events, including the following:

- by the written agreement of AAMG and Buyer;

- by either party if the merger is not completed on or before April 30, 2015 or such other date as the parties agree in writing;

- by either party if any governmental entity issues a law or order, or refuses to grant any required consent or approval, that has the effect of making the merger illegal or that otherwise prohibits the completion of the merger;

- by either party if the other party breaches any of the representations and warranties made in the agreement and plan of merger or fails to perform any covenant or agreement set forth in the agreement and plan of merger and such breach or failure is not curable and results in the inability to satisfy certain conditions to the completion of the merger described above; or

- by either party if the AAMG shareholders fail to approve the agreement and plan of merger as required by law.

**Indemnification**

*By the Shareholders.* If the closing occurs, and subject to certain limitations, the shareholders will indemnify Buyer and Merger Sub for all losses resulting from (i) any breach of any representation or warranty (other than a fundamental representation or warranty) made by AAMG in the agreement and plan of merger, (ii) any breach of any fundamental representation or warranty (organization and

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 94 of 232   Document 1-1

qualification, authority, capitalization and subsidiaries) made by AAMG in the agreement and plan of merger, (iii) any breach of any covenant made by AAMG in the agreement and plan of merger that was required to be complied with at or prior to the closing, (iv) any unpaid transaction-related expenses incurred by AAMG at or prior to the closing, (v) certain tax matters, including, subject to certain limitations, any liability of AAMG for unpaid income taxes relating to pre-closing periods, (vi) claims by any AAMG shareholder that chooses to exercise dissenters' rights (net of the amount such shareholder would have received as consideration in the merger), (vii) claims by any AAMG shareholder arising out of any actual inaccuracy of Exhibit 11.15(c) to the agreement and plan of merger, which sets forth each shareholder's pro rata ownership of common stock as described above, (viii) any undisclosed indebtedness of AAMG or its subsidiaries, (ix) either of the two litigations to which subsidiaries of the Company are party in Italy and Thailand, and (x) either of the two litigations threatened against subsidiaries of the Company in Germany and Italy (we refer to items (ii) through (x) collectively as the dollar-one indemnities). **Importantly, other than with respect to actual common law fraud, Buyer's sole source of indemnification under the agreement and plan of merger will be recovery from the $12 million escrow amount, and Buyer may not seek indemnification from any individual shareholder or in any amount in excess of the escrow amount.**

*Limitations on Loss.* In addition to limiting the recovery of Buyer and Merger Sub to the escrow amount, the indemnification obligations of the shareholders contained in the agreement and plan and merger are subject to other limitations, including the following:

- (i) the obligation to pay losses in connection with breaches of representations and warranties (other than fundamental representations and warranties) will survive the completion of the merger for a period of 18 months, (ii) the obligation to pay losses in connection with breaches of covenants of the Company required to be performed at or prior to the closing and claims by any AAMG shareholder that chooses to exercise dissenters' rights will survive the completion of the merger for a period of 12 months, (iii) the obligation to pay losses in connection with the dollar-one indemnities (other than as set forth in clause (iv) below) will survive the completion of the merger for a period of 60 months, and (iv) the obligation to pay losses in connection with the two litigations to which subsidiaries of the Company are party in Italy and Thailand and the two litigations threatened against subsidiaries of the Company in Germany and Italy (if one or both of such threatened litigations has resulted in litigation) will survive the completion of the merger until the applicable litigation has been finally resolved;

- except for the dollar-one indemnities (other than pre-closing income taxes), the shareholders will not have any liability for losses for any individual item or group of items arising out of the same condition or circumstances where the losses are less than $25,000 (which we refer to as the de minimis threshold), and no such losses will be taken into consideration for purposes of determining whether the deductible described below has been reached;

- except for the dollar-one indemnities, the shareholders will not have any liability for losses until the aggregate amount of all losses exceeds $750,000 (which we refer to as the deductible). After the deductible is reached, subject to the $25,000 de minimis threshold and certain other limitations, the shareholders will be responsible to indemnify Buyer and Merger Sub for all losses, but only to the extent such losses exceed the amount of the deductible. For example, if Buyer were to incur an aggregate of $1,000,000 in losses (other than in connection with the dollar-one indemnities), assuming that each of the individual items of loss comprising such aggregate amount exceed $25,000, then the shareholders' indemnification obligations would be $250,000; and

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 95 of 232   Document 1-1

- other than for actual common law fraud, the shareholders will not have any obligation to indemnify Buyer or Merger Sub for any amount of losses suffered by Buyer or Merger Sub in excess of the then remaining balance of the escrow amount.

*By Buyer and the Surviving Corporation.* If the closing occurs, and subject to certain limitations, Buyer and the surviving corporation will indemnify the shareholders for all losses resulting from (i) any breach of any representation and warranty made by Buyer and Merger Sub in the agreement and plan of merger and (ii) any breach of any covenant made by Buyer and Merger Sub (or the surviving corporation) in the agreement and plan of merger.

*Letters of Transmittal.* Notably, if any shareholder breaches the representations and warranties set forth in its letter of transmittal, then Buyer may pursue a claim for such breach directly against that shareholder, without regard to any of the provisions of the agreement and plan of merger (or the escrow amount).

## Shareholders' Representative

By signing and submitting a letter of transmittal, each shareholder appoints Joseph P. Zvesper as the "shareholders' representative." The shareholders' representative is authorized and appointed by each shareholder as its exclusive agent and attorney-in-fact to do any and all things and to execute any and all transaction agreements in such shareholder's name with respect to all matters that are the subject of the agreement and plan of merger and the escrow agreement. Buyer may deal exclusively with the shareholders' representative in respect of the agreement and plan of merger and the escrow agreement. Each shareholder waives any and all claims against the shareholders' representative arising out of or in connection with his actions or failures to act in the capacity of the shareholders' representative under or in connection with the agreement and plan of merger and the escrow agreement, except as may be caused by willful misconduct of the shareholders' representative. Further, each shareholder (other than the ESOP), in accordance with his or her pro rata share as described above, agrees to indemnify and hold harmless the shareholders' representative against any loss, liability or expense incurred without willful misconduct by the shareholders' representative in connection with the performance of his duties under the agreement and plan of merger.

## Transaction Agreements and Additional Information

The agreement and plan of merger, including the form of letter of transmittal, is attached as Exhibit A to this information statement. For convenience purposes, the other exhibits to the agreement and plan of merger and the company disclosure schedule referenced in the agreement and plan of merger are not attached to or included with this information statement. We urge you to read the agreement and plan of merger in its entirety.

AAMG's executive officers and directors will make themselves available to answer any reasonable questions from any shareholder. Questions regarding the merger should be directed to Joseph P. Zvesper, the Company's Chairman & Chief Executive Officer, at +1 (414) 225-1034 or via email at jzvesper@american-appraisal.com. Each shareholder of record as of January 30, 2015 may request to review financial information of the Company at the Company's facilities prior to the special meeting by delivering a written request to Joseph P. Zvesper at least five days prior to the special meeting.

The foregoing summary is qualified in its entirety by reference to the agreement and plan of merger, the exhibits to the agreement and plan of merger, the company disclosure schedule and all other transaction documents.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 96 of 232   Document 1-1

## SURRENDER OF CERTIFICATES AND PAYMENT OF CONSIDERATION

We will provide shareholders with instructions describing the process for surrendering stock certificates in order to receive the applicable portion of the merger consideration, without interest and less applicable withholding tax. Among other items, these instructions will require shareholders to complete and return to AAMG a letter of transmittal in the form that we will provide. Shareholders who do not believe the merger consideration is reflective of the "fair value" of their shares may elect not to surrender their shares in exchange for the applicable portion of the merger consideration and may instead seek to exercise dissenters' rights as described below.

Shareholders that do not seek to exercise dissenters' rights must comply with these instructions if they wish to surrender stock certificates in order to receive the applicable portion of the merger consideration, without interest and less applicable withholding tax. Shareholders that seek to exercise dissenters' rights must comply with Sections 180.1301 through 180.1331, or Subchapter XIII, of the Wisconsin Business Corporation Law (known as the WBCL), a copy of which is attached as Exhibit B to this information statement and which is briefly summarized below.

## DISSENTERS' RIGHTS

Under Sections 180.1301 through 180.1331, or Subchapter XIII, of the WBCL, dissenters' rights are available, subject to the procedures described in those statutes, to record holders of shares of our common stock and beneficial shareholders who object to the merger and demand payment of the "fair value" of their shares in cash in connection with the completion of the merger. For purposes of the WBCL, the "fair value" of a dissenting shareholder's shares means the value of the shares immediately prior to the effective time of the merger, excluding any appreciation or depreciation in anticipation of the merger unless exclusion would be inequitable.

Dissenting shareholders are required to follow certain procedures set forth in the WBCL to receive in cash the fair value of their shares. Set forth below is a brief summary of those procedures, which does not purport to be complete and is qualified by reference to the actual statutes. Subchapter XIII is reprinted in its entirety as Exhibit B to this information statement, and the summary contained in this information statement is qualified by reference to the full text of Exhibit B. **Shareholders should read Exhibit B for a description of all statutory provisions related to dissenters' rights.**

Pursuant to Section 180.1321 of the WBCL, any shareholder or beneficial shareholder desiring to assert dissenters' rights must do the following: (i) deliver to AAMG, before the vote to approve the agreement and plan of merger is taken, written notice of such dissenting shareholder's intent to demand payment for his or her shares if the proposed agreement and plan of merger is consummated; and (ii) not vote in favor of the agreement and plan of merger. Such written notice should be sent to AA Management Group, Inc., c/o Foley & Lardner LLP, 777 East Wisconsin Avenue, Milwaukee, WI 53202, Attention: Bryan S. Schultz. **A vote against approval of the agreement and plan of merger, in person or by proxy, will not in and of itself constitute a notice of intent to demand payment satisfying the requirements of Subchapter XIII.** A dissenting shareholder who fails to satisfy either or both of clauses (i) and (ii) above will not be entitled to payment for such shares under Subchapter XIII.

A shareholder or beneficial shareholder generally must assert dissenters' rights for all shares that the shareholder beneficially owns. A record shareholder may assert dissenters' rights as to fewer than all of the shares registered in the record shareholder's name only if the record shareholder dissents with respect to all shares beneficially owned by any one person and notifies AAMG of that person's name and address. A beneficial shareholder asserting dissenters' rights must, with respect to all shares of which he

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 97 of 232   Document 1-1

or she is the beneficial owner, submit to AAMG the written consent of the record shareholder with respect to those shares no later than the time that the beneficial shareholder asserts dissenters' rights.

No later than ten days after the agreement and plan of merger is approved at the special meeting, AAMG will send a written dissenters' notice to each of its shareholders who has dissented to the agreement and plan of merger in accordance with Section 180.1321 of the WBCL. Upon delivery of such notice, each dissenting shareholder will have 30 days to demand payment in writing and deposit the certificate or certificates representing such shares with respect to which he or she has dissented. A dissenting shareholder who does not demand payment within the designated time period is not entitled to payment for his or her shares under Subchapter XIII. A shareholder or beneficial shareholder with share certificates who does not deposit his or her certificates where required and by the date set forth in the dissenters' notice similarly will not be entitled to payment under Subchapter XIII.

Upon receipt of a payment demand or the effective time of the merger, whichever is later, AAMG will pay each dissenting shareholder who has properly perfected his or her dissenters' rights the amount that AAMG estimates to be the fair value of such shares, plus accrued interest, as provided in Section 180.1325 of the WBCL. A dissenting shareholder who does not agree with AAMG's estimate of the fair value of his or her shares or the amount of interest due must notify AAMG of his or her estimate in writing within 30 days after AAMG made or offered payment for such shares. If the dissenting shareholder and AAMG cannot agree upon the fair value of the shares or amount of interest due, then AAMG must file a petition in the circuit court for the county in which its principal office is located requesting a finding and determination of the fair value of such shares and the accrued interest thereon. If AAMG fails to institute such a proceeding within 60 days after the dissenting shareholder notifies AAMG of his or her disagreement, then AAMG must pay each dissenting shareholder whose demand remains unsettled the amount demanded by such shareholder. See Sections 180.1330 and 180.1331 of the WBCL in Exhibit B for the statutory provisions governing such a court proceeding.

## TAX CONSEQUENCES

This summary is of a general nature and is provided solely for informational purposes. This summary is not intended to be, and should not be construed to be, legal or tax advice. No representation with respect to the tax consequences to any particular shareholder is made. You should consult your own advisors with respect to your particular circumstances.

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 98 of 232    Document 1-1

## General

Below is a summary of the material United States federal income tax consequences of the merger applicable to a U.S. person (as defined below) holding our company common stock whose shares of company common stock are converted into cash pursuant to the merger. This summary is based upon current provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated under the Code, rulings, pronouncements, judicial decisions and administrative interpretations of the Internal Revenue Service, all of which are subject to change, possibly on a retroactive basis, at any time by legislative, judicial or administrative action. This summary is limited to U.S. persons that hold our stock as capital assets within the meaning of Section 1221 of the Code for federal income tax purposes (generally, assets held for investment) and does not address the tax treatment of dissenting shareholders. No ruling has been or will be sought from the Internal Revenue Service regarding the income or other tax consequences of the merger, and no assurance can be given that the Internal Revenue Service will not challenge the conclusions stated below or will not assert, or that a court will not sustain, a position contrary to any of the income tax consequences described below.

This summary does not purport to be a complete analysis of all the potential U.S. federal income tax effects and does not address all of the tax consequences that may be relevant to a particular shareholder in light of his or her individual circumstances. Without limiting the generality of the foregoing, this summary does not address the effect of any special rules applicable to certain types of holders, including, without limitation, non-U.S. persons, persons who hold our stock as part of a straddle, hedge, conversion transaction or other risk reduction or integrated investment transaction, tax-exempt entities, broker-dealers, traders in securities who elect the mark-to-market method of accounting for their securities, financial institutions, regulated investment companies, insurance companies, S-corporations, partnerships and other pass-thru entities, trusts and persons who hold our stock pursuant to a compensatory arrangement with us or beneficially through the ESOP.

In addition, this summary does not address the tax consequences of the merger under any U.S. state or local or other tax laws, any U.S. federal estate and gift tax laws (or Medicare tax on unearned income), any foreign tax laws or any tax treaties.

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) is a holder of company common stock, the tax treatment of a partner in the partnership or any equity owner of such other entity will generally depend upon the status of the person and the activities of the partnership or other entity treated as a partnership for United States federal income tax purposes.

The term "U.S. person" means a beneficial owner of our stock that is:

- an individual who is a citizen of the United States or who is a resident alien of the United States for U.S. federal income tax purposes;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) organized under the laws of the United States, any state or the District of Columbia; or

- a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or if a valid election is in effect under applicable Treasury Regulations to be treated as a U.S. person.

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 99 of 232    Document 1-1

Each U.S. holder of company common stock is urged to consult his or her tax advisor as to the particular tax consequences to such holder of the merger, including the applications of state, local and foreign tax laws and possible tax law changes.

**Circular 230 Disclosure**

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE CODE; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE MATTERS ADDRESSED BY THE WRITTEN ADVICE HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**U.S. Federal Income Tax Consequences to U.S. Persons Generally**

Generally (and subject to the discussion below), a U.S. person whose shares of company common stock are converted into cash in the merger will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount realized in connection with the merger and such U.S. person's adjusted tax basis in the shares of company common stock that are surrendered.

Generally, gain or loss recognized by such U.S. person will be capital gain or loss, which will be long-term capital gain or loss if the holding period for the shares of our stock exceeds one year at the time of the merger. Long-term capital gains recognized by an individual are generally subject to tax at reduced rates. In addition, there are limits on the deductibility of capital losses. The amount and character of gain or loss must be determined separately for each block of our stock converted into cash in the merger.

**Installment Method of Accounting**

Because a U.S. person may receive, in part, consideration pursuant to the merger that will be paid following the close of the taxable year in which the merger is consummated, the holder may be eligible to report gain realized on the disposition of company common stock under the "installment method" of accounting for U.S. federal income tax purposes. If the installment method is available and the holder does not elect out of such treatment, a U.S. person generally would recognize capital gain in each year that such holder receives a payment in connection with the merger for his, her or its company common stock in an amount equal to the difference, if any, between (i) the total of such payments received in such taxable year, and (ii) the portion of the U.S. person's adjusted tax basis in the company common stock allocated to the payments. The holder's adjusted tax basis will be allocated to each payment in the same proportion as such payment bears to all payments, both non-contingent and contingent, provided for under the agreement and plan of merger. In doing so, the holder must assume that all future contingent payments will be received. Therefore, if any such contingent payments are not actually paid, the holder could be required to recompute the balance of gain to be recognized. Any tax basis not recovered may constitute a capital loss once it is determined that no such payments will be received. The deductibility of capital losses is subject to certain limitations.

A U.S. holder that is otherwise eligible to report gain on the sale of company common stock under the installment method of accounting may elect not to have the installment method rules apply. A holder making such an election generally will recognize in the year of the sale capital gain or loss equal to the difference, if any, between (i) the sum of cash received in the merger and the fair market value of expected future payments and (ii) the U.S. holder's adjusted tax basis in the shares surrendered. Such

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 100 of 232   Document 1-1

capital gain or loss will be long-term or short-term capital gain or loss depending upon the holder's holding period for his, her or its company common stock, as described in the preceding paragraph.

A stockholder that reports gain under the installment method may be required to pay interest on the deferred tax liability. In general, the total face amount of all installment obligations (including the right to receive subsequent payments) exceeds, at the close of any taxable year, $5,000,000, interest is required to be paid to the Internal Revenue Service on the deferred tax liability.

The application of the installment sale rules is complex and depends on each holder's specific situation. U.S. persons should contact their tax advisors concerning the applicability of the installment method to their sales of company common stock and the advisability of electing out of such treatment.

*Portion of Consideration Treated as Imputed Interest*

As noted above, pursuant to the agreement and plan of merger, holders of company common stock may receive consideration in the form of cash following the close of the taxable year in which the conversion of their company common stock occurs. A portion of such cash received by a U.S. holder will be treated as interest for U.S. federal income tax purposes that must be accounted for in accordance with the Code. The amount of imputed interest is equal to the excess of (i) the amount of cash received over (ii) the present value of such amount described in clause (i) as of the closing date, discounted at the applicable federal rate in effect at the closing date. The portion of such payments characterized as interest will be taxed as ordinary income.

**Backup Withholding and Information Reporting**

In general, information reporting requirements will apply to cash received by a U.S. person in connection with the merger. This information reporting obligation, however, does not apply with respect to certain U.S. persons. If a U.S. person subject to the reporting requirements fails to supply its correct taxpayer identification number in the manner required by applicable law or is notified by the Internal Revenue Service that it has failed to properly report payments of interest and dividends, a backup withholding tax at a rate of 28% generally will be imposed on the amount of the cash received. A U.S. person may generally credit any amounts withheld under the backup withholding provisions against its U.S. federal income tax liability, which may entitle the U.S. person to a refund, provided that the required information is furnished to the Internal Revenue Service. Such amounts, once withheld, are not refundable by AAMG.

**GENERAL**

Our board of directors does not know of any other matter to come before the special meeting. Your cooperation in giving this matter your immediate attention will be appreciated.

By Order of Our Board of Directors,

Joseph P. Zvesper
Chairman and Chief Executive Officer

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 101 of 232    Document 1-1

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Agreement and Plan of Merger |
| Exhibit B | - | Dissenters' Rights Statutes |



**Exhibit A**

**Agreement and Plan of Merger**

See attached.

TEMPORARILY SEALED

4839-3580-5217.7

17

AGREEMENT AND PLAN OF MERGER

AMONG

DUFF & PHELPS, LLC,

D&P ALABAMA ACQUISITION CORP.,

AA MANAGEMENT GROUP, INC.

and

SHAREHOLDERS' REPRESENTATIVE

dated as of

January 30, 2015

TEMPORARILY SEALED

4835-2058-0896.15

# TABLE OF CONTENTS

Page

**ARTICLE 1 THE MERGER**................................................................................... 2
Section 1.1.    Merger ................................................................................ 2
Section 1.2.    Closing ............................................................................... 3
Section 1.3.    Effective Time..................................................................... 3
Section 1.4.    Effects of the Merger........................................................... 3
Section 1.5.    Articles of Incorporation ..................................................... 3
Section 1.6.    Bylaws ................................................................................ 3
Section 1.7.    Directors and Officers ......................................................... 3
Section 1.8.    Effect on Capital Stock........................................................ 3
Section 1.9.    Stock Transfer Books .......................................................... 4
Section 1.10.   Lost Certificates ................................................................. 4
Section 1.11.   Surrender and Payment Procedures...................................... 4
Section 1.12.   Dissenting Shares ............................................................... 5

**ARTICLE 2 MERGER CONSIDERATION; PAYMENT**................................ 5
Section 2.1.    Merger Consideration.......................................................... 5
Section 2.2.    Payment of Merger Consideration ....................................... 5
Section 2.3.    Payment of Company Transaction Expenses ......................... 6
Section 2.4.    Tax Treatment of Certain Payments...................................... 6

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES**............................. 7
Section 3.1.    Representations and Warranties of the Company ................... 7
Section 3.2.    Representations and Warranties of Buyer and Merger Sub ......... 21
Section 3.3.    No Other Representations or Warranties ............................... 22

**ARTICLE 4 COVENANTS PRIOR TO THE CLOSING**............................... 23
Section 4.1.    Company Requisite Shareholder Vote ................................... 23
Section 4.2.    Pre-Closing Access to Information; Confidentiality................ 23
Section 4.3.    Conduct of Business Pending the Closing ............................. 24
Section 4.4.    Further Actions................................................................... 26
Section 4.5.    Exclusivity......................................................................... 26
Section 4.6.    Notification of Litigation..................................................... 27

**ARTICLE 5 ADDITIONAL COVENANTS**.................................................. 27
Section 5.1.    Post-Closing Access to Information...................................... 27
Section 5.2.    Employee Matters............................................................... 28
Section 5.3.    Directors, Officers and Employees ...................................... 29
Section 5.4.    Intermediary Transaction ................................................... 31
Section 5.5.    Merger Sub Compliance...................................................... 31
Section 5.6.    Further Assurances............................................................. 31
Section 5.7.    Special Litigation Matters Escrow ....................................... 31
Section 5.8.    Tax Matters ....................................................................... 33

4835-2058-0896.15

**ARTICLE 6 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER AND MERGER SUB** ......................................................................................... 36
    Section 6.1.   Accuracy of Representations and Warranties ............................................ 36
    Section 6.2.   Performance of Obligations ................................................................... 37
    Section 6.3.   Delivery of Documents ......................................................................... 37
    Section 6.4.   No Legal Prohibition ............................................................................ 37
    Section 6.5.   Company Requisite Shareholder Vote ..................................................... 37
    Section 6.6.   Company Material Adverse Effect ........................................................... 37
    Section 6.7.   ESOP Matters ..................................................................................... 37

**ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY** ......... 37
    Section 7.1.   Accuracy of Representations and Warranties ............................................ 37
    Section 7.2.   Performance of Obligations ................................................................... 38
    Section 7.3.   Delivery of Certain Payments and Documents ........................................... 38
    Section 7.4.   No Legal Prohibition ............................................................................ 38
    Section 7.5.   Company Requisite Shareholder Vote ..................................................... 38
    Section 7.6.   ESOP Matters ..................................................................................... 38

**ARTICLE 8 INDEMNIFICATION** ............................................................................... 38
    Section 8.1.   Indemnification by Shareholders ............................................................ 38
    Section 8.2.   Indemnification by Buyer ..................................................................... 41
    Section 8.3.   Procedures Relating to Indemnification Among Buyer and
                     Shareholders ..................................................................................... 41
    Section 8.4.   Procedures Relating to Indemnification for Third Party Claims ..................... 42
    Section 8.5.   Sole Source of Indemnification .............................................................. 43
    Section 8.6.   Exclusive Remedy ............................................................................... 43

**ARTICLE 9 DOCUMENTS TO BE DELIVERED AT THE CLOSING** ............................... 44
    Section 9.1.   Items to be Delivered by the Company .................................................... 44
    Section 9.2.   Items to be Delivered by Buyer .............................................................. 45

**ARTICLE 10 TERMINATION** .................................................................................... 46
    Section 10.1.  General ............................................................................................. 46
    Section 10.2.  Post-Termination Obligations ................................................................ 47
    Section 10.3.  Effect of Termination .......................................................................... 47

**ARTICLE 11 MISCELLANEOUS** ............................................................................... 47
    Section 11.1.  Shareholders' Representative ................................................................ 47
    Section 11.2.  Publicity ........................................................................................... 50
    Section 11.3.  Entire Agreement ............................................................................... 51
    Section 11.4.  Assignment ....................................................................................... 51
    Section 11.5.  Governing Law and Language ............................................................... 51
    Section 11.6.  Consent to Jurisdiction; Waiver of Jury Trial ........................................... 51
    Section 11.7.  Amendment ...................................................................................... 51
    Section 11.8.  Waiver ............................................................................................. 52
    Section 11.9.  Notice .............................................................................................. 52
    Section 11.10. Expenses .......................................................................................... 53
    Section 11.11. Company Disclosure Schedule ............................................................... 53
    Section 11.12. Conflicts and Privilege ........................................................................ 54

Section 11.13. Interpretive Provisions ............................................................... 55
Section 11.14. Definitions ................................................................................. 55

TEMPORARILY SEALED

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 107 of 232   Document 1-1

## EXHIBITS

| | | |
|---|---|---|
| Exhibit 1.7 | - | Surviving Corporation Officers |
| Exhibit 1.11 | - | Letter of Transmittal |
| Exhibit 4.3 | - | Conduct of Business Pending the Closing |
| Exhibit 8.4 | - | Special Indemnification Defense Schedule |
| Exhibit 9.1(b) | - | Form of Noncompetition Agreement |
| Exhibit 9.1(c) | - | Form of Compensation Agreement |
| Exhibit 9.1(f) | - | Resignations |
| Exhibit 11.13 | - | Company Knowledge |
| Exhibit 11.15(a) | - | Form of Escrow Agreement |
| Exhibit 11.15(b) | - | Key Employees |
| Exhibit 11.15(c) | - | Pro Rata Share |
| Exhibit 11.15(d) | - | Shareholder Liability Amount |

TEMPORARILY SEALED

# AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement") is made and effective as of January 30, 2015 by and among Duff & Phelps, LLC, a Delaware limited liability company ("Buyer"), D&P Alabama Acquisition Corp., a Wisconsin corporation ("Merger Sub"), AA Management Group, Inc., a Wisconsin corporation (the "Company"), and, solely in his capacity as Shareholders' Representative, Joseph P. Zvesper, an adult resident of the State of Wisconsin. Capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in Section 11.14.

WHEREAS, the Company and its Subsidiaries are engaged in the business of providing valuation and related services for business, financial, legal and tax purposes (the "Business");

WHEREAS, the Board of Managers of Buyer and the respective Boards of Directors of Merger Sub and the Company desire to enter into a transaction whereby Merger Sub will merge with and into the Company (the "Merger"), pursuant to which each issued and outstanding share of Common Stock, $0.01 par value per share, of the Company (the "Company Common Stock") not owned directly or indirectly by the Company will be cancelled and, as and to the extent set forth in this Agreement, converted into the right to receive a portion of the Merger Consideration as provided for herein;

WHEREAS, the Board of Managers of Buyer and the respective Boards of Directors of Merger Sub and the Company have approved this Agreement and the consummation of the transactions contemplated hereby, including the Merger;

WHEREAS, as a condition to its willingness to enter into this Agreement, Buyer has required that certain shareholders of the Company enter into a shareholder support agreement (the "Voting Agreements") with Buyer and Merger Sub, concurrently with the execution and delivery of this Agreement, which Voting Agreements shall become effective as of the date of this Agreement; and

WHEREAS, Buyer, Merger Sub and the Company desire to make certain representations, warranties and covenants in connection with, and to prescribe certain conditions to, the transactions contemplated by this Agreement, including the Merger.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and conditions set forth in this Agreement, and intending to be legally bound, the Parties agree as follows:

## ARTICLE 1

## THE MERGER

Section 1.1.    Merger.  Upon the terms and subject to the conditions set forth in this Agreement and in accordance with the Wisconsin Business Corporation Law (the "WBCL"), Merger Sub shall be merged with and into the Company at the Effective Time. Following the Effective Time, the Company shall continue as the surviving corporation (the "Surviving Corporation") and the separate corporate existence of Merger Sub shall terminate.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 109 of 232   Document 1-1

Section 1.2.    Closing.  Unless this Agreement shall have been terminated pursuant to Section 10.1, the consummation of the transactions contemplated by this Agreement (the "Closing") shall occur at the offices of Foley & Lardner LLP, 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, at 10:00 a.m., local time, on the third Business Day after the satisfaction or waiver of all of the conditions set forth in ARTICLE 6 and ARTICLE 7, other than conditions that, by their nature, will be satisfied at the Closing, or such other location, time and date as Buyer and the Company shall agree in writing (the actual date of the Closing is referred to as the "Closing Date").  The Parties intend that the pre-Closing and the Closing shall be effected, to the extent practicable, by conference call, the electronic delivery of documents and the prior physical exchange of certain other documents to be held in escrow by outside counsel to the recipient Party pending authorization by the delivering Party (or its outside counsel) of their release at the Closing.

Section 1.3.    Effective Time.  At the Closing, the Company shall file articles of merger (the "Articles of Merger") with the Department of Financial Institutions of the State of Wisconsin in such form as is required by, and executed in accordance with, the WBCL.  The Merger shall become effective at such time as the Articles of Merger are duly filed with the Department of Financial Institutions of the State of Wisconsin or at such subsequent time as Buyer and the Company shall agree and specify in the Articles of Merger (the time and date that the Merger becomes effective is referred to as the "Effective Time").

Section 1.4.    Effects of the Merger.  At and after the Effective Time, the Merger shall have the effects set forth in this Agreement and in the applicable provisions of the WBCL. From and after the Effective Time, the Surviving Corporation shall succeed to all the assets, rights, privileges, powers and franchises and be subject to all of the liabilities, restrictions, disabilities and duties of the Company and Merger Sub, all as provided under the WBCL.

Section 1.5.    Articles of Incorporation.  The articles of incorporation of Merger Sub, as in effect immediately prior to the Effective Time, shall be the articles of incorporation of the Surviving Corporation until thereafter amended in accordance with applicable Law. Notwithstanding the foregoing, the name of the Surviving Corporation shall be "AA Management Group, Inc." and the articles of incorporation of the Surviving Corporation shall so provide.

Section 1.6.    Bylaws.  The bylaws of Merger Sub, as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Corporation, until thereafter amended in accordance with applicable Law.

Section 1.7.    Directors and Officers.  The directors of Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, until the earlier of their resignation or removal or their respective successors are duly elected and qualified, as the case may be, in accordance with the articles of incorporation and bylaws of the Surviving Corporation. The individuals set forth in Exhibit 1.7 shall be the officers of the Surviving Corporation, until the earlier of their resignation or removal or their respective successors are duly elected and qualified, as the case may be, in accordance with the articles of incorporation and bylaws of the Surviving Corporation.

Section 1.8.    Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of any Shareholder, Buyer, Merger Sub, the Company or any holder of any of the following securities:

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 110 of 232   Document 1-1

(a)    Each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than shares to be canceled pursuant to Section 1.8(b) and Dissenting Shares as provided in Section 1.12) shall be cancelled and automatically converted into the right to receive a portion of the Merger Consideration determined in accordance with Section 2.2(c).

(b)    Each share of Company Common Stock that is owned directly or indirectly by the Company as treasury stock or otherwise immediately prior to the Effective Time shall be automatically canceled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(c)    Each share of common stock, par value $0.001 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one validly issued, fully paid and nonassessable share of common stock, par value $0.001 per share, of the Surviving Corporation and shall constitute the only outstanding shares of capital stock of the Surviving Corporation.

Section 1.9.    Stock Transfer Books.  The stock transfer books of the Company shall be closed immediately at the Effective Time with respect to all shares of Company Common Stock outstanding immediately prior to the Effective Time, and there shall be no further transfers of shares of Company Common Stock on the records of the Company.  After the Effective Time, any Certificates formerly representing shares of Company Common Stock presented to Buyer or the Surviving Corporation for any reason shall be cancelled and converted into the right to receive the applicable portion of the Merger Consideration with respect to the shares of Company Common Stock formerly represented thereby.

Section 1.10.    Lost Certificates.   If any certificate or other instrument that, immediately prior to the Effective Time, represented shares of Company Common Stock (a "Certificate") shall have been lost, stolen or destroyed, then, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, Buyer shall cause the Surviving Corporation to deliver to Shareholders' Representative (on behalf of such Person) in exchange for such lost, stolen or destroyed Certificate the applicable portion of the Merger Consideration, without any interest paid thereon, with respect to the shares of Company Common Stock formerly represented thereby.

Section 1.11.    Surrender and Payment Procedures.   Promptly after the Effective Time (but in no event later than three Business Days following the Effective Time), the Surviving Corporation shall mail to each Shareholder of record immediately prior to the Effective Time, excluding those Shareholders who have provided the Company with a completed Letter of Transmittal and, if applicable, related Certificate or affidavit of loss meeting the criteria set forth in Section 1.10 at or prior to the Closing, and excluding, for the avoidance of doubt, the Company and any Subsidiary of the Company or holders of Dissenting Shares who have not subsequently withdrawn or lost their rights of appraisal, a letter of transmittal in the form attached hereto as Exhibit 1.11 (the "Letter of Transmittal").  Upon surrender of a Certificate for cancellation to the Surviving Corporation or delivery of an affidavit of loss meeting the criteria set forth in Section 1.10, together with such Letter of Transmittal, duly executed and completed, and such other documents as may be reasonably required pursuant to the Letter of Transmittal, such Shareholder shall be entitled to receive a portion of the Merger Consideration determined in accordance with Section 2.2(c) of this Agreement and any Certificate so surrendered shall forthwith be cancelled.  No interest shall be paid

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 111 of 232   Document 1-1

or accrued on the Merger Consideration. If any payment of the Merger Consideration is to be made to a Person other than the Person in whose name the applicable surrendered Certificate is registered, then it shall be a condition to the payment of such Merger Consideration that (a) the Certificate so surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and delivered to the Surviving Corporation and (b) the Person requesting such payment shall have (i) paid any transfer and other Taxes required by reason of such payment in a name other than that of the registered holder of the Certificate surrendered or (ii) established to the reasonable satisfaction of Buyer that any such Taxes either have been paid or are not payable. Until surrendered as contemplated by this Section 1.11, each Certificate (other than shares to be canceled pursuant to Section 1.8(b) and Dissenting Shares as provided in Section 1.12) shall at any time after the Effective Time represent solely the right to receive upon such surrender the applicable portion of the Merger Consideration determined in accordance with Section 2.2(c).

Section 1.12. Dissenting Shares. Notwithstanding anything to the contrary in this Agreement, any shares of Company Common Stock issued and outstanding immediately prior to the Effective Time that are held by a holder who (i) has properly exercised his, her or its dissenters' rights in accordance with the WBCL and (iii) has not effectively withdrawn, failed to perfect or otherwise lost his, her or its rights to appraisal (collectively, the "Dissenting Shares"), shall not be converted as described in Section 1.8, but, at the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, shall be cancelled and shall be converted into the right to receive only such consideration as determined to be due to such holder as provided in the WBCL; provided, however, if such holder effectively withdraws his, her or its exercise of dissenters' rights or fails to perfect or otherwise loses his, her or its dissenters' rights, in any case, pursuant to the WBCL, then such holder's shares of Company Common Stock shall be treated as having been cancelled and to have been converted, as of the Effective Time, into the right to receive a portion of the Merger Consideration pursuant to Section 1.8(a), without any interest thereon, upon surrender of the Certificate or Certificates formerly representing such shares.

## ARTICLE 2

### MERGER CONSIDERATION; PAYMENT

Section 2.1. Merger Consideration. The aggregate amount of cash into which the shares of Company Common Stock described in Section 1.8(a) shall be converted upon the consummation of the Merger shall be an amount equal to $86,000,000 minus the sum of (i) the Shareholder Liability Amount and (ii) the Company Transaction Expenses (the "Merger Consideration").

Section 2.2. Payment of Merger Consideration. At the Closing or, if applicable in the case of subclause (c) below, on such later date as the applicable Letter of Transmittal is delivered to Buyer or the Surviving Corporation as indicated below, Buyer, on behalf of Merger Sub, shall deliver the Merger Consideration by wire transfer of immediately available funds free of costs and charges as follows:

(a) to the Escrow Agent for deposit in the Escrow Account, the Escrow Deposit;

(b) to the Shareholders' Representative for deposit in the Administrative Expense Account, the Administrative Expense Deposit;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 112 of 232   Document 1-1

(c)　　as and when contemplated by Section 1.11, to each Shareholder holding shares of Company Common Stock immediately prior to the Effective Time (for the avoidance of doubt, other than the Dissenting Shares and shares of Company Common Stock held by the ESOP) who has delivered a Letter of Transmittal (together with any Certificate or an affidavit of loss meeting the criteria set forth in Section 1.10 and such other documents as may be reasonably required pursuant to the Letter of Transmittal) to Buyer or the Surviving Corporation, into an account designated in such Letter of Transmittal, an amount equal to (i) the product of (A) the Per Share Merger Consideration multiplied by (B) the total number of shares of Company Common Stock held by such Shareholder, minus (ii) such Shareholder's Pro Rata Share of the Escrow Deposit, minus (iii) such Shareholder's Pro Rata Share of the Administrative Expense Deposit and minus (iv) the amount of employment-related Tax withholding imposed upon such Shareholder as a Current Employee or Former Employee of the Company in respect of payment therefor in accordance with Section 2.2(d);

(d)　　to the Company, the aggregate amount of employment-related Tax withholdings imposed upon each Shareholder who is or was an employee of the Company to the extent the amount paid to such Shareholder under Section 2.2(c) is reduced by such Tax withholding. For purposes of determining the amount of any employment-related Tax withholding imposed on a Shareholder, the Parties shall take the position that amounts attributable to each Shareholder's share of amounts in the Escrow Account and the Administrative Expense Account shall not be subject to Tax withholding until such amounts are released and payable to the Shareholder pursuant to the terms of the Escrow Agreement or Section 11.1(c), as the case may be; and

(e)　　as and when contemplated by Section 1.11, to the ESOP Trustee, into an account designated by the ESOP Trustee, an amount equal to the product of (i) the Per Share Merger Consideration multiplied by (ii) the total number of shares of Company Common Stock held by the ESOP.

(f)　　Notwithstanding anything to the contrary set forth in this Agreement, Buyer, Merger Sub, the Company and the Surviving Corporation will be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of shares of Company Common Stock such amounts as are required under the Code or any provision of state, local or foreign Tax Law. To the extent that amounts are so withheld by Buyer, Merger Sub, the Company or the Surviving Corporation, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the holder of shares of Company Common Stock in respect of which such deduction and withholding were made by Buyer, Merger Sub, the Company or the Surviving Corporation. The Parties shall cooperate in good faith to minimize the amount of any Taxes withheld.

Section 2.3.　　Payment of Company Transaction Expenses. At the Closing, Buyer, on behalf of Merger Sub, shall deliver to each of the recipients set forth in the applicable Payoff Letters, the Company Transaction Expenses.

Section 2.4.　　Tax Treatment of Certain Payments. Any indemnity payments made pursuant to Section 8.1(a) shall be deemed to be, and each of Buyer, the Surviving Corporation and the Shareholders shall treat such payments as, an adjustment to the Merger Consideration for Tax purposes, unless otherwise required by applicable Law.

Case 2:18-cv-00841-JPS　Filed 06/01/18　Page 113 of 232　Document 1-1

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Section 3.1. <u>Representations and Warranties of the Company</u>. As a material inducement for Buyer and Merger Sub to enter into this Agreement and except as set forth in the disclosure schedule delivered by the Company to Buyer and Merger Sub concurrently with the execution and delivery of this Agreement (the "<u>Company Disclosure Schedule</u>"), the Company represents and warrants to Buyer and Merger Sub as of the date hereof and as of the Closing as follows:

(a) <u>Organization and Qualification</u>. The Company and each of its Subsidiaries is a corporation or other entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization. Each of the Company and its Subsidiaries has all requisite company power, legal right and authority to own, operate and lease its properties and to carry on its business as and where it currently conducts its business. The Company and each of its Subsidiaries is duly qualified or licensed to do business as a foreign corporation or other entity and is in good standing in each jurisdiction wherein the character of the properties owned by it, or the nature of its business, makes such qualification or licensing necessary, except where the failure to be so qualified or licensed or in good standing would not, individually or in the aggregate, result in a liability that is material to the Company and its Subsidiaries taken as a whole. The Company has made available to Buyer complete and correct copies of the certificate of incorporation and by-laws (or similar organizational documents) of the Company and each of its Subsidiaries, each as amended to date. <u>Section 3.1(a)</u> of the Company Disclosure Schedule sets forth the directors (or managers) and officers of the Company and each of its Subsidiaries.

(b) <u>Authorization</u>.

(i) <u>Authority and Approval</u>. The Company has full power and authority to execute and deliver this Agreement and the Related Documents to which it is a party and, subject to receipt of the Company Requisite Shareholder Vote, to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Company of this Agreement and the Related Documents and the consummation by the Company of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of the Company (the "<u>Company Board</u>"). No other or further corporate act or proceeding on the part of the Company is necessary to authorize this Agreement or the Related Documents or the consummation by the Company of the transactions contemplated hereby and thereby, except, with respect to this Agreement and the transactions contemplated hereby (including the Merger), for the affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock (the "<u>Company Requisite Shareholder Vote</u>") and the ESOP Approval. This Agreement and each of the Related Documents has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement and each of the Related Documents by the other parties hereto and thereto, this Agreement and each of the Related Documents constitutes a valid and binding obligation of the Company, enforceable

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 114 of 232   Document 1-1

against the Company in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting creditors' rights generally and by general equitable principles (whether considered in a proceeding at Law or in equity) and in the discretion of the court before which any proceeding therefor may be brought.

(ii)     Recommendation.  The Company Board has unanimously, by resolutions duly adopted at a meeting duly called and held at which all directors were present and voted, which resolutions have not been rescinded, modified or withdrawn in any way, (A) approved, and declared advisable, this Agreement and the transactions contemplated by this Agreement, including the Merger, upon the terms and subject to the conditions set forth herein, (B) determined that this Agreement and the transactions contemplated by this Agreement, including the Merger, taken together, are at a price and on terms that are advisable and in the best interests of the Company and the Shareholders and (C) recommended that the Shareholders adopt this Agreement.

(c)     No Violation.  Neither the execution and delivery by the Company of this Agreement or the Related Documents nor the consummation by the Company of the transactions contemplated hereby and thereby (i) will violate or result in the violation of, or constitute a default under (whether with or without the giving of notice, lapse of time or both), any provision of any Law or Order applicable to the Company or any of its Subsidiaries or by which any material asset of the Company or any of its Subsidiaries is bound; (ii) will require any authorization, consent or approval by, filing with or notice to any Person (other than with respect to any Contract, which is covered exclusively by subclause (iv) in this Section 3.1(c)) or Governmental Entity, except for (A) the requirements of any Regulatory Law applicable to the transactions contemplated hereby, (B) the requirements of the WBCL with respect to the filing of the Articles of Merger and (C) such authorization, consent, approval, filing or notice requirements that become applicable solely as a result of the regulatory status of Buyer, Merger Sub or any of their respective Affiliates; (iii) will violate, conflict with, constitute a default under, or result in the automatic termination of, or accelerate the performance required by, any provision of the Restated and Amended Articles of Incorporation or Amended and Restated Bylaws of the Company or the equivalent organizational documents of any of its Subsidiaries; (iv) will materially breach or materially conflict with, or constitute a material default under (whether with or without the giving of notice, lapse of time or both), or give to the other party thereto (whether with or without the giving of notice, lapse of time or both) any right of termination or modification (or other material contractual right, including a right to any payment) under, the express terms of any Material Contract; or (v) will result in the creation of any Lien upon any of the capital stock or material assets of the Company or any of its Subsidiaries (excluding Liens created or suffered by Buyer or Merger Sub and Permitted Liens).

(d)     Capitalization.  The authorized capital stock of the Company consists entirely of (i) 50,000 shares of Preferred Stock, par value $0.01 per share, none of which are issued and outstanding, and (ii) 250,000 shares of Company Common Stock, of which 53,128.5579 shares of Company Common Stock are issued and outstanding and, as of the date of this Agreement, are owned beneficially and of record by the Shareholders in the

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 115 of 232   Document 1-1

respective amounts set forth in <u>Section 3.1(d)</u> of the Company Disclosure Schedule, which Schedule also sets forth the number of shares of Company Common Stock held by the ESOP in the aggregate and beneficially for each ESOP participant as of the date of this Agreement. All issued and outstanding shares of Company Common Stock have been duly authorized and validly issued, and are fully paid and nonassessable. The Company (a) has not issued securities convertible into or exchangeable for any capital stock or other equity securities of the Company, (b) has not issued options, warrants, preemptive rights, rights of first refusal or other rights to purchase or subscribe to any capital stock or other equity securities of the Company or securities that are convertible into or exchangeable for any capital stock or other equity securities of the Company and (c) is not party to any Contract relating to the repurchase, redemption, issuance, ownership, voting, sale, transfer or disposition of any capital stock or other equity securities of the Company, any such convertible or exchangeable securities or any such options, warrants, preemptive rights, rights of first refusal or other rights. Neither the Company nor any of its Subsidiaries owns any capital stock or other equity securities of any other Person.

(e) <u>Subsidiaries</u>. <u>Section 3.1(e)</u> of the Company Disclosure Schedule sets forth a correct and complete list of all direct and indirect Subsidiaries of the Company. The Company owns, directly or indirectly, all of the issued and outstanding shares of capital stock and other equity securities of each of its Subsidiaries, free and clear of all Liens (excluding Liens created or suffered by Buyer or Merger Sub and Permitted Liens). All issued and outstanding shares of capital stock and other equity securities of each Subsidiary that are owned, directly or indirectly, by the Company have been duly authorized and validly issued, and are fully paid and nonassessable. None of the Company's Subsidiaries (i) has issued securities convertible into or exchangeable for any capital stock or other equity securities of such Subsidiary, (ii) has issued options, warrants, preemptive rights, rights of first refusal or other rights to purchase or subscribe to any capital stock or other equity securities of such Subsidiary or securities that are convertible into or exchangeable for any capital stock or other equity securities of such Subsidiary or (iii) is party to any Contract relating to the repurchase, redemption, issuance, ownership, voting, sale, transfer or disposition of any capital stock or other equity securities of such Subsidiary.

(f) <u>Financial Statements</u>.

(i) <u>Section 3.1(f)(i)</u> of the Company Disclosure Schedule contains true and complete copies of (A) the audited consolidated financial statements (consisting of balance sheets, statements of income and comprehensive income, statements of cash flows, statements of shareholders' equity and notes to financial statements) of the Company and its Subsidiaries for each of the fiscal years ended March 31, 2014 and March 31, 2013, which financial statements have been reported on, and are accompanied by, the signed, unqualified opinion of PricewaterhouseCoopers LLP, independent accountants for the Company and its Subsidiaries for such years, and (B) an unaudited consolidated balance sheet of the Company and its Subsidiaries as of November 30, 2014 (the "<u>Recent Balance Sheet</u>") and unaudited consolidated statements of income and comprehensive income, cash flows, and shareholders' equity of the Company and its Subsidiaries for the eight months then ended (<u>subclauses (A)</u> and <u>(B)</u> collectively, the "<u>Financial Statements</u>"). The Financial Statements were prepared in accordance with GAAP, as in effect on the respective dates of the Financial Statements and

Case 2:18-cv-00841-JPS Filed 06/01/18 Page 116 of 232 Document 1-1

applied on a basis consistent with past practice (except as set forth in the notes to the audited Financial Statements), and fairly present, in all material respects, the consolidated financial condition and results of operations of the Company and its Subsidiaries as of the dates thereof and for the periods covered thereby (except in the case of the unaudited Financial Statements as of and for the period ended November 30, 2014, for normal year-end adjustments and the absence of footnote disclosure).

(ii)　　The Company's Net Working Capital is consistent with the normal operations of the Company's business.

(iii)　　Neither the Company nor any of its Subsidiaries has any material liabilities that would be required to be reflected or reserved against on a consolidated balance sheet of the Company and its Subsidiaries prepared in accordance with GAAP (as applied by the Company and its Subsidiaries on a consistent basis), other than (A) liabilities reflected or reserved against on the Recent Balance Sheet and (B) liabilities incurred in the ordinary course of business since the date of the Recent Balance Sheet.

(iv)　　As of the close of business on the Business Day immediately preceding the date of this Agreement, neither the Company nor any of its Subsidiaries had any outstanding Indebtedness.

(g)　　Tax Matters.

(i)　　Returns. The Company and each Subsidiary has filed (or has had filed on its behalf) all Tax Returns that it was required to file under applicable Laws and regulations. All such Tax Returns were correct and complete in all respects and were prepared in compliance with all applicable Laws and regulations. All Taxes due and owing by (or with respect to the operations of) the Company and each Subsidiary as of the date of the Recent Balance Sheet have been paid or accrued as of such date in accordance with GAAP, as in effect on the date of the Recent Balance Sheet and applied on a basis consistent with past practice. Neither the Company nor any Subsidiary is the beneficiary of any extension of time within which to file any Tax Return. Since January 1, 2012, neither the Company nor any of its Subsidiaries has received written notice from any Governmental Entity in a jurisdiction in which the Company or a Subsidiary does not file Tax Returns that the Company or such Subsidiary, as applicable, is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings) upon any of the assets of the Company or any Subsidiary.

(ii)　　Audits. As of the date of this Agreement, (A) there is no audit examination, deficiency or proposed adjustment pending or, to the knowledge of the Company, threatened with respect to any Tax Returns filed or Taxes due and owing by the Company or any of its Subsidiaries, and (B) there are no outstanding Contracts or waivers extending the statutory period of limitations for a Tax assessment applicable to any Tax Returns of the Company or any of its Subsidiaries with respect to a taxable period for which such statute of limitations is still open.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 117 of 232   Document 1-1

(iii)     Neither the Company nor any Subsidiary has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that remains in effect as of the date of this Agreement.

(iv)     The Company has not been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii).  Neither the Company nor any Subsidiary is a party to or bound by any Tax allocation or sharing agreement, other than pursuant to the customary provisions of any agreement entered into in the ordinary course of business the primary purpose of which is not related to Taxes (such as leases, licenses or credit agreements).  Neither the Company nor any Subsidiary (A) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) and (B) has any liability for the Taxes of any Person (other than the Company or a Subsidiary) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise (in the case of clause (B), other than pursuant to the customary provisions of any agreement entered into in the ordinary course of business the primary purpose of which is not related to Taxes (such as leases, licenses or credit agreements)).

(v)     Neither the Company nor any Subsidiary will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)     "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or foreign income Tax Law) executed on or prior to the Closing Date;

(iii)     intercompany transaction or excess loss account described under Code §1502 (or any corresponding or similar provision of state, local or foreign income Tax Law) completed on or prior to the date of this Agreement;

(iv)     installment sale or open transaction disposition made on or prior to the Closing Date;

(v)     prepaid amount received on or prior to the Closing Date; or

(vi)     election under Code §108(i) made on or prior to the Closing Date.

(vi)     Neither the Company nor any Subsidiary has distributed stock of another Person, or has had its stock distributed by another Person, in a

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 118 of 232   Document 1-1

transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361 within the prior three years.

(vii) Neither the Company nor any Subsidiary has engaged in any "listed transaction" as defined in the Treasury Regulations promulgated under §6011 of the Code.

(viii) The Company has not (A) received from any current Shareholder a written election under Code §83(b) or (B) claimed a deduction on any Tax Return of the Company, in each case, relating to any share of restricted Company Common Stock that remains subject to vesting as of the date of this Agreement and as of immediately prior to the Closing, which vesting will be triggered as a result of the consummation of the transactions contemplated by this Agreement ("Restricted Stock").

(ix) Each Shareholder of the Company as of the date of this Agreement is either (A) a natural person, (B) a trust as described in Code §1361(c)(27) or (C) an exempt organization described in Code §1361(c)(6).

(h) Accounts Receivable. All accounts receivable reflected on the Recent Balance Sheet, and all accounts receivable of the Company and its Subsidiaries that have arisen from the date of the Recent Balance Sheet, (i) arose out of bona fide arm's length transactions made in the ordinary course of business consistent with past practice, (ii) are (or will be) the legally binding obligations of the Persons obligated to pay such amounts and (iii) are not subject to any written dispute (except to the extent any such dispute is reflected in the reserves for doubtful accounts shown on the Recent Balance Sheet in the case of accounts receivable reflected on the Recent Balance Sheet).

(i) Intentionally Omitted.

(j) Absence of Certain Changes. Since the date of the Recent Balance Sheet, there has not been a Company Material Adverse Effect. Except as expressly required by this Agreement or permitted under Section 4.3, since the date of the Recent Balance Sheet, the Company and its Subsidiaries have operated only in the ordinary course of business and there has not been any action taken by the Company or any of its Subsidiaries of the type described in Section 4.3, which had such action been taken by the Company or any of its Subsidiaries following the date hereof without Buyer's approval, would have violated Section 4.3.

(k) Litigation and Orders. (i) There is, and for the past two years there has been, no litigation, investigation (about which the Company has knowledge), arbitration or similar proceeding instituted (either as plaintiff or defendant) or, to the knowledge of the Company, there is no litigation, arbitration, investigation or similar proceeding threatened against the Company or any of its Subsidiaries, and (ii) there is and for the past two years there has been no Order pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries, other than Orders of general application (i.e., not specifying any particular Person). Without limitation, no portion of the business or assets of the Company or any of its Subsidiaries is subject to any Order to be sold or is being condemned, expropriated or otherwise taken by any Governmental Entity with or without

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 119 of 232   Document 1-1

payment of compensation therefor, and to the knowledge of the Company, no such condemnation, expropriation or taking has been planned, scheduled or proposed.

(l)  Laws and Orders.  The Company and its Subsidiaries are in compliance and, for the past three years, have been in compliance, in each case, in all material respects with all applicable Laws and Orders.  Since January 1, 2012, neither the Company nor any of its Subsidiaries have received written notice or other written communication of any material violation of or material lack of compliance with any Laws or Orders from any Governmental Entity.  All reports required to be filed by or on behalf of the Company or any of its Subsidiaries with any Governmental Entity have been filed and, when filed, were correct and complete in all material respects.  Since January 1, 2012, there has been no release or disposal of any Hazardous Substance by the Company or any of its Subsidiaries, and neither the Company nor any of its Subsidiaries have caused any Person to be exposed to any Hazardous Substance, in each case, that has given rise to, or would give rise to, liability of the Company or any of its Subsidiaries pursuant to Environmental Laws.

(m)  Licenses and Permits.  The Company and its Subsidiaries have all material licenses, permits, approvals, authorizations, registrations, certifications and consents of all Governmental Entities that are necessary for the conduct of their respective businesses as currently conducted.  Section 3.1(m) of the Company Disclosure Schedule sets forth a true, complete and correct list of all material licenses, permits, approvals, authorizations, registrations, certifications and consents of all Governmental Entities issued to the Company or any of its Subsidiaries that are currently in effect.  All such material licenses, permits, approvals, authorizations, registrations, certifications and consents are presently in full force and effect.  The Company and its Subsidiaries are and have been in compliance in all material respects with all such licenses, permits, approvals, authorizations, registrations, certifications and consents.  All required filings with respect to such licenses, permits, approvals, authorizations, registrations, certifications and consents have been timely made and all required applications for the renewal thereof have been timely filed (in each case, subject to any extensions applicable thereto).

(n)  Leased Real Property.  Neither the Company nor any of its Subsidiaries owns any real property.  Section 3.1(n) of the Company Disclosure Schedule sets forth a list of all real property currently leased or subleased by the Company or any of its Subsidiaries (collectively, the "Leased Real Property") or otherwise occupied by the Company or any of its Subsidiaries.  Neither the Company nor any of its Subsidiaries has subleased, licensed or otherwise granted any Person a continuing right to use or occupy such Leased Real Property or any portion thereof. To the knowledge of the Company, no Person other than the Company or its applicable Subsidiary, or the owner or prime lessor of the Leased Real Property, has any right to possess the Leased Real Property.  The Company and its Subsidiaries are in compliance in all material respects with all conditions subject to which the occupancy and use of the Leased Real Property by the Company or its applicable Subsidiary has been granted by the relevant Governmental Entity.  To the knowledge of the Company, there is no existing or proposed plan to construct, modify or realign any street, highway, power line or pipeline that would materially adversely affect the current use of the Leased Real Property by the Company or its applicable Subsidiary.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 120 of 232   Document 1-1

(o)   Title to and Condition of Assets.

(i)   Title.  The Company and each of its Subsidiaries has good and marketable title to all of the material assets owned by it, including such owned assets reflected in the Recent Balance Sheet (except for assets sold since the date of the Recent Balance Sheet in the ordinary course of business).  Such owned assets are held free and clear of all Liens, other than Liens created or suffered by Buyer or Merger Sub and Permitted Liens.  The Company and each of its Subsidiaries has a valid leasehold interest in all of the material assets leased by it in the conduct of the Business.  Such leased assets are held free and clear of all Liens, other than Liens created or suffered by Buyer, Merger Sub, Permitted Liens or, to the knowledge of the Company, the owner of such leased assets.

(ii)   Condition.  All material tangible personal property and assets owned or leased by the Company or any of its Subsidiaries and used in the conduct of the Business are in such working condition and in a state of maintenance and repair sufficient to permit the use of such personal property or asset as used in the Business as presently conducted (ordinary maintenance, wear and tear excepted).

(p)   Insurance.  The Company has made available to Buyer copies of all insurance policies of the Company and each of its Subsidiaries with a policy period in effect as of the date of this Agreement, other than policies that fund any Benefit Plan (collectively, the "Company Insurance Policies").  Each Company Insurance Policy is outstanding and in full force and effect and all premiums and other payments due and payable by the Company or any of its Subsidiaries under any Company Insurance Policy have been paid in full in timely fashion.  Neither the Company nor any of its Subsidiaries has received any written notice of cancellation, threatened termination or non-renewal with respect to any Company Insurance Policy.  There is no material claim by the Company or any of its Subsidiaries pending under any Company Insurance Policy as to which coverage has been denied or disputed in writing by the underwriters of such policies, other than customary reservation of rights provisions.  The aggregate annual premium that the Company is paying with respect to the Company's directors' and officers' liability insurance policy for the current policy period that includes the date of this Agreement is set forth in Section 3.1(p) of the Company Disclosure Schedule.

(q)   Material Contracts.  Section 3.1(q) of the Company Disclosure Schedule sets forth a complete and accurate list of each of the following types of Contracts to which the Company or any of its Subsidiaries is party or is bound:

(i)   any Contract for the lease or sublease of real property by the Company or any of its Subsidiaries;

(ii)   any Contract for the lease of tangible personal property by the Company or any of its Subsidiaries that provides for an annual rental fee in excess of $100,000 (or its foreign currency equivalent as of the date of this Agreement) or a term that will continue for more than 12 months after the Closing Date and cannot be terminated by either party thereto without penalty upon 60 days or less written notice;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 121 of 232   Document 1-1

(iii)     any Contract (including all statements of work or other similar associated contracts issued thereunder) involving the provision of services by the Company or any of its Subsidiaries that provides for a fee or other consideration payable to the Company or such Subsidiary in any calendar year in excess of $500,000 (or its foreign currency equivalent as of the date of this Agreement) or a term that will continue for more than 12 months after the Closing Date and cannot be terminated by any party thereto without penalty upon 60 days or less written notice, other than Contracts for an annual update of insurable value entered into in the ordinary course of business and providing for an annual fee or other consideration payable to the Company or its applicable Subsidiary in an amount less than $50,000 (or its foreign currency equivalent as of the date of this Agreement);

(iv)     any Contract (including all statements of work or similar associated contracts issued thereunder) with a vendor or licensor that provides for annual expenditures by the Company or any of its Subsidiaries in excess of $100,000 as of the date of this Agreement (or its foreign currency equivalent as of the date of this Agreement) or a term that will continue for more than 12 months after the Closing Date and cannot be terminated by either party thereto without penalty upon 60 days or less written notice;

(v)     any Contract evidencing outstanding Indebtedness or guarantees of Indebtedness of the Company or any of its Subsidiaries;

(vi)     any Contract pursuant to the express terms of which the Company or any of its Subsidiaries has mortgaged, pledged or otherwise placed a Lien (other than a Permitted Lien) on any material portion of the Company's and its Subsidiaries' assets taken as a whole;

(vii)     any collective bargaining agreement or other Contract with any labor union, works council or other representative of a group of employees;

(viii)     any employment Contract with any Current Employee that provides for payment of an annual salary, wages, bonus, commissions or other incentives in excess of $250,000 (or its foreign currency equivalent as of the date of this Agreement);

(ix)     any joint venture, partnership Contract or Contract with respect to the lending or investing of funds or providing for the ownership of or investments in the equity of any Person;

(x)     any consulting, development, joint development or similar Contract relating to any Company Intellectual Property;

(xi)     any Contract that expressly grants to a third party any right, title or interest in or to any material Company Intellectual Property, excluding Contracts that may be cancelled by the Company or its applicable Subsidiary on notice of not less than 30 days without liability;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 122 of 232   Document 1-1

(xii) any Contract (excluding licenses for commercial off the shelf computer software that are generally available on nondiscriminatory pricing terms) pursuant to which the Company or any of its Subsidiaries obtains the right to use any Intellectual Property material to the Business;

(xiii) any Contract containing (A) any non-competition covenant that prohibits or that materially limits or materially restricts the future business activity of the Company or any of its Subsidiaries with respect to the Business as currently conducted including any exclusivity provision in favor of any third party or (B) any provision limiting the ability of the Company or its Subsidiaries to use or exploit any Company Intellectual Property material to the Business.

(xiv) any Contract which contains any most-favored nations provision or most-favored pricing provision; and

(xv) any express warranty Contract with respect to the Company's or any of its Subsidiaries' services other than client Contracts entered into in the ordinary course of business.

The Company has made available to Buyer a true and correct copy of each Material Contract, together with all material amendments thereto. Each Material Contract is in full force and effect and (i) is enforceable by the Company or its applicable Subsidiary in accordance with its terms (except as such may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles) and (ii) to the knowledge of the Company, assuming the due authorization, execution and delivery thereof by each other party thereto, against each other party thereto. Neither the Company nor any of its Subsidiaries is in breach or default in any material respect under any Material Contract and neither the Company nor any of its Subsidiaries has taken any action which, upon giving of notice or lapse of time or both, would constitute such a material breach or default. The Company or its applicable Subsidiary (and to the knowledge of the Company, the other party thereto) has performed all material obligations under each Material Contract required to be performed by such party, except for such instances of non-performance that have been waived in writing by such other party, the Company or its applicable Subsidiary, as the case may be. No party to any Material Contract has given a written notice or other written communication of termination or non-renewal of such Material Contract that is currently pending. For purposes of this Agreement, "Material Contract" means each Contract listed or required to be listed in Section 3.1(q) of the Company Disclosure Schedule.

(r) Employee Benefit Plans.

(i) Benefit Plans. Section 3.1(r)(i) of the Company Disclosure Schedule sets forth a complete and correct list of all material "employee benefit plans," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, and all material severance, separation, deferred compensation, equity or equity-based, fringe, vacation, leave, employment, change-in-control, retirement, profit sharing, disability, bonus, incentive, commission, welfare and other material compensation or benefit plans, programs, policies, arrangements, or agreements, whether or not

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 123 of 232   Document 1-1

written, (A) that are sponsored, maintained or contributed or required to be contributed to by the Company or any of its Subsidiaries or (B) under or with respect to which the Company or any of its Subsidiaries has any current or contingent obligation or liability, in each case, other than as mandated or imposed by applicable Law (collectively, the "Benefit Plans"). The Company and its Subsidiaries are in compliance and, for the past three years, have been in compliance, in each case, in all material respects with all obligations applicable to them in connection with any benefit or compensation plans or programs mandated or imposed by applicable Law.

(ii)　　Available Documentation.　With respect to each Benefit Plan, to the extent applicable, the Company has made available to Buyer a true and complete copy of (A) the plan document or other governing Contract (and each amendment thereto) or a description of the terms of any unwritten Benefit Plan, (B) the most recently distributed summary plan description and each summary of material modification thereto, (C) each trust or other funding Contract, (D) the most recent favorable IRS determination letter or opinion letter (in the case of a prototype plan) received from the Internal Revenue Service (the "IRS"), (E) the most recently prepared Form 5500 annual report, actuarial report and financial statements, and (F) with respect to the ESOP, the agreement between the Company and the ESOP Trustee.

(iii)　　Multiemployer, Pension and Post-Termination Plans. None of the Benefit Plans, and none of the Company, any of its Subsidiaries, or any Person that, together with the Company or any of its Subsidiaries, at any relevant time would be treated as a single employer under Section 414 of the Code (each, an "ERISA Affiliate") sponsors, maintains, contributes to, is required to contribute to, or has any current or contingent liability or obligation under or with respect to: (A) a "multiemployer plan," as defined in Section 3(37) of ERISA, (B) a plan that has two or more contributing sponsors at least two of whom are not under common control within the meaning of Section 4063 of ERISA, (C) a plan that is or was subject to Title IV of ERISA or Section 412 of the Code, or (D) a plan, policy, program, arrangement or agreement that provides post-retirement or post-termination health or other welfare benefits to any Person (other than continuation coverage required under applicable Law for which the covered Person pays the full cost of coverage). Each of the Company, its Subsidiaries and the ERISA Affiliates has complied and is in compliance with the requirements of Section 4980B of the Code. None of the Company or any of its Subsidiaries has any current or continent liability or obligation with respect to any benefit or compensation plan, program, agreement, policy, contract or arrangement as a consequence of at any time being considered a single employer under Section 414 of the Code with any other Person.

(iv)　　Compliance.　Each Benefit Plan has been established, maintained, funded and administered in material compliance in form and operation with its own terms and in material compliance in form and operation with all applicable Laws. All material notices, reports and information relating to the Benefit Plans required to be filed by the Company or any of its Subsidiaries with any Governmental Entity or provided by the Company or any of its Subsidiaries to

Case 2:18-cv-00841-JPS　Filed 06/01/18　Page 124 of 232　Document 1-1

participants or their beneficiaries have been timely filed and provided. There is no litigation, action, dispute, claim, investigation, audit, demand, arbitration or similar proceeding pending (other than routine claims for benefits being reviewed pursuant to the plan's internal claim and appeals process) or, to the knowledge of the Company, threatened with respect to any Benefit Plan or against the assets of any Benefit Plan, and there are no facts or circumstances that could reasonably be expected to give rise to any such litigation, action, dispute, claim, investigation, audit, demand, arbitration or similar proceeding. Each Benefit Plan intended to be qualified under Section 401(a) of the Code is so qualified and has received a current favorable IRS determination letter as to the tax-qualified status of the plan and trust as to form or is a prototype covered by a favorable IRS opinion letter, and no fact or circumstance exists that could adversely affect such Benefit Plan's qualification. None of the Company, any of its Subsidiaries, or any employee of any of them or, to the knowledge of the Company, any other Person has engaged, in a "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code, with respect to any Benefit Plan for which no individual or class exemption exists. With respect to any Benefit Plan, no breach of fiduciary duty (as determined under ERISA) has occurred. All contributions, distributions, reimbursements and premium payments required to be made with respect to any Benefit Plan have been made on or before their due dates and contributions, distributions, reimbursements, and premium payments not yet due have been made or properly accrued.

(v) ESOP. Without limiting the generality of the foregoing provisions of this Section 3.1(r): (i) the ESOP qualifies as an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code and has been maintained in form and operation in compliance with Sections 401(a) and 4975 of the Code; (ii) there is no loan outstanding between the ESOP and any other Person (including any "party in interest" or "disqualified Person" as such terms are defined in Section 3(14) of ERISA and Section 4975(e)(2) of the Code, respectively); (iii) all employer securities at any time held by the ESOP have at all times been "employer securities" as defined in Section 409(l) of the Code and "qualifying employer securities" as defined in Section 4975(e)(8) of the Code and Section 407(d)(5) of ERISA; (iv) none of the Company or any of its Subsidiaries has been subject at any time to any tax imposed by Sections 4978 and 4979A of the Code with respect to any "disposition" by the ESOP of any shares of stock of the Company or any of its Subsidiaries; (v) neither the ESOP nor any "fiduciary" (as defined in Section 3(21) of ERISA) of the ESOP has at any time engaged in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code with respect to the ESOP; and (vi) any transaction to which the ESOP was at any time a party involving the purchase, sale or exchange of any security complied with the applicable requirements of ERISA and the Code, including Section 3(18) of ERISA.

(vi) Accelerated Payments. Except with respect to the ESOP Amendment, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, alone or together with any other event, require either the Company or any of its Subsidiaries to pay any compensation or benefits to any Person, accelerate the

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 125 of 232   Document 1-1

time of vesting, payment or distribution of any compensation or benefits, increase the amount of any compensation or benefits, or obligate any Person to fund any Benefit Plan.

(s) <u>Labor Matters</u>. Neither the Company nor any of its Subsidiaries is a party to or otherwise bound by any collective bargaining agreement or other Contract with any labor union, works council or other employee representative of a group of employees. To the knowledge of the Company: (i) no employees of the Company or any of its Subsidiaries are legally organized or recognized as a labor organization or represented by any labor union or labor organization with respect to their employment with the Company or any of its Subsidiaries, in each case, other than as mandated or imposed by applicable Law; (ii) no labor union, works council or group of employees of the Company or any of its Subsidiaries has made a pending demand for recognition, certification, representation or bargaining; (iii) there are no representation or certification proceedings or petitions pending or threatened to be brought or filed against the Company or any of its Subsidiaries with any Governmental Entity and (iv) no other union organizing activities involving employees of the Company or any of its Subsidiaries have occurred within the past three years. There are no strikes, work stoppages, pickets, walkouts, lockouts, or other material labor disputes pending or, to the knowledge of the Company, threatened against or to which the Company or any of its Subsidiaries is a party and no such disputes have occurred within the past three years. Since January 1, 2011, neither the Company nor any of its Subsidiaries has implemented any employee layoffs that have given rise to any liability of the Company or any of its Subsidiaries under the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Law (collectively, the "<u>WARN Act</u>"). To the actual knowledge of the Company, no executive officer or managing director of the Company has notified the Company that he or she has any present intention to terminate his or her employment with the Company.

(t) <u>International Trade Matters</u>. The Company and its Subsidiaries currently are and have been in compliance with all applicable economic sanctions Laws, including the U.S. economic sanctions Laws administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("<u>OFAC</u>"), and all applicable anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act ("<u>FCPA</u>") and the UK Bribery Act. None of the Company or any of its Subsidiaries, nor any of their respective directors, officers, employees, nor, to the knowledge of the Company, any of their respective authorized agents or other Persons acting on their behalf is designated on, or is owned or controlled by any Person that is designated on, any list of restricted parties maintained under applicable economic sanctions laws, including the list of Specially Designated Nationals and Blocked Persons, the Foreign Sanctions Evaders list, or the Sectoral Sanctions Identifications list, all of which are maintained by OFAC. None of the Company or any of its Subsidiaries, nor any of their respective directors, officers, employees, nor, to the knowledge of the Company, any of their respective authorized agents or other Persons acting on their behalf: (i) has made, paid or received any unlawful bribes, kickbacks or similar payments to or from any Governmental Entity; (ii) has made or paid any unlawful contributions, directly or indirectly, to a domestic or foreign political Person or candidate; or (iii) otherwise has made or paid any improper foreign payment (as defined under the FCPA).

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 126 of 232   Document 1-1

(u)     Intellectual Property Rights.

(i)     Registered Intellectual Property.   Section 3.1(u) of the Company Disclosure Schedule sets forth a list of all Company Intellectual Property that is registered or for which a pending application for registration has been applied for by or on behalf of the Company or one of its Subsidiaries. All registrations set forth on Section 3.1(u) of the Company Disclosure Schedule are subsisting and in force and, to the knowledge of the Company, are valid and enforceable, and all applications set forth on Section 3.1(u) of the Company Disclosure Schedule are pending and, to the knowledge of the Company, in good standing. All registration, maintenance and renewal fees due and payable prior to the date of this Agreement in connection with the Company Intellectual Property set forth on Section 3.1(u) of the Company Disclosure Schedule have been paid. To the knowledge of the Company, there are no oppositions, cancellations, invalidity proceedings, interferences or re-examination proceedings presently pending with respect to the Company Intellectual Property set forth on Section 3.1(u) of the Company Disclosure Schedule.

(ii)     Non-Infringement.   The conduct of the Business as currently conducted does not infringe, violate or misappropriate any valid and enforceable Intellectual Property rights of any other Person in a manner materially adverse to the Company or any of its Subsidiaries. During the past three years, neither the Company nor any of its Subsidiaries has received any written charge, complaint, claim, demand, or notice alleging infringement, dilution, violation or misappropriation of the Intellectual Property rights of any Person or challenging the validity or enforceability of any Company Intellectual Property. To the knowledge of the Company, no Person is infringing, violating or misappropriating any of the Company's or its Subsidiaries' rights in any of the Company Intellectual Property in a manner materially adverse to the Company or any of its Subsidiaries.

(iii)     Trade Secrets.   The Company and its Subsidiaries have taken commercially reasonable measures to protect the confidentiality of the trade secrets owned or controlled by the Company and its Subsidiaries.   Without limiting the foregoing, the Company and its Subsidiaries have requested that each Current Employee execute and deliver to the Company or its applicable Subsidiary a Confirmation of Compliance in substantially the form made available to Buyer, pursuant to which each Current Employee acknowledges that he or she understands and agrees to comply with the Company's Worldwide Corporate Policies and Guidelines and Worldwide Practice Policies and Standards, in each case, in substantially the form made available to Buyer.

(iv)     Company Systems.   In the twelve months preceding the date hereof, there have been no failures, breakdowns or continued substandard performance of the computer systems, including software, hardware, servers, networks and interfaces used by or on behalf of the Company or any of its Subsidiaries (the "Company Systems") that have caused any substantial disruption or interruption in, or to the Company's or any of its Subsidiaries' use of, the Company Systems (taken as a whole) that have not been remedied.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 127 of 232   Document 1-1

(v) <u>Assets Necessary to Business</u>. The Company and its Subsidiaries own or have a valid right to use all of the material assets, tangible and intangible, that are necessary for use in the conduct of the Business as currently conducted.

(w) <u>Certain Affiliate Relationships</u>. There are no Contracts, loans, leases, accounts receivable, accounts payable or other legally binding agreements or transactions (other than for employee compensation paid in the ordinary course of business and other ordinary incidents of employment) between the Company or any of its Subsidiaries, on the one hand, and any Shareholder, director, officer or employee of the Company or any of its Subsidiaries, or to the knowledge of the Company, any member of such Shareholder's, director's, officer's or employee's immediate family (related by blood, marriage or adoption), on the other hand. No Shareholder, director, officer or employee of the Company or any of its Subsidiaries owns or has any ownership interest in any of the material assets used in the conduct of the Business as currently conducted.

(x) <u>Fees</u>. Neither the Company nor any of its Subsidiaries has paid or may become obligated to pay any fee or commission to any broker, finder or investment banker in connection with the transactions contemplated by this Agreement or the negotiation thereof.

Section 3.2. <u>Representations and Warranties of Buyer and Merger Sub</u>. As a material inducement for the Company to enter into this Agreement and except as set forth in the disclosure schedule delivered by Buyer to the Company concurrently with the execution and delivery of this Agreement (the "<u>Buyer Disclosure Schedule</u>"), Buyer and Merger Sub make the following representations and warranties to the Company and the Shareholders:

(a) <u>Organization and Qualification</u>. Each of Buyer and Merger Sub is a limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation. Each of Buyer and Merger Sub has all requisite company power, legal right and authority to own, operate and lease its properties and to carry on its business as and where it currently conducts its business. Each of Buyer and Merger Sub is duly qualified or licensed to do business as a foreign limited liability company or corporation and is in good standing in each jurisdiction wherein the character of the properties owned by it, or the nature of its business, makes such licensing or qualification necessary.

(b) <u>Authorization</u>. Each of Buyer and Merger Sub has the full power and authority to execute and deliver this Agreement and the Related Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer and Merger Sub of this Agreement and the Related Documents and the consummation by Buyer and Merger Sub of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Managers of Buyer and the Board of Directors of Merger Sub. No other or further company act or proceeding on the part of Buyer or Merger Sub is necessary to authorize this Agreement or the Related Documents or the consummation by Buyer and Merger Sub of the transactions contemplated hereby and thereby. This Agreement and each of the Related Documents has been duly executed and delivered by each of Buyer and Merger Sub and, assuming the due authorization, execution and delivery of this Agreement and the Related Documents by the other parties hereto and thereto, this Agreement and each of the

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 128 of 232    Document 1-1

Related Documents constitutes a valid and binding obligation of Buyer and Merger Sub, enforceable against Buyer and Merger Sub in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting creditors' rights generally and by general equitable principles (whether considered in a proceeding at Law or in equity) and in the discretion of the court before which any proceeding therefor may be brought.

(c)    No Violation.    Neither the execution and delivery by Buyer and Merger Sub of this Agreement or the Related Documents nor the consummation by Buyer and Merger Sub of the transactions contemplated hereby and thereby (i) will violate or result in any violation of, or constitute a default under (whether with or without the giving of notice, lapse of time or both), any provision of any Law or Order applicable to Buyer or Merger Sub, (ii) will require any authorization, consent or approval by, filing with or notice to any Person or Governmental Entity, except for the requirements of the WBCL with respect to the filing of the Articles of Merger, or (iii) will violate, conflict with, constitute a default under, or result in the automatic termination of, or accelerate the performance required by, any term or provision of the Certificate of Formation or Limited Liability Company Agreement of Buyer or the Articles of Incorporation or Bylaws of Merger Sub or of the express terms of any material Contract to which Buyer or Merger Sub is party.

(d)    Litigation.    There is no litigation, action, suit, proceeding, claim, investigation, arbitration or similar proceeding instituted, pending or, to the knowledge of Buyer, threatened against or involving Buyer or Merger Sub, and there is no outstanding Order pending or, to the knowledge of Buyer or Merger Sub, threatened with respect to Buyer or Merger Sub, that, individually or in the aggregate, would be reasonably expected to have the effect of preventing, delaying, making illegal or otherwise interfering with any of the transactions contemplated hereby.

(e)    Capitalization of Merger Sub.    The authorized capital stock of Merger Sub consists of 1,000 shares of Common Stock, par value $0.001 per share, all of which are outstanding, validly issued, fully paid and nonassessable. All of the issued and outstanding capital stock of Merger Sub is, and at the Effective Time will be, owned by Buyer or a direct or indirect wholly-owned Subsidiary of Buyer. Merger Sub has not conducted any business prior to the date of this Agreement and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature, other than those incident to its formation and pursuant to this Agreement and the transactions contemplated hereby.

(f)    Financial Capacity.    Buyer has, and at or prior to the Effective Time Merger Sub will obtain from Buyer, funds immediately available to enable it to pay the Merger Consideration and all other amounts that Buyer or Merger Sub is required to pay pursuant to this Agreement.

(g)    Fees.    None of Buyer, Merger Sub or any of their respective Affiliates has employed, paid or is or may become obligated to pay any fees or commissions to any broker, finder, investment banker, consultant or other intermediary in connection with the transactions provided for herein or in connection with the negotiation thereof.

Section 3.3.    No Other Representations or Warranties.    Buyer and Merger Sub acknowledge that the representations and warranties set forth in this Agreement have been negotiated

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 129 of 232    Document 1-1

at arm's length among sophisticated business entities. Except for the representations and warranties made by the Company in Section 3.1, Buyer and Merger Sub acknowledge that none of the Company, any Shareholder, any of their respective Affiliates or any Person acting on behalf of any of the foregoing makes or has made any other express or any implied representation or warranty to Buyer or Merger Sub regarding the Company, any of its Subsidiaries, the Business or any other matter, including any information, document or material made available or provided to Buyer or Merger Sub in certain "data rooms," management presentations or offering or information memoranda. **EXCEPT WITH RESPECT TO THE REPRESENTATIONS AND WARRANTIES MADE BY THE COMPANY IN SECTION 3.1, THE COMPANY AND EACH SHAREHOLDER DISCLAIM ALL OTHER EXPRESS AND ALL IMPLIED WARRANTIES RELATING THERETO, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.** Without limitation, in connection with the investigation of the Company, its Subsidiaries and the Business, Buyer and Merger Sub have received from or on behalf of the Company or its Affiliates certain estimates, projections and other forecasts and plans, including projected statements of operating revenues and income from operations of the Business and certain business plan information. Buyer and Merger Sub acknowledge that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer and Merger Sub are familiar with such uncertainties, that Buyer and Merger Sub are taking full responsibility for making their own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to them (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) and that, except in the case of actual common law fraud, Buyer and Merger Sub shall have no claim against the Company, any Shareholder, any of their respective Affiliates or any Person acting on behalf of any of the foregoing with respect thereto. None of the Company, any Shareholder, any of the respective Affiliates or any Person acting on behalf of any of the foregoing makes any representation or warranty with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions or the accuracy of the information underlying such estimates, projections and forecasts). It is understood and agreed that nothing in this Section 3.3 shall in any manner prohibit, limit or restrict the rights of any party hereunder in the case of actual common law fraud.

## ARTICLE 4

## COVENANTS PRIOR TO THE CLOSING

Section 4.1. <u>Company Requisite Shareholder Vote</u>. The Company, acting through the Company Board, as soon as reasonably practicable following the execution of this Agreement by the Company shall request, in accordance with the WBCL, the Company Requisite Shareholder Vote and, in accordance with Code Section 409(e) and the terms of the ESOP, the ESOP Approval.

Section 4.2. <u>Pre-Closing Access to Information; Confidentiality</u>. Except for information that, if provided, would adversely affect the ability of the Company or any of its Subsidiaries to assert attorney-client or attorney work product privilege or a similar privilege, for information relating to communications regarding the divesture of the Company, any of its Subsidiaries and/or the Business (including information relating to the identity of other Persons expressing an interest in acquiring the Company, any of its Subsidiaries and/or the Business and the terms of all such proposals), for information that, in the reasonable opinion of the Company's legal counsel, may result in a violation of any Law or Order or any binding Contract entered into prior to the date of this Agreement applicable to the Company or any of its Subsidiaries and for information

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 130 of 232   Document 1-1

that the Company reasonably believes is competitively sensitive, the Company shall, and shall cause each of its Subsidiaries and each of the Company's and its Subsidiaries' officers, key employees and agents to, during the period commencing on the date of this Agreement and ending at the Effective Time, furnish or cause to be furnished to Buyer and its representatives, at reasonable times and upon reasonable notice, (a) subject to the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed), such access, during normal business hours, to the Leased Real Property as Buyer reasonably requests with due regard to minimizing disruption of the conduct of the Business and (b) such access to the books, records and other information of the Business as Buyer reasonably requests. None of Buyer, any Affiliate of Buyer or any representative of the foregoing shall, directly or indirectly, contact or communicate with any employees or consultants of the Company or any of its Subsidiaries or any third party that has business dealings with the Company or any of its Subsidiaries (including customers, vendors and lessors) with respect to the transactions contemplated hereby, except in consultation with the Company and then only with the express prior written approval of the Company (such consent not to be unreasonably withheld, conditioned or delayed). Buyer shall treat all information obtained from or on behalf of the Company, any Shareholder, any of their respective Affiliates or otherwise as "Evaluation Material" under the Confidentiality Agreement, dated August 12, 2014, between the Company and Buyer (the "Confidentiality Agreement"), and Buyer shall continue to honor, and cause its representatives to honor, its obligations thereunder. At the Effective Time, the Confidentiality Agreement shall automatically terminate.

Section 4.3. <u>Conduct of Business Pending the Closing</u>. From the date of this Agreement until the Effective Time, except as expressly required or permitted hereby, for actions set forth in <u>Exhibit 4.3</u>, or for actions consented to by Buyer in writing (which consent shall not be unreasonably withheld, conditioned or delayed) or required by applicable Law:

(a) the Company shall, and shall cause its Subsidiaries to, operate the Business in the ordinary course, on a basis consistent with past practice and maintain Net Working Capital consistent with the normal operations of the Company's business;

(b) the Company shall not, and shall cause its Subsidiaries not to, increase or grant any increase in the salaries, wages or bonus compensation payable or to become payable to any of its employees, except for increases required under any contractual arrangement set forth on <u>Section 3.1(q)</u> of the Company Disclosure Schedule or that is not required to be set forth on <u>Section 3.1(q)</u> of the Company Disclosure Schedule because it does not meet the applicable materiality threshold set forth in <u>Section 3.1(q)</u>;

(c) the Company shall not, and shall cause its Subsidiaries not to, enter into any employment, benefits, change of control, severance or termination Contract with any of its or their employees or any amendment thereto;

(d) the Company shall not, and shall cause its Subsidiaries not to, implement any employee layoffs that would give rise to any notice obligations or liability of the Company or any of its Subsidiaries under the WARN Act;

(e) the Company shall not, and shall cause its Subsidiaries not to, (1) incur or guaranty any Indebtedness, other than (A) intercompany borrowings among the Company and its Subsidiaries or in the ordinary course of business and (B) borrowings in the ordinary course of business under lines of credit in effect as of the date of this

Agreement and in an aggregate net amount not in excess of $2,500,000, (2) make any loans, advances or capital contributions to, or investment in, any other Person (other than a Subsidiary) or (3) pledge or otherwise subject to any Lien (other than Liens created by operation of law, Permitted Liens, or Liens created or suffered by Buyer or Merger Sub) (including by merger, consolidation, or sale of stock or assets) any material property or asset owned by the Company or any of its Subsidiaries;

(f)     the Company shall not, and shall cause its Subsidiaries not to, amend (other than amendments for the renewal of existing Leased Real Property with renewal terms of two years or less, provided such amendments contain terms and conditions consistent in all material respects with the existing terms and conditions of the leases for such Leased Real Property) or terminate any Material Contract, or, other than client Contracts entered into in the ordinary course of business, enter into any Contract that, if entered into prior to the date hereof, would be a Material Contract;

(g)     the Company shall not, and shall cause its Subsidiaries not to, amend their respective charter, bylaws or similar organizational documents or make any changes in the authorized or issued capital stock or other equity securities of the Company or any of its Subsidiaries;

(h)     the Company shall not, and shall cause its Subsidiaries not to, issue or authorize the issuance of, or agree to issue (whether through the issuance of granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), any shares of its capital stock or its other equity securities;

(i)     the Company shall not, and shall cause its Subsidiaries not to, split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or any of its other equity securities;

(j)     the Company shall not declare, set aside, establish a record date for, make or effect a distribution of any cash or cash equivalents or property to Shareholders or enter into any Contract with respect to the voting of its capital stock or other equity securities (other than the Voting Agreements);

(k)     the Company shall not, and shall cause its Subsidiaries not to, make capital expenditures, or commit to make capital expenditures other than in the ordinary course of business consistent with past practice;

(l)     the Company shall not, and shall cause its Subsidiaries not to, sell, lease, assign or otherwise transfer or dispose of any material properties or assets of the Company or any of its Subsidiaries;

(m)     the Company shall not license, permit to lapse or abandon any material Company Intellectual Property, except entering into licenses in the ordinary course of business;

(n)     the Company shall not, and shall cause its Subsidiaries not to, acquire any portion of the equity securities, or any material portion of the assets, of any entity or

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 132 of 232   Document 1-1

other business organization or division thereof (whether directly or indirectly and whether by merger, sale of stock, reorganization, recapitalization, joint venture or otherwise);

(o) the Company shall not, and shall cause its Subsidiaries not to, make any material change in the accounting methods, principles or practices used by it, except as required by GAAP;

(p) the Company shall not, and shall cause its Subsidiaries not to, make any elections, or any changes in its current elections, with respect to Taxes;

(q) the Company shall not, and shall cause its Subsidiaries not to, settle any Tax claim or assessment relating to the Company or any of its Subsidiaries, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to pay any Tax claim or assessment relating to the Company, or fail to pay any Tax as it comes due, in each case, except in the ordinary course of business and except for the failure to pay any Taxes being disputed in good faith by appropriate proceedings;

(r) the Company shall not, and shall cause its Subsidiaries not to, settle or compromise any litigation (whether or not commenced prior to the date of this Agreement);

(s) the Company shall not, and shall cause its Subsidiaries not to, enter into any Contract (other than for employee compensation paid in the ordinary course of business and other ordinary incidents of employment) with any Shareholder, director, officer or employee of the Company or any of its Subsidiaries or any individual known by the Company to be a member of such Shareholder's, director's, officer's or employee's immediate family (related by blood, marriage or adoption); and

(t) the Company shall not, and shall cause its Subsidiaries not to, make a legally binding commitment to take any of the actions described in this Section 4.3.

Section 4.4.     Further Actions. Prior to the Closing, each Party shall cooperate with and assist each other Party, and shall use its reasonable best efforts, to (a) take, or cause to be taken, all appropriate actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby and make effective the transactions contemplated by this Agreement as soon as practicable, including preparing and filing as promptly as practicable all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (b) obtain and maintain all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any other Person, including any Governmental Entity, that are necessary, proper or advisable to consummate the transactions contemplated hereby; provided, however, that such assistance and efforts shall not include any requirement of the Company or any of its Subsidiaries to expend any money (other than expenses incurred in the ordinary course of business), incur any liability, commence any litigation, arbitration or similar proceeding or offer or grant any accommodation (financial or otherwise) to any Person.

Section 4.5.     Exclusivity. The Company agrees that, commencing on the date of this Agreement and until the earlier of the Effective Time or the date on which this Agreement has been terminated in accordance with its terms (the "Exclusivity Period"), Buyer and Merger Sub shall

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 133 of 232    Document 1-1

have the exclusive right to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Company agrees that, unless this Agreement is terminated in accordance with its terms, the Company shall not (and the Company shall not cause or permit any Affiliate or Representative or any other Person acting on their behalf to), directly or indirectly, through any shareholder, partner, Affiliate or Representative or otherwise, (a) solicit, initiate or encourage the submission of any proposal or offer (an "Acquisition Proposal") from any Person (including any of its shareholders, Affiliates or Representatives) relating to any liquidation, dissolution, recapitalization of, merger or consolidation with or into, or acquisition or purchase of all or any portion of the equity interests of, or any material portion of the assets of the Company or any other similar transactions or business combination, or (b) participate in any discussions or negotiations regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage any effort or attempt by any other person or entity to do or seek to do any of the foregoing. The Company represents that it has suspended (and has caused its shareholders, Affiliates and Representatives to suspend), and shall cease for the duration of the Exclusivity Period, all contacts, discussions and negotiations with third parties (other than Buyer and its Affiliates and Representatives) regarding any Acquisition Proposal.

Section 4.6.    Notification of Litigation.    Prior to the Closing, the Company shall promptly notify Buyer (in writing after the Company has notice thereof), and Buyer shall promptly notify the Company (in writing after Buyer has notice thereof), and keep such other Party advised, as to any litigation, arbitration, investigation or similar proceeding pending and known to such Party or, to its knowledge, threatened against such Party or any of its Affiliates that challenges the transactions contemplated hereby.

ARTICLE 5

ADDITIONAL COVENANTS

Section 5.1.    Post-Closing Access to Information.    After the Closing, upon written request, Buyer shall, and shall cause the Surviving Corporation to, afford Shareholders' Representative and its counsel, accountants and other representatives, during normal business hours, reasonable access to the books, records and other information in Buyer's or the Surviving Corporation's possession or control relating to the Surviving Corporation and its Subsidiaries with respect to periods prior to the Closing, and the right to make copies and extracts therefrom at its expense, to the extent such access is reasonably required by the Shareholders' Representative for financial reporting, Tax or accounting purposes; provided that, neither Buyer nor the Surviving Corporation shall be required to disclose information to the extent the disclosure of such information would, based on the advice of counsel, (i) result in the waiver of any attorney-client or other legal privilege with respect to such information or (ii) contravene any applicable Laws or Orders. Without limitation, after the Closing, Buyer shall, and shall cause the Surviving Corporation to, make available to the Shareholders' Representative and its counsel, accountants and other representatives, as reasonably requested in a written notice, and to any Tax authority that is legally permitted to receive the following pursuant to its subpoena power or its equivalent, the books, records and other information relating to Tax liabilities or potential Tax liabilities of the Shareholders for all periods prior to and including the Closing Date and shall preserve all such books, records and other information until the expiration of any applicable statute of limitations for assessment or refund of Taxes or extensions thereof. Notwithstanding the provisions of this Section 5.1, while the existence of an adversarial proceeding between or among the Parties will not abrogate or suspend the provisions of this Section 5.1, as to such records or other information directly pertinent to such

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 134 of 232   Document 1-1

dispute, the Shareholders' Representative may not utilize this Section 5.1 but rather, absent agreement, must utilize the rules of discovery.

Section 5.2.    Employee Matters.

(a)    Continuation of Employee Benefits.  For a period of not less than one year after the Closing Date (or, if shorter, during the period of continued employment of the relevant Current Employee), Buyer shall, or shall cause the Surviving Corporation and its Subsidiaries to, (i) provide each Current Employee a base salary at least equal to that provided to such Current Employee by the Company or its applicable Subsidiary as of the Effective Time and (ii) provide the Current Employees with benefit plans, programs, agreements and arrangements (other than equity-based (including any employee stock ownership plan), defined benefit pension, retiree or post-termination health or life insurance, and non-qualified deferred compensation plans, programs, agreements and arrangements) that are, in the aggregate, no less favorable to the Current Employees than the benefit plans, programs, agreements and arrangements (other than equity-based (including the ESOP), defined benefit pension, retiree or post-termination health or life insurance, and non-qualified deferred compensation plans, programs, agreements and arrangements) that the Company and its Subsidiaries provide for the benefit of the Current Employees as of the Effective Time.

(b)    Service Credit.  Buyer shall, or shall cause the Surviving Corporation and its Subsidiaries to, recognize all service with the Company and its Subsidiaries through the Effective Time for purposes of eligibility, vesting and entitlement to benefits (but not benefit accrual) under any benefit plan, program, agreement or arrangement for which an employee's period of service is relevant and that is provided by Buyer or the Surviving Corporation and its Subsidiaries for the benefit of the Current Employees after the Effective Time ("Buyer's Plans") to the same extent such Current Employees' service was recognized by the Company or any of its Subsidiaries for the same purpose under an analogous Benefit Plan and except to the extent such credit would result in the duplication of benefits or compensation for the same period of service.   Solely with respect to the calendar year in which the Closing Date occurs, Buyer shall, or shall cause the Surviving Corporation and its Subsidiaries to, use commercially reasonable efforts to (i) cause all pre-existing condition (or actively at work or similar) limitations, eligibility waiting periods, evidence of insurability requirements and other conditions under such group health plans to be waived with respect to Current Employees and their respective eligible dependents to the extent they would not apply (or were previously satisfied) under the comparable Benefit Plan in which such Current Employees and their respective eligible dependents participated immediately prior to the Closing, and (ii) provide Current Employees and their respective eligible dependents with credit for any co-payments, deductibles and offsets (or similar payments) made during the plan year in which the Closing occurs for the purpose of satisfying any applicable deductible, out-of-pocket or similar requirements under any such group health plan with respect to the same plan year.

(c)    Company 401(k) Plan.  At least one Business Day prior to the Closing Date, but contingent upon the Closing, the Company shall (i) take all actions necessary to terminate the American Appraisal Associates Retirement Investment Plan (the "Company 401(k) Plan") in compliance with its terms and the requirements of applicable Law, (ii) cease all contributions to the Company 401(k) Plan with respect to compensation

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 135 of 232   Document 1-1

attributable to periods after the date on which the Company 401(k) Plan is terminated, and (iii) one hundred percent vest all participants under the Company 401(k) Plan, with such termination, cessation and vesting to be effective no later than the Business Day preceding the Closing Date. Buyer shall provide all Current Employees who have an account balance under the Company 401(k) Plan the opportunity to elect a direct rollover of the Current Employee's account balance, including an in-kind rollover of any outstanding plan loans, under the Company 401(k) Plan to Buyer's 401(k) defined contribution retirement plan in which such Current Employee will be eligible to participate following the Closing. Prior to or at the Closing, the Company shall present evidence to Buyer in a form reasonably satisfactory to Buyer of the Company's compliance with the requirements of this Section 5.2(c). Buyer shall be responsible for all costs, fees and expenses incurred by Buyer or the Company in connection with the termination of the Company 401(k) Plan.

(d)    No Third-Party Beneficiaries.    The Parties acknowledge and agree that all provisions contained in this Section 5.2 are included for the sole benefit of the Parties hereto and that no third-party shall have any rights or remedies, including any third-party beneficiary rights, as a consequence of this Section 5.2. Nothing in this Section 5.2, whether express or implied, shall (i) constitute an amendment to any Benefit Plan or any other benefit or compensation plan, program, policy, agreement or arrangement, (ii) prohibit or limit the ability of Buyer, the Surviving Corporation, or any of its Subsidiaries from amending, modifying, or terminating any benefit or compensation plan, program, policy, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them, (iii) obligate Buyer, the Surviving Corporation or any of its Subsidiaries to retain the employment of a particular employee or maintain any particular compensation (except as set forth in Section 5.2(a)(i)) or benefit plan, program, policy, agreement or arrangement, (iv) create any obligation of the Parties with respect to any benefit or compensation plan, program, agreement or arrangement of Buyer, the Company, the Surviving Corporation or any of their Subsidiaries following the Closing, or (v) confer on any Current Employee or any other Person any right to employment or continued employment or any particular term or condition of employment (except as set forth in Section 5.2(a)(i)) or limit the ability of the Buyer, the Surviving Corporation or any of their Affiliates to terminate the employment of any employee, including any Current Employee, at any time and for any or no reason.

Section 5.3.    Directors, Officers and Employees.

(a)    Indemnification.    The articles of incorporation and bylaws of the Surviving Corporation shall contain provisions no less favorable with respect to the exculpation, indemnification and advancement or reimbursement of expenses of directors, officers and employees of the Company and its Subsidiaries than are set forth in the Restated and Amended Articles of Incorporation and Amended and Restated Bylaws of the Company as in effect on the date of this Agreement. For a period of six years after the Effective Time, Buyer shall not, and shall not permit the Surviving Corporation or any of its Subsidiaries to, amend, repeal or otherwise modify any provision in the Surviving Corporation's or any of its Subsidiaries' certificate of incorporation or bylaws (or equivalent governing document) relating to the exculpation, indemnification or advancement or reimbursement of expenses of any director, officer or employee (unless required by Law), it being the intent of the Parties that the directors, officers and employees of the Surviving Corporation and its Subsidiaries shall continue to be entitled to such

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 136 of 232   Document 1-1

exculpation, indemnification and advancement or reimbursement of expenses to the full extent of the Law. Notwithstanding anything to the contrary, the Shareholders' Representative and each Shareholder hereby agree that with respect to the amount of any claim for indemnification or any payment obligation for which such Shareholder is, pursuant to a Final Resolution, liable to any Buyer Indemnified Party under ARTICLE 8, such Shareholder will not be entitled to seek indemnification, contribution or reimbursement of such amount from the Surviving Corporation or any of its Subsidiaries.

      (b)   Insurance.

      (i)   Prior to the Effective Time, the Company shall cause to be obtained a "tail" liability insurance policy covering each Person currently covered by the Company's directors' and officers' liability insurance policy, and each Person who becomes covered by the Company's directors' and officers' liability insurance policy prior to the Effective Time, with a claims period of at least six and one-half years from and after the Effective Time and in amount and scope at least as favorable as the Company's directors' and officers' liability insurance policy as of the date hereof, for claims arising from facts or events that occurred at or prior to the Effective Time, including the transactions contemplated by this Agreement (the "D&O Tail Policy").

      (ii)   Prior to the Effective Time, the Company shall cause to be obtained a "tail" errors and omissions insurance policy covering each Person currently covered by the Company's errors and omissions insurance policy, and each Person who becomes covered by the Company's errors and omissions insurance policy prior to the Effective Time, with a claims period of at least three years from and after the Effective Time and in amount and scope at least as favorable as the Company's errors and omissions insurance policy as of the date hereof, for claims arising from facts or events that occurred at or prior to the Effective Time, including the transactions contemplated by this Agreement (the "E&O Tail Policy").

      (iii)   Buyer and the Company shall each be responsible for 50% of the aggregate premium amount for the D&O Tail Policy and the E&O Tail Policy, which amount shall be paid in the manner set forth in this Section 5.3(b)(iii). Prior to the Closing, the Company will pay or cause to be paid to the applicable insurance provider the entire aggregate premium amount for the D&O Tail Policy and the E&O Tail Policy, of which amount $335,509 (the "Liability Insurance Premium Amount") shall be a Company Transaction Expense. The Company shall be entitled to retain the entire amount of any premium reimbursement received by the Company with respect to its prior directors' and officers' liability insurance policy and prior errors and omissions insurance policy. For purposes of this Section 5.3(b)(iii), the aggregate premium amount shall include all Taxes and commissions imposed upon the payment of the applicable premium.

      (c)   Successors and Assigns. If Buyer or the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 137 of 232   Document 1-1

merger or (ii) transfers or conveys all or substantially all of its assets to any Person, then, and in each such case, Buyer shall cause proper provision to be made so that the successors and assigns of Buyer or the Surviving Corporation, as the case may be, expressly assume the obligations set forth in this Section 5.3.

(d)     Third Party Beneficiaries.  The provisions of this Section 5.3 are (i) intended to be for the benefit of, and shall be enforceable by, each Person who is now, or who at any time prior to the date of this Agreement was, or who prior to the Effective Time becomes, a director, officer or employee of the Company, any of its Subsidiaries or any other entity that the Company or any of its Subsidiaries owns or owned an equity security (including in his or her role as a fiduciary of the employee benefit plans of the Company or any of its Subsidiaries) (an "Indemnified Agent") and his or her heirs and representatives and (ii) in addition to, and not in substitution of, any other rights, including rights to indemnification and advancement of expenses, that any Indemnified Agent may be entitled to, or hereafter acquire, under any Law, Contract, provision of the Company's or the Surviving Corporation's articles of incorporation or bylaws or otherwise.

Section 5.4.     Intermediary Transaction.  From and after the Closing, Buyer shall not take any action with respect to the Surviving Corporation that would cause the transactions contemplated by this Agreement to constitute part of a transaction that is the same as, or substantially similar to, the "Intermediary Transaction Tax Shelter" described in Internal Revenue Service Notices 2001-16 and 2008-111.

Section 5.5.     Merger Sub Compliance.  Without limiting any other provision of this Agreement, Buyer shall cause Merger Sub (and the Surviving Corporation) to comply with, and perform its obligations under, this Agreement.

Section 5.6.     Further Assurances.  From time to time following the Effective Time, upon the request of any other Party and without further consideration, each Party shall execute and deliver to the requesting Party such documents and take such action as the requesting Party reasonably requests to consummate, effect, confirm or evidence the intent and purpose of the Parties under this Agreement and the transactions contemplated hereby.

Section 5.7.     Special Litigation Matters Escrow.  On the date that is 60 months following the Closing Date (the "Step Down Date"), Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each holder of shares of Company Common Stock who received a portion of the Merger Consideration pursuant to Section 2.2(c) (collectively, the "Participating Shareholders") an amount, determined based on such Participating Shareholder's Pro Rata Share, such that the funds then remaining in the Escrow Account, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, would equal the Special Indemnity Escrow Amount; provided, however, that in no event shall Shareholders' Representative, any Participating Shareholder or any other Person be required to contribute any additional amount to the Escrow Account at any time following the Closing.  On and after the Step Down Date, upon the Final Resolution of each of the Special Litigation Matters, the Special Indemnity Escrow Amount shall be reduced as follows:

(a)     On the Step Down Date, if neither the Thailand Litigation nor the Italy Litigation has reached a Final Resolution, then no amount of the Special Indemnity

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 138 of 232   Document 1-1

Escrow Amount shall be disbursed by the Escrow Agent to the Participating Shareholders on the Step Down Date;

(b) On the Step Down Date: (i) if either the Thailand Litigation or the Italy Litigation has reached a Final Resolution, then, on the Step Down Date, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being $6,000,000; (ii) if both the Thailand Litigation and the Italy Litigation have reached a Final Resolution, but one or both of the Germany Threatened Litigation and the Italy Threatened Litigation have resulted in a then-pending litigation, arbitration or similar proceeding that has not reached a Final Resolution (each, a "Pending Litigation"), then, on the Step Down Date, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being the lesser of (A) the aggregate amount of monetary damages sought in all Pending Litigations and (B) $2,000,000; and (iii) if both the Thailand Litigation and the Italy Litigation have reached a Final Resolution and neither the Germany Threatened Litigation nor the Italy Threatened Litigation is, on the Step Down Date, a Pending Litigation, then, on the Step Down Date, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being $0.

(c) Following the Step Down Date: (i) if either the Thailand Litigation or the Italy Litigation reaches a Final Resolution, then, on the date of such Final Resolution, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being $6,000,000; (ii) if both the Thailand Litigation and the Italy Litigation reach a Final Resolution, but, on the date of the later of the Final Resolution of the Thailand Litigation and the Italy Litigation, one or both of the Germany Threatened Litigation and the Italy Threatened Litigation is a Pending Litigation, then, on the date of the later of the Final Resolution of the Thailand Litigation and the Italy Litigation, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for any pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being the lesser of (A) the aggregate amount of monetary

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 139 of 232    Document 1-1

damages sought in all Pending Litigations and (B) $2,000,000; and (iii) if both the Thailand Litigation and the Italy Litigation have reached a Final Resolution and neither the Germany Threatened Litigation nor the Italy Threatened Litigation is, on the date of the later of the Final Resolution of the Thailand Litigation and the Italy Litigation, a Pending Litigation, then, on the date of the later of the Final Resolution of the Thailand Litigation and the Italy Litigation, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being $0.

(d)     For the avoidance of doubt, if on any date on or after the Step Down Date, (i) both the Italy Litigation and the Thailand Litigation have reached a Final Resolution and (ii) on or after the date of the later of the Final Resolution of the Italy Litigation and the Thailand Litigation, (A) neither the Germany Threatened Litigation nor the Italy Threatened Litigation is a Pending Litigation and/or (B) all Pending Litigations have reached a Final Resolution, then, on such date, Buyer and Shareholders' Representative shall instruct the Escrow Agent to disburse to each Participating Shareholder, an amount, determined based on such Participating Shareholder's Pro Rata Share, of the then remaining Special Indemnity Escrow Amount that would result, after giving effect to all such disbursements and any reserves for pending claims under the Escrow Agreement, in the then remaining balance of the Special Indemnity Escrow Amount being $0.

(e)     All disbursements to be made by the Escrow Agent to the Participating Shareholders pursuant to this Section 5.7 may be made to Shareholders' Representative, acting as attorney-in-fact and agent of all Participating Shareholders, and Shareholders' Representative shall distribute all such disbursements to the Participating Shareholders in accordance with their respective Pro Rata Share.

Section 5.8.    Tax Matters.    The provision of this Section 5.8 shall govern the allocation of responsibility as between Buyer, the Shareholders and the Shareholders' Representative for certain Tax matters following the Closing Date:

(a)     Tax Returns.    Following the Closing, the Company shall prepare and file, at its expense, on a timely basis all Tax Returns of the Company or any Subsidiary for any period beginning prior to the Closing Date related to Pre-Closing Income Taxes (each a "Pre-Closing Income Tax Return").    To the extent the Company or any Subsidiary historically utilized a paid-preparer with respect to the applicable Pre-Closing Income Tax Return, the Company or such Subsidiary shall utilize such paid-preparer (or such other certified public accounting firm reasonably satisfactory to Shareholders' Representative and Buyer) as paid preparer for such Pre-Closing Income Tax Return.    All such Pre-Closing Income Tax Returns shall be prepared in accordance with the conventions provided in this Section 5.8. The Company shall pay any Pre-Closing Income Taxes shown on any such Pre-Closing Income Tax Return (subject to indemnification as provided in ARTICLE 8).

(b)     Tax Return Procedure.    Following the Closing Date, Buyer shall provide a draft of any Pre-Closing Income Tax Return (including any amended return) to

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 140 of 232   Document 1-1

Shareholders' Representative for its review and comment at least 30 days prior to the due date, taking into account any available extensions (or as soon as practicable if such Pre-Closing Income Tax Return is due less than 30 days following the Closing Date). All reasonable comments and changes requested by Shareholders' Representative shall be incorporated in the Pre-Closing Income Tax Return actually filed; provided such comments are consistent with applicable Tax Law and the provisions of this Agreement. Shareholders' Representative shall provide such comments and changes no later than five Business Days prior to the due date taking into account any available extensions (or as soon as practicable if such Pre-Closing Income Tax Return is due less than 30 days following the Closing Date). Any dispute with respect to the Pre-Closing Income Taxes reflected on any Pre-Closing Income Tax Return shall be resolved in the manner provided in Section 5.8(h).

(c) <u>Reporting Methodologies</u>. Except as otherwise required by applicable Law, Buyer, the Company and Shareholders' Representative agree with respect to each Pre-Closing Income Tax Return as follows: (i) to prepare (or caused to be prepared) each such Pre-Closing Income Tax Return on a basis consistent with the Company's existing procedures, practices and accounting methods; (ii) to report (and have the Company and each Subsidiary of the Company report) any amounts paid by the Company or any Subsidiary of the Company with respect to accountants, lawyers and investment bankers for services in connection with the Merger, to the extent paid or accrued on or prior to the Closing Date, as being deductible for income Tax purposes on or before the Closing Date (or portion of the Tax period beginning before the Closing Date and ending after the Closing Date which ends on the Closing Date) and to not apply the "next day rule" under Treasury Regulation section 1.1502-76(b)(1)(ii)(B) with respect to such deductions; (iii) to make (and have the Company and each Subsidiary of the Company make) an election under Revenue Procedure 2011-29 to deduct seventy percent (70%) of any amounts that are success-based fees as defined in Treasury Regulation section 1.263(a)-5(f); (iv) to report (and have the Company and each Subsidiary of the Company report) the payment of any benefit or amount tied to the Merger or accelerated vesting of any benefit tied to the Merger as being deductible for income Tax purposes on or before the Closing Date (or portion of the Tax period beginning before the Closing Date and ending after the Closing Date which ends on the Closing Date ending on the Closing Date) and to not apply the "next day rule" under Treasury Regulation section 1.1502-76(b)(1)(ii)(B) with respect to such deductions; (v) that no election under Section 338(g) of the Code will be made with respect to the acquisition of the Company or any Subsidiary of the Company pursuant to this Agreement; (vi) that no election shall be made by any Party (or any Subsidiary of such Party) under Treasury Regulation section 1.1502-76(b)(2) (or any similar provision of applicable Law) to ratably allocate items incurred by the Company and its Subsidiaries; (vii) any net operating loss, if any, reported on a Pre-Closing Income Tax Return will be carried back to the maximum extent permitted by applicable Law; (viii) to report (and have the Company and each Subsidiary of the Company report) any gains, income, deductions, losses, or other items realized by the Company or any Subsidiary of the Company on the Closing Date resulting from any Buyer Closing Date Transactions as occurring on the day after the Closing Date pursuant to the "next day rule" under Treasury Regulation section 1.1502-76(b)(1)(ii)(B) and (ix) pursuant to Treasury Regulation section 1.83-6(a), the deduction for the vesting of the Restricted Stock shall be claimed in the Company's taxable year which includes December 31, 2015 and, therefore, will not be claimed in a Pre-Closing Income Tax Return. Neither Buyer, the Company nor any Subsidiary of the Company shall file any Pre-Closing Income Tax Return with an original due date, including available extensions,

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 141 of 232   Document 1-1

prior to the date of this Agreement for which the Company determined such filing was not required or impractical without the prior written consent of Shareholders' Representative. Unless otherwise required by a determination of the applicable Tax authority that is final, neither Buyer, the Company or any Subsidiary shall file a Tax Return that is inconsistent with this Section 5.8 and neither Buyer, the Company nor any Subsidiary of the Company shall take any position during the course of any Tax audit, proceeding or other dispute that is inconsistent with any provision of this Section 5.8.

(d) _Amendment_. After the Closing, Buyer and the Company shall not, and shall cause the Company or any Subsidiary to, amend, restate, or otherwise modify any Tax Return filed by the Company or any Subsidiary with respect to a period starting prior to the Closing Date without the prior written consent of the Stockholders' Representative (which consent shall not be unreasonably withheld or delayed).

(e) _Refund_. Any refund or credit of income Taxes (including any interest paid thereon) for any Pre-Closing Income Tax Return of the Company or any of its Subsidiaries or for a period starting prior to the Closing Date (and attributable to the portion of the period ending on the Closing Date for any Tax period ending after the Closing Date) other than a refund or credit arising from a net operating loss, credit or similar item arising in a taxable period beginning after the Closing Date or in the case of a taxable period which includes but does not end on the Closing Date, the portion of such period commencing after the Closing Date (a "Pre-Closing Income Tax Refund"), net of any reasonable out-of-pocket expenditures incurred by Buyer, the Company or any Subsidiary of the Company in order to obtain such Pre-Closing Income Tax Refund, shall be the property of the Shareholders and shall be paid to Shareholders' Representative for payment to the Shareholders (based on each Shareholder's Pro Rata Share) by Buyer if such amount (or the benefit of such amount, if, for example, a Pre-Closing Income Tax Refund is credited against income Tax for another year) is received by Buyer or the Company or any of their respective Subsidiaries or Affiliates). Buyer shall cooperate in the filing of a claim for refund for the Company or any of its Subsidiaries with respect to any Pre-Closing Income Tax Refund if: (A) Shareholders' Representative reasonably requests that Buyer, the Company or any Subsidiary of the Company file such claim for refund; (B) all costs related to the preparation of such claim for refund are paid for by the Shareholders; and (C) the filing of such claim for refund does not materially and adversely affect Buyer, the Company or any Subsidiary of the Company as reasonably determined by Buyer.

(f) _Conduct and Notice of Audits_. If an audit or examination is commenced, an adjustment is proposed or any other claim is made by any Tax authority, or the initiation of any discussion, filing or other action by Buyer, the Company or any Subsidiary of the Company with respect to the Company or any of its Subsidiaries with respect to jurisdictions that the Company and its Subsidiaries did not file a Tax Return for such period, in each case, with respect to Taxes that are allocated to the Shareholders or for which the Shareholders could be liable or responsible under this Agreement (together with any related proceeding, a "Tax Proceeding"), then Buyer, the Company or the applicable Subsidiary of the Company shall promptly notify Shareholders' Representative of such Tax Proceeding (or prior to the initiation of such action, if applicable). Notwithstanding anything to the contrary in Section 8.4, Shareholders' Representative may elect, at the Shareholders' expense, to have control over the conduct of such Tax Proceeding and the Company shall take any actions (including providing powers of attorney) necessary for Shareholders'

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 142 of 232   Document 1-1

Representative to have such control; provided, however, that, in such case, (i) Buyer may participate in such Tax Proceeding at its own expense; (ii) Shareholders' Representative shall not settle any Tax Proceeding in a manner that could reasonably be expected to adversely affect Buyer, the Company or any Subsidiary of the Company after the Closing Date without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed); and (iii) Shareholders' Representative shall keep Buyer timely informed with respect to the commencement, status and nature of any Tax Proceeding.

(g) <u>Cooperation on Tax Matters</u>. Buyer, the Company, each Subsidiary of the Company and Shareholders' Representative shall cooperate fully, as and to the extent reasonably requested, in connection with the filing of Tax Returns pursuant to this <u>Section 5.8</u> and any audit, appeal, hearing, litigation or other proceeding or filing with respect to Taxes of the Company or any Subsidiary or any Shareholder. Such cooperation shall include the retention (or delivery) and (upon request) the provision of records and information that are reasonably relevant to any Tax proceeding and making employees reasonably available on a mutually convenient basis to provide additional information, explanation or testimony of any material provided hereunder.

(h) <u>Disputes</u>. Any dispute as to any amount of underlying Tax addressed by this <u>Section 5.8</u> shall be resolved by submission of the disputed items to an independent certified public accounting firm reasonably satisfactory to both Buyer and Shareholders' Representative (the "<u>Independent Accountants</u>"). The Independent Accountants, acting as an expert only and not as an arbitrator, shall be instructed to resolve any such disputes within the earlier of 30 days after its appointment or three days prior to the due date for filing the applicable Tax Return. The resolution of such disputes by the Independent Accountants shall be set forth in writing, shall be within the range of dispute between Buyer and Shareholders' Representative and shall be binding upon all Parties. The fees and expenses of the Independent Accountants shall be borne equally by the Shareholders, on the one hand, and Buyer, on the other hand. If any dispute with respect to a Tax Return is not resolved prior to the due date of such Tax Return, such Tax Return shall be initially filed in the manner which the Party responsible for preparing such Tax Return deems correct, and upon resolution, shall be adjusted in accordance with such resolution.

## ARTICLE 6

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER AND MERGER SUB

Each and every obligation of Buyer and Merger Sub to be performed on or after the Closing Date under this Agreement is subject to the satisfaction (or written waiver by Buyer) as of the Closing of each of the following conditions:

Section 6.1. <u>Accuracy of Representations and Warranties</u>. Each of the representations and warranties of the Company set forth in this Agreement shall be true and correct as of the Closing Date as though then made (other than representations and warranties of the Company set forth in this Agreement that speak as of a specific date or time, which need be true and correct only as of such date or time), except for breaches of representations and warranties (determined for these purposes without giving effect to any qualification as to "materiality," "Company Material Adverse Effect" or similar qualification) that, individually or in the aggregate, would not constitute a Company Material Adverse Effect; provided; however, that each Fundamental

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 143 of 232   Document 1-1

Representation shall be true and correct in all material respects, other than Section 3.1(d) (Capitalization) which shall be true and correct in all respects except for any breach of such representation that is not reasonably expected to result in Losses in excess of $750,000; and the Company shall have delivered to Buyer a certificate dated the Closing Date and signed by an officer of the Company in the officer's capacity as such confirming the foregoing.

Section 6.2.   Performance of Obligations.  The Company shall have performed and complied in all material respects with all covenants and obligations of the Company required by this Agreement to be performed or complied with by the Company on or prior to the Closing (it being understood that this Section 6.2 shall be construed with respect to all covenants and obligations taken as a whole, as opposed to each covenant and obligation individually); and the Company shall have delivered to Buyer a certificate dated the Closing Date and signed by an officer of the Company in the officer's capacity as such confirming the foregoing.

Section 6.3.   Delivery of Documents.   The Company shall have delivered, or caused to have been delivered, to Buyer the documents described in Section 9.1.

Section 6.4.   No Legal Prohibition.   No preliminary or permanent injunction or other Law or Order (excluding Regulatory Laws and Orders arising thereunder or related thereto) shall have been enacted, entered, promulgated, adopted, issued or enforced by any Governmental Entity that is then in effect and has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 6.5.   Company Requisite Shareholder Vote.   This Agreement and the transactions contemplated hereby, including the Merger, shall have been approved by the Company Requisite Shareholder Vote in accordance with the WBCL.

Section 6.6.   Company Material Adverse Effect.   Since the date of this Agreement, there shall not have occurred and be continuing a Company Material Adverse Effect.

Section 6.7.   ESOP Matters.   The ESOP Financial Advisor shall have issued the ESOP Fairness Opinion, the ESOP Trustee shall have made and certified the ESOP Determination, the ESOP Approval shall have been obtained and certified by the ESOP Trustee, and the Company shall have properly adopted and executed the ESOP Amendment.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY

Each and every obligation of the Company to be performed on or after the Closing Date under this Agreement is subject to the satisfaction (or written waiver by the Company) as of the Closing of each of the following conditions:

Section 7.1.   Accuracy of Representations and Warranties.   Each of the representations and warranties of Buyer and Merger Sub set forth in this Agreement shall be true and correct as of the Closing Date as though then made (other than representations and warranties of Buyer and Merger Sub set forth in this Agreement that speak as of a specific date or time, which need be true and correct only as of such date or time), except for breaches of such representations and warranties (determined for these purposes without giving effect to any "materiality," "material

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 144 of 232   Document 1-1

adverse effect" or similar qualification) that, individually or in the aggregate, would not reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with any of the transactions contemplated by this Agreement; and Buyer shall have delivered to the Shareholders' Representative a certificate dated the Closing Date and signed by an officer of Buyer in the officer's capacity as such confirming the foregoing.

Section 7.2. <u>Performance of Obligations</u>. Buyer and Merger Sub shall have performed and complied in all material respects with all covenants and obligations of Buyer and Merger Sub required by this Agreement to be performed or complied with by Buyer and Merger Sub on or prior to the Closing (it being understood that this <u>Section 7.2</u> shall be construed with respect to all covenants and obligations taken as a whole, as opposed to each covenant and obligation individually); and Buyer shall have delivered to the Shareholders' Representative a certificate dated the Closing Date and signed by an officer of Buyer in the officer's capacity as such confirming the foregoing.

Section 7.3. <u>Delivery of Certain Payments and Documents</u>. Buyer shall have delivered, or caused to have been delivered, to the applicable payees, the wire transfer contemplated by <u>Section 2.2</u> and to the Shareholders' Representative, each of the documents described in <u>Section 9.2</u>.

Section 7.4. <u>No Legal Prohibition</u>. No preliminary or permanent injunction or other Law or Order (excluding Regulatory Laws and Orders arising thereunder or related thereto) shall have been enacted, entered, promulgated, adopted, issued or enforced by any Governmental Entity that is then in effect and has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 7.5. <u>Company Requisite Shareholder Vote</u>. This Agreement and the transactions contemplated hereby, including the Merger, shall have been approved by the Company Requisite Shareholder Vote in accordance with the WBCL.

Section 7.6. <u>ESOP Matters</u>. The ESOP Financial Advisor shall have issued the ESOP Fairness Opinion, the ESOP Trustee shall have made and certified the ESOP Determination, the ESOP Approval shall have been obtained and certified by the ESOP Trustee, and the Company shall have properly adopted and executed the ESOP Amendment.

## ARTICLE 8

## INDEMNIFICATION

Section 8.1. <u>Indemnification by Shareholders</u>.

(a) <u>General</u>. From and after the Closing, and subject to the terms and conditions of this <u>ARTICLE 8</u> and the Escrow Agreement, Buyer and its Affiliates (including the Surviving Corporation), and their respective directors, officers, employees, shareholders, members, partners, Affiliates and controlling persons (collectively, the "<u>Buyer Indemnified Parties</u>"), shall be indemnified and held harmless by the Shareholders, solely through claims made in accordance with the Escrow Agreement, from and against all Losses asserted against or incurred by any Buyer Indemnified Party by reason of or

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 145 of 232   Document 1-1

resulting from (i) any breach of any of the representations and warranties of the Company set forth in Section 3.1, and (ii) each of the Dollar One Indemnity Items.

(b)    Limitations. The Shareholders' obligations under Section 8.1(a) shall be subject to the following limitations:

(i)    the Shareholders shall not have any liability for Losses under Section 8.1(a) for any individual item, or group of items arising out of the same condition or circumstance, where the Losses related thereto for which the Shareholders would otherwise be required to provide indemnification are less than $25,000 (the "De Minimis Threshold"), and no Losses related thereto shall be counted for purposes of determining whether the Deductible has been achieved; provided, however, that the limitation set forth in this Section 8.1(b)(i) shall not apply to the Dollar One Indemnity Items (other than Indemnified Taxes) or an act of actual common law fraud by the Company;

(ii)    the Shareholders shall not have any liability for Losses under subclause (i) of Section 8.1(a) unless and until the aggregate dollar amount of all Losses related thereto for which the Shareholders would otherwise be required to provide indemnification exceeds an amount equal to $750,000 (the "Deductible"), at which point the Shareholders, subject to the other provisions of this Section 8.1(b), shall indemnify the Buyer Indemnified Parties for such Losses, but only to the extent such Losses exceed $750,000; provided, however, that the limitation set forth in this Section 8.1(b)(ii) shall not apply to the extent such Losses result from a breach of a Fundamental Representation or an act of actual common law fraud by the Company;

(iii)    the Shareholders shall not have any liability for Losses under Section 8.1(a) to the extent the aggregate amount of Losses related thereto for which the Shareholders would otherwise be required to provide indemnification exceeds the then current Escrow Amount held in the Escrow Account; provided, however, that the limitation set forth in this Section 8.1(b)(iii) shall not apply to the extent such Losses result from an act of actual common law fraud by the Company;

(iv)    except to the extent such damages are awarded to a third party, the Shareholders shall not have any liability for Losses under Section 8.1(a) for punitive or exemplary damages, and no Losses related thereto shall be aggregated for purposes of subclause (ii) of this Section 8.1(b);

(v)    the obligation of the Shareholders to indemnify the Buyer Indemnified Parties against any Losses under Section 8.1(a) (other than the Special Litigation Matters) shall be reduced by the full amount of any reserve, provision or allowance (in the form of an accrued liability or an offset to an asset or similar item in conformity with GAAP as applied by the Company on a consistent basis) that was specifically identified (by liability or asset or category of liabilities or assets) on the Recent Balance Sheet with respect to the matter for which the Shareholders would otherwise be required to provide such indemnification;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 146 of 232   Document 1-1

(vi)    the obligation of the Shareholders to indemnify the Buyer Indemnified Parties against any Losses under Section 8.1(a) shall be reduced (A) to take into account any Tax benefits actually realized by any Buyer Indemnified Party with respect to such Losses, (B) by the amount received by any Buyer Indemnified Party pursuant to any indemnification by, or any indemnification or other agreement with, any third party with respect to such Losses and (C) by the amount of insurance proceeds or other cash receipts or sources of reimbursement received by any Buyer Indemnified Party from third parties, including third party insurers, with respect to such Losses (in each case of (B) and (C), net of any deductibles or other payments made or costs incurred in connection with such recovery); provided, however, that (1) the Parties agree that no right of subrogation shall accrue or inure to the benefit of any source of any amounts described in this subclause (vi), (2) if the Shareholders pay to any Buyer Indemnified Party (through a disbursement from the Escrow Account) an amount in respect of Losses and any Buyer Indemnified Party thereafter receives from a third party an amount in respect of such Losses, then Buyer shall promptly repay to the Shareholders' Representative (who shall distribute such payment to the Shareholders in accordance with their Pro Rata Share) an amount equal to the lesser of that sum and the amount that the Shareholders paid in respect of such Losses and (3) Buyer shall, and shall cause the other Buyer Indemnified Parties to, use commercially reasonable efforts to seek any contractually available indemnification from the Company's third party subcontractors that perform services on the Company's behalf for the Company's client engagements and (4) Buyer shall, and shall cause the other Buyer Indemnified Parties, to use commercially reasonable efforts to pursue available insurance under the Company's and its Subsidiaries' insurance policies;

(vii)    the Shareholders shall not have any liability for Losses under subclause (i) of Section 8.1(a) following the date that is 18 months after the Closing Date; provided, however, that (1) Buyer shall have a right to pursue a claim under subclause (i) of Section 8.1(a) (and shall be entitled to be indemnified for any such Losses) with respect to any breach of a Fundamental Representation until the date that is 60 months after the Closing Date, and (2) Buyer shall preserve its right to pursue a claim under subclause (i) of Section 8.1(a) with respect to a particular breach of representation and warranty if Buyer, prior to the expiration of the applicable period set forth in this Section 8.1(b)(vii), delivers a notice that constitutes an Indemnification Notice, but only with respect to the content of, and on the basis set forth in, such Indemnification Notice;

(viii)    the Shareholders shall not have any liability for Losses under subclauses (ii) and (v) of the definition of Dollar One Indemnity Items following the date that is 12 months after the Closing Date; provided, however, that Buyer shall preserve its right to pursue a claim under such provisions if Buyer, prior to the date that is 12 months after the Closing Date, delivers a notice that constitutes an Indemnification Notice, but only with respect to the content of, and on the basis set forth in, such Indemnification Notice; provided further, it being agreed and understood that Buyer shall be entitled to deliver an Indemnification Notice with respect to subclause (v) of the definition of Dollar One Indemnity Items as soon as an appraisal rights action has been filed;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 147 of 232   Document 1-1

(ix)     the Shareholders shall not have any liability for Losses in respect of subclauses (i), (iii), (iv), (vi), (vii) and (viii) of the definition of Dollar One Indemnity Items following the date that is 60 months after the Closing Date; provided, however, with respect to subclause (viii) of the definition of Dollar One Indemnity Items, if, as of the date that is 60 months after the Closing Date (A) either the Italy Litigation or the Thailand Litigation has not reached a Final Resolution or (B) there exists one or more Pending Litigations, then the Buyer Indemnified Parties' right to be indemnified against Losses in respect of the Italy Litigation or the Thailand Litigation, as applicable, or such Pending Litigations shall survive until the Final Resolution of each of the Italy Litigation and the Thailand Litigation and all such Pending Litigations; and

(x)     notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 8.1 will permit or require the ESOP to indemnify any Persons, or prevent or limit the ESOP Trustee from taking such actions as it reasonably deems necessary to satisfy its obligations under ERISA.

(c)     Mitigation.  Any party seeking indemnification under this Agreement shall make commercially reasonable efforts to mitigate any Losses as and to the extent required by applicable Law.

(d)     Materiality.  For the purposes of determining whether there has been a breach of any representation or warranty of the Company set forth in Section 3.1 and the amount of Losses related thereto, the representations and warranties of the Company set forth in Section 3.1 shall be considered without regard to any qualification as to "materiality" or "Company Material Adverse Effect" set forth therein as if such qualification were deleted from such representation and warranty; provided, however, that this Section 8.1(d) shall not apply (i) to the representations and warranties of the Company set forth in the first sentence of Section 3.1(j), (ii) to any reference to a "Material Contract" or (iii) to any list of "material" documents as required to be listed in any Section of the Company Disclosure Schedule.

Section 8.2.     Indemnification by Buyer.  From and after the Closing and subject to the terms and conditions of this ARTICLE 8, Buyer shall indemnify and hold harmless the Shareholders and their Affiliates, and their respective directors, officers, employees, controlling Persons, heirs and representatives, from and against all Losses asserted against or incurred by any such Person by reason of or resulting from any (a) breach of the representations and warranties of Buyer and Merger Sub set forth in Section 3.2, or (b) breach of the covenants of Buyer and Merger Sub (or the Surviving Corporation) set forth in this Agreement.

Section 8.3.     Procedures Relating to Indemnification Among Buyer and Shareholders.  As promptly as practicable following becoming aware of a claim for which indemnification under this ARTICLE 8 can be obtained, the Party seeking indemnification under this ARTICLE 8 (the "Indemnified Party") shall provide written notice to the Party from whom indemnification is sought (the "Indemnifying Party"), setting forth the specific facts and circumstances, in reasonable detail, relating to such Loss or Losses, the amount of Loss or Losses (if known or reasonably estimable) and the specific Section(s) of this Agreement upon which the Indemnified Party is relying in seeking such indemnification (an "Indemnification Notice"). Except as otherwise set forth in Section 8.1(b), an Indemnified Party's failure to provide an Indemnification

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 148 of 232   Document 1-1

Notice within the time period specified above shall not relieve the Indemnifying Party from its indemnification obligations with respect to the subject of the Indemnification Notice, except to the extent the Indemnifying Party is prejudiced as a result of such failure.

Section 8.4.    Procedures Relating to Indemnification for Third Party Claims.

(a)    Notice.  As promptly as practicable following receipt of written notice of a claim or demand made by any third party, including any Governmental Entity (a "Third Party Claim"), for which the Indemnified Party will be seeking indemnification hereunder, the Indemnified Party shall provide an Indemnification Notice to the Indemnifying Party relating to the Third Party Claim.  Thereafter, upon an Indemnifying Party's assumption of the defense of such Third Party Claim (and for so long as the Indemnifying Party satisfies the Control of Defense Conditions), the Indemnified Party shall deliver to the Indemnifying Party, as promptly as practicable following the Indemnified Party's receipt thereof, copies of all notices and documents, including all court papers, received by the Indemnified Party relating to the Third Party Claim.  Except as otherwise set forth in Section 8.1(b), an Indemnified Party's failure to provide an Indemnification Notice within the time period specified above shall not relieve the Indemnifying Party from its indemnification obligations with respect to the subject of the Indemnification Notice, except to the extent the Indemnifying Party is prejudiced as a result of such failure.

(b)    Defense.  If a Third Party Claim is made against an Indemnified Party, then the Indemnifying Party shall be entitled to participate in the defense of the Third Party Claim and, if the Indemnifying Party so chooses, to assume the defense of the Third Party Claim at its own expense with nationally recognized counsel reasonably acceptable to the Indemnified Party (it being understood that Foley & Lardner LLP or its successor shall be deemed approved for purposes of this Agreement); provided that, prior to the Indemnifying Party assuming control of such defense, it shall first verify to the Indemnified Party in writing within fifteen Business Days of its receipt of the notice of a Third Party Claim that the Indemnifying Party shall indemnify the Indemnified Party (with no reservation of rights as to the merits of the claim for indemnification by the Indemnified Party but subject to the limitations set forth in Section 8.1(b), Section 8.5 and Section 8.6) for all Losses actually incurred by the Indemnified Party with respect to such Third Party Claim (the "Control of Defense Conditions"); and provided further that the Indemnifying Party shall not be entitled to assume control of such defense if (i) the claim relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation, (ii) the claim seeks monetary damages in an amount that exceeds, or that could reasonably be expected to exceed, the amount of funds remaining in the Escrow Account on the date that the Indemnifying Party chooses to assume the defense of such Third Party Claim, after giving effect to any reserves for pending claims under the Escrow Agreement (other than such Third Party Claim); (iii) the claim seeks injunctive or similar equitable relief (excluding, for the avoidance of doubt, equitable relief claims that are ancillary to a claim principally involving monetary damages); (iv) upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to appropriately prosecute or defend such Third Party Claim, or (v) the Indemnified Party reasonably concludes that the Indemnified Party and the Indemnifying Party have conflicting interests with respect to such Third Party Claim or that the Indemnified Party has one or more defenses not available to the Indemnifying Party.  If the Indemnifying

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 149 of 232   Document 1-1

Party assumes such defense by satisfying the Control of Defense Conditions, then (A) the Indemnifying Party shall not be liable to the Indemnified Party for legal expenses subsequently incurred by the Indemnified Party in connection with the defense of the Third Party Claim while the Control of Defense Conditions continue to be satisfied and (B) the Indemnified Party shall have the right to participate in the defense of the Third Party Claim and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party, it being understood, however, that the Indemnifying Party shall control such defense. If the Indemnifying Party chooses to defend any Third Party Claim, then the Indemnifying Party and Indemnified Party shall cooperate in the defense of the Third Party Claim. Such cooperation shall include the retention and (upon the Indemnifying Party's request) provision to the Indemnifying Party of records that are reasonably relevant to the Third Party Claim and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided. If the Indemnifying Party shall control the defense of any Third Party Claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement or compromise of, or ceasing to defend, such Third Party Claim if, pursuant to or as a result of such settlement, compromise or cessation, injunctive or similar equitable relief shall be imposed against the Indemnified Party (excluding, for the avoidance of doubt, equitable relief ancillary to a claim principally involving monetary damages) or if such settlement or compromise does not expressly and unconditionally release the Indemnified Party from all liabilities and obligations with respect to such Third Party Claim, without prejudice. If the Indemnifying Party, within fifteen Business Days after receipt of an Indemnification Notice relating to a Third Party Claim, chooses not to assume defense of the Third Party Claim or fails to defend the Third Party Claim actively and in good faith, then the Indemnified Party shall (upon further notice to the Indemnifying Party) have the right to undertake the defense of the Third Party Claim at the Indemnifying Party's sole cost and expense (to the extent such Third Party Claim is otherwise indemnifiable hereunder). With respect to the Special Litigation Matters and any matter described in clause (v) of the definition of "Dollar One Indemnity Items," the terms and conditions set forth on the Special Indemnification Defense Schedule attached hereto as Exhibit 8.4 shall control over the provisions of this Section 8.4.

Section 8.5.    Sole Source of Indemnification. The Buyer Indemnified Parties' sole source of indemnification payments hereunder shall be claims made against the Escrow Amount in accordance with the Escrow Agreement. In no event shall any Shareholder be directly liable for any indemnification or other payment to any Buyer Indemnified Party hereunder. No Buyer Indemnified Party shall have the right to satisfy, in whole or in part, any amounts owing to such Buyer Indemnified Party under this Agreement, including this ARTICLE 8, or any Contract entered into pursuant to this Agreement by setting off against, withholding or reducing any amounts owed to such Buyer Indemnifying Party by any Shareholder. Nothing in this Section 8.5 shall in any manner limit or restrict a Party's rights in the case of an act of actual common law fraud by Buyer, Merger Sub or the Company.

Section 8.6.    Exclusive Remedy. From and after the Closing, except in the case of an act of actual common law fraud by Buyer, Merger Sub or the Company, the indemnification provisions of this ARTICLE 8 shall be the sole and exclusive remedy with respect to any and all claims arising out of or relating to this Agreement, the negotiation and execution of this Agreement or any Contract entered into pursuant to this Agreement (except to the extent otherwise expressly set forth therein) or the performance by the Parties of its or their terms, and no other remedy shall be had

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 150 of 232   Document 1-1

pursuant to any contract, misrepresentation, strict liability or tort theory or otherwise by any Party and its officers, directors, employees, agents, affiliates, attorneys, consultants, insurers, successors and assigns, all such remedies being hereby expressly waived to the fullest extent permitted under applicable Law; provided that the foregoing shall not in any manner prohibit, limit or restrict the rights of any Party in the case of an act of actual common law fraud by Buyer, Merger Sub or the Company. In addition to the foregoing, except in the case of an act of actual common law fraud by the Company, the amount of indemnification obligations of the Shareholders set forth in this ARTICLE 8 shall be the maximum amount of indemnification obligations set forth hereunder, and neither Buyer nor Merger Sub shall be entitled to a rescission of this Agreement (or any related agreements) or any further indemnification rights or claims of any nature whatsoever, all of which are hereby expressly waived by Buyer and Merger Sub to the fullest extent permitted under applicable Law. The Buyer Indemnified Parties shall be entitled only to a single recovery for all Losses that arise in connection with the matter giving rise to a breach of representation, warranty or covenant, even if such matter shall involve breaches of multiple representations, warranties and covenants.

## ARTICLE 9

## DOCUMENTS TO BE DELIVERED AT THE CLOSING

Section 9.1.    Items to be Delivered by the Company.    At the Closing, the Company shall deliver, or cause to be delivered, to Buyer the following documents, in each case, duly executed or otherwise in proper form:

(a)    the Escrow Agreement, executed by the Shareholders' Representative and the Escrow Agent;

(b)    a noncompetition agreement in substantially the form attached hereto as Exhibit 9.1(b) (each, a "Noncompetition Agreement"), executed by each Key Employee;

(c)    a cash and equity incentive award agreement (each, a "Compensation Agreement"), substantially in the form attached hereto as Exhibit 9.1(c), executed by each Key Employee identified as executing a Compensation Agreement in Exhibit 11.15(b), providing for the payment or award by Buyer or the Surviving Corporation, subject to the terms and conditions set forth therein, of cash or equity interests in Buyer to each such individual;

(d)    the certificates described in Section 6.1 and Section 6.2, in each case, in form and substance reasonably acceptable to Buyer and the Shareholders' Representative;

(e)    a copy of the resolutions of the Company Board described in Section 3.1(b)(ii), certified by the Secretary of the Company;

(f)    the resignations of the directors (or managers) and officers of the Company and its Subsidiaries identified in Exhibit 9.1(f), effective as of the Effective Time;

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 151 of 232   Document 1-1

(g) a copy of the Company Requisite Shareholder Vote, certified by the Secretary of the Company in accordance with the Amended and Restated Bylaws of the Company and the WBCL;

(h) the duly adopted and executed ESOP Amendment, the final ESOP Fairness Opinion issued by the ESOP Financial Advisor and a certificate duly executed by the ESOP Trustee certifying as to the ESOP Determination and the ESOP Approval; and

(i) all other documents, instruments or writings required to be delivered to Buyer at or prior to the Closing pursuant to this Agreement and such other certificates of authority and similar instruments as Buyer reasonably requests.

Section 9.2. <u>Items to be Delivered by Buyer</u>. At the Closing, Buyer shall deliver, or cause to be delivered, to the Escrow Agent the wire transfer contemplated by <u>Section 2.2(a)</u>, to the obligees with respect to the Company Transaction Expenses the wire transfers contemplated by <u>Section 2.3</u>, and to the Shareholders' Representative the wire transfers contemplated by <u>Section 2.2(b)</u> and <u>Section 2.2(d)</u> and the following documents, in each case, duly executed or otherwise in proper form:

(a) the Escrow Agreement, executed by Buyer and Merger Sub;

(b) the Noncompetition Agreements, executed by Buyer;

(c) the Compensation Agreements, executed by Buyer;

(d) the certificates described in <u>Section 7.1</u>, and <u>Section 7.2</u>, in each case, in form and substance reasonably acceptable to the Company and the Shareholders' Representative;

(e) a copy of the resolutions of the Board of Managers of Buyer authorizing and approving this Agreement and the consummation of the transactions contemplated hereby (including the Merger), certified by the Secretary of Buyer;

(f) a copy of the resolutions of the Board of Directors and sole shareholder of Merger Sub authorizing and approving this Agreement and the consummation of the transactions contemplated hereby (including the Merger), certified by the Secretary of Merger Sub; and

(g) all other documents, instruments or writings required to be delivered to the Shareholders' Representative at or prior to the Closing pursuant to this Agreement and such other certificates of authority and similar instruments as the Shareholders' Representative reasonably requests.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 152 of 232   Document 1-1

# ARTICLE 10

## TERMINATION

Section 10.1.  General.  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, only as follows:

(a)  at any time prior to the Closing, by the written agreement of Buyer and the Company;

(b)  by Buyer or the Company if the Closing shall not have occurred on or prior to April 30, 2015 or such other date as Buyer and the Company agree to in writing (the "Termination Date"); provided, however, that if a Party seeking termination pursuant to this subclause (b) is in breach of any of its representations, warranties or covenants set forth in this Agreement and such breach would allow the other Party to refuse to consummate the transactions contemplated by this Agreement due to the condition set forth in Section 6.1 or Section 6.2 (in the case of termination sought by the Company) or Section 7.1 or Section 7.2 (in the case of termination sought by Buyer) not being capable of being satisfied, then that Party may not terminate this Agreement pursuant to this subclause (b);

(c)  by Buyer, if Buyer is not then in material breach of any term of this Agreement, if there occurs a breach of any representation, warranty or covenant of the Company or the Shareholders contained in this Agreement, and which breach is not curable and would cause either of the closing conditions set forth in Section 6.1 or Section 6.2 to not be capable of being satisfied on or prior to the Termination Date;

(d)  by the Company, if the Company is not then in material breach of any term of this Agreement, if there occurs a breach of any representation, warranty or covenant of Buyer or Merger Sub contained in this Agreement, and which breach is not curable and would cause either of the closing conditions set forth in Section 7.1 or Section 7.2 to not be capable of being satisfied on or prior to the Termination Date;

(e)  by Buyer or the Company, if any Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law or Order, or refused to grant any required consent or approval, that has the effect of making the consummation of the transactions contemplated hereby illegal or that otherwise prohibits the consummation of transactions contemplated hereby and such Order or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this subclause (e) shall not be available to a Party if such Order or other action was primarily due to the failure of such Party to perform any of its obligations under this Agreement or such Party's breach of any of its representations or warranties contained in this Agreement; or

(f)  by Buyer or the Company if this Agreement and the transactions contemplated hereby, including the Merger, shall not have been approved by the Company Requisite Shareholder Vote in accordance with the WBCL at the meeting of shareholders called and held by the Company for the purpose thereof after the date of this Agreement (or of any adjournment or postponement thereof).

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 153 of 232   Document 1-1

Section 10.2. _Post-Termination Obligations._   To terminate this Agreement as provided in subclause (b), (c), (d), (e) or (f) of Section 10.1, the terminating Party shall provide the other Parties with written notice of its election to terminate this Agreement, and upon delivery of such written notice in accordance with Section 11.9:

(a)   the transactions contemplated hereby shall be terminated, without further action by any Party;

(b)   Buyer and Merger Sub shall return all documents and other materials relating to the transactions contemplated hereby received from or on behalf of the Company (and all copies thereof), whether so obtained before, on or after the execution and delivery of this Agreement, to the Company in accordance with, and in the manner prescribed by, the Confidentiality Agreement; and

(c)   all information relating to the Company, any of its Subsidiaries, the Business or the transactions contemplated hereby received or accumulated by Buyer, Merger Sub or their respective representatives shall be treated as Evaluation Material in accordance with the Confidentiality Agreement (as supplemented by this Agreement), which shall remain in full force and effect, as supplemented by this Agreement, notwithstanding the termination of this Agreement.

Section 10.3. _Effect of Termination._   If this Agreement is terminated as provided in Section 10.1, then this Agreement shall forthwith become wholly void and of no further force and effect, and there shall be no liability under this Agreement on the part of the Parties, except that the respective obligations of the Parties under the penultimate sentence of Section 4.2 and the provisions of Section 10.2 and ARTICLE 11 (and the Confidentiality Agreement) shall remain in full force and effect; provided, however, that termination shall not relieve any Party from liabilities for damages incurred or suffered by the other Parties as a result of any act of actual common law fraud by such Party or any willful and material breach of this Agreement by such Party prior to such termination.

## ARTICLE 11

## MISCELLANEOUS

Section 11.1. _Shareholders' Representative._

(a)   _Appointment._   By voting in favor of the adoption of this Agreement and the consummation of the Merger or participating in the Merger and receiving the benefits thereof or by signing a Letter of Transmittal, each Shareholder hereby irrevocably appoints the Shareholders' Representative as such Shareholder's representative, attorney-in-fact and agent, with full power of substitution to act in the name, place and stead of such Shareholder in accordance with the terms of this Agreement and to act on behalf of such Shareholder in any amendment of or litigation, arbitration or similar proceeding involving this Agreement, and to do or refrain from doing all such further acts and things, and to execute all such documents, as the Shareholders' Representative shall deem necessary or appropriate in conjunction with any of the transactions contemplated hereby, including the power:

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 154 of 232   Document 1-1

(i)    to execute and deliver, and administer all matters pertaining to performance under, the Escrow Agreement;

(ii)    to administer the Administrative Expense Account in accordance with Section 11.1(e);

(iii)    to take all action necessary or desirable in connection with the waiver of any condition to the obligations of the Company to consummate the transactions contemplated by this Agreement;

(iv)    to negotiate, execute and deliver all ancillary agreements, statements, certificates, notices, approvals, extensions, waivers, undertakings, amendments and other documents required or permitted to be given in connection with the consummation of the transactions contemplated hereby (it being understood that such Shareholder shall execute and deliver any such documents that the Shareholders' Representative designates and agrees to execute);

(v)    to give and receive all notices and communications to be given or received under this Agreement and to receive service of process in connection with any claims under this Agreement and the transactions contemplated hereby;

(vi)    to direct, on behalf of such Shareholder, the payment of any and all amounts due and payable to such Shareholder pursuant to this Agreement;

(vii)    to defend, agree to, object to, negotiate, resolve, enter into settlements and compromises of, demand litigation of, and comply with orders of courts with respect to Third-Party Claims and claims made on the Shareholders by Buyer or Merger Sub pursuant to ARTICLE 8;

(viii)    to defend, agree to, object to, negotiate, resolve, enter into settlements and compromises of, demand litigation of, and comply with orders of courts with respect to actions by holders of Dissenting Shares;

(ix)    to incur any costs and expenses for the account of the Shareholders, manage the payment of such costs and expenses, and make all determinations which may be required or permitted to be taken by the Shareholders under this Agreement, including any engagement of and/or the fees and expenses associated with the engagement of legal counsel, accountants, investment bankers, financial advisers and the ESOP Trustee, the ESOP Financial Advisor and counsel to the ESOP;

(x)    to control on behalf of the Shareholders the privileges and information of the Shareholders pursuant to Section 11.12; and

(xi)    to take all actions that, under this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby, may be taken by such Shareholder and to do or refrain from doing any further act or deed

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 155 of 232    Document 1-1

on behalf of such Shareholder that the Shareholders' Representative deems necessary or appropriate in its sole discretion relating to the subject matter of this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby as fully and completely as such Shareholder could do if personally present.

(b) <u>Access to Information</u>. Prior to the Closing, the Shareholders' Representative shall have reasonable access to information about the Company and its Subsidiaries and the reasonable assistance of the Company's officers and employees for purposes of performing the Shareholders' Representative's duties and exercising the Shareholders' Representative's rights hereunder, including the Duff & Phelps FilesAnywhere online data room established in connection with the transactions contemplated hereby (the "<u>Data Room</u>"), and the Shareholders' Representative shall be entitled to keep, from and after the Closing, a complete copy of the Data Room (to be provided by the Company on the date of this Agreement); provided, however, that, at all times from and after the date of this Agreement, the Shareholders' Representative shall (i) use any nonpublic information from or about the Company or Buyer (including materials contained in the Data Room) only to perform its obligations and exercise its rights under this Agreement and (ii) treat confidentially and not disclose any nonpublic information from or about the Company or Buyer (including materials contained in the Data Room) to anyone (except (A) as required by Law or (B) on a need to know basis to the Shareholders' Representative's advisors and consultants and to the Shareholders, in each case, who agree in writing to treat such information in accordance with this <u>Section 11.1(b)</u>).

(c) <u>Administrative Expense Account</u>. The Shareholders' Representative shall hold the Administrative Expense Amount in the Administrative Expense Account as a fund from which the Shareholders' Representative shall pay any fees, expenses or costs it incurs in performing its duties and obligations under this Agreement and the other documents and instruments executed and delivered pursuant hereto (including the Escrow Agreement) by or on behalf of the Shareholders, including fees and expenses incurred pursuant to the procedures and provisions set forth in <u>Section 8.4</u> and legal and consultant fees, expenses and costs for reviewing, analyzing and defending any claim or process arising under or pursuant to this Agreement. At such time and from time to time that the Shareholders' Representative determines in its good faith discretion that a portion of the Administrative Expense Amount will not be required for the payment of such fees, expenses or costs, the Shareholders' Representative shall distribute to each Shareholder such Shareholder's Pro Rata Share of the applicable amounts from the Administrative Expense Account. The Shareholders will not receive any interest or earnings on the Administrative Expense Amount and irrevocably transfer and assign to the Shareholders' Representative any ownership right that they may otherwise have had in any such interest or earnings. The Shareholders' Representative will not be liable for any loss of principal of the Administrative Expense Amount other than as a result of its willful misconduct.

(d) <u>Liability</u>. The Shareholders' Representative shall not be liable to the Shareholders for any act taken or omitted by it as permitted under this Agreement or the Escrow Agreement and the transactions contemplated hereby and thereby, except to the extent such act is taken or omitted by willful misconduct. The Shareholders' Representative shall not be responsible to any Shareholder in any manner whatsoever for any failure or inability of Buyer or any other Person to honor any of the provisions of this

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 156 of 232   Document 1-1

Agreement. The Shareholders' Representative shall be fully protected by the Shareholders in acting on and relying upon any written notice, direction, request, waiver, consent, receipt or other paper or document which the Shareholders' Representative in good faith believes to be genuine (including facsimiles thereof) and to have been signed or presented by the proper party or parties. The Shareholders' Representative shall not be liable to the Shareholders for any error of judgment, or any act done or step taken or omitted by the Shareholders' Representative in good faith or for any mistake in fact or Law, or for anything that the Shareholders' Representative may do or refrain from doing in connection with this Agreement, except for the Shareholders' Representative's own willful misconduct. The Shareholders' Representative may consult with counsel of its own choice and shall have full and complete authorization and protection for any action taken and suffered by it in good faith and pursuant to the opinion of such counsel.

(e) <u>Indemnity</u>. The Shareholders agree, in accordance with their respective Pro Rata Share, to indemnify the Shareholders' Representative for, and to hold the Shareholders' Representative harmless against, any Losses suffered or incurred without willful misconduct on the part of the Shareholders' Representative arising out of or in connection with the Shareholders' Representative exercising its rights or performing its duties under this Agreement or the Escrow Agreement and the transactions contemplated hereby and thereby, including costs and expenses of successfully defending the Shareholders' Representative against any claim of liability with respect thereto. If not paid directly to the Shareholders' Representative by the Shareholders, any such Losses suffered or incurred by the Shareholders' Representative may be recovered by the Shareholders' Representative from the Administrative Expense Amount at such time as remaining amounts would otherwise be distributable to the Shareholders, if any; provided, however, that, while this <u>Section 11.1(e)</u> allows the Shareholders' Representative to be paid from the Administrative Expense Amount, this <u>Section 11.1(e)</u> does not relieve the Shareholders from their obligation to promptly pay such Losses suffered or incurred by the Shareholders' Representative as they are suffered or incurred, nor does it prevent the Shareholders' Representative from seeking any remedies available to it at law or otherwise.

(f) <u>Enforcement of Agreement</u>. The Parties acknowledge and agree that the Shareholders' Representative shall have the right to enforce the rights of the Shareholders under this Agreement against Buyer and the Surviving Corporation.

Section 11.2. <u>Publicity</u>. The Parties agree that no public release or announcement concerning the transactions contemplated hereby shall be issued or made by or on behalf of any Party without the prior written consent of Buyer and the Shareholders' Representative (which consent shall not be unreasonably withheld, conditioned or delayed), except as such release or announcement may, in the reasonable judgment of the releasing Party, be required by Law, in which case the Party required to make the release or announcement shall use commercially reasonable efforts to allow the other Party reasonable time to comment on such release or announcement in advance of such issuance. Except in connection with the procurement of the necessary consents and approvals, the Parties agree to keep the terms of this Agreement confidential, except to the extent required by applicable Law or for financial reporting purposes and except that the Parties may disclose such terms to their respective accountants and other representatives and direct and indirect shareholders, in connection with the ordinary conduct of their respective businesses (so long as such Persons agree to keep the terms of this Agreement confidential; provided, however, that in connection with obtaining the Company Requisite Shareholder Vote, the Company shall request the Shareholders to keep the

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 157 of 232   Document 1-1

terms of this Agreement confidential). Notwithstanding the foregoing, press releases or similar public announcements shall not include any financial terms of the transaction unless inclusion of any such terms is expressly agreed upon in writing by all Parties hereto or is required by applicable Law.

Section 11.3.  Entire Agreement.  This Agreement (including the exhibits attached hereto, the Company Disclosure Schedule and the Buyer Disclosure Schedule), the agreements and documents referred to herein that relate to the transactions contemplated hereby (including the Related Documents) and the Confidentiality Agreement, supersede all prior agreements and understandings, written and oral, and constitute (together with the other documents and instruments to be executed and delivered pursuant hereto) a complete and exclusive statement of the terms of the agreement among the Parties with respect to its subject matter.

Section 11.4.  Assignment.  No Party shall assign, transfer or encumber this Agreement, or its rights or obligations hereunder, in whole or in part, voluntarily or by operation of Law (including by virtue of a merger or similar transaction), without the prior written consent of Buyer and the Shareholders' Representative, and any attempted assignment, transfer or encumbrance without such consent shall be void and without effect; provided, that Buyer may assign all of its rights and obligations hereunder to any third party who subsequently purchases all or substantially all of the then-existing assets or ownership interests of Buyer and its Subsidiaries in a single transaction or series of related transactions.  Subject to the previous sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective permitted successors and permitted assigns.

Section 11.5.  Governing Law and Language.  This Agreement shall be construed and interpreted according to the Laws of the State of Delaware, excluding any choice of law rules that may direct the application of the Laws of another jurisdiction.  This Agreement shall be construed and interpreted in accordance with the English language only, which language shall be controlling in all respects.  No translation, if any, of this Agreement shall have any force or effect in the interpretation hereof or in the determination of the intent of the Parties hereunder.

Section 11.6.  Consent to Jurisdiction; Waiver of Jury Trial.  Each Party stipulates that any dispute or disagreement between or among the Parties as to the interpretation of any provision of, or the performance of obligations under, this Agreement shall be commenced and prosecuted in its entirety exclusively in, and consents to the exclusive jurisdiction and proper venue of, the courts of the State of Delaware.  Each Party consents to personal and subject matter jurisdiction and venue in such court and waives and relinquishes all right to object to the suitability or convenience of such venue or forum by reason of their present or future domiciles or by any other reason.  The Parties acknowledge that all directions issued by the forum court, including all injunctions and other decrees, will be binding and enforceable in all jurisdictions and countries. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY DISPUTE OR DISAGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.7.  Amendment.  No amendments or supplements to this Agreement shall be valid and binding unless set forth in a written agreement executed and delivered by or on behalf of Buyer and the Shareholders' Representative (on behalf of the Shareholders); provided, however, that after the execution of the Company Requisite Shareholder Vote, no amendment shall be made that by

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 158 of 232   Document 1-1

Law requires further approval by the Shareholders without obtaining such requisite approval under the WBCL.

Section 11.8. Waiver. No waiver by any Party of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed and delivered by the Party so waiving. Except as provided in the preceding sentence, no action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any representations, warranties or covenants set forth in this Agreement and in any documents delivered or to be delivered pursuant hereto. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

Section 11.9. Notice. All notices, requests, claims, demands and other communications under this Agreement shall be given in writing and shall be personally delivered, sent by e-mail transmission or sent by private overnight mail courier service (providing proof of delivery) as follows:

(a)     If to Buyer or Merger Sub or, after the Effective Time, the Surviving Corporation, to:

Duff & Phelps Corporation
55 East 52nd Street, Floor 31
New York, NY 10055
Attention: General Counsel
Email: generalcounsel@duffandphelps.com

(with a copy to, which shall not constitute notice)

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: Michael D. Paley, P.C.
Email: Michael.Paley@kirkland.com

(b)     If to the Shareholders, the Shareholders' Representative or, prior to the Effective Time, the Company, to:

Joseph P. Zvesper
Shareholders' Representative
777 North Prospect Avenue
Milwaukee, Wisconsin 53202
Email: jzvesper@american-appraisal.com

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 159 of 232   Document 1-1

(with a copy to, which shall not constitute notice)

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: Jay O. Rothman
Bryan S. Schultz
Email: jrothman@foley.com
brschultz@foley.com

or to such other Person or address as any Party shall have specified by notice in writing to the other Parties. If personally delivered, then such communication shall be deemed delivered upon actual receipt; if sent by e-mail transmission, then such communication shall be deemed delivered the day of the transmission or, if the transmission is not made before 5:00 p.m., at the place of receipt, on a Business Day, the first Business Day after transmission (and the sender shall bear the burden of proof of delivery); and if sent by Federal Express or other national overnight courier, then such communication shall be deemed delivered upon receipt.

Section 11.10. Expenses.

(a) Transfer Taxes. All sales, use, transfer, intangible, recordation, documentary stamp or similar Taxes or charges, of any nature whatsoever, applicable to or resulting from the transactions contemplated hereby shall be borne by the Surviving Corporation.

(b) Other. Except as otherwise expressly provided in this Agreement, each Party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby.

Section 11.11. Company Disclosure Schedule.

(a) Disclosure. Any fact or item disclosed in any Section of the Company Disclosure Schedule shall be deemed disclosed in each other Section of the Company Disclosure Schedule to which such fact or item may apply so long as it is reasonably apparent that such disclosure is applicable thereto. The Company Disclosure Schedule is qualified in its entirety by reference to specific provisions of this Agreement. The Company Disclosure Schedule is not intended to constitute, and shall not be construed as, an admission or indication that any such fact or item is required to be disclosed. Any fact or item disclosed in the Company Disclosure Schedule shall not by reason only of such inclusion be deemed to be material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement, and no disclosure in the Company Disclosure Schedule relating to any possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. References in the Company Disclosure Schedule to any Contract, Benefit Plan, Order, instrument, document or legal proceeding are qualified in their entirety by reference to more detailed information in documents attached

Case 2:18-cv-00841-JPS Filed 06/01/18 Page 160 of 232 Document 1-1

thereto or previously made available to Buyer and Merger Sub and their respective representatives.

(b) Updates. Prior to the Closing, the Company shall have the right to supplement, modify or update the Company Disclosure Schedule but only with respect to any matter first arising or, if such representation or warranty is qualified by knowledge, of which the Company first becomes aware, after the date hereof and that, if existing or occurring at or prior to the date hereof or in the case of any representation qualified by knowledge if known prior to the date hereof, would have been required to be set forth or described on such Company Disclosure Schedule; provided, however, that, (i) for purposes of determining whether the condition set forth in Section 6.1 is satisfied, the Company Disclosure Schedule shall be deemed to include only the information contained in the Company Disclosure Schedule as of the date of this Agreement and (ii) no disclosure contained in any such supplement, modification or update shall be taken into account (i.e., the Company Disclosure Schedule shall be read as if such additional disclosure were not reflected thereon) for purposes of determining the Buyer Indemnified Parties' rights to indemnification pursuant to ARTICLE 8 of this Agreement, except with respect to (A) any matter for which Buyer has provided its written consent in accordance in Section 4.3 or (B) any supplement, modification or update of any list of "material" documents as required to be listed in any Section of the Company Disclosure Schedule, but which are not the subject of any provision of Section 4.3.

Section 11.12. Conflicts and Privilege. Buyer, on behalf of itself and its Affiliates (which, for this purpose, shall be deemed to include the Surviving Corporation) agrees that, notwithstanding any current or prior representation of the Company and its Subsidiaries by Foley & Lardner LLP, Foley & Lardner LLP shall be allowed to represent the Shareholders (and the Shareholders' Representative) in any matters and disputes adverse to Buyer, the Surviving Corporation and/or its Subsidiaries that relate to this Agreement and the transactions contemplated hereby. Buyer, on behalf of itself and its Affiliates (which, for this purpose, shall be deemed to include the Surviving Corporation) hereby (a) waives any claim that Buyer, the Surviving Corporation or any of its Subsidiaries has or may have that Foley & Lardner LLP has a conflict of interest or is otherwise prohibited from engaging in such representation and (b) agrees that, if a dispute arises after the Closing between Buyer, the Surviving Corporation or any of its Subsidiaries and any Shareholder (or the Shareholders' Representative), then Foley & Lardner LLP may represent the Shareholders (and/or the Shareholders' Representative) in such dispute even though the interests of the Shareholders (and/or the Shareholders' Representative) may be directly adverse to Buyer, the Surviving Corporation and/or its Subsidiaries and even though Foley & Lardner LLP may have represented the Surviving Corporation (i.e., the Company) in a matter substantially related to such dispute. Buyer, on behalf of itself and its Affiliates (which, for this purpose, shall be deemed to include the Surviving Corporation), also agrees that, as to all communications between or among Foley & Lardner LLP and the Shareholders, the Company and/or any of their respective Affiliates that relate to the negotiation, documentation or consummation of transactions contemplated hereby, the attorney-client privilege, and the expectation of client confidence and all other rights thereto, belong to the Shareholders and may be controlled by the Shareholders' Representative and shall not pass to or be claimed by or used or disclosed by Buyer, the Surviving Corporation or any of its Subsidiaries. Notwithstanding the foregoing, if a dispute arises between Buyer, the Surviving Corporation or any of its Subsidiaries and a third party other than, and unaffiliated with, the Shareholders (and the Shareholders' Representative) after the Closing, then the Surviving Corporation (to the extent applicable) may assert the attorney-client

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 161 of 232   Document 1-1

privilege to prevent disclosure to such third party of confidential communications by Foley & Lardner LLP; provided, however, that the Surviving Corporation may not waive such privilege without the prior written consent of the Shareholders' Representative in each instance.

Section 11.13. Interpretive Provisions. For purposes of this Agreement, (a) the words "including" and "include" shall be deemed to be followed by the words "without limitation," (b) the words "herein," "hereof," "hereby," "hereto" or "hereunder" refer to this Agreement as a whole, (c) term "knowledge" when used in the phrases "to the knowledge of the Company" or "the Company has no knowledge" or words of similar import shall mean, and shall be limited to, the actual knowledge of the individuals listed in Exhibit 11.13 after reasonable inquiry of such individuals' direct reports, (d) references to "$" refer to United States Dollars and (e) the words "made available" shall mean contained in the Data Room as of one (1) Business Day prior to the date hereof, the contents of which shall be placed on a DVD and two copies distributed to each of Buyer and Shareholders' Representative on the date hereof. When calculating the period of time before which, within which or following which any act is required to be done pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Unless the context otherwise requires, references in this Agreement (i) to Articles, Sections and exhibits mean the Articles and Sections of, and the exhibits attached to, this Agreement and (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof. The exhibits referred to in this Agreement, the Company Disclosure Schedule and the Buyer Disclosure Schedule shall be construed with and as an integral part of this Agreement. Capitalized terms used but not otherwise defined in the exhibits referred to in this Agreement, the Company Disclosure Schedule and the Buyer Disclosure Schedule shall have the meanings set forth in this Agreement. Titles to Articles and headings of Sections are inserted for convenience of reference only and shall not be deemed a part of or to affect the meaning or interpretation of this Agreement. Notwithstanding the fact that this Agreement has been drafted or prepared by one of the Parties, each Party confirms that both it and its counsel have reviewed, negotiated and adopted this Agreement as the joint agreement and understanding of the Parties. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party. If any provision of this Agreement, or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable. This Agreement may be executed (A) by signatures exchanged via facsimile, e-mail or other electronic means, and shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in Person and (B) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.14. Definitions. For purposes of this Agreement, the term:

"Acquisition Proposal" shall have the meaning set forth in Section 4.5.

"Administrative Expense Account" shall mean the account designated by the Shareholders' Representative into which the payment of the Administrative Expense Deposit pursuant to Section 2.2(b) shall be made and any succeeding account in which the Administrative Expense Amount shall be held by the Shareholders' Representative.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 162 of 232   Document 1-1

"Administrative Expense Amount" shall mean the Administrative Expense Deposit, as such sum may be increased from time to time due to any earnings on such amounts and reduced from time to time due to payments made from the Administrative Expense Account in accordance with the terms of this Agreement.

"Administrative Expense Deposit" shall mean $1,000,000.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "control", when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Agreement" shall have the meaning set forth in the preamble of this Agreement and Plan of Merger.

"Articles of Merger" shall have the meaning set forth in Section 1.3.

"Benefit Plans" shall have the meaning set forth in Section 3.1(r)(i).

"Business" shall have the meaning set forth in the recitals of this Agreement.

"Business Day" shall mean any day other than Saturday, Sunday or other day on which commercial banks in the State of Wisconsin are authorized or required by Law to be closed.

"Buyer" shall have the meaning set forth in the preamble of this Agreement.

"Buyer's Plans" shall have the meaning set forth in Section 5.2(b).

"Buyer Closing Date Transaction" means any transaction outside the ordinary course of business (except for transactions expressly contemplated by this Agreement) engaged in by the Company or any Subsidiary of the Company on the Closing Date, which occurs after the Closing at the direction of Buyer, including any transaction engaged in by Buyer, the Company or any Subsidiary of the Company in connection with financing any obligation of Buyer, the Company or any Subsidiary of the Company to make payment under this Agreement.

"Buyer Disclosure Schedule" shall have the meaning set forth in Section 3.2.

"Buyer Indemnified Parties" shall have the meaning set forth in Section 8.1(a).

"Certificate" shall have the meaning set forth in Section 1.10.

"Change of Control Payments" means all retention, bonus, change in control or similar payments that become payable by the Company to any Current Employee or Former Employee pursuant to any Contract in effect immediately prior to the Effective Time, whether immediately or in the future, directly as a result of the consummation of the transactions contemplated by this Agreement, including any taxes associated therewith; provided, however, that,

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 163 of 232   Document 1-1

for the avoidance of doubt, (a) no amount payable pursuant to any Compensation Agreement shall be considered a Change of Control Payment and (b) the accelerated vesting of any award of Company Common Stock shall not be considered a Change of Control Payment.

"**Closing**" shall have the meaning set forth in Section 1.2.

"**Closing Date**" shall have the meaning set forth in Section 1.2.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"**Company**" shall have the meaning set forth in the preamble of this Agreement.

"**Company 401(k) Plan**" shall have the meaning set forth in Section 5.2(c).

"**Company Board**" shall have the meaning set forth in Section 3.1(b)(i).

"**Company Common Stock**" shall have the meaning set forth in the recitals of this Agreement.

"**Company Disclosure Schedule**" shall have the meaning set forth in Section 3.1.

"**Company Insurance Policies**" shall have the meaning set forth in Section 3.1(p).

"**Company Intellectual Property**" means all Intellectual Property that is owned or purported to be owned by the Company or any of its Subsidiaries.

"**Company Material Adverse Effect**" shall mean any change, event, development or occurrence that, individually or in the aggregate with other changes, events, developments or occurrences, (a) has had, or would reasonably be expected to have, a material adverse effect upon the business, assets, liabilities, operations, financial condition or financial results of operations of the Company and its Subsidiaries taken as a whole or (b) prevents the Company from consummating the transactions contemplated hereby. Notwithstanding the foregoing, (i) General Developments and Transaction Developments shall not be deemed, either alone or in combination, to constitute a Company Material Adverse Effect and (ii) no change, event, development, occurrence or effect arising from or attributable to any General Developments or Transaction Developments shall be taken into account in determining whether there has been a Company Material Adverse Effect or in determining the scope of a Company Material Adverse Effect.

"**Company Requisite Shareholder Vote**" shall have the meaning set forth in Section 3.1(b)(i).

"**Company Systems**" shall have the meaning set forth in Section 3.1(u)(iv).

"**Company Transaction Expenses**" means (a) all costs, fees and expenses payable to third parties (including all fees and disbursements of counsel, investment banks, financial

advisors and accountants) that are incurred by the Company at or prior to the Closing (whether paid by the Company prior to, at or following the Closing) in connection with the negotiation, documentation or consummation of the transactions contemplated by this Agreement, (b) all Change of Control Payments and (c) the Liability Insurance Premium Amount.

"Compensation Agreement" shall have the meaning set forth in Section 9.1(c).

"Confidentiality Agreement" shall have the meaning set forth in Section 4.2.

"Contract" shall mean any written or oral indenture, mortgage, deed of trust, lease, licensing agreement, contract, commitment, instrument or other legally binding agreement.

"Control of Defense Conditions" shall have the meaning set forth in Section 8.4(b).

"Current Employees" shall mean all employees of the Company as of the Effective Time (other than the Persons listed in Exhibit 9.1(f)).

"Data Room" shall have the meaning set forth in Section 11.1(b).

"Deductible" shall have the meaning set forth in Section 8.1(b)(ii).

"De Minimis Threshold" shall have the meaning set forth in Section 8.1(b)(i).

"Dissenting Shares" shall have the meaning set forth in Section 1.12.

"Dollar One Indemnity Items" shall mean each of and collectively, (i) any breach of the Fundamental Representations, (ii) any breach of any covenant of the Company contained herein to be performed at or prior to the Closing, (iii) unpaid Company Transaction Expenses, (iv) Indemnified Taxes, (v) claims by any holder of Company Common Stock as a result of the exercise of such holder's appraisal rights (net of any amount that would have otherwise been payable to such holder pursuant to the terms of this Agreement), (vi) claims by any Shareholder arising out of any actual inaccuracy of the information set forth on the Pro Rata Share schedule attached hereto as Exhibit 11.15(c), (vii) Indebtedness to the extent such Indebtedness is neither disclosed in Section 3.1(f)(iv) of the Company Disclosure Schedule or reflected on the Recent Balance Sheet, and (viii) the Special Litigation Matters.

"D&O Tail Policy" shall have the meaning set forth in Section 5.3(b)(i).

"Effective Time" shall have the meaning set forth in Section 1.3.

"Environmental Laws" shall mean all Laws concerning human health (but excluding Laws relating to occupational exposure), pollution or protection of the environment, as in effect on the date of this Agreement.

"ERISA" shall have the meaning set forth in Section 3.1(r)(i).

"ERISA Affiliate" shall have the meaning set forth in Section 3.1(r)(iii).

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 165 of 232    Document 1-1

"Escrow Account" shall mean the account designated by the Escrow Agent into which the payment of the Escrow Deposit pursuant to Section 2.2(a) shall be made and any succeeding account in which the Escrow Amount shall be held by the Escrow Agent.

"Escrow Agent" shall mean U.S. Bank, National Association, as escrow agent under the Escrow Agreement, or any successor Person appointed in accordance with the terms of the Escrow Agreement.

"Escrow Agreement" shall mean an escrow agreement in substantially the form attached hereto as Exhibit 11.15(a).

"Escrow Amount" shall mean the Escrow Deposit, as such sum may be increased from time to time due to any earnings on such amounts and reduced from time to time due to payments made from the Escrow Account in accordance with the terms of this Agreement and the Escrow Agreement.

"Escrow Deposit" shall mean $12,000,000. For the avoidance of doubt, the Escrow Deposit includes the Special Indemnity Escrow Amount.

"ESOP" shall mean the American Appraisal Associates, Inc. Employee Stock Ownership Plan and its related trust.

"ESOP Amendment" shall mean an amendment to the ESOP, in form and substance reasonably satisfactory to Buyer, adopted prior to the Closing Date, but effective in all respects as of the Effective Time, providing that: (i) upon the Closing Date, the ESOP shall no longer be considered an "employee stock ownership plan" (as defined in Section 4975 of the Code); (ii) upon the Closing Date, the ESOP shall be terminated, with such termination to be implemented by the ESOP Trustee as soon as reasonably practicable following the Closing Date; (iii) upon the Closing Date, each ESOP Participant shall become fully vested in his or her benefits under the ESOP; and (iv) upon the Closing Date, the ESOP shall no longer permit distributions in the form of employer securities.

"ESOP Approval" shall mean a vote in favor of the transactions contemplated by this Agreement by a majority of ESOP Participants who elect to vote after a pass-through of the vote with respect to the transactions contemplated by this Agreement to such ESOP Participants.

"ESOP Determination" shall mean the determination by the ESOP Trustee, in the exercise of its fiduciary discretion under ERISA and in accordance with ERISA, that the consummation of the transactions contemplated by this Agreement is in the best interests of the ESOP Participants and does not cause the ESOP to function other than for the exclusive purpose of providing benefits to the ESOP Participants.

"ESOP Fairness Opinion" shall mean an opinion of the ESOP Financial Advisor, dated as of the Closing Date, to the effect that, as of such date, (i) the consideration to be paid to the ESOP Trustee, on behalf of the ESOP, in connection with the transactions contemplated by this Agreement is not less than adequate consideration (as defined in Section 3(18) of ERISA) and (ii) the transactions contemplated by this Agreement are fair to the ESOP from a financial point of view.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 166 of 232   Document 1-1

4835-2058-0896.15

"**ESOP Financial Advisor**" shall mean Prairie Capital Advisors, Inc., the independent appraiser meeting the requirements of Section 401(a)(28)(C) of the Code that has been duly engaged by the ESOP Trustee on behalf of the ESOP in connection with the transactions contemplated by this Agreement.

"**ESOP Participant**" shall mean any participant in, or beneficiary of a deceased participant in, the ESOP as of immediately prior to the Effective Time.

"**ESOP Trustee**" shall mean GreatBanc Trust Co., the independent fiduciary that has been duly engaged by the Company to act as a discretionary trustee of the ESOP in connection with the transactions contemplated by this Agreement.

"**Exclusivity Period**" shall have the meaning set forth in Section 4.5.

"**E&O Tail Policy**" shall have the meaning set forth in Section 5.3(b)(ii).

"**FCPA**" shall have the meaning set forth in Section 3.1(t).

"**Final Resolution**" shall mean, with respect to any Special Litigation Matter, (a) the issuance of a final non-appealable judgment by a court of competent jurisdiction, (b) a dismissal with prejudice or (c) the execution of a final settlement and release.

"**Financial Statements**" shall have the meaning set forth in Section 3.1(f).

"**Former Employee**" shall mean an individual, other than a Current Employee, who was an employee of the Company, any of its Subsidiaries or any of their respective predecessors at the time that he or she last terminated employment.

"**Fundamental Representation**" shall mean the representations and warranties of the Company set forth in the first sentence of Section 3.1(a) (Organization and Qualification), but only with respect to the organization and valid existence of the Company; Section 3.1(b) (Authorization); Section 3.1(d) (Capitalization), other than with respect to the number of shares of Company Common Stock held beneficially for each ESOP Participant; Section 3.1(e) (Subsidiaries); and Section 3.1(x) (Fees).

"**GAAP**" shall mean generally accepted accounting principles in the United States.

"**General Developments**" shall mean (a) any developments or occurrences affecting domestic or foreign economic conditions in general or the securities, commodities or financial markets in general or the political conditions generally of the United States or any other country or jurisdiction in which the Company or any Subsidiary operates, (b) any commencement, continuation or escalation of any act of terrorism or war (whether declared or undeclared), (c) any natural disasters, (d) any developments or occurrences relating to or affecting the industries or geographic areas in which the Company or any of its Subsidiaries operates, (e) any changes in or interpretations of any Law applicable to the Company or any of its Subsidiaries or GAAP occurring after the date of this Agreement, and/or (f) any failure in and of itself by the Company and its Subsidiaries to meet any estimates of revenues or earnings for any period (but not the underlying cause of such failure), but excluding, in each of the cases described in subclauses (a)-(d) above, any

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 167 of 232   Document 1-1

effect to the extent arising from a development or occurrence that has a materially disproportionately impact on the Company and its Subsidiaries (taken as a whole) relative to similarly situated companies principally engaged in the industries in which the Company and its Subsidiaries conduct the Business.

"Germany Threatened Litigation" shall mean the matter described in Item 2(a) of Section 3.1(k) of the Company Disclosure Schedule

"Governmental Entity" shall mean any nation or government, court, arbitrator, department, commission, board, bureau, agency, authority, instrumentality or other body, whether federal, state, local, foreign or other (including antitrust authorities that have jurisdiction to review the transactions contemplated hereby).

"Hazardous Substance" shall mean any hazardous materials, hazardous substances, hazardous wastes, hazardous chemicals, toxic substances, pollutants, contaminants, petroleum, building mold, asbestos, polychlorinated biphenyls, or other substance or waste with respect to which liability may be imposed pursuant to Environmental Laws.

"Indebtedness" of a Person, as of any date of determination, shall mean, without duplication (a) all obligations of such Person for borrowed money, whether current or funded, secured or unsecured and including, without limitation, the unpaid principal amount of, and accrued interest thereon, (b) all obligations of such Person evidenced by bonds, debentures, notes, mortgages (including chattel mortgages) or similar instruments, (c) all obligations of such Person as lessee that are or should be capitalized on the books of such Person, prepared in accordance with GAAP applied on a basis consistent with the preparation of the Recent Balance Sheet, (d) all obligations of such Person under derivative, hedging, swap, foreign exchange or similar Contracts, (e) all indebtedness of others of the type described in clauses (a) or (b) guaranteed or secured by any Lien on such Person's assets or stock, (f) all obligations of such Person under letters of credit, and (g) all obligations of such Person for accrued interest, prepayment premiums, penalties or other similar charges with respect to any of the foregoing. Notwithstanding the foregoing and for the avoidance of doubt, "Indebtedness" shall not mean or include any obligations of the Company and its Subsidiaries under (i) undrawn letters of credit, (ii) bid bonds, performance bonds, bankers' acceptances or similar surety instruments, or (iii) intercompany obligations that the Company or any of its Subsidiaries owe to any of the Company and its Subsidiaries.

"Indemnification Notice" shall have the meaning set forth in Section 8.3.

"Indemnified Agent" shall have the meaning set forth in Section 5.3(d).

"Indemnified Party" shall have the meaning set forth in Section 8.3.

"Indemnifying Party" shall have the meaning set forth in Section 8.3.

"Indemnified Taxes" shall mean all Pre-Closing Income Taxes to the extent not reflected as an accrual on the consolidated balance sheet of the Company and its Subsidiaries as of the Effective Time, which accrual will be in accordance with GAAP (as applied by the Company on a consistent basis) and consistent with the Company's past practice of booking tax accruals, but excluding any Taxes imposed pursuant to a Buyer Closing Date Transaction.

Case 2:18-cv-00841-JPS    Filed 06/01/18    Page 168 of 232    Document 1-1

"Independent Accountants" shall have the meaning set forth in Section 5.8(h).

"Intellectual Property" means all U.S. and foreign (a) trademarks, service marks, logos, trade names, trade dress, domain names, including all goodwill associated with any of the foregoing, (b) copyrights and copyrightable works, proprietary models, processes, formulas, software and similar rights, (c) patent and patent applications (together with all reissues, continuations, continuations-in-part, revisions, extensions and reexaminations thereof), designs, algorithms, indices and similar intellectual property rights and tangible embodiments of any of the foregoing (in any medium including electronic media); (d) trade secrets under applicable Law; and (e) together with rights to sue for past, present and future infringement of each and any of the foregoing and the goodwill associated therewith; and all common law rights and registrations and applications to register, reissue, extend or renew the registration of any of the foregoing with any Governmental Entity in any country.

"Italy Litigation" shall mean the matter described in Item 1(a) of Section 3.1(k) of the Company Disclosure Schedule.

"Italy Threatened Litigation" shall mean the matters described in Items 2(b) and 2(c) of Section 3.1(k) of the Company Disclosure Schedule.

"Key Employee" shall mean each of the individuals listed on Exhibit 11.15(b).

"Law" shall mean any federal, state, local or foreign law or other statute, ordinance, rule, code or regulation.

"Leased Real Property" shall have the meaning set forth in Section 3.1(n).

"Letter of Transmittal" shall have the meaning set forth in Section 1.11.

"Liability Insurance Premium Amount" shall have the meaning set forth in Section 5.3(b)(iii).

"Lien" shall mean any mortgage, lien, pledge, charge, security interest, deed of trust or other encumbrance.

"Loss" shall mean (a) all debts, liabilities, Taxes and obligations owed to or at the behest of any other Person, (b) all losses, damages, judgments, awards, penalties, fines and settlements, (c) all demands, claims, suits, actions, causes of action, proceedings and assessments and (d) all reasonable out-of-pocket costs and expenses (including interest (but excluding prejudgment interest in any litigated or arbitrated matter other than that payable to a third party), court costs and reasonable fees and expenses of attorneys and expert witnesses) of investigating, defending or asserting any of the foregoing.

"Material Contract" shall have the meaning set forth in Section 3.1(q).

"Merger" shall have the meaning set forth in the recitals of this Agreement.

"Merger Consideration" shall have the meaning set forth in Section 2.1.

4835-2058-0896.15

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 169 of 232   Document 1-1

"Merger Sub" shall have the meaning set forth in the preamble to this Agreement.

"Net Working Capital" shall mean, with respect to the Company and its Subsidiaries, the consolidated current assets less the consolidated current liabilities, all determined without giving effect to the transactions contemplated by this Agreement and the payment of the Shareholder Liability Amount and determined in accordance with GAAP applied on a basis consistent with the preparation of the Recent Balance Sheet.

"Noncompetition Agreement" shall have the meaning set forth in Section 9.1(b).

"OFAC" shall have the meaning set forth in Section 3.1(t).

"Orders" shall mean any order, writ, injunction, judgment, plan, ruling or decree of any Governmental Entity or arbitrator.

"Participating Shareholders" has the meaning set forth in Section 5.7.

"Party" shall mean (a) Buyer, (b) Merger Sub, (c) the Company, (d) Shareholders' Representative (in such capacity) and (e) for purposes of Section 3.3, Section 8.5, Section 11.1, Section 11.9, Section 11.12 and Section 11.15, the Shareholders, as the context requires.

"Payoff Letter" shall mean a payoff letter, in form and substance reasonably satisfactory to Buyer and the Company, setting forth, with respect to each Company Transaction Expense: (a) the obligee with respect to such Company Transaction Expense; (b) the outstanding amount (including any accrued but unpaid interest thereon) of such Company Transaction Expense as of the Effective Time; and (c) wire transfer instructions for Buyer's payment of such Company Transaction Expense pursuant to Section 2.3. The Company shall use its commercially reasonable efforts to obtain and deliver to Buyer all applicable Payoff Letters at least two Business days prior to the Closing Date.

"Pending Litigation" shall have the meaning set forth in Section 5.7(b).

"Permitted Liens" shall mean (a) Liens for current Taxes and assessments not yet due and payable or being contested in good faith by appropriate proceedings and in respect of which a reserve has been established in the Financial Statements, (b) Liens as reflected in title or other public records relating to the Leased Real Property, (c) Liens that would be disclosed by an accurate survey, (d) Liens arising or created by municipal and zoning ordinances which have jurisdiction over the Leased Real Property, (e) carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or similar Liens arising out of work performed, services provided or materials delivered that are not reflected in the public records, that arise in the ordinary course of business for amounts which are not yet due and payable or being contested in good faith by appropriate proceedings and in respect of which a reserve has been established in the Financial Statements and (f) Liens that, individually or in the aggregate, do not materially detract from the value, or impair in any material manner the use, of the properties or assets subject thereto.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 170 of 232   Document 1-1

"Per Share Merger Consideration" shall mean the quotient of (a) the Merger Consideration divided by (b) the aggregate number of shares of Company Common Stock issued and outstanding immediately prior to the Effective Time.

"Person" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a Governmental Entity.

"Pre-Closing Income Taxes" shall mean the Taxes of the Company or any Subsidiary measured by or with respect to income (including franchise taxes) with respect to a Tax period ending on or before the Closing Date and, in the case of a Tax period that begins on or before the Closing Date and ends after the Closing Date, the Taxes allocable to the portion of such period ending on the Closing Date based on a deemed closing of the books.

"Pre-Closing Income Tax Refund" shall have the meaning set forth in Section 5.8(e).

"Pre-Closing Income Tax Return" shall have the meaning set forth in Section 5.8(a).

"Pro Rata Share" shall mean the percentage attributed to each Participating Shareholder (which, for the avoidance of doubt, shall be calculated without giving effect to any shares of Company Common Stock held by the ESOP) under the heading "Pro Rata Share" in the table set forth in Exhibit 11.15(c).

"Recent Balance Sheet" shall have the meaning set forth in Section 3.1(f).

"Regulatory Law" shall mean any Law that is designed or intended to prohibit, restrict or regulate (a) foreign investment or (b) actions having the purpose or effect of monopolization or restraint of trade or lessening of competition.

"Related Documents" shall mean the Escrow Agreement, the Noncompetition Agreements, the Compensation Agreements and any other agreements, certificates and instruments as amended from time to time, to be executed and delivered in connection with this Agreement, but excluding, for the avoidance of doubt, all Letters of Transmittal.

"Representatives" shall have the meaning set forth in Section 4.4(a).

"Restricted Stock" shall have the meaning set forth in Section 3.1(g)(viii).

"Shareholder" shall mean any Person who holds shares of Company Common Stock, but excluding any Person who holds only Dissenting Shares.

"Shareholder Liability Amount" shall mean the aggregate amount, calculated as of the opening of business on the Closing Date, of the Company's outstanding obligations for the purchase price payable to former Shareholders of the Company in consideration for the Company's redemption of shares of Company Common Stock from such former Shareholders, the calculation of which, as of November 30, 2014 (solely for informational purposes), is reflected on Exhibit 11.15(d).

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 171 of 232   Document 1-1

"**Shareholders' Representative**" shall mean Joseph P. Zvesper or, if Joseph P. Zvesper becomes unable or unwilling to serve as the Shareholders' Representative, then such other Person or Persons as may be designated by a majority of the Shareholders, based on each Shareholder's Pro Rata Share.

"**Special Indemnity Escrow Amount**" shall mean an amount equal to $8,000,000.

"**Special Litigation Matters**" shall mean each of, and collectively, the Italy Litigation, the Italy Threatened Litigation, the Thailand Litigation and the Germany Threatened Litigation.

"**Step Down Date**" shall have the meaning set forth in Section 5.7.

"**Subsidiaries**" of any Person shall mean any corporation or other form of legal entity an amount of the outstanding voting securities of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting securities, 50% or more of the equity interests of which) is owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries.

"**Surviving Corporation**" shall have the meaning set forth in Section 1.1.

"**Taxes**" shall mean any and all federal, state, local, foreign or other taxes of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any tax authority, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth, and taxes in the nature of excise, withholding, ad valorem or value added; provided, however, that "Taxes" shall not include any utility (e.g., water or sewer) charges or fees.

"**Tax Proceeding**" shall have the meaning set forth in Section 5.8(f).

"**Tax Return**" shall mean any return, declaration, report, estimate, claim for refund, or information return or statement relating to, or required to be filed in connection with, any Taxes, including any schedule, form, attachment or amendment.

"**Termination Date**" shall have the meaning set forth in Section 10.1(b).

"**Thailand Litigation**" shall mean the matters described in Items 1(c) and 1(d) of Section 3.1(k) of the Company Disclosure Schedule.

"**Third Party Claim**" shall have the meaning set forth in Section 8.4(a).

"**Transaction Developments**" shall mean (a) any acts or omissions expressly required or expressly permitted by this Agreement, (b) the announcement by any Party of its execution and delivery of this Agreement and/or (c) any acts or omissions taken at the written request, or with the prior written approval, of Buyer or Merger Sub.

"**Voting Agreements**" shall have the meaning set forth in the recitals of this Agreement.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 172 of 232   Document 1-1

"WARN Act" shall have the meaning set forth in Section 3.1(s).

"WBCL" shall have the meaning set forth in Section 1.1.

Where any group or category of items or matters is defined collectively in the plural number, any item or matter within such definition may be referred to using such defined term in the singular number, and vice versa.

[Signature page follows]

TEMPORARILY SEALED

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 173 of 232   Document 1-1

IN WITNESS WHEREOF, the Parties have executed and delivered or caused their respective duly authorized officers to execute and deliver this Agreement and Plan of Merger as of the day and year first written above.

**DUFF & PHELPS, LLC**

By: _____
Name: _____
Title: _____

**D&P ALABAMA ACQUISITION CORP.**

By: _____
Name: _____
Title: _____

**AA MANAGEMENT GROUP, INC.**

By: _____
Name: _____
Title: _____

**SHAREHOLDERS' REPRESENTATIVE:**

By: _____
Name: Joseph P. Zvesper

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 174 of 232   Document 1-1

EXHIBIT 1.11

## FORM OF

### LETTER OF TRANSMITTAL

**To Accompany Certificates Representing Shares
of AA Management Group, Inc. Common Stock pursuant to
the Agreement and Plan of Merger**

*This Letter of Transmittal, the certificates for Shares (as defined below), the enclosed IRS Form W-9 (or for non-U.S. persons, applicable IRS Form W-8) and any other required documents should be sent or delivered to the Company, by mail, hand or overnight courier at the address set forth below:*

AA Management Group, Inc.
c/o American Appraisal Associates, Inc.
411 East Wisconsin Avenue, Suite 1900
Milwaukee, Wisconsin 53202
Attention:  Joseph P. Zvesper
Telephone:  (414) 225-1034
Email:  jzvesper@american-appraisal.com

**DELIVERY OF THIS LETTER OF TRANSMITTAL TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE WILL NOT CONSTITUTE A VALID DELIVERY.  YOU MUST SIGN THIS LETTER OF TRANSMITTAL WHERE INDICATED BELOW AND, AS DESCRIBED IN THE INSTRUCTIONS ATTACHED HERETO, COMPLETE THE IRS FORM W-9 PROVIDED BELOW OR THE APPROPRIATE IRS FORM W-8 IF YOU ARE A NON-U.S. STOCKHOLDER.**

**THE INSTRUCTIONS ACCOMPANYING THIS LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY BEFORE THIS LETTER OF TRANSMITTAL IS COMPLETED.**

Ladies and Gentlemen:

Upon the terms and conditions set forth in the Agreement and Plan of Merger (as amended, restated or otherwise modified from time to time, the "Merger Agreement"), dated as of January 30, 2015, by and among Duff & Phelps, LLC, a Delaware limited liability company (the "Buyer"), D&P Alabama Acquisition Corp., a Wisconsin corporation and wholly-owned subsidiary of the Buyer (the "Merger Sub"), AA Management Group, Inc., a Wisconsin corporation (the "Company"), and Joseph P. Zvesper, solely in his capacity as the Shareholders' Representative thereunder (the "Shareholders' Representative"), pursuant to which Merger Sub will merge with and into the Company, with the Company as the surviving entity (the "Merger"), each of the Company's outstanding shares of Common Stock, $0.01 par value per share (the "Common Shares"), and each of the Company's outstanding and unvested shares of restricted Common Stock (the "Restricted Common Shares" and, together with the Common Shares, the "Shares") shall be converted into the right to receive in cash a portion of the Merger Consideration, upon the consummation of the Merger (the "Closing") and the corresponding cancellation of such outstanding Shares.  Capitalized terms used and not defined in this Letter of Transmittal have the respective meanings ascribed to them in the Merger Agreement.

The Board of Directors of the Company (the "Board") has (i) approved and declared advisable the Merger Agreement and the transactions contemplated thereby, including the Merger, (ii) determined that the Merger Agreement and the transactions contemplated thereby, including the Merger, taken together, are at a price and on terms that are advisable and in the best interests of the Company and the

stockholders of the Company and (iii) recommend that the stockholders of the Company adopt the Merger Agreement. Concurrently with the execution and delivery of the Merger Agreement, and as a condition to the Buyer's willingness to enter into the Merger Agreement, certain holders of Shares representing approximately sixty percent (60%) of the votes entitled to be cast with respect to the Merger, pursuant to the Wisconsin Business Corporation Law (the "WBCL"), entered into shareholder support agreements pursuant to which each such shareholder has agreed to vote his or her Shares in favor of the Merger Agreement and the transactions contemplated thereby, including the Merger. If the Merger is approved by the requisite shareholder vote under the WBCL, in order to receive your portion of the Merger Consideration, as specified in the Merger Agreement, you will need to execute and deliver this Letter of Transmittal. For your information and convenience, a copy of the Merger Agreement is enclosed herewith. We encourage you to read the Merger Agreement to understand its terms.

The certificates evidencing the undersigned's Shares (the "Certificates") are (i) enclosed with this Letter of Transmittal, in which case the undersigned hereby surrenders such Certificates to the Company in accordance with the instructions to this Letter of Transmittal, (ii) held by the Company on the undersigned's behalf, in which case the undersigned hereby surrenders to the Company such Certificates identified as being held by the Company on the undersigned's behalf in the table below titled "Description of Shares Surrendered" and/or (iii) declared by the undersigned to be lost, stolen or destroyed, in which case the undersigned (A) has completed an Affidavit of Loss with respect to such lost, stolen or destroyed Certificates, which is enclosed with this Letter of Transmittal, (B) hereby surrenders to the Company such lost, stolen or destroyed Certificates identified in the Affidavit of Loss and (C) hereby agrees to post a bond in such amount as the Company may reasonably direct as indemnity against any claim that may be made against it with respect to such lost, stolen or destroyed Certificates. For the avoidance of doubt, the undersigned's surrender of Certificates pursuant to this Letter of Transmittal shall be subject to the condition precedent that the Closing occurs and, if the Closing does not occur, the Company will return all physically surrendered Certificates to the undersigned.

Under the terms of the Merger Agreement, a portion of the Merger Consideration is being placed into an escrow account (the "Escrow Deposit," together with any earnings on such amounts and reduced from time to time in accordance with the Merger Agreement, the "Escrow Amount") to satisfy potential indemnification payments that may become due to the Buyer Indemnified Parties following the Merger. You acknowledge that, at the Closing, the Escrow Deposit will be deposited with the Escrow Agent pursuant to Section 2.2(a) of the Merger Agreement, and, if there are indemnification payments paid from the Escrow Amount in favor of any Buyer Indemnified Party, some or all of your Pro Rata Share of the Escrow Amount will not be paid to you as additional Merger Consideration. In addition, under the terms of the Merger Agreement, a portion of the Merger Consideration is being placed into an administrative expense account (the "Administrative Expense Deposit," together with any earnings on such amounts and reduced from time to time in accordance with the Merger Agreement, the "Administrative Expense Amount") to satisfy administrative and other expenses paid by the Shareholders' Representative on behalf of all shareholders following the Merger. You acknowledge that, at the Closing, the Administrative Expense Deposit will be deposited into the Administrative Expense Account pursuant to Section 2.2(b) of the Merger Agreement, and, to the extent of any administrative or other expenses paid by the Shareholders' Representative on behalf of all shareholders following the Merger, some or all of your Pro Rata Share of the Administrative Expense Amount will not be paid to you as additional Merger Consideration.

The undersigned hereby represents and warrants, for the benefit of each of the parties to the Merger Agreement (including, the Buyer and the Merger Sub), that, as of the date hereof: (i) the undersigned is the sole record and beneficial owner of, and has good title to, all of the Shares identified in the table below titled "Description of Shares Surrendered" (the "Surrendered Shares"), and there exist no restrictions on transfer, options, proxies, voting agreements, voting trusts or Liens affecting any of the

2

Surrendered Shares, except as set forth in the Articles of Incorporation and Bylaws of the Company; (ii) the undersigned owns no equity securities or other securities of the Company other than the Surrendered Shares; (iii) if the undersigned is a trust, it is duly organized and validly existing under the laws of the jurisdiction of its organization and has all requisite power and authority to own its properties; (iv) the execution and delivery of this Letter of Transmittal by the undersigned does not, and the consummation of the transactions contemplated hereby will not, constitute a violation or breach of, conflict with, result in a default (or an event which, with notice or lapse of time or both, would result in a default) under or result in the creation of any Lien on any of the Surrendered Shares under, (A) any contract, commitment, agreement, understanding, arrangement or restriction of any kind to which the undersigned is a party or by which the undersigned is bound, (B) any applicable Law affecting the undersigned or (C) if the undersigned is a trust, the undersigned's trust agreement; (v) undersigned has full power, capacity and authority to execute, deliver and perform this Letter of Transmittal and to consummate the transactions contemplated hereby, and if the undersigned is a trust, the execution, delivery and performance by the undersigned of this Letter of Transmittal has been duly authorized by all necessary action on the part of the undersigned and its trustee(s) and beneficiaries; (vi) this Letter of Transmittal has been duly and validly executed and delivered by the undersigned and constitutes a valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting the enforcement of creditor's rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law; (vii) the undersigned has not entered into, nor will the undersigned enter into, any contract, agreement, arrangement or understanding with any Person which will result in the obligation of Buyer or the Company or any of their Affiliates to pay any finder's fee, brokerage commission or similar payment in connection with this Letter of Transmittal or the Merger Agreement or the transactions contemplated hereby or thereby; and (viii) the undersigned has read and agreed to all of the terms and conditions set forth herein and in the Merger Agreement that are applicable to the undersigned and has had the opportunity to consult with its legal counsel or other advisors (including tax advisors) with respect to the meaning and intent of, the Merger Agreement and this Letter of Transmittal, including, but not limited to, the acknowledgements, releases, waivers and appointments contained herein.

Without in any way limiting any other provision of this Letter of Transmittal, the undersigned hereby confirms and agrees (i) with the appointment by the Board of Joseph P. Zvesper as the "Shareholders' Representative" with all of the powers and authority contemplated by Section 11.1 of the Merger Agreement, (ii) that the Shareholders' Representative shall have full power and authority, including power of substitution, acting in the name of and for and on behalf of the undersigned, to take any and all actions and make any and all decisions under the Merger Agreement and the Escrow Agreement which the Shareholders' Representative, in its sole discretion, deems necessary or proper and (iii) that the terms and conditions of Section 11.1 of the Merger Agreement shall be and are binding on the undersigned as fully as if the undersigned were an original signatory to the Merger Agreement.

The undersigned acknowledges and agrees (i) by execution and delivery of this Letter of Transmittal, all agreements by and between the undersigned and the Company, to the extent relating to the undersigned's ownership of the Surrendered Shares prior to the Effective Time, shall be terminated effective as of the Effective Time and shall thereafter be of no further force or effect, (ii) to retain in strict confidence the Merger Agreement, including information included in or attached to the Merger Agreement and the accompanying materials (collectively, the "Confidential Information"), (iii) not to disclose the Confidential Information to others, provided that the undersigned may disclose Confidential Information (A) to the extent required by applicable Law or stock exchange rules, or requested or required by any Governmental Entity, and (B) to its agents (including its attorneys and accountants) who need to know such Confidential Information, provided that each such person is informed that such

3

4850-6886-6081.4

Confidential Information is strictly confidential and agrees not to disclose or use such information except as provided herein.

The representations, warranties and covenants of the undersigned contained in this Letter of Transmittal shall survive the Effective Time.

The undersigned, upon request, will execute and deliver any additional documents reasonably deemed appropriate or necessary by the Company in connection with the surrender of the Surrendered Shares. All authority conferred or agreed to be conferred in this Letter of Transmittal shall not be affected by, and shall survive, the death, incapacity, liquidation or dissolution of the undersigned and any obligation of the undersigned shall be binding upon the successors, assigns, heirs, executors, administrators and legal representatives of the undersigned.

The undersigned consents to the provisions of the Merger Agreement and the Escrow Agreement applicable to the undersigned and agrees that the sole right that the undersigned shall have in respect of the undersigned's ownership interest in the Surrendered Shares shall be the undersigned's right to receive payment of a portion of the Merger Consideration for the Surrendered Shares in accordance with, and subject to, the terms and provisions of the Merger Agreement and the Escrow Agreement.

The undersigned understands that the surrender is not made in acceptable form until receipt by the Company of this Letter of Transmittal, duly completed and signed, together with all accompanying evidences of authority in form reasonably satisfactory to the Company, and that delivery of the enclosed Certificates, if any, will be effected, and the risk of loss and title to such certificate(s) will pass, only upon proper delivery thereof to the Company. All questions as to validity, form and eligibility of any surrender of Certificates hereunder will be determined by the Company and such determination shall be final and binding.

This Letter of Transmittal, and all claims or causes of action that may be based upon, arise out of or relate to this Letter of Transmittal, or the execution or performance of this Letter of Transmittal, shall be governed by and construed in accordance with the Laws of the State of Delaware applicable to contracts made and performed in such state, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

Any proceeding or action arising out of or relating to this Letter of Transmittal or the transactions contemplated hereby may be brought in any state or federal court located in the State of Delaware, and the undersigned irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding or action, waives any objection the undersigned may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of the proceeding or action shall be heard and determined only in any such court, and agrees not to bring any proceeding or action arising out of or relating to this Letter of Transmittal or the transactions contemplated hereby in any other court. Nothing herein contained shall be deemed to affect the right to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed in any other jurisdiction, in each case, to enforce judgments obtained in any action, suit or proceeding brought pursuant to this Letter of Transmittal.

**IN ANY PROCEEDING ARISING HEREFROM THE UNDERSIGNED CONSENTS TO TRIAL WITHOUT A JURY IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LETTER OF TRANSMITTAL, REGARDLESS OF THE FORM OF PROCEEDING.**

4

4850-6886-6081.4

The Buyer, the Merger Sub and the Company shall be entitled to seek and obtain an injunction, specific performance and other equitable relief to prevent breaches and threatened breaches of this Letter of Transmittal by the undersigned and to enforce specifically the terms and provisions hereof.

*****

THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT WILL BE TAXABLE TO THE UNDERSIGNED. NONE OF THE BUYER, THE MERGER SUB, THE SHAREHOLDERS' REPRESENTATIVE OR THE COMPANY IS GIVING ANY TAX ADVICE IN CONNECTION WITH THE MERGER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY. THE UNDERSIGNED IS URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF SUCH TRANSACTIONS.

THIS LETTER OF TRANSMITTAL CONSTITUTES THE VALID AND BINDING AGREEMENT OF THE UNDERSIGNED ENFORCEABLE AGAINST THE UNDERSIGNED IN ACCORDANCE WITH ITS TERMS AND, ONCE SUBMITTED, IS IRREVOCABLE.

5

4850-6886-6081.4

# INSTRUCTIONS

### Forming Part of the Terms and Conditions of this Letter of Transmittal

1.    *Delivery of Letter of Transmittal and Certificates.*  Certificates for all physically surrendered Shares (or, if necessary, an Affidavit of Loss), as well as this Letter of Transmittal, and, as described below, the IRS Form W-9 (or IRS Form W-8, as applicable) (or a manually signed PDF hereof and thereof), properly completed and duly executed, and any other documents required by this Letter of Transmittal, must be received by the Company at the address set forth herein.  If Certificates (or, if necessary, an Affidavit of Loss) are forwarded separately to the Company, a properly completed and duly executed Letter of Transmittal and, as described below, the IRS Form W-9 (or IRS Form W-8, as applicable), must accompany each such delivery.  The method of delivery of Certificates and all other required documents is at the election and risk of the surrendering holder.  The delivery will be deemed made only when actually received by the Company.  Risk of loss shall pass only upon proper delivery of the Certificates to the Company.  If such delivery is by mail, it is recommended that such Certificates be sent by registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to assure timely delivery.

2.    *Inadequate Space.*  If the space provided on this Letter of Transmittal is inadequate, the Certificate numbers and the number of Shares should be listed on a separate signed schedule affixed hereto.

3.    *Signatures on Letter of Transmittal; Signature Guarantee.*  If this Letter of Transmittal is signed by the registered holder(s) of the Certificates, the signature(s) must be exactly the same as the name(s) appear(s) on the face of the Certificates without alteration, enlargement or any change whatsoever.  If any of the Certificates delivered hereby are held of record by two or more holders, all such holders must sign this Letter of Transmittal.

If Certificates are surrendered by two or more joint holders or owners, all such persons must sign.

If Certificates are registered in different names on several Certificates, it will be necessary to complete, sign and submit as many separate Letters of Transmittal as there are different registrations of Certificates.

In case of endorsements or signatures by attorneys, executors, administrators, trustees, guardians, agents or others acting in a fiduciary or representative capacity, the Certificates must be accompanied by evidence satisfactory to the Company of the authority of the persons to make the endorsement or to sign, together with all supporting documents necessary to validate the surrender.

If this Letter of Transmittal is signed by a person other than the registered holder(s) of Shares evidenced by Certificates surrendered hereby, the Certificates must be endorsed or accompanied by appropriate stock powers, in either case signed exactly as the name or names of the registered holder or holders appears on the Certificates, and subject to the previous paragraph.

If Certificates are surrendered by a registered holder who has completed the box entitled "Special Payment Instructions," signatures on this Letter of Transmittal must be guaranteed by a firm that is a member in good standing of a recognized Medallion Program approved by the Securities Transfer Association, Inc., including the Security Transfer Agent Medallion Program, the New York Stock Exchange, Inc. Medallion Signature Program or the Stock Exchanges Medallion Program, or is otherwise an "eligible guarantor institution," as that term is defined in Rule 17Ad-15 under the Securities Exchange Act of 1934 (an "Eligible Institution"), unless surrendered on behalf of an Eligible Institution.

6

4850-6886-6081.4

No signature guarantee, endorsement of the Certificates or separate stock powers are required on this Letter of Transmittal if this Letter of Transmittal is signed by the registered holder(s) of the Certificates surrendered herewith and payment is to be made directly to such registered holder(s).

4. **Letter of Transmittal Required; Surrender of Certificates; Lost Certificates.** Holders of The undersigned will not receive the portion of Merger Consideration pursuant to the terms of the Merger Agreement in exchange for their Certificates unless and until this Letter of Transmittal and the IRS Form W-9 (or IRS Form W-8, as applicable), duly completed and signed, are delivered to the Company, together with the Certificates or, if necessary, an Affidavit of Loss, and any required accompanying evidences of authority in form reasonably satisfactory to the Company. If the Certificates have been lost, stolen or destroyed, please complete and return the enclosed Affidavit of Loss together with your Letter of Transmittal. If you are required to complete and return the enclosed Affidavit of Loss, then you will also be required by the Company to post a bond in such amount as the Company may reasonably direct as indemnity against any claim that may be made against the Company with respect to such lost, stolen or destroyed Certificates.

5. **Validity of Surrender; Irregularities.** All questions as to validity, form and eligibility of any surrender of Certificates hereunder will be determined by the Company, and such determination shall be final and binding. The Company reserves the right to waive any irregularities or defects in the surrender of any Certificates, and its interpretations of the terms and conditions of this Letter of Transmittal (including these instructions) with respect to such irregularities or defects shall be final and binding. A surrender will not be deemed to have been made until all irregularities have been cured or waived by the Company.

6. **Stock Transfer Taxes.** Except as set forth in this Instruction 6, any stock transfer taxes with respect to the surrender of Shares will be paid by the undersigned and the amount to be so paid by the undersigned will be deducted from any funds distributable to the undersigned in accordance with the Merger Agreement. If, however, payment for the Surrendered Shares is to be made to any person other than the registered holder, the amount of any stock transfer taxes (whether imposed on the registered holder or such other person) payable on account of the transfer to such person will be deducted from the payment if satisfactory evidence of the payment of such taxes, or exemption therefrom, is not submitted. Except as provided in this Instruction 6, it will not be necessary for transfer tax stamps to be affixed to the Certificates.

7. **Special Payment Instructions.** If a wire transfer for the payment in respect of the Surrendered Shares is to be issued in the name of a person other than the signer of this Letter of Transmittal or if a wire transfer is to be made to a person other than the signer of this Letter of Transmittal, the box entitled "Special Payment Instructions" on this Letter of Transmittal should be completed. See instruction 3 for signature guarantee requirements.

8. **Requests for Assistance or Additional Copies.** Any questions and requests for assistance may be directed to the Company at the telephone number and location set forth herein. Requests for additional copies of this Letter of Transmittal may be directed to the Company.

9. **Backup Federal Income Tax Withholding and Form W-9.** Under the "backup withholding" provisions of U.S. Federal tax law, the Purchaser may be required to withhold U.S. federal taxes from the payments of cash for Surrendered Shares. To prevent backup withholding, each surrendering holder of Shares that is a U.S. person for U.S. federal income tax purposes (a "U.S. Holder") must complete and sign the Form W-9, and either: (a) provide the holder's correct taxpayer identification number ("TIN") and certify, under penalties of perjury, that the TIN provided is correct (or that such holder is awaiting a TIN), and that (i) the holder has not been notified by the Internal Revenue Service

7

("IRS") that the holder is subject to backup withholding as a result of failure to report all interest or dividends, or (ii) the IRS has notified the holder that the holder is no longer subject to backup withholding; or (b) provide an adequate basis for exemption. In general, an individual's TIN is the individual's Social Security Number. If the surrendered Certificates are registered in more than one name or are not in the name of the actual owner, consult the Specific Instructions to the Form W-9 for additional guidance on which number to report. If the Purchaser is not provided with the correct TIN or an adequate basis for exemption, the holder may be subject to a $50 penalty imposed by the IRS and backup withholding.

If payment in respect of Surrendered Shares is to be made pursuant to Special Payment Instructions to a person other than the surrendering holder, backup withholding will apply unless such other person, rather than the surrendering holder, complies with the procedures described above to avoid backup withholding.

Exempt holders (including, among others, corporations) are not subject to backup withholding tax requirements. Exempt holders, other than non-U.S. Holders, should furnish their TIN, check the "Exempt payee" box on the IRS Form W-9 and sign, date, and return the IRS Form W-9 to the disbursing agent. Non-U.S. holders will generally be required to complete a Form W-8BEN or other appropriate form in order to avoid backup withholding, as discussed below. Holders are urged to consult their independent tax advisors to determine the application of the backup withholding tax and information reporting requirements to them.

Failure to complete the Form W-9 will not, by itself, cause Shares to be deemed invalidly delivered, but may require the Purchaser to withhold U.S. federal taxes from the amount of any payments in respect of such Shares made pursuant to the Merger Agreement. Backup withholding is not an additional federal income tax. Rather, the federal income tax liability of a person subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained from the IRS.

10.     *Form W-8BEN for Non-U.S. Persons.* Non-U.S. Persons are not subject to backup withholding and reporting requirements. Such persons should indicate their exempt status on (and should not complete the remaining portion of) the Form W-9 to avoid possible erroneous backup withholding. Additionally, in order to satisfy the Purchaser that a foreign holder qualifies as an exempt foreign recipient, such foreign holder must complete, execute and submit IRS Form W-8BEN, also included with these materials. Holders are urged to consult their own tax advisors to determine whether they are exempt. **Please note that there are additional Form W-8's if the W-8BEN does not apply to your particular situation. The W-8 forms can be accessed at the following IRS links:**

> *http://www.irs.gov/pub/irs-pdf/fw8bene.pdf*
> http://www.irs.gov/pub/irs-pdf/fw8ben.pdf
> http://www.irs.gov/pub/irs-pdf/fw8eci.pdf
> http://www.irs.gov/pub/irs-pdf/fw8imy.pdf
> http://www.irs.gov/pub/irs-pdf/fw8exp.pdf

11.     *Withholdings.* The Buyer, the Company, the Shareholders' Representative and the Escrow Agent may withhold federal and state income tax and other amounts required to be withheld under applicable Law or otherwise from the amounts payable under the Merger Agreement or Escrow Agreement.

8

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 182 of 232   Document 1-1

**\*\*\*\*\*\*\*\*\*IMPORTANT – SIGN HERE\*\*\*\*\*\*\*\*\***

**(Also Complete and Return IRS Form W-9 Below or Applicable IRS Form W-8)**

_____

_____
**(Signature(s) of Owner(s))**

Dated:_____, ____

(Must be signed by the registered holder(s) exactly as name(s) appear(s) on stock certificate(s) or by person(s) to whom the shares of Common Stock represented thereby have been assigned or transferred as evidenced by endorsements or stock powers transmitted therewith. If signature is by trustee, executor, administrator, guardian, attorney-in-fact, agent, officer of a corporation or any other person acting in a fiduciary or representative capacity, please provide the following information. See Instruction 3.)

Name(s)_____
**(Please Print)**

Capacity (full title)_____

Address_____
**(Street Address)**

_____
**(City, State, Zip Code)**

Area Code & Telephone Number_____

Tax Identification or

Social Security No.: _____

Wire Transfer Instructions:

    Bank Name: _____

    ABA Number: _____

    Account Name: _____

    Account Number: _____

    Further Credit Account Name (if applicable): _____

    Further Credit Account Number: (if applicable): _____

Bank Area Code and Telephone No.: _____

Bank Contact Person: _____

9

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 183 of 232   Document 1-1

**SPECIAL PAYMENT
INSTRUCTIONS
Signature Guarantee Required**

**(See Instructions 3 and 7)**

To be completed ONLY if the wire transfer for the payment in respect of Surrendered Shares (less the amount of any federal income tax required to be withheld) is to be issued in the name of someone other than the undersigned.

Send Wire to:

Name _____
        (Please Print)

Address _____

_____

_____

Tax Identification or

Social Security No.: _____
                (See Form W-9)

Wire Transfer Instructions:

    Bank Name: _____

    ABA Number: _____

    Account Name: _____

    Account Number: _____

    Further Credit Account Name (if applicable): _____

    Further Credit Account Number: (if applicable): _____

Bank Area Code and Telephone No.: _____

Bank Contact Person: _____

**Signature Guarantee (See Instruction 3)**

_____

10

4850-6886-6081.4

| DESCRIPTION OF SHARES SURRENDERED | | | | |
|---|---|---|---|---|
| Name and Address of Registered Owner<br><br>(Please fill in exactly as name appears on the Certificate(s), if applicable)<br><br>(Please print) | Description of Shares | Number of Shares | Certificate No(s) | Check below if the Certificates are already held by the Company on your behalf |
| | Common Shares | | | |
| | Restricted Shares | | | |
| | Total: | | | |

☐    If any Certificate(s) representing Shares that you own has (have) been lost, stolen or destroyed, check this box. With respect to such Certificates that have been lost, stolen or destroyed, please complete and return the enclosed Affidavit of Loss together with your Letter of Transmittal. If you are required to complete and return the enclosed Affidavit of Loss, then you will also be required by the Company to post a bond in such amount as the Company may reasonably direct as indemnity against any claim that may be made against it with respect to such lost, stolen or destroyed Certificates.

11

4850-6886-6081.4

## AA MANAGEMENT GROUP, INC.

## AFFIDAVIT OF LOSS

The undersigned does hereby certify that they are the owner and holder of Certificate Number

_____ representing (select one):

☐ _____ (_____) Common Shares

☐ _____ (_____) Restricted Shares

of AA Management Group, Inc., a Wisconsin corporation (the "Company"), and does further certify as

follows:

1. The undersigned has made a diligent search for said share certificate and has been unable to locate said share certificate;

2. The undersigned has not assigned, transferred or hypothecated said share certificate;

3. The undersigned will, in the event said share certificate is recovered, cause the same to be returned to the Company for cancellation;

4. The undersigned agrees to indemnify and hold harmless the Company from any and all loss, liability, damages, penalties, fines, costs, taxes and expenses (including all reasonable attorneys' fees and court costs) incurred by the Company resulting from, arising out of, relating to or caused by the loss, misplacement or destruction of said share certificate; and

5. The undersigned agrees, upon request of the Company, to post a bond in such amount as the Company may reasonably direct as security for the indemnification obligations of the undersigned set forth in Item 4 above.

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Loss as of the _____ day of

_____, 2015.

_____

Printed Name: _____

12

4850-6886-6081.4

**Form W-9**

See Attached.

TEMPORARILY SEALED

**13**

**Exhibit B**

**Dissenters' Rights Statutes**

See attached.

TEMPORARILY SEALED

4839-3580-6217.7

**18**

Updated 2013–14 Wis. Stats. Published and certified under s. 35.18. January 1, 2015.

37    Updated 13–14 Wis. Stats.

business entity that was converted is no longer subject to the applicable law of the jurisdiction that governed the organization of the prior form of business entity and is subject to the applicable law of the jurisdiction that governs the new form of business entity.

2. If the conversion is from or to a business entity under the laws applicable to which one or more of the owners thereof is liable for the debts and obligations of such business entity, such owner or owners shall continue to be or become so liable for debts and obligations of such business entity, but only for such debts and obligations accrued during the period or periods in which such laws are applicable to such owner or owners. This subdivision does not affect liability under any taxation laws.

(b) The business entity continues to have all liabilities of the business entity that was converted.

(c) The business entity continues to be vested with title to all property owned by the business entity that was converted without reversion or impairment.

(d) The articles of incorporation, articles of organization, certificate of limited partnership, or other similar governing document, whichever is applicable, of the business entity are as provided in the plan of conversion.

(e) All other provisions of the plan of conversion apply.

(5) After a plan of conversion is submitted and approved, the business entity that is to be converted shall deliver to the department for filing a certificate of conversion that includes all of the following:

(a) The plan of conversion.

(b) A statement that the plan of conversion was approved in accordance with the applicable law of the jurisdiction that governs the organization of the business entity.

(bm) A statement indicating whether the business entity that is to be converted has a fee simple ownership interest in any Wisconsin real estate.

(c) The registered agent and registered office, record agent and record office, or other similar agent and office of the business entity before and after conversion.

(6) Any civil, criminal, administrative, or investigatory proceeding that is pending by or against a business entity that is converted may be continued by or against the business entity after the effective date of conversion.

**History:** 2001 a. 44; 2005 a. 476.

**Next Economy Legislation Allowing Complex Business Reorganizations.** Boucher, Borowski, & Nichols. Wis. Law. Aug. 2002.

## SUBCHAPTER XII

## SALE OF ASSETS

**180.1201 Sale of assets in regular course of business; mortgage of assets; transfer of assets to subsidiary.** (1) A corporation may, on the terms and conditions and for the consideration determined by the board of directors, do any of the following:

(a) Sell, lease, exchange or otherwise dispose of all, or substantially all, of its property in the usual and regular course of business.

(b) Sell, lease, exchange or otherwise dispose of less than substantially all of its property whether or not in the usual and regular course of business.

(c) Mortgage, pledge, dedicate to the repayment of indebtedness, whether with or without recourse, or otherwise encumber any or all of its property whether or not in the usual and regular course of business.

(d) Transfer any or all of its assets to one or more corporations or other entities, all of the shares or interests of which are owned by the corporation, unless the transfer is in connection with a plan or action involving the sale, exchange, or disposal of all or substantially all of the assets of the corporation and requires shareholder approval under s. 180.1202.

(2) Unless required by the articles of incorporation, approval by the shareholders of a transaction permitted in sub. (1) is not required.

**History:** 1989 a. 303; 1991 a. 16; 2005 a. 476.

**180.1202 Sale of assets other than in regular course of business.** (1) Except as provided in sub. (5), a corporation may sell, lease, exchange or otherwise dispose of all, or substantially all, of its property, with or without goodwill, otherwise than in the usual and regular course of business, on the terms and conditions and for the consideration determined by the corporation's board of directors, upon adoption of a resolution by the board of directors approving the proposed transaction and approval by its shareholders of the proposed transaction.

(2) The corporation shall notify each shareholder, whether or not entitled to vote, of the proposed shareholders' meeting in accordance with s. 180.0705, except the notice shall be given no fewer than 20 days before the meeting date. The notice shall also state that the purpose, or one of the purposes, of the meeting is to consider the sale, lease, exchange or other disposition of all, or substantially all, of the property of the corporation and contain or be accompanied by a description of the transaction.

(3) Unless this chapter, the articles of incorporation or bylaws adopted under authority granted in the articles of incorporation require a greater vote or a vote by voting groups, the proposed transaction is authorized if approved by a majority of all the votes entitled to be cast on the transaction.

(4) After a sale, lease, exchange or other disposition of property is authorized, the transaction may be abandoned, subject to any contractual rights, without further shareholder action.

(5) A transaction that constitutes a distribution is governed by s. 180.0640 and not by this section.

**History:** 1989 a. 303; 1991 a. 16; 1997 a. 254.

In determining whether "substantially all" corporate assets are transferred within the meaning of s. 180.71 [now s. 180.1202] more than dollar values must be considered. The determinative factor is whether the sale changes the nature of corporate activity. Sorman v. Hombeck, 156 Wis. 2d 256, 457 N.W.2d 874 (Ct. App. 1990).

## SUBCHAPTER XIII

## DISSENTERS' RIGHTS

**180.1301 Definitions.** In ss. 180.1301 to 180.1331:

(1) "Beneficial shareholder" means a person who is a beneficial owner of shares held by a nominee as the shareholder.

(1m) "Business combination" has the meaning given in s. 180.1130 (3).

(2) "Corporation" means the issuer corporation or, if the corporate action giving rise to dissenters' rights under s. 180.1302 is a merger or share exchange that has been effectuated, the surviving domestic corporation or foreign corporation of the merger or the acquiring domestic corporation or foreign corporation of the share exchange.

(3) "Dissenter" means a shareholder or beneficial shareholder who is entitled to dissent from corporate action under s. 180.1302 and who exercises that right when and in the manner required by ss. 180.1320 to 180.1328.

(4) "Fair value," with respect to a dissenter's shares other than in a business combination, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable. "Fair value," with respect to a dissenter's shares in a business combination, means market value, as defined in s. 180.1130 (9) (a) 1. to 4.

(5) "Interest" means interest from the effectuation date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all of the circumstances.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 189 of 232   Document 1-1

Updated 2013–14 Wis. Stats. Published and certified under s. 35.18. January 1, 2015.

**180.1301**　　**BUSINESS CORPORATIONS**　　　　　　　　　　Updated 13–14 Wis. Stats.　　**38**

(6) "Issuer corporation" means a domestic corporation that is the issuer of the shares held by a dissenter before the corporate action.

**History:** 1989 a. 303; 1991 a. 16.

Date of payment" in sub. (5) refers to the actual payment date by a complicated following a special proceeding, even if the payment occurred after a "verdict, decision or report," within the meaning of s. 814.04 (4), or after "judgment," within the meaning of s. 815.05 (8). This the definition of interest contained in sub. (5) applies to the time period following a court decision on fair value until final payment is made. HMO–W Incorporated v. SSM Health Care System, 2003 WI App 137, 265 Wis. 2d 49, 667 N.W.2d 733, 02–0642.

The phrase "into that is fair and equitable under all of the circumstances" in sub. (5) directs the circuit court to consider the circumstances of the particular case in determining the interest rate to be paid. It was appropriate under this standard to look at the borrowing power of a parent corporation to determine if the rate the subsidiary would obtain would be the rate the parent could obtain. HMO–W Incorporated v. SSM Health Care System, 2003 WI App 137, 265 Wis. 2d 49, 667 N.W.2d 733, 02–0642.

**180.1302　Right to dissent.** (1) Except as provided in sub. (4) and s. 180.1008 (3), a shareholder or beneficial shareholder may dissent from, and obtain payment of the fair value of his or her shares in the event of, any of the following corporate actions:

(a) Consummation of a plan of merger to which the issuer corporation is a party if any of the following applies:

1. Shareholder approval is required for the merger by s. 180.1103 or by the articles of incorporation.

2. The issuer corporation is a subsidiary that is merged with its parent under s. 180.1104.

3. The issuer corporation is a parent that is merged with its subsidiary under s. 180.1104. This subdivision does not apply if all of the following are true:

a. The articles of incorporation of the surviving corporation do not differ from the articles of incorporation of the parent before the merger, except for amendments specified in s. 180.1002 (1) to (9).

b. Each shareholder of the parent whose shares were outstanding immediately before the effective time of the merger holds the same number of shares with identical designations, preferences, limitations, and relative rights, immediately after the merger.

c. The number of voting shares, as defined in s. 180.1103 (5) (a) 2., outstanding immediately after the merger, plus the number of voting shares issuable as a result of the merger, either by the conversion of securities issued pursuant to the merger or the exercise of rights or warrants issued pursuant to the merger, do not exceed by more than 20 percent the total number of voting shares of the parent outstanding immediately before the merger.

d. The number of participating shares, as defined in s. 180.1103 (5) (a) 1., outstanding immediately after the merger, plus the number of participating shares issuable as a result of the merger, either by the conversion of securities issued pursuant to the merger or the exercise of rights or warrants issued pursuant to the merger, do not exceed by more than 20 percent the total number of participating shares of the parent outstanding immediately before the merger.

(b) Consummation of a plan of share exchange if the issuer corporation's shares will be acquired, and the shareholder or the shareholder holding shares on behalf of the beneficial shareholder is entitled to vote on the plan.

(c) Consummation of a sale or exchange of all, or substantially all, of the property of the issuer corporation other than in the usual and regular course of business, including a sale in dissolution, but not including any of the following:

1. A sale pursuant to court order.

2. A sale for cash pursuant to a plan by which all or substantially all of the net proceeds of the sale will be distributed to the shareholders within one year after the date of sale.

(cm) Consummation of a plan of conversion.

(d) Except as provided in sub. (2), any other corporate action taken pursuant to a shareholder vote to the extent that the articles of incorporation, bylaws or a resolution of the board of directors provides that the voting or nonvoting shareholder or beneficial shareholder may dissent and obtain payment for his or her shares.

(2) Except as provided in sub. (4) and s. 180.1008 (3), the articles of incorporation may allow a shareholder or beneficial shareholder to dissent from an amendment of the articles of incorporation and obtain payment of the fair value of his or her shares if the amendment materially and adversely affects rights in respect of a dissenter's shares because it does any of the following:

(a) Alters or abolishes a preferential right of the shares.

(b) Creates, alters or abolishes a right in respect of redemption, including a provision respecting a sinking fund for the redemption or repurchase, of the shares.

(c) Alters or abolishes a preemptive right of the holder of shares to acquire shares or other securities.

(d) Excludes or limits the right of the shares to vote on any matter or to cumulate votes, other than a limitation by dilution through issuance of shares or other securities with similar voting rights.

(e) Reduces the number of shares owned by the shareholder or beneficial shareholder to a fraction of a share if the fractional share so created is to be acquired for cash under s. 180.0604.

(3) Notwithstanding sub. (1) (a) to (c), if the issuer corporation is a statutory close corporation under ss. 180.1801 to 180.1837, a shareholder of the statutory close corporation may dissent from a corporate action and obtain payment of the fair value of his or her shares, to the extent permitted under sub. (1) (d) or (2) or s. 180.1803, 180.1813 (1) (d) or (2) (b), 180.1815 (3) or 180.1829 (1) (c).

(4) Unless the articles of incorporation provide otherwise, subs. (1) and (2) do not apply to the holders of shares of any class or series if the shares of the class or series are registered on a national securities exchange or quoted on the National Association of Securities Dealers, Inc., automated quotations system on the record date fixed to determine the shareholders entitled to notice of a shareholders meeting at which shareholders are to vote on the proposed corporate action.

(5) Except as provided in s. 180.1833, a shareholder or beneficial shareholder entitled to dissent and obtain payment for his or her shares under ss. 180.1301 to 180.1331 may not challenge the corporate action creating his or her entitlement unless the action is unlawful or fraudulent with respect to the shareholder, beneficial shareholder or issuer corporation.

**History:** 1989 a. 303; 1991 a. 16; 2001 a. 44; 2005 a. 476.

Minority discounts are inappropriate under dissenters' rights statutes and will not be applied in determining "fair value" under sub. (1). Each dissenting shareholder should be assigned the proportionate extent of his or her shares in the going interest in the entire company. HMO–W Incorporated v. SSM Health Care System, 2000 WI 46, 234 Wis. 2d 707, 611 N.W.2d 250, 98–2834.

The Role of Discounts in Determining "Fair Value" Under Wisconsin's Dissenters' Rights Statutes: The Case for Discounts. Emory. 1995 WLR 1155.

**180.1303　Dissent by shareholders and beneficial shareholders.** (1) A shareholder may assert dissenters' rights as to fewer than all of the shares registered in his or her name only if the shareholder dissents with respect to all shares beneficially owned by any one person and notifies the corporation in writing of the name and address of each person on whose behalf he or she asserts dissenters' rights. The rights of a shareholder who under this subsection asserts dissenters' rights as to fewer than all of the shares registered in his or her name are determined as if the shares as to which he or she dissents and his or her other shares were registered in the names of different shareholders.

(2) A beneficial shareholder may assert dissenters' rights as to shares held on his or her behalf only if the beneficial shareholder does all of the following:

(a) Submits to the corporation the shareholder's written consent to the dissent not later than the time that the beneficial shareholder asserts dissenters' rights.

Case 2:18-cv-00841-JPS　Filed 06/01/18　Page 190 of 232　Document 1-1

Updated 2013–14 Wis. Stats. Published and certified under s. 35.18. January 1, 2015.

39 Updated 13–14 Wis. Stats.
BUSINESS CORPORATIONS 180.1327

(b) Submits the consent under par. (a) with respect to all shares of which he or she is the beneficial shareholder.

History: 1989 a. 303.

**180.1320 Notice of dissenters' rights.** (1) If proposed corporate action creating dissenters' rights under s. 180.1302 is submitted to a vote at a shareholders' meeting, the meeting notice shall state that shareholders and beneficial shareholders are or may be entitled to assert dissenters' rights under ss. 180.1301 to 180.1331 and shall be accompanied by a copy of those sections.

(2) If corporate action creating dissenters' rights under s. 180.1302 is authorized without a vote of shareholders, the corporation shall notify, in writing and in accordance with s. 180.0141, all shareholders entitled to assert dissenters' rights that the action was authorized and send them the dissenters' notice described in s. 180.1322.

History: 1989 a. 303.
When the plaintiff was not a shareholder at the time of the complained of acts, it had no right to vote in dissent to a plan of liquidation and dissolution, and it could not be a dissenter entitled to notice of dissenters' rights, it only one who can vote in dissent is entitled to such notice under this section. Borns v. Continental Advanced Technologies, Inc. 2003 WI App 135, 266 Wis. 2d 253, 667 N.W.2d 709, 01–2624.

**180.1321 Notice of intent to demand payment.** (1) If proposed corporate action creating dissenters' rights under s. 180.1302 is submitted to a vote at a shareholders' meeting, a shareholder or beneficial shareholder who wishes to assert dissenters' rights shall do all of the following:

(a) Deliver to the issuer corporation before the vote is taken written notice that complies with s. 180.0141 of the shareholder's or beneficial shareholder's intent to demand payment for his or her shares if the proposed action is effectuated.

(b) Not vote his or her shares in favor of the proposed action.

(2) A shareholder or beneficial shareholder who fails to satisfy sub. (1) is not entitled to payment for his or her shares under ss. 180.1301 to 180.1331.

History: 1989 a. 303.

**180.1322 Dissenters' notice.** (1) If proposed corporate action creating dissenters' rights under s. 180.1302 is authorized at a shareholders' meeting, the corporation shall deliver a written dissenters' notice to all shareholders and beneficial shareholders who satisfied s. 180.1321.

(2) The dissenters' notice shall be sent no later than 10 days after the corporate action is authorized at a shareholders' meeting or without a vote of shareholders, whichever is applicable. The dissenters' notice shall comply with s. 180.0141 and shall include or have attached all of the following:

(a) A statement indicating where the shareholder or beneficial shareholder must send the payment demand and where and when certificates for certificated shares must be deposited.

(b) For holders of uncertificated shares, an explanation of the extent to which transfer of the shares will be restricted after the payment demand is received.

(c) A form for demanding payment that includes the date of the first announcement to news media or to shareholders of the terms of the proposed corporate action and that requires the shareholder or beneficial shareholder asserting dissenters' rights to certify whether he or she acquired beneficial ownership of the shares before that date.

(d) A date by which the corporation must receive the payment demand, which may not be fewer than 30 days nor more than 60 days after the date on which the dissenters' notice is delivered.

(e) A copy of ss. 180.1301 to 180.1331.

History: 1989 a. 303.

**180.1323 Duty to demand payment.** (1) A shareholder or beneficial shareholder who is sent a dissenters' notice described in s. 180.1322, or a beneficial shareholder whose shares are held by a nominee who is sent a dissenters' notice described in s. 180.1322, must demand payment in writing and certify whether he or she acquired beneficial ownership of the shares before the

date specified in the dissenters' notice under s. 180.1322 (2) (c). A shareholder or beneficial shareholder with certificated shares must also deposit his or her certificates in accordance with the terms of the notice.

(2) A shareholder or beneficial shareholder with certificated shares who demands payment and deposits his or her share certificates under sub. (1) retains all other rights of a shareholder or beneficial shareholder until these rights are canceled or modified by the effectuation of the corporate action.

(3) A shareholder or beneficial shareholder with certificated or uncertificated shares who does not demand payment by the date set in the dissenters' notice, or a shareholder or beneficial shareholder with certificated shares who does not deposit his or her share certificates where required and by the date set in the dissenters' notice, is not entitled to payment for his or her shares under ss. 180.1301 to 180.1331.

History: 1989 a. 303.

**180.1324 Restrictions on uncertificated shares.** (1) The issuer corporation may restrict the transfer of uncertificated shares from the date that the demand for payment for those shares is received until the corporate action is effectuated or the restrictions released under s. 180.1326.

(2) The shareholder or beneficial shareholder who asserts dissenters' rights as to uncertificated shares retains all of the rights of a shareholder or beneficial shareholder, other than those restricted under sub. (1), until these rights are canceled or modified by the effectuation of the corporate action.

History: 1989 a. 303.

**180.1325 Payment.** (1) Except as provided in s. 180.1327, as soon as the corporate action is effectuated or upon receipt of a payment demand, whichever is later, the corporation shall pay each shareholder or beneficial shareholder who has complied with s. 180.1323 the amount that the corporation estimates to be the fair value of his or her shares, plus accrued interest.

(2) The payment shall be accompanied by all of the following:

(a) The corporation's latest available financial statements, audited and including footnote disclosure if available, but including not less than a balance sheet as of the end of a fiscal year ending not more than 16 months before the date of payment, an income statement for that year, a statement of changes in shareholders' equity for that year and the latest available interim financial statements, if any.

(b) A statement of the corporation's estimate of the fair value of the shares.

(c) An explanation of how the interest was calculated.

(d) A statement of the dissenter's right to demand payment under s. 180.1328 if the dissenter is dissatisfied with the payment.

(e) A copy of ss. 180.1301 to 180.1331.

History: 1989 a. 303.

**180.1326 Failure to take action.** (1) If an issuer corporation does not effectuate the corporate action within 60 days after the date set under s. 180.1322 for demanding payment, the issuer corporation shall return the deposited certificates and release the transfer restrictions imposed on uncertificated shares.

(2) If after returning deposited certificates and releasing transfer restrictions, the issuer corporation effectuates the corporate action, the corporation shall deliver a new dissenters' notice under s. 180.1322 and repeat the payment demand procedure.

History: 1989 a. 303.

**180.1327 After-acquired shares.** (1) A corporation may elect to withhold payment required by s. 180.1325 from a dissenter unless the dissenter was the beneficial owner of the shares before the date specified in the dissenters' notice under s. 180.1322 (2) (c) as the date of the first announcement to news media or to shareholders of the terms of the proposed corporate action.

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 191 of 232   Document 1-1

(2) To the extent that the corporation elects to withhold payment under sub. (1) after effectuating the corporate action, it shall estimate the fair value of the shares, plus accrued interest, and shall pay this amount to each dissenter who agrees to accept it in full satisfaction of his or her demand. The corporation shall send with its offer a statement of its estimate of the fair value of the shares, an explanation of how the interest was calculated, and a statement of the dissenter's right to demand payment under s. 180.1328 if the dissenter is dissatisfied with the offer.

History: 1989 a. 303.

**180.1328 Procedure if dissenter dissatisfied with payment or offer.** (1) A dissenter may, in the manner provided in sub. (2), notify the corporation of the dissenter's estimate of the fair value of his or her shares and amount of interest due, and demand payment of his or her estimate, less any payment received under s. 180.1325, or reject the offer under s. 180.1327 and demand payment of the fair value of his or her shares and interest due, if any of the following applies:

(a) The dissenter believes that the amount paid under s. 180.1325 or offered under s. 180.1327 is less than the fair value of his or her shares or that the interest due is incorrectly calculated.

(b) The corporation fails to make payment under s. 180.1325 within 60 days after the date set under s. 180.1322 for demanding payment.

(c) The issuer corporation, having failed to effectuate the corporate action, does not return the deposited certificates or release the transfer restrictions imposed on uncertificated shares within 60 days after the date set under s. 180.1322 for demanding payment.

(2) A dissenter waives his or her right to demand payment under this section unless the dissenter notifies the corporation of his or her demand under sub. (1) in writing within 30 days after the corporation made or offered payment for his or her shares. The notice shall comply with s. 180.9141.

History: 1989 a. 303.
When payment is made by check, the payment date under sub. (2) is the date the payor receives the check. Kohler Co. v. Sogen International Fund, Inc. 2000 WI App 60, 233 Wis. 2d 592, 608 N.W.2d 746, 99–0960.

**180.1330 Court action.** (1) If a demand for payment under s. 180.1328 remains unsettled, the corporation shall bring a special proceeding within 60 days after receiving the payment demand under s. 180.1328 and petition the court to determine the fair value of the shares and accrued interest. If the corporation does not bring the special proceeding within the 60–day period, it shall pay each dissenter whose demand remains unsettled the amount demanded.

(2) The corporation shall bring the special proceeding in the circuit court for the county where its principal office or, if none in this state, its registered office is located. If the corporation is a foreign corporation without a registered office in this state, it shall bring the special proceeding in the county in this state in which was located the registered office of the issuer corporation that merged with or whose shares were acquired by the foreign corporation.

(3) The corporation shall make all dissenters, whether or not residents of this state, whose demands remain unsettled parties to the special proceeding. Each party to the special proceeding shall be served with a copy of the petition as provided in s. 801.14.

(4) The jurisdiction of the court in which the special proceeding is brought under sub. (2) is plenary and exclusive. The court may appoint one or more persons as appraisers to receive evidence and recommend decision on the question of fair value. An appraiser has the power described in the order appointing him or her or in any amendment to the order. The dissenters are entitled to the same discovery rights as parties in other civil proceedings.

(5) Each dissenter made a party to the special proceeding is entitled to judgment for any of the following:

(a) The amount, if any, by which the court finds the fair value of his or her shares, plus interest, exceeds the amount paid by the corporation.

(b) The fair value, plus accrued interest, of his or her shares acquired on or after the date specified in the dissenter's notice under s. 180.1322 (2) (c), for which the corporation elected to withhold payment under s. 180.1327.

History: 1989 a. 303.
Because this section does not provide for different procedures, all procedural mechanisms under chs. 801 to 847 are available in an action under this section. Kohler Co. v. Sogen International Fund, Inc. 2000 WI App 60, 233 Wis. 2d 592, 608 N.W.2d 746, 99–0960.

Subs. (2) and (4) establish a rule of venue applicable within Wisconsin's judicial system and do not attempt to block corporations from using federal diversity jurisdiction. Albert Trostel & Son v. Edward Notz, 679 F.3d 627 (2012).

**180.1331 Court costs and counsel fees.** (1) (a) Notwithstanding ss. 814.01 to 814.04, the court in a special proceeding brought under s. 180.1330 shall determine all costs of the proceeding, including the reasonable compensation and expenses of appraisers appointed by the court and shall assess the costs against the corporation, except as provided in par. (b).

(b) Notwithstanding ss. 814.01 and 814.04, the court may assess costs against all or some of the dissenters, in amounts that the court finds to be equitable, to the extent that the court finds the dissenters acted arbitrarily, vexatiously or not in good faith in demanding payment under s. 180.1328.

(2) The parties shall bear their own expenses of the proceeding, except that, notwithstanding ss. 814.01 to 814.04, the court may also assess the fees and expenses of counsel and experts for the respective parties, in amounts that the court finds to be equitable, as follows:

(a) Against the corporation and in favor of any dissenter if the court finds that the corporation did not substantially comply with ss. 180.1320 to 180.1328.

(b) Against the corporation or against a dissenter, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously or not in good faith with respect to the rights provided by this chapter.

(3) Notwithstanding ss. 814.01 to 814.04, if the court finds that the services of counsel and experts for any dissenter were of substantial benefit to other dissenters similarly situated, the court may award to these counsel and experts reasonable fees to be paid out of the amounts awarded the dissenters who were benefited.

History: 1989 a. 303.

## SUBCHAPTER XIV

## DISSOLUTION

**180.1401 Dissolution before issuance of shares.** (1) The incorporators or the board of directors of a corporation that has not issued shares may authorize the dissolution of the corporation.

(2) At any time after dissolution is authorized under sub. (1), the corporation may dissolve by delivering to the department for filing articles of dissolution that include all of the following:

(a) The name of the corporation.

(b) The date of its incorporation.

(c) A statement that none of the corporation's shares has been issued.

(d) A statement that no debt of the corporation remains unpaid.

(e) A statement that the incorporators or the board of directors, specifying which, authorized the dissolution in accordance with this section.

(3) A corporation is dissolved under this section on the effective date of its articles of dissolution.

History: 1989 a. 303; 1993 a. 27.

TEMPORARILY SEALED

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT G

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

CONFIDENTIAL

*CONFIDENTIAL ESOP PARTICIPANT INFORMATION*

**Confidential Information Statement**

in connection with the

**AGREEMENT AND PLAN OF MERGER**

**AMONG**

**DUFF & PHELPS, LLC,**

**D&P ALABAMA ACQUISITION CORP.,**

**AA MANAGEMENT GROUP, INC.**

and

**SHAREHOLDERS' REPRESENTATIVE**

**DATED: FEBRUARY 3, 2015**



CONFIDENTIAL

## TABLE OF CONTENTS

Page

Proposed Transaction.................................................................................................... 1
Questions and Answers About the Transaction .............................................................. 2
Summary of the Terms of the Merger Agreement .......................................................... 6
Information About the Company ..................................................................................... 8
Information About the Buyer........................................................................................... 8
Cautionary Statement Concerning Forward-Looking Statements ................................... 8

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved these securities or determined if this Confidential Information Statement is accurate or adequate. Any representation to the contrary is unlawful.

i

# AA MANAGEMENT GROUP, INC.

## PROPOSED TRANSACTION

The board of directors (the "Board of Directors") of AA Management Group, Inc. (the "Company") has approved the transactions contemplated by an Agreement and Plan of Merger, entered into by and among the Company, D&P Alabama Acquisition Corp., a Wisconsin corporation ("Merger Sub"), Duff & Phelps, LLC, a Delaware limited liability company ("Buyer"), and, solely in his capacity as Shareholders' Representative, Joseph P. Zvesper, on January 30, 2015 (the "Merger Agreement"). Pursuant to the transactions contemplated by the Merger Agreement (the "Transaction"), in exchange for the merger consideration and performance of other terms and conditions of the Merger Agreement, Merger Sub shall be merged with and into the Company and the Company shall continue as the surviving corporation and the separate corporate existence of Merger Sub shall terminate. As a result of the Transaction, the Buyer will become the sole owner of the Company. The Transaction requires certain approvals from ESOP participants and from GreatBanc Trust Company (the "ESOP Trustee"), the independent trustee of the American Appraisal Associates, Inc. Employee Stock Ownership Plan (the "ESOP") which is a shareholder of the Company. As a participant in the ESOP, you have the right to direct the ESOP Trustee how to vote the shares of Company stock allocated to your ESOP account.

*The Company's Board of Directors recommends that you direct the ESOP Trustee to vote FOR the proposal to approve the Merger Agreement and approve the Transaction.*

The Company's Board of Directors consists of Joseph P. Zvesper, Chairman and CEO of the Company, Kimberly L. Russo, Executive Vice President and Chief Financial Officer of the Company, John C Barnsley, non-executive board member, and K. Thor Lundgren, non-executive board member. The Board of Directors has unanimously approved the Merger Agreement and the Transaction, and recommends approval by the ESOP Trustee and the ESOP participants.

Please exercise your right to vote on the Transaction. Regardless of the number of shares of the Company stock allocated to your ESOP account, it is important that your shares be represented and voted. In order to direct the ESOP Trustee on how to vote, please fill out and return the enclosed confidential voting card and return it to: GreatBanc Trust Company, Attn: Jeff Scholl, 801 Warrenville Rd., Suite 500, Lisle, Illinois 60532. Alternatively the voting card may be faxed to GreatBanc Trust Company, Attn: Jeff Scholl, at (630) 810-4501, or e-mailed to Jeff Scholl, at jscholl@greatbanctrust.com. Your voting card must be received no later than 4 P.M. CENTRAL TIME, on February 23, 2015.

This Confidential Information Statement provides you with detailed information about the proposed Transaction. You should read the entire document carefully.

*The Transaction is a complex transaction. You are strongly urged to read and consider carefully all information in this Confidential Information Statement.*

You should not construe this Confidential Information Statement or any prior or subsequent communication from or with the Company or the Buyer, or any professional associated with the Company, as legal, tax, or investment advice. While this information is provided to aid your consideration of the matters discussed in this Confidential Information

1

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 197 of 232   Document 1-1

Statement, you should consult your own advisors regarding legal, accounting, tax and other matters concerning the proposed Transaction.

This Confidential Information Statement is dated February 3, 2015, which is when it first is being delivered to ESOP participants. You should not assume that the information in this Confidential Information Statement is accurate as of any date other than the above date.

## Questions and Answers About the Transaction

*Q: Why are the Company and Buyer proposing to enter into the Transaction?*

A: The Board of Directors believes that consummating the Transaction with the Buyer will provide the Company with financing sources capable of providing growth capital to the Company. After several months of discussions with the Buyer and its affiliates, the Company's Board of Directors has concluded that entering into the Transaction with the Buyer is in the best interests of the Company and the shareholders of the Company. The Board of Directors believes the strategic objectives of both the Company and the Buyer will be enhanced by the consummation of the Transaction. The Buyer identified the Company as a good acquisition candidate and approached the Company to determine the Company's interest in pursuing the contemplated Transaction. The Company believes the Buyer is a good business partner.

*Q: How will the Company fit into the Buyer organization?*

A: The Company will be a wholly-owned subsidiary of the Buyer. Following the Transaction, the current officers of the Company and its subsidiaries are expected to have a role in managing the operations of the Company and its subsidiaries and the employees of the Company and its subsidiaries will remain employees of Company and its subsidiaries.

*Q: What will I receive as a result of the Transaction?*

A: The Merger Agreement provides for an enterprise value of the Company of $86,000,000. Upon completion of the merger, the outstanding shares of common stock (other than shares of common stock held by dissenting shareholders) will be converted into the right to receive an aggregate sum equal to $86,000,000, minus the amount of certain obligations of the Company incurred to redeem shares of common stock from certain former shareholders, and minus the amount of certain transaction-related expenses of the Company. The Trustee estimates (based on information supplied by the Company) that, as of the date of this information statement, the merger consideration into which each share of common stock held by the ESOP will be converted will be equal to approximately $1,450 to $1,475 per share. **Please note that these figures are estimates only and are based on certain assumptions and, therefore, are subject to change. Please see the Merger Agreement for additional details.**

The Company will distribute funds to the ESOP as part of the closing of the Merger Agreement (the "Closing"). You will receive credit for approximately $1,450 to $1,475 for every share of Company stock allocated to your ESOP account, representing a premium of approximately 70% over the March 31, 2014, valuation of shares of Company stock. **Please note that these figures are estimates only and are based on certain assumptions and,**

2

therefore, are subject to change. Please see the Merger Agreement for additional details.

*Q: When will I be able to Receive a Distribution of the Proceeds from the Transaction from the ESOP ?*

A: The Company is expected to apply for a favorable determination letter from the Internal Revenue Service (the "IRS") approving the termination of the ESOP. If the Company files for a favorable determination letter from the IRS and subject to a final agreement by and between the Company and the ESOP Trustee, you might be permitted to rollover or take a distribution of a certain percentage of the cash credited to your ESOP account as the result of the Transaction within a reasonable period of time following the Closing, but prior to receipt of the favorable determination letter from the IRS. You might have the option to either: (1) initiate a rollover of the funds allocated to your ESOP account into an individual retirement account ("IRA") or another qualified retirement plan (such as a 401k plan) that will accept a rollover from the ESOP; or (2) take a direct distribution of the funds allocated to your ESOP account (withholding will apply as required by law). These funds might be available for rollover or distribution within approximately 90 to 120 days after the Closing. The Company may arrange for a representative of an independent service provider to attend on-site meetings to assist ESOP participants who would like to rollover their ESOP proceeds into an IRA.

If the Company files for a favorable determination letter from the IRS, the cash allocated to your ESOP account (or the remaining cash if a distribution is allowed as described in the paragraph above) will be held in the ESOP Trust and invested by the ESOP Trustee on your behalf until such time as the Company receives a favorable determination letter from the IRS concerning the tax-qualified status of the termination of the ESOP. The Company and the ESOP Trustee will submit a request to obtain a favorable determination letter with respect to the ESOP after the Transaction is closed. You should be aware that this process can take a long time, and the Trustee does not believe the funds will be distributed until 12 to 24 months after the Closing of the Transaction. During this time, the ESOP Trustee will invest the retained funds in money market funds, short term government obligations or other short term securities.

After receipt of a favorable determination letter from the IRS concerning the tax-qualified status of the termination of the ESOP, the cash allocated to your ESOP account (or the remaining cash if a distribution is allowed as described in the first paragraph above) will be available for distribution by the ESOP and you will then have the option to either: (1) initiate a rollover of the funds allocated to your ESOP account into an IRA or another qualified retirement plan; or (2) take a direct distribution of the funds allocated to your ESOP account (withholding will apply as required by law).

You will receive a distribution package from the ESOP's plan administrator when you become eligible to take a distribution from the ESOP at the times distributions will be made from the ESOP as described above. If you properly transfer your ESOP account balances into an IRA or another qualified retirement plan, no tax will be due at that time. The Company encourages you to carefully consider this favorable option for rolling over your retirement funds.

3

If, however, you elect to take a direct distribution of your ESOP account balances and you have not yet reached the age of 59 $\frac{1}{2}$, you may be liable to pay both a 10% penalty tax and ordinary income tax on the amount distributed to you from the ESOP on your ESOP proceeds. This is a penalty which can be avoided if you roll over your ESOP proceeds into an IRA or another qualified retirement plan. You are encouraged to consult with your own tax advisor as to the tax consequences of the transfer or withdrawal of your ESOP account balances.

*Q: Is the Company Board of Directors recommending that I vote in favor of the Transaction?*

A: Yes. After careful consideration, the Board of Directors of the Company unanimously determined that the Transaction is advisable, fair, and in the best interests of the Company and the shareholders of the Company, and has approved the Merger Agreement and the Transaction. Accordingly, the Board of Directors recommends that you direct the ESOP Trustee to vote "FOR" the proposal to approve the Transaction.

The ESOP Trustee's financial advisor has done a preliminary review of the Transaction and has advised the ESOP Trustee that as of the date of the Merger Agreement it appears that the ESOP will be receiving adequate consideration in connection with the Transaction and that the Transaction is fair from a financial point of view to the ESOP as a shareholder of the Company. The ESOP Trustee also is expecting to receive a final opinion from its financial advisor in connection with the Transaction as of the Closing, which shall conclude that the ESOP will be receiving adequate consideration in connection with the Transaction and that the Transaction is fair from a financial point of view to the ESOP as a shareholder of the Company. The ESOP Trustee will not be able to proceed with the Transaction unless the ESOP Trustee receives this final opinion.

Q: *Are there risks to the ESOP associated with the Transaction?*

A: The ESOP is not a party to the Merger Agreement and is therefore not directly responsible for any representations, warranties or covenants relating to the operations of the Company prior to the Transaction or after the Transaction. The ESOP will not make any representations or warranties to the Buyer concerning the Company and will not be directly liable for any indemnification payments which may be owing to the Buyer under the Merger Agreement. Any claims made by the Buyer for indemnity will be made solely against the monies put in an escrow account by the other shareholders (not the ESOP) of the Company (the "Escrow"). The Buyer will not be able to seek indemnification from the shareholders with respect to any claims (except a claim based on common law fraud) it may have against the shareholders pursuant to the Merger Agreement after the period of the Escrow has expired, which period shall expire 18 months after Closing for most claims and 60 months after Closing for certain identified claims against the Company (or later if there are pending claims for indemnification at that time). In addition, the ESOP Trustee will receive prior to Closing a final opinion from its financial advisor that the ESOP is receiving adequate consideration in connection with the Transaction and that the Transaction is fair from a financial point of view to the ESOP as a shareholder of the Company.

4

*Q: How will the Transaction work?*

A: If the Transaction is approved and all other conditions to Closing provided for in the Merger Agreement are satisfied, the Company will become wholly-owned by the Buyer. The Buyer has indicated that the current officers of the Company and its subsidiaries are expected to have a role in managing the current operations of the Company and its subsidiaries within the Buyer's organization, and the Company's and its subsidiaries' employees will remain employees of the Company and its subsidiaries.

*Q: Who needs to approve the Transaction?*

A: The Board of Directors has approved the Transaction. In addition, under applicable law, approval of the Transaction will require the affirmative vote of a majority of the shares of Company stock outstanding on the record date established by the Board of Directors to conduct a special shareholders meeting to vote to approve the Transaction.

In accordance with the terms of the ESOP, ESOP participants are entitled to direct the ESOP Trustee on whether to vote the shares of the Company stock allocated to their ESOP accounts to approve the Transaction. Also, the ESOP Trustee has the full discretion on how to vote any shares of the Company stock held by the ESOP for which an ESOP participant has not provided any voting instructions or if the Trustee determines that following the ESOP participant voting instructions would violate ERISA.

*Q: What are the key terms of the Merger Agreement?*

A: The Merger Agreement governs the key terms of the Transaction, including:

- representations and warranties concerning the Buyer;

- representations and warranties concerning the Company;

- the rights of the Buyer to obtain indemnification from the shareholders (other than the ESOP) in the event that the Company breaches its representations and warranties or other provisions of the Merger Agreement;

- the rights of shareholders to obtain indemnification from the Buyer in the event that the representations and warranties concerning the Buyer are breached; and

- conditions which must be satisfied or waived in order for the parties to close the Transaction.

    Additionally, certain Company executives are required to execute employment, confidentiality, non-competition and non-solicitation agreements.

*Q: When is the Transaction scheduled to close?*

A: The formal Closing of the Transaction is tentatively scheduled for February 28, 2015, although the Closing cannot take place until all conditions to Closing have been satisfied. The Closing could be delayed until a later date.

5

*Q: What do I do if I have questions?*

A: Please contact Paul Trost, at (630) 810-4943, or Jeff Scholl, at (630) 810-4942, of GreatBanc Trust Company, who are employees of the ESOP Trustee if you have any questions.

You may also wish to consult your own legal and/or financial advisor. Although the Company's legal counsel, Foley & Lardner, LLP, has been involved in the negotiation of this Transaction, it has acted on behalf of the Company and has not represented any shareholder or the ESOP participants personally.

*Q: How can I vote?*

A: You can direct the ESOP Trustee on whether to vote the shares of the Company stock allocated to your ESOP account to approve the Transaction by filling out the enclosed confidential voting card and returning it in the enclosure provided to (per the attached voting instructions):

> GreatBanc Trust Company
> Attn: Jeff Scholl
> 801 Warrenville Rd., Suite 500
> Lisle, Illinois 60532
> Email: jscholl@greatbanctrust.com
> Fax: (630) 810-4501

*Q: What else do I need to do?*

A: If your current address changes after the Closing of the Transaction and before all proceeds are distributed, you must advise the ESOP Trustee of such address change. Final distributions will not take place for 12 to 24 months after the Transaction is consummated.

### Summary of the Terms of
### The Merger Agreement

**Closing Conditions**

The Company's obligation to complete the Transaction is subject to the satisfaction or waiver by the Company of the following conditions, among others:

- the delivery of the merger consideration by the Buyer;

- the Merger Agreement must be approved by the Company shareholders;

6

- a majority of the ESOP participants that elect to vote must approve the Transaction in a separate "pass through" vote conducted by the ESOP Trustee, and certain other matters pertaining to the ESOP must be completed;

- the ESOP Trustee must determine that the Transaction is in the best interests of ESOP participants;

- Buyer and Merger Sub must perform and comply in all material respects with their respective obligations and covenants to be performed or complied with prior to the Closing; and

- no injunction or other law or order shall have the effect of making the merger illegal or otherwise prohibiting the completion of the merger.

The Buyer's obligation to complete the Transaction is also subject to the satisfaction or waiver by the Buyer of the following conditions:

- the Merger Agreement must be approved by the Company shareholders;

- a majority of the ESOP participants that elect to vote must approve the Transaction in a separate "pass through" vote conducted by the ESOP Trustee, and certain other matters pertaining to the ESOP must be completed;

- the ESOP Trustee must determine that the Transaction is in the best interests of ESOP participants;

- Company must perform and comply in all material respects with its obligations and covenants to be performed or complied with prior to the Closing;

- there must not have been an event or series of events, including any breach of any representation and warranty made by Company in the Merger Agreement, that has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, financial condition or results of operations of Company; and

- no injunction or other law or order shall have the effect of making the merger illegal or otherwise prohibiting the completion of the merger.

## Shareholder Representative

The shareholders, by voting in favor of the Merger Agreement, shall be appointing Joseph P. Zvesper as the shareholder representative to represent the shareholders with respect to the Transaction and related events. For example, the shareholder representative may negotiate

7

and agree to settlements with the Buyer with respect to issues that arise under the Merger Agreement, give and receive payments, notices, waivers, reports and other communications in connection with the Transaction, execute miscellaneous documents associated with the Transaction, negotiate and agree to amendments to the Merger Agreement, and negotiate and otherwise handle claims for indemnification.

The ESOP Trustee, or its duly appointed successor trustee, will represent the ESOP with respect to the Transaction and the disposition and distribution of the ESOP's assets (including the cash received from the Transaction once it is distributed to the ESOP until the ESOP is terminated and all of the assets of the ESOP are disbursed to the ESOP participants).

## Information About the Company

The Company and its subsidiaries are engaged in the business of providing valuation and related services for business, financial, legal and tax purposes.

## Information About the Buyer and Merger Sub

The Buyer is a Delaware limited liability company and a global valuation and corporate finance advisor. Its primary service areas are valuation, dispute consulting, mergers and acquisitions, restructuring, alternative assets, tax, transaction opinions and legal management consulting. The Merger Sub was formed for the purpose of acquiring the Company.

## Cautionary Statement Concerning Forward-Looking Statements

This Confidential Information Statement and the documents incorporated by reference into this Confidential Information Statement contain forward-looking statements that involve risks and uncertainties, such as statements of the Company's and Buyer's post-closing plans, objectives, expectations and intentions. When used in this Confidential Information Statement and the documents incorporated by reference into this Confidential Information Statement, the words "may", "might", "should", "expects", "anticipates", "believes", "estimates", "intends" and "plans" and similar expressions are intended to identify certain of these forward-looking statements. Because these forward-looking statements involve risks and uncertainties, the actual results of the Company, Buyer and the post-closing plan could differ materially from those expressed or implied by the forward-looking statements in this Confidential Information Statement and the documents incorporated by reference into this Confidential Information Statement.

8

# EXHIBIT H

**FILED**
**02-05-2018**
**John Barrett**
**Clerk of Circuit Court**
**2018CV001032**
**Honorable Glenn H**
**Yamahiro-34**
**Branch 34**

# THIS DOCUMENT CONFIDENTIAL AND BEING FILED UNDER SEAL

TEMPORARILY SEALED

# PARTICIPANT DIRECTIVE STATEMENT

February 3, 2015

**To: Participants in the American Appraisal Associates, Inc. Employee Stock Ownership Plan**

As a participant in the American Appraisal Associates, Inc. Employee Stock Ownership Plan (the "ESOP" or the "Plan"), you have the right to direct GreatBanc Trust Company, the trustee of the ESOP (the "ESOP Trustee"), as to how to vote the shares of AA Management Group, Inc., a Wisconsin corporation (the "Company"), stock allocated to your account in the ESOP (the "ESOP Account") with respect to the transactions contemplated by an Agreement and Plan of Merger, entered into by and among the Company, D&P Alabama Acquisition Corp., a Wisconsin corporation ("Merger Sub"), Duff & Phelps, LLC, a Delaware limited liability company ("Buyer"), and, solely in his capacity as Shareholders' Representative, Joseph P. Zvesper, on January 30, 2015 (the "Merger Agreement"). The transactions contemplated by the Merger Agreement are hereinafter referred to as the "Transaction." The ESOP also provides that the ESOP Trustee will vote the shares of Company stock that are allocated to any participant's ESOP Account for which it fails to receive participant voting instructions, in its own discretion. The Transaction is scheduled to be voted upon by the Company's shareholders at a special meeting of shareholders to take place on February 24, 2015.

The ESOP Trustee has enclosed the following documents to assist you with this decision:

- this Participant Directive Statement for the participants of the ESOP;

- a Voting Card to direct the ESOP Trustee;

- a Company prepared Information Statement directed to shareholders of the Company setting forth a general description of the Transaction ("Company Statement"); and

- a Confidential Information Statement (a "Proxy Statement") directed to ESOP participants setting forth a general description of the Transaction.

The Company Statement was prepared by the Company and the Company is solely responsible for the accuracy of the information contained thereon. The Proxy Statement was prepared by the ESOP Trustee and approved by the Company. The Company Statement and the Proxy Statement are hereinafter referred to collectively as the "Information Materials." The documents provided herein provide the entire description of the transactions and shall supersede any prior oral or written communications you have received from the Company regarding the transaction. The Company has agreed to indemnify and hold the ESOP Trustee harmless from damages, losses or expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred or suffered as a result or arising out of any the information contained in the Information Materials or the failure to include material information relating to the Company and its operations or the terms of the Transaction in the Information Materials.

LP 5873318.6\37383-99320

Approval of the Transaction by the requisite vote of the Company's shareholders is a condition to the consummation of the Transaction. The terms and conditions of the Transaction (and the underlying Transaction documents) are described and set forth in the Merger Agreement, and such terms and conditions are briefly summarized below and are more fully described in the Information Materials. Because these summaries are brief, you should review the Information Materials (and the Merger Agreement itself contained therein) in their entirety. If there is any conflict between the Information Materials and this Participant Directive Statement, the Information Materials control.

## SUMMARY OF THE TRANSACTION

As described in more detail below in the "Brief Description of What Will Happen to the ESOP in Connection with the Transaction" section, it is estimated by the Company that shares allocated to ESOP Accounts will be entitled to receive cash equal to approximately $1,450 to $1,475 per share upon the effective date of the Transaction or shortly thereafter. **Please note that these figures are estimates only and are based on certain assumptions and, therefore, are subject to change. Please see the agreement and plan of merger for additional details.**

After the Transaction, the current officers of the Company shall lead and manage the operations of the Company in conjunction with Buyer's board of directors and leadership teams.

The Merger Agreement contains certain representations by the Buyer and the Company as to certain facts related to the Transaction. These representations and warranties generally survive for 18 months after the Transaction is completed. The Merger Agreement also imposes numerous obligations on the parties to the transaction (for example, pre and post-closing covenants, satisfaction of closing conditions and indemnification obligations). The merger consideration to be received by shareholders (other than the ESOP) at the closing will be reduced by (i) $12,000,000, which will be deposited into an interest-bearing escrow account for the purpose of securing the shareholders' potential obligations to indemnify Buyer and Merger Sub under the indemnification provisions of the Merger Agreement, and (ii) transaction costs, which will be deposited into an interest-bearing escrow account for the purpose of providing the shareholders' representative (who is expected to be Joseph P. Zvesper) with funds to cover costs and expenses incurred on behalf of the shareholders from and after the closing. These reductions will apply to each shareholder (other than the ESOP) based on their pro rata share, which is an amount specified pursuant to the terms of the Merger Agreement and calculated based on the number of shares of common stock that a shareholder (other than the ESOP) owns in relation to the total number of shares of common stock (other than shares of common stock held by the ESOP) outstanding as of the closing. The ESOP is not a party to the Merger Agreement and is not liable to any party for any breach of the Merger Agreement or any breach of representation or covenant contained therein, except for common law fraud.

## BRIEF DESCRIPTION OF WHAT WILL HAPPEN
## TO THE ESOP IN CONNECTION WITH THE TRANSACTION

On or prior to the closing of the Transaction, the Company will terminate the ESOP. Although the ESOP will technically be terminated at or prior to the closing of the Transaction, the process of implementing the termination and making distribution to ESOP participants will

2

occur after the closing of the Transaction. The Company is expected to apply for a favorable determination letter from the Internal Revenue Service (the "IRS") approving the termination of the ESOP. If the Company files for a favorable determination letter, a portion of the cash received by the ESOP in connection with the Transaction might be distributed to the ESOP participants after termination of the ESOP but prior to receipt of the IRS favorable determination letter, although this has not yet been determined. If a favorable determination letter application is filed, the final distribution from the ESOP will be paid to you when the Company and ESOP Trustee receive the favorable determination letter from the IRS.

## ROLE OF ESOP PLAN PARTICIPANTS IN THE TRANSACTION

The Company has scheduled a special meeting of its shareholders to take place on February 24, 2015 to consider and vote on the Transaction. The Transaction must be approved by the affirmative vote of a majority of the shares of the Company's stock issued and outstanding as of the record date, which is January 30, 2015 (the "Record Date").

The shares of Company stock that are owned by the ESOP Trust (and certificates evidencing such shares) make up approximately 10% of the Company's shares outstanding and are held by the ESOP Trustee acting on behalf of the ESOP. Therefore, as a participant in the ESOP, you are not a direct shareholder of the Company. However, under the terms of the ESOP, you do have the right to provide instructions to the ESOP Trustee regarding how the shares of Company's stock allocated to your ESOP Account are to be voted by the ESOP Trustee in connection with the Transaction. However, if the Transaction is approved by the holders of a majority of the outstanding shares of Company stock present at the shareholders' meeting at which a quorum is present, approved by a majority of the ESOP participants who elect to vote in a separate "pass through" vote conducted by the ESOP Trustee, and all other conditions for the closing of the Transaction are satisfied, then the Transaction will be approved, regardless of whether you instruct the ESOP Trustee to vote your allocated shares of Company stock for or against the Transaction. See the "The Plan's Participant Voting Instruction Provision" section below for additional details.

Enclosed is a Confidential Voting Card for you to use to instruct the ESOP Trustee how you wish to vote the shares of the Company's stock allocated to your ESOP Account. **Your completed Confidential Voting Card must be received by 4 p.m. Central Time on February 23, 2015.**

## ESOP TRUSTEE POSITION ON THE TRANSACTION/BOARD OF DIRECTORS RECOMMENDATION

The ESOP Trustee makes no recommendation to ESOP participants or their beneficiaries as to what instructions they should deliver with respect to how to vote their allocated shares of Company stock held in their ESOP Account with respect to the Transaction. The ESOP Trustee has also not yet determined how it will vote allocated shares held in the ESOP for which no instructions are received with regard to the Transaction. However, the Board of Directors of the Company has recommended that shareholders vote FOR the Transaction.

3

## ESOP FINANCIAL ADVISOR OPINION

The ESOP Trustee has retained Prairie Capital Advisors, Inc. ("Prairie Capital") as its independent financial advisor with respect to the Transaction. Prairie Capital has done a preliminary review of the Transaction and has advised the ESOP Trustee that as of the date of the Merger Agreement it appears that the ESOP will be receiving adequate consideration in connection with the Transaction and that the Transaction is fair from a financial point of view to the ESOP as a shareholder of the Company. The ESOP Trustee also is expecting to receive a final opinion from Prairie Capital in connection with the Transaction as of the closing of the Transaction, which shall conclude that the ESOP will be receiving adequate consideration in connection with the Transaction and that the Transaction is fair from a financial point of view to the ESOP as a shareholder of the Company. The ESOP Trustee will not be able to proceed with the Transaction unless the ESOP Trustee receives this final opinion.

## VOTING PROCEDURES

A "Voting Card" and a return envelope (with postage pre-paid) for your Voting Card are enclosed.

After you have read this letter and the enclosed materials, please do the following:

(i)     Mark, date and sign your Voting Card.

(ii)     Mail it to the ESOP Trustee in the enclosed envelope, send it by fax to the ESOP Trustee c/o Jeff Scholl, at (630) 810-4501, or e-mail it in PDF format to jscholl@greatbanctrust.com, so that it will be *received by* the ESOP Trustee agent no later than 4 p.m. Central Time on February 23, 2015.

The Voting Card is the only document that you are required to complete and deliver in order to instruct the ESOP Trustee how to vote the shares of Company stock allocated to your ESOP Account. However, if your Voting Card is completed improperly (for example, it is not signed, or not marked in a way to make your instructions clear), then the ESOP Trustee may disregard it and vote the allocated shares of Company stock in your ESOP Account at its own discretion.

## THE PLAN'S PARTICIPANT VOTING INSTRUCTION PROVISION

The Plan's governing document provides that its participants are entitled to instruct the ESOP Trustee as to the voting of shares of Company stock allocated to their ESOP Account with respect to the Transaction. The Plan also provides that the ESOP Trustee will vote those allocated shares for which it fails to receive participant voting instructions, in its own discretion.

You should understand that the actions of the ESOP Trustee with respect to voting the shares of Company stock held in the Plan are governed by the fiduciary duties and requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). Although the law is not entirely clear on how the ERISA fiduciary duties apply with respect to the voting of employer securities, the United States Department of Labor (the "DOL") has informally stated certain

4

standards that it believes a trustee should follow in respect of following participant directions as to how to vote shares of stock held by an ESOP. Based on the guidance from the DOL, a trustee of an ESOP is permitted to vote the shares of Company stock held in the Plan in accordance with the instructions received from its participants, if among other things, the ESOP Trustee is reasonably assured that all of the following conditions are met:

A. *That the participants have been provided with sufficient information to enable them to make an informed decision in instructing the ESOP Trustee how to vote their allocated shares.*

This letter and the enclosed materials are intended to provide you with sufficient information on which to make an informed decision. If additional facts arise in a timely manner that the ESOP Trustee believes you should know about, the ESOP Trustee will make them available to you. You have the right to request from the Company, and the Company will timely provide copies of any of the agreements proposed to be entered into by the parties. If you desire any further information, please contact the ESOP Trustee by calling Jeff Scholl at (630) 810-4942.

B. *That the participants have acted independently and without coercion in instructing the ESOP Trustee how to vote their allocated shares.*

As of the date of this letter, the ESOP Trustee is not aware of any reason why the Plan participants would not be acting independently in completing their Voting Cards, or would be subject to coercion by any individual or the Company. The Company is aware that the participants should be free from coercion in completing their Voting Cards. If you are subjected to any coercion by any person, please contact the ESOP Trustee.

C. *That the individual participants' voting instructions are kept confidential.*

The Voting Cards will be tabulated by the ESOP Trustee and each participant's vote will be kept confidential by the ESOP Trustee. The Company will not have access to individual Voting Cards even after the matters to be voted on have been decided.

D. *That the voting instruction provisions of the Plan are consistent with ERISA. That is, the ESOP Trustee must follow the voting instruction provisions, unless it concludes that to do so would be imprudent or contrary to the best interests of the participants.*

If participants instruct the ESOP Trustee to vote their shares of Company stock allocated to their ESOP Account in a certain manner, and the ESOP Trustee determines that doing so would be imprudent or otherwise not for the exclusive purpose of providing benefits to the participants, then the ESOP Trustee can and must disregard the instructions of the participants, and vote all of the shares of Company stock held by the Plan in the manner it believes is required under ERISA. The ESOP Trustee has not yet determined that any vote as to the transaction is such that disregarding participant instructions would be necessary. It is possible that the ESOP Trustee may make such a determination prior to the time that the ESOP Trustee's vote is to be made, and it will make its final determination in this regard immediately prior to this time. One example of a circumstance under which the ESOP Trustee might determine to disregard the participants' instructions would be if new information becomes available, and it is not possible to communicate to the participants in a timely manner.

5

Case 2:18-cv-00841-JPS   Filed 06/01/18   Page 210 of 232   Document 1-1

## CHANGING OR REVOKING YOUR VOTING CARD

If you decide to change your voting instructions to the ESOP Trustee after you have submitted your Voting Cards, you must obtain a new form from the Company. By properly completing and timely returning a new Voting Card, your previously submitted Voting Card will be automatically revoked.

You may also revoke your Voting Card by notifying the ESOP Trustee in writing of your decision to revoke, but if you do not timely submit a new valid Voting Card, the allocated shares of Company stock held in your ESOP Account covered by the revoked Voting Card will be treated as if no Voting Card was received from you. After 4 p.m. Central Time on February 23, 2015, no Voting Card will be accepted and no Voting Card may be changed or revoked. Therefore, it is important that you complete and return your Voting Card in time for it to reach the ESOP Trustee by 4 p.m. Central Time on February 23, 2015.

## HOW TO CONTACT THE ESOP TRUSTEE

If you have any questions or comments concerning the procedure for completing and/or returning your Voting Card, please contact the ESOP Trustee by calling Jeff Scholl, at (630) 810-4942, or faxing him at (630) 810-4501. Your communication will be kept confidential.

Sincerely,


GREATBANC TRUST COMPANY, as ESOP Trustee of the
American Appraisal Associates, Inc. Employee Stock Ownership Plan


**The Voting card must be received no later than 4 p.m. Central Time on February 23, 2015 or it will be disregarded.**

6

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

# EXHIBIT I

# Voting Card

**AA Mangement Group, Inc. Special Meeting of Shareholders** to be held on Tuesday, February 24, 2015, at 9:00 a.m., Central Standard Time, at the offices of Foley & Lardner LLP, 777 East Wisconsin Avenue, 40th Floor, Milwaukee, Wisconsin 53202.

Deadline for voting direction: 4 p.m. Central Time on February 23, 2015

You are encouraged to send your voting direction via fax at (630) 810-4501, by mail or by e-mailing a PDF of this voting direction card to jscholl@greatbanctrust.com. If you decide to rescind or change your voting direction prior to the deadline date, you may also do this via fax, mail or e-mail. Retain this card for this purpose.

**Proposals**

Item 1  To direct GreatBanc Trust Company, the trustee of the American Appraisal Associates, Inc. Employee Stock Ownership Plan and related trust (the "ESOP"), as to how to vote the shares of AA Management Group, Inc., a Wisconsin corporation (the "Company"), stock allocated to your account in the ESOP with respect to the "Transaction." The term "Transaction" means those transactions contemplated under the terms and conditions of that certain Agreement and Plan of Merger, entered into by and among the Company, D&P Alabama Acquisition Corp., a Wisconsin corporation, Duff & Phelps, LLC, a Delaware limited liability company, and, solely in his capacity as Shareholders' Representative, Joseph P. Zvesper, on January 30, 2015.

PETER HUCK
1100 MADERA CIRCLE
ELM GROVE, WI 53122

Shares: **50.9432**

**Retain this information for your reference**

LP 5890378.2 \ 37383-99320

▼ Detach and mail this card in the enclosed prepaid envelope. Do not return this card to your employer. ▶

Item 1    Transaction    ☒ For  ☐ Against  ☐ Abstain

Signature: _Peter S Huck_

Date: _2/16/15_

PETER HUCK
1100 MADERA CIRCLE
ELM GROVE, WI 53122

GREATBANC TRUST COMPANY, TRUSTEE
FOR AA MANAGEMENT GROUP, INC.
801 WARRENVILLE RD, STE 500
LISLE, IL 60532

# EXHIBIT J

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

GREATBANC
TRUST COMPANY



# EXHIBIT K

FILED
02-05-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

American Appraisal Associates, Inc.
411 East Wisconsin Avenue Milwaukee, WI 53202
tel 414 271 7240

Leading / Thinking / Performing



**American Appraisal**

### American Appraisal Associates, Inc. Profit Sharing Plan
### Final Distribution Release Agreement

This document sets forth the Agreement between you, on your own behalf and on behalf of your heirs, executors, successors, agents and assigns, and American Appraisal Associates, LLC, on its own behalf and on behalf of the American Appraisal Associates, Inc. Profit Sharing Plan, its parent, subsidiary and affiliated corporations, and their respective successors, assigns, representatives, agents, shareholders, officers, directors, as well as its and their present and former employees (hereinafter collectively referred to as the "Company").

The American Appraisal Associates, Inc. Profit Sharing Plan (the "Plan) was terminated effective February 24, 2015. As a result, the Plan held assets to be distributed in accordance with the Plan documents. At present, the Plan is in a position to make its' final distribution of Plan assets.

In consideration of the final distribution of Plan assets, you hereby irrevocably and unconditionally release and forever discharge for yourself, your heirs, executors, administrators, representatives, successors and assigns, the Company from liability for any and all claims or damages that you had, have or may have against the Company as of the date of your execution of this Agreement, whether known or unknown to you. You expressly acknowledge that this Agreement is also intended to include in its effect, without limitation, all claims which you do not know or suspect to exist at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such claim or claims. You further agree that you will not file any action, claim or demand against the Company for any of the claims released herein.

Your signature below indicates that you are entering into this Agreement fully, knowingly and voluntarily without duress, coercion, and with a full understanding of its terms.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE ABOVE AGREEMENT INCLUDING THE RELEASE OF ALL CLAIMS AS DESCRIBED HEREIN. I FURTHER ACKNOWLEDGE THAT I HAVE HAD THE OPPORTUNITY AND TIME ALLOWED FOR UNDER THIS AGREEMENT TO CONSULT WITH COUNSEL OF MY CHOOSING.**

AGREED AND ACCEPTED BY:                    WITNESSED BY:

PRINT NAME: _____    _____

SIGNATURE: _____    _____

DATE: _____    _____

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**Return completed agreement to Kimberly Russo via email at Kimberly.russo@duffandphelps.com or via mailing address listed above by September 6, 2016.**

STATE OF WISCONSIN　　　CIRCUIT COURT　　　MILWAUKEE COUNTY
　　　　　　　　　　　　　　CIVIL DIVISION

---

PETER S. HUCK,

　　　　　　　　　　　　　　　　Plaintiff,

　　　　　　　　　　　v.　　　　　　　　　　　Case No. 2018CV001032
　　　　　　　　　　　　　　　　　　　　　　　Intentional Tort 30106
DUFF & PHELPS, LLC,　　　　　　　　　　　Money Judgment 30301
AA MANAGEMENT GROUP, INC., a wholly
owned subsidiary of DUFF & PHELPS, LLC,
JOSEPH P. ZVESPER, and
PRAIRIE CAPITAL ADVISERS, INC.,

　　　　　　　　　　　　　　　　Defendants.

---

### PLAINTIFF'S FIRST SET OF REQUESTS TO ADMIT, INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

---

**TO:　ALL DEFENDANTS**

　　　　Plaintiff, Peter S. Huck ("Huck" or "Plaintiff"), by and through his attorneys,

Gierke Frank Noorlander LLC, requests that within forty-five (45) days of service,

Defendants Duff & Phelps, LLC ("Duff & Phelps"), AA Management Group, Inc.

("AAMG"), Joseph P. Zvesper ("Zvesper") and Prairie Capital Advisers, Inc. ("Prairie

Capital") (collectively, "Defendants"), answer the following Requests to Admit and

Interrogatories and produce all documents and other tangible items responsive to the

following Requests for Production of Documents.  These discovery requests are

pursuant to Wis. Stats. §§ 804.11, 804.08 and 804.09.

　　　　The documents and tangible things referred to herein are to be produced for

inspection and copying at the law offices of Gierke Frank Noorlander LLC, 1011 North

Mayfair Road, Suite 304, Wauwatosa, WI 53226, unless other arrangements are made.

1

## DEFINITIONS

1.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) by any method.

2.      "Complaint" means Plaintiff's Complaint and any amendments thereto.

3.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

4.      "Huck" or "Plaintiff" means the plaintiff named in the Complaint.

5.      "Duff & Phelps" means Duff & Phelps, LLC, a Defendant named in the Complaint.

6.      "AAMG" means AA Management Group, Inc., a Defendant named in the Complaint.

7.      "Zvesper" means Joseph P. Zvesper, a Defendant named in the Complaint.

8.      "Prairie Capital" means Prairie Capital Advisers, Inc., a Defendant named in the Complaint.

9.      "Defendants" or "you" means the defendants named in the present action. This definition is not intended to impose a discovery obligation on any person who is not a party to this case.

10.      "Document" means, without limitation, the original, all copies, all drafts, and translations of any information in any written, recorded, or graphic form, including all memoranda of oral conversations, as well as all compilations, catalogs, and summaries of information or data, whether typed, handwritten, printed, or recorded, or otherwise produced or reproduced, and shall include but is not limited to any photograph, photostat, microfilm, or other reproduction thereof, including without limitation each and every note, memorandum, letter, telegram, publication, telex,

2

circular, release, article, report, prospectus, record, financial statement, computer disc, computer tape, microfiche, microform, index, list, claims file, analysis chart, account-book, draft, summary, diary, transcript, agreement, calendar, graph, receipt, chart, business record, insurance policy, computer printout, contract and orders. "Document" also means any type or audible recording, any photograph or motion picture or videotape, and any non-identical copy thereof, either by virtue of other materials appearing thereon, such as handwriting or typewriting, or otherwise.

11.    "Identify" when used with respect to documents means to give, to the extent known, the:

        a.      type of document;
        b.      general subject matter;
        c.      date of the document; and
        d.      author(s), addressee(s) and recipients.

9.    "Identify" when used with respect to persons means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of the person need be listed in response to subsequent discovery requesting the identification of that person.

10.    "Person" or "persons" means any natural person or any business, legal or government agency, entity or association.

3

## INSTRUCTIONS

1.     In responding to these requests, you are required to obtain and furnish all information available to you and any of your representatives, employees, agents, servants or attorneys and to obtain and furnish all information that is in your possession or under your control, or in the possession or under the control of your representatives, employees, agents, servants or attorneys.

2.     If you are unable to respond to any of the requests completely after exercising due diligence to secure the information necessary to provide a complete response, so state, and respond to each such request to the fullest extent possible. Specify the extent of your knowledge and your inability to respond to the remainder, and set forth whatever information or knowledge you have concerning the unanswered portions and the efforts you made to obtain the requested information.

3.     If any document to be identified is known to have existed and cannot now be located, or has been destroyed or discarded, then identify each such document by stating:

      a.     the last known custodian;
      b.     whether the document is missing or lost or was destroyed or discarded;
      c.     the date of loss, destruction or discard;
      d.     the manner of destruction or discard;
      e.     the reasons for destruction or discard;
      f.     the persons authorizing or carrying out such destruction or discard;
      g.     the efforts made to locate lost or misplaced documents; and
      h.     a statement describing the document, including a summary of its contents, the identity of its author and the persons to whom it was sent or shown.

4.     If any documents which are no longer in existence contained information responsive to any request, then in response to that request:

      a.     identify all information contained in the documents;

4

b.     identify each type of document (e.g., letters, ledger, etc.) which contained the information;
c.     state the time period during which the documents were maintained;
d.     state the circumstances under which the documents ceased to exist;
e.     identify all persons who have knowledge of the circumstances under which the documents ceased to exist; and
f.     identify all persons who have knowledge or had knowledge of the documents and their contents.

5.     If you contend that any of the information called for by any of these requests is privileged, or if you have withheld information on any ground of confidentiality, set forth, with regard to all such information:

a.     the nature of the privilege asserted;
b.     the factual basis for asserting the privilege; and
c.     the subject matter to which your claim of privilege or confidentiality relates.

6.     These requests shall be deemed to seek responses as of the date hereof and to the fullest extent provided by the Wisconsin Rules of Civil Procedure. These requests are of a continuing nature and you are required to serve supplemental responses if you obtain or become aware of additional or different information after the date of your initial response.

## REQUESTS TO ADMIT

1.     Admit that representatives of AAMG, including but not limited to Zvesper, communicated with representatives of Duff & Phelps regarding a potential merger of their respective companies prior to the date that AAMG began communicating with Plaintiff regarding Plaintiff's early retirement from AAMG.

**ANSWER:**

2.     Admit that representatives of AAMG, including but not limited to Zvesper, first communicated with Plaintiff regarding Plaintiff's early retirement from AAMG and

5

that it was representatives of AAMG, including by not limited to Zvesper who first suggested that Plaintiff retire early.

**ANSWER:**

## INTERROGATORIES

1.      State the name(s), business address(es) and job title(s) of the individual(s) answering, or providing any information used to answer, these Interrogatories.

**ANSWER:**

2.      Identify and describe all documents referred to or consulted in the preparation of Defendants' answers and responses to Plaintiff's discovery requests.

**ANSWER:**

3.      Identify each corporate Defendant by providing its corporate name, business address, date of formation, and tax identification number.

**ANSWER:**

4.      Identify all civil complaints or criminal charges that have ever been asserted against the individual Defendant, Zvesper, including the name of the forum before which the complaint or charge was brought, the person initiating the procedure, how each complaint or charge was disposed of, and state the location of the records regarding same.

**ANSWER:**

5.      Identify each and every statement that any representative of any Defendant have made since January 1, 2014, regarding the potential and/or resulting

6

merger between AAMG and Duff & Phelps, including in your answer the substance of the statement(s), the date(s) of the statement(s), the individual(s) to whom the statement(s) was/were made, and the method(s) of communicating the statement(s), i.e. oral conversation, electronic mail, written correspondence, etc.

**ANSWER:**

6.    Identify each and every statement that any representative of any Defendant have made since January 1, 2014, regarding the proposed and/or resulting retirement of Plaintiff, including in your answer the substance of the statement(s), the date(s) of the statement(s), the individual(s) to whom the statement(s) was/were made, and the method(s) of communicating the statement(s), i.e. oral conversation, electronic mail, written correspondence, etc.

**ANSWER:**

7.    Identify each and every statement that any representative of any Defendant have made since January 1, 2014, regarding the proposed and/or resulting retirement of Mr. Lee Hackett, including in your answer the substance of the statement(s), the date(s) of the statement(s), the individual(s) to whom the statement(s) was/were made, and the method(s) of communicating the statement(s), i.e. oral conversation, electronic mail, written correspondence, etc.

**ANSWER:**

8.    Identify the exact date on which AAMG first communicated with Duff & Phelps regarding a potential merger of the two respective companies.

**ANSWER:**

7

9.      Identify the exact date on which AAMG first communicated with Plaintiff r regarding a potential merger of the AAMG and Duff & Phelps.

**ANSWER:**

10.      Identify the exact date on which AAMG first communicated with Plaintiff regarding his retirement.

**ANSWER:**

11.      Identify who first communicated with Plaintiff regarding his retirement, the date of that communication, and the substance of that communication, including the reasons given for Plaintiff to retire.

12.      Explain the reasons and rationale for AAMG to offer Plaintiff early retirement.

**ANSWER:**

13.      Identify the exact date on which AAMG first contacted Prairie Capital to solicit the appraisal attached as Exhibit C to the Complaint for the fair market value of the common stock of AAMG.

**ANSWER:**

14.      Explain the reasons and rationale for Zvesper's and/or any representative of AAMG's decision to offer Plaintiff a position as a part-time, temporary consultant for AAMG subsequent to Plaintiff's retirement date of September 30, 2014.

**ANSWER:**

8

15. Identify all persons who will be called as fact witnesses at trial on any Defendants' behalf and state the areas or subject matter of their presently contemplated testimony.

**ANSWER:**

16. Identify all persons who Defendants intend to call at trial to offer testimony in the form of opinion testimony and the substance of their contemplated opinion testimony.

**ANSWER:**

17. Identify each person that any Defendant expects to call as an expert witness at trial, and state as to each such person: (a) the person's name, profession or occupation, and residence and business addresses; (b) the subject matter on which the person is expected to testify; (c) the substance of the facts and opinions to which the person is expected to testify; (d) the specific data and grounds on which the person bases his/her opinion; (e) a complete bibliography of the textbooks, treatises, articles and other works which such person regards as authoritative on the subject matter on which such person will be testifying; and (f) the manner in which such person became familiar with the facts of the case.

**ANSWER:**

18. If Defendants and/or Defendants' attorneys, agents or other representatives are aware of the existence of any written or recorded statements made by or for any party or witness with regard to the merger between AAMG and Duff & Phelps, and/or to the occurrences alleged in the Complaint, state the name of each

9

person making the statement, the date of the statement, and identify the person now in possession of the statement or copy thereof.

**ANSWER:**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Any and all documents identified in any of Defendants' answers to Plaintiff's First Set of Interrogatories.

**RESPONSE:**

2.      Any and all documents evidencing communications between and amongst any representative of AAMG, which relate and/or refer to the potential and/or resulting retirement of Plaintiff and Plaintiff's Stock Redemption and Non-Solicitation Agreement with AAMG, dated August 2, 2014.

**RESPONSE:**

3.      Any and all documents evidencing communications between and amongst any representative of AAMG and any representative of Duff & Phelps, which relate and/or refer to the potential and/or resulting retirement of Plaintiff and Plaintiff's Stock Redemption and Non-Solicitation Agreement with AAMG, dated August 2, 2014.

**RESPONSE:**

4.      Any and all documents evidencing communications between and amongst any representative of AAMG, which relate and/or refer to the potential and/or resulting retirement of Mr. Lee Hackett.

**RESPONSE:**

10

5. Any and all documents evidencing communications between and amongst any representative of AAMG and any representative of Duff & Phelps, which relate and/or refer to the potential and/or resulting retirement of Mr. Lee Hackett.

**RESPONSE:**

6. Any and all correspondence between and amongst any Defendants, and/or any third party, which relates and/or refers to the potential and/or resulting merger of AAMG and Duff & Phelps, or to the subject matter of the current action.

**RESPONSE:**

7. Any and all documents that AAMG provided to Prairie Capital, which resulted in Prairie Capital's appraisal of the fair market value of the common stock of AAMG on or about August 4, 2014.

**RESPONSE:**

8. Any and all correspondence between any representative of AAMG and any representative of Prairie Capital from January 1, 2014 through June 30, 2015, which relates to Prairie Capital's appraisal of the fair market value of the common stock of AAMG, or to the subject matter of the current action.

**RESPONSE:**

9. All drafts of Prairie Capital's August 4, 2014, appraisal of the fair market value of the common stock of AAMG that is attached as Exhibit C to the Complaint.

**RESPONSE:**

10. All Minutes from any board meeting of AAMG, which occurred from

11

January 1, 2014 through June 30, 2015.

**RESPONSE:**

11.    Any and all documents containing the name, home and/or business addresses of all persons with knowledge or information regarding any relevant fact relating to this case.

**RESPONSE:**

12.    All exhibits which will be offered into evidence at the time of trial.

**RESPONSE:**

13.    Any and all documents which have been provided to any expert or lay witness who may or will be called to testify on your behalf at trial or any evidentiary hearing in this matter.

**RESPONSE:**

14.    Any and all documents received from any person who may or will be called as an expert or lay witness at trial or any evidentiary hearing.

**RESPONSE:**

15.    Any and all resumes, curriculum vitae, and reports of experts retained or employed by Defendants.

**RESPONSE:**

16.    Any and all written or recorded statements (signed or unsigned) from any party to this action concerning, directly or indirectly, the merger of AAMG and Duff & Phelps.

**RESPONSE:**

12

17.    Any and all written or recorded statements (signed or unsigned) of any third parties concerning, directly or indirectly, the merger of AAMG and Duff & Phelps.

**RESPONSE:**

18.    Any and all documents which relate and/or refer to the subject matter of the current action.

**RESPONSE:**

Dated this 1st day of May, 2018.

**GIERKE FRANK NOORLANDER LLC**

Electronically signed by: Nora E. Gierke

Nora E. Gierke
State Bar No. 1033618
ngierke@gierkefrank.com
David E. Frank
State Bar No. 1056505
dfrank@gierkefrank.com
Willem J. Noorlander
wnoorlander@gierkefrank.com
State Bar No. 1033089
1011 North Mayfair Road, Suite 304
Wauwatosa, WI 53226
P: 414.395.4600
F: 414.921.4108

13

Peter S Huck vs. Duff & Phelps, LLC et al

**Electronic Filing Notice**

Case No. 2018CV001032
Class Code: Intentional Tort

FILED
02-06-2018
John Barrett
Clerk of Circuit Court
2018CV001032
Honorable Glenn H
Yamahiro-34
Branch 34

DUFF & PHELPS, LLC
55 EAST 52ND STREET
NEW YORK NY 10055

Case number 2018CV001032 was electronically filed with/converted by the Milwaukee County Clerk of Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $ 20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: c7a47f**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 414-278-4120.

**BY THE COURT:**

Electronically signed by John Barrett
Clerk of Circuit Court

02-06-2018
Date

GF-180(CCAP), 06/2017 Electronic Filing Notice          §801.18(5)(d), Wisconsin Statutes

This form shall not be modified. It may be supplemented with additional material.

Case 2:18-cv-00841-JPS Filed 06/01/18 Page 231 of 232 Document 1-1

MAY 0 2 2018